GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
By:     CRISTINE IRVIN PHILLIPS
        ANDREW E. KRAUSE
        LAUREN A. LIVELY
Assistant United States Attorneys
86 Chambers Street, Third Floor
New York, New York 10007
Telephone Nos. (212) 637-2696/2769/2689
Facsimile Nos. (212) 637-2702/2786/2717
cristine.phillips@usdoj.gov
andrew.krause@usdoj.gov
lauren.lively@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA *ex rel.* PETER D. GRUBEA,

Plaintiff,

v.

ROSICKI, ROSICKI & ASSOCIATES, P.C., *et al.*,

Defendants.

12 Civ. 7199 (JSR)

**COMPLAINT-IN-INTERVENTION**

---

UNITED STATES OF AMERICA,

Plaintiff-Intervenor,

v.

ROSICKI, ROSICKI & ASSOCIATES, P.C., ENTERPRISE PROCESS SERVICE, INC., and PARAMOUNT LAND, INC.,

Defendants.

Plaintiff-Intervenor, the United States of America, by its attorney, Geoffrey S. Berman, United States Attorney for the Southern District of New York, files this Complaint-In-Intervention, alleging upon information and belief as follows:

### PRELIMINARY STATEMENT

1.      The United States of America brings this action seeking treble damages and penalties against Defendants Rosicki, Rosicki & Associates, P.C. ("Rosicki"), Enterprise Process Service, Inc. ("Enterprise"), and Paramount Land, Inc. ("Paramount" and collectively, "Defendants") under the False Claims Act, 31 U.S.C. § 3729 *et seq*., based on Defendants' scheme to generate expenses for foreclosure-related services that were falsely and fraudulently inflated with knowledge that those expenses would be passed on to, and paid by, the Federal National Mortgage Association ("Fannie Mae").

2.      As set forth more fully below, the United States alleges that, since at least May 27, 2009, and continuing to the present, Rosicki, a law firm specializing in mortgage foreclosures; Enterprise, a service of process company wholly owned by the two founding partners of Rosicki (the "Rosicki partners"); and Paramount, a title search company also wholly owned by the Rosicki partners, defrauded Fannie Mae, a Government-Sponsored Entity. Specifically, Defendants perpetrated a scheme whereby Rosicki, acting as counsel to any one of numerous mortgage servicing companies (the "Servicers"), engaged Enterprise and Paramount, ostensibly to serve process and perform title searches as required to effectuate a mortgage foreclosure for Fannie Mae-owned mortgage loans.    In reality, however, Enterprise and Paramount carried out these functions by engaging third-party vendors to perform the majority of the work, and then applied exponential mark-ups to those vendors' bills for foreclosure-related services despite adding little or no value to the services that the vendors performed.    Enterprise

and Paramount submitted their marked-up expenses, which exceeded market rates, to Rosicki, which then billed the Servicers for those expenses, with knowledge that the Servicers would submit claims to Fannie Mae for reimbursement of the expenses, and that Fannie Mae would pay those claims.   Defendants' submission of these fraudulently inflated expenses to the Servicers, which then sought and received reimbursement from Fannie Mae, caused Fannie Mae to pay millions of dollars for falsely and fraudulently inflated foreclosure expenses generated by Defendants.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over this action under the False Claims Act pursuant to 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. § 3730(a), as well as pursuant to the Court's general equitable jurisdiction.

4.     Venue is appropriate in this District pursuant to 31 U.S.C. § 3732(a), as well as 28 U.S.C. §§ 1391(b) and (c), because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## THE PARTIES

5.     Plaintiff is the United States of America.

6.     Relator Peter Grubea ("Relator") is a resident of New York.

7.     Defendant Rosicki is a New York corporation with its principal place of business in Plainview, New York.   At all times relevant, Rosicki has been a law firm specializing in mortgage foreclosures, as well as bankruptcy, evictions, collections, and closings throughout New York State, including in the Southern District of New York.

8.     Enterprise is a New York corporation with its principal place of business in Islip, New York.   Enterprise markets itself as a company that performs service of process, along with

related services such as skip tracing, document retrieval, and court filing.   Enterprise is wholly

owned by the Rosicki partners, one of whom also served as Enterprise's Chief Executive Officer.

8.     Paramount is a New York corporation with a principal place of business in Islip,

New York.   Paramount markets itself as a full service title agency.   Paramount is wholly

owned by the Rosicki partners, one of whom also served as Paramount's Chief Executive

Officer.

## FANNIE MAE

10.    The Federal National Mortgage Association, known colloquially as Fannie Mae,

was chartered by Congress with a mission to provide liquidity, stability, and affordability to the

United States housing and mortgage markets.   Fannie Mae is located at 3900 Wisconsin

Avenue, NW in Washington, D.C.   Fannie Mae and its counterpart, the Federal Home Loan

Mortgage Corporation, known colloquially as Freddie Mac, are known as Government-

Sponsored Entities or "GSEs."

11.    As part of its mission, Fannie Mae purchases single-family residential mortgages

from mortgage companies and other financial institutions, providing revenue that allows those

institutions to fund additional loans.   Fannie Mae then either holds the loans in its investment

portfolios or bundles them into mortgage-backed securities that are sold to investors.

12.    As a result of the dramatic decline in the housing market in 2007-2008, following

which Fannie Mae faced potential economic collapse, Congress passed the Housing and

Economic Recovery Act of 2008 ("HERA"), Pub. L. No. 110-289, 122 Stat. 2654.

13.    Among other things, HERA created the Federal Housing Finance Agency

("FHFA") and authorized the FHFA director to appoint FHFA as conservator for the GSEs.

14.    On September 6, 2008, the FHFA director placed the GSEs into conservatorship.

15.     On September 7, 2008, the FHFA, in its capacity as Fannie Mae's conservator, executed a Senior Preferred Stock Purchase Agreement (the "SPA") with the U.S. Department of the Treasury ("Treasury").   Under that agreement, Treasury made billions of dollars of emergency capital available to Fannie Mae, in exchange for preferred shares of Fannie Mae stock and various related benefits.

16.     The SPA was executed to ensure that Fannie Mae remained financially viable, which served the important Government interest of stabilizing the housing markets. *See Statement by Secretary Henry M. Paulson, Jr. on Treasury and Federal Housing Finance Agency Action to Protect Financial Markets and Taxpayers*, Sept. 7, 2008 (*available at* https://www.treasury.gov/press-center/press-releases/Pages/hp1129.aspx) (last visited Mar. 26, 2018).

17.     As part of the SPA, Fannie Mae agreed to make quarterly dividend payments to Treasury.   Under the original terms of the SPA, the amount Fannie Mae owed in dividends each quarter was equal to 10% of the total amount of funds Fannie Mae had obtained from Treasury.

18.     In May 2009, the FHFA amended the SPA to double the maximum amount of funds available to Fannie Mae, from $100 billion to $200 billion.   The SPA was amended for a second time in December 2009.

19.     As of June 30, 2012, Fannie Mae had withdrawn approximately $116 billion in funds from Treasury pursuant to the SPA.

20.     On August 17, 2012, Fannie Mae and Treasury once again amended the SPA, this time changing the nature of Fannie Mae's quarterly dividend obligation.   Instead of making the 10% payment each quarter, under this version of the SPA (the "Third Amendment"), Fannie Mae

agreed that the amount of the dividend it owed to Treasury each quarter would be, effectively, the amount by which its net worth exceeded a $3 billion capital reserve.

21.     Since the execution of the Third Amendment, Fannie Mae has paid Treasury quarterly dividends of varying amounts, calculated according to the terms of the Third Amendment as described above.   Fannie Mae's dividend obligation as set forth in the Third Amendment remains in effect today.

## THE FALSE CLAIMS ACT

22.     The False Claims Act establishes liability to the United States for an individual who, or entity that, "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," *id.* § 3729(a)(1)(B).   "Knowingly" is defined to include actual knowledge of, as well as reckless disregard or deliberate ignorance of, the truth or falsity of the information.   *Id.* § 3729(b)(1). No proof of specific intent to defraud is required.   *Id.*

23.     On May 26, 2009, Congress passed the Fraud Enforcement and Recovery Act of 2009 ("FERA").   *See* Pub. L. No. 111-21, § 4(f)(1), 123 Stat. 1617, 1625 (2009).   FERA modified the definition of a "claim" under the False Claims Act to include "any request or demand, whether under a contract or otherwise, for money or property . . . that is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government – (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded. . . ." 31 U.S.C. § 3729(b)(2)(A)(ii).

24.     Congress enacted FERA in part to "help protect Americans from future frauds that exploit the economic assistance programs intended to restore and rebuild our economy."   S. Rep. No. 111-10, at 1-2 (2009).

## FACTS

### Fannie Mae, Servicers and Foreclosure Firms

25.     Fannie Mae engages Servicers to perform or oversee the performance of various actions in connection with Fannie Mae-owned residential mortgage loans, including pursuing foreclosure when mortgagors become delinquent on mortgage payments. Fannie Mae maintains a contractual relationship with each of its approved Servicers, pursuant to which the Servicers agree to follow the Fannie Mae Servicing Guide (the "Servicing Guide"), among other requirements.   *See* Fannie Mae Servicing Guide, Part I, at 102 (effective Jan. 31, 2003) (2012).

26.     In furtherance of their servicing duties, the Servicers hire law firms (the "Foreclosure Firms") as needed to carry out all actions necessary to effectuate mortgage foreclosures under the applicable laws.

27.     Prior to 2013, Fannie Mae maintained a list of approved Foreclosure Firms called the Retained Attorney Network ("RAN"), and Servicers typically were required to select Foreclosure Firms from among the list of RAN firms.

28.     To be part of the RAN, Foreclosure Firms signed retention agreements with Fannie Mae, which incorporated all aspects of the Servicing Guide.

29.     In 2013, Fannie Mae terminated the RAN and allowed Servicers greater flexibility in selecting law firms for foreclosure work.   But the Foreclosure Firms selected by the Servicers were and are still required to be approved by Fannie Mae.

30.     Following the termination of the RAN, any Foreclosure Firm retained by a Servicer to perform work on Fannie Mae-owned mortgage loans must sign a limited retention agreement directly with Fannie Mae, pursuant to which the Foreclosure Firm agrees to maintain familiarity with, and follow as applicable, all aspects of the Servicing Guide.

31.     Accordingly, both before and after termination of the RAN (and at all times relevant to this complaint), all Foreclosure Firms providing foreclosure-related services in connection with Fannie Mae-owned loans had to enter into a retention agreement with Fannie Mae pursuant to which they agreed to follow all aspects of the Servicing Guide.

32.     When Foreclosure Firms are retained by Servicers to effectuate mortgage foreclosures for Fannie Mae-owned mortgage loans, the Foreclosure Firms submit bills for both their legal fees and for expenses related to foreclosure-related services, such as service of process and title searches ("foreclosure expenses"), to the Servicers.   To the extent the Foreclosure Firms hire third parties to perform any of the foreclosure-related services, the foreclosure expenses billed by those third parties are incorporated into the bills submitted by the Foreclosure Firms to the Servicers.

33.     The Servicers pay the bills for legal fees and foreclosure expenses submitted by the Foreclosure Firms, and then submit claims to Fannie Mae for reimbursement of those costs. *See* Fannie Mae Servicing Guide, Part VIII, § 110.03 (effective Dec. 7, 2006) (2012).

34.     Servicers submit claims to Fannie Mae for reimbursement of foreclosure expenses using a Cash Disbursement Request, Form 571.   Fannie Mae reimburses Servicers for 100% of qualifying foreclosure expenses.   *See id.* § 110.04 (effective Jan. 31, 2003) (2012).

**Relevant Fannie Mae Requirements**

35.     The Servicing Guide obligates the Foreclosure Firms (as well as the Servicers) to ensure that their foreclosure expenses adhere to certain requirements designed to make certain that Fannie Mae is not overcharged for those expenses.

36.     For example, the Servicing Guide requires that "[b]oth the servicer and the foreclosure attorney (or trustee) must make every effort to reduce foreclosure-related costs and expenses in a manner that is consistent with all applicable laws."   Fannie Mae Servicing Guide, Part VIII, § 110.03 (effective Dec. 7, 2006) (2012).

37.     The Servicing Guide also specifies that all foreclosure expenses submitted by Foreclosure Firms must be "actual, reasonable, and necessary," as a condition of reimbursement by Fannie Mae.   *Id.*

38.     With respect to title-related expenses specifically, the Servicing Guide states that they "must be kept at a minimum."   *Id.*

39.     Additionally, the retention agreements signed by Fannie Mae and the Foreclosure Firms list state-specific maximums for certain expenses such as title searches, but also make clear that Fannie Mae generally expects the actual costs to be lower.

40.     Those retention agreements also reiterate that foreclosure expenses must be actual, reasonable, and necessary in order to be reimbursable by Fannie Mae.

41.     Fannie Mae took other steps to communicate these requirements as they related to Foreclosure Firms, including by reiterating the requirements to the Foreclosure Firms directly in periodic trainings and email surveys.

**Foreclosure-Related Services**

42.     To execute a foreclosure in New York State, a complaint must be filed with the court and served upon the homeowner and all other parties with a potential interest in the property.

43.     The Foreclosure Firm handling the legal action typically engages a process server to effect service of the necessary papers.

44.     It also may be necessary to conduct database searches (referred to as "skip traces") to locate the homeowner or other parties to be served; the Foreclosure Firm may conduct these searches or may engage the process server or another entity to perform them.

45.     Additionally, a title search must be run on the property to determine the holder(s) of title to the property and to determine all other individuals and entities with a potential interest in the property.   This title search required for a foreclosure is more limited than the title search required when a property is sold; the foreclosure title search goes back only to the acquisition of the property by its current owner, and is commonly referred to as a "foreclosure search."

46.     A Foreclosure Firm typically engages a title company to perform foreclosure searches.

47.     Other services that may be required as part of the foreclosure process, which the Foreclosure Firm either performs or outsources, include arranging for the publication of notices in a newspaper and filing documents related to the foreclosure proceedings with the court.

**Defendants' Scheme**

48.     Rosicki, Rosicki & Associates, P.C. was incorporated on July 24, 1997. Previously, the firm had operated as the Law Offices of Cynthia Rosicki, which was incorporated on June 23, 1994.

49.     The business model of the Rosicki firm is typical for a Foreclosure Firm: much of the work required to effectuate a mortgage foreclosure is performed by non-attorney staff under the supervision of relatively few attorneys.

50.     Legal fees for foreclosure work are capped by Fannie Mae and others. Accordingly, Rosicki, like other Foreclosure Firms, has few legitimate opportunities to increase its profit margins other than by increasing the volume of foreclosures that it handles.

51.     On October 13, 1998, Rosicki sent a letter to Fannie Mae, announcing that it had "incorporated a new affiliate entity," which was Enterprise, and that Enterprise's purpose was "to serve process and conduct related functions."

52.     The letter represented that the creation of Enterprise "eliminates unnecessary coordination with the middle person at the process service company."

53.     The letter also represented that "Enterprise will utilize the same price rates currently being charged by area process servers" and so "the fees will be the same reasonable and usual ones which the FannieMae (*sic*) servicers have been incurring to date."

54.     Enterprise has operated continuously since 1998 as an affiliate of Rosicki, under the ownership and direction of the Rosicki partners.

55.     Paramount was incorporated on October 19, 2009.   Prior to that time, the Rosicki partners had owned and operated a title company under various names starting in 2003.

56.     Since its founding, Paramount has operated at all times under the ownership and direction of the Rosicki partners.

57.     The Rosicki partners also have owned and operated two legal publishing companies (these other entities, along with Enterprise and Paramount, are collectively referred to herein as the "Rosicki Affiliates").

11

58.     While each of the Rosicki Affiliates was separately incorporated by the Rosicki

partners, none of the Rosicki Affiliates, including Enterprise and Paramount, has ever functioned

as an independent business.   None of the Rosicki Affiliates has maintained its own information

technology, human resources, benefits, administration, payroll, or accounting departments.

Moreover, two of Enterprise's three branches operate out of Rosicki's office space, and the other

Enterprise branch and other Rosicki Affiliates are housed in buildings owned by the Rosicki

partners.

59.     The Rosicki Affiliates often have operated with minimal staff.   For example,

when Rosicki opened its first title affiliate, the day-to-day operations of that entity were handled

entirely by one former Rosicki paralegal, with no changes to that individual's salary.   Similarly,

the above-referenced legal publishing company was run by one or two individuals working from

home.

60.     Rosicki and the Rosicki Affiliates maintain combined financial statements.

Those statements reflect that, at their peak, Enterprise and Paramount alone generated larger net

revenues than Rosicki did in all areas of its legal practice.

61.     At all times relevant, the Rosicki partners maintained ultimate authority and

control over the business operations of all the Rosicki Affiliates, including Enterprise and

Paramount.

62.     Rosicki was the primary or only client of the Rosicki Affiliates.   Likewise,

Rosicki utilized the Rosicki Affiliates for foreclosure-related services almost exclusively; the

only exception was when a foreclosure action required a geographic reach that exceeded the

Rosicki Affiliates' capabilities.

63.     Using the Rosicki Affiliates, including Enterprise and Paramount, for foreclosure-related services allowed the Rosicki partners to control the amount that Rosicki was charged for those services.

64.     With respect to Fannie Mae loans, rather than adhering to its obligation to "make every effort to reduce foreclosure-related costs and expenses," Rosicki, along with Enterprise and Paramount, created a system in which Enterprise and Paramount acted as vehicles for marking up foreclosure expenses as much as possible, while adding as little operating expense as possible, in order to maximize the revenue Enterprise and Paramount obtained from foreclosure expenses, on behalf of their owners, the Rosicki partners.

65.     Defendants focused on maximizing foreclosure expenses because overcharging for those expenses was one of the few ways that Defendants could increase their profit margins, due to the caps on the amount that Rosicki could charge in legal fees for most foreclosure actions.   As stated by one of the Rosicki partners in an email to Rosicki employees dated April 1, 2005, "we must maximize our billing" for title expenses "since they are only allowing a very reduced fee" for legal services.

66.     Rosicki, Enterprise, and Paramount executed this mark-up scheme by engaging third-party vendors to perform the majority of the services that ostensibly were performed by Enterprise and Paramount.   These vendors charged competitive rates and in many instances, also performed work for other Foreclosure Firms.   Enterprise and Paramount paid these vendors for each item of work performed and issued each of them a Form 1099 at year-end for tax purposes.

67.     Enterprise and Paramount issued bills for the work done by the vendors that were exponentially higher than what the vendors charged, yet added little or no value to the services that the vendors performed.

68.     Rosicki, in turn, represented to the Servicers that the Enterprise and Paramount bills reflected the cost of the services incurred, and sought and received payment for those expenses from the Servicers, including for foreclosures involving Fannie Mae-owned loans.

69.     As reflected by statements in the above-referenced April 1, 2005 email, Rosicki was aware that the Servicers sought reimbursement from Fannie Mae for the foreclosure expenses it submitted.

### i.     Enterprise

70.     Enterprise engaged third-party vendors to perform the majority of the actual process service work ostensibly performed by Enterprise.   When Rosicki sent a summons and complaint for a mortgage foreclosure to Enterprise, Enterprise would then provide those papers to a third-party vendor, which would serve them.

71.     The third-party vendors charged Enterprise approximately $15-25 per individual served to effect in-person service of a summons and complaint.   Other charges from the third-party vendors included service on "John Doe" parties with a potential interest in the property in question, which was typically about $10 for each "John Doe" served.

72.     Enterprise would then generate an invoice for service of process that would exponentially mark up the cost of the services as charged by the vendors.   Enterprise typically charged $75-125 for in-person service, $50 for attempted service (for which the vendors often did not charge at all, or charged at most $5-10), and $75 for John Doe service.   Enterprise applied these substantial mark-ups despite having added little or no value to the services actually performed by the vendors.

73.     The Enterprise bills significantly exceeded competitive market rates for the geographic areas where Enterprise operated.

74.     Notably, in many instances where Rosicki had to submit bills for its foreclosure-related expenses to courts for judicial approval (including in connection with Fannie Mae-owned loans), Rosicki reported substantially lower costs for service of process than the actual bills Enterprise and Rosicki submitted to the Servicers for comparable work.

75.     Rosicki was well aware of the amount of mark-ups being applied to Enterprise's bills. In fact, senior attorneys at Rosicki, including the Rosicki partners, were apprised of the revenue margins being made on each vendor, which ranged from 300% to 750%.   For example, in an email copying the Rosicki partners dated May 7, 2009, Enterprise listed each of the individuals who performed actual process service work on behalf of Enterprise, listed the amounts charged by those process servers to Enterprise, and listed the extraordinary markups of those costs billed by Enterprise.   The email lists the "ratio" of the inflated amounts billed by Enterprise as compared to the amounts billed by the process servers.

76.     Despite being aware of its obligation to Fannie Mae to minimize the cost of process service, and to submit only foreclosure expenses that were actual and reasonable, Rosicki submitted the inflated and excessive Enterprise bills for service of process to the Servicers for foreclosures involving Fannie Mae-owned loans, and was paid for those expenses. The costs for those expenses were then passed on to and paid by Fannie Mae.

77.     Nor did Rosicki adhere to its obligation to minimize foreclosure expenses in instances where service of process was needed in a geographic area outside of Enterprise's reach. Rather, Rosicki entered into a referral arrangement with another process service company that charged above-market rates—some of the highest nationally—whereby Rosicki would send out-of-state process service work to that company in exchange for referrals of New York process service work to Enterprise.   Rosicki had knowledge that the work it was referring for Fannie

Mae-owned loans would result in Fannie Mae reimbursing foreclosure expenses at above-market rates, but made the referrals anyway in order to gain more business for Enterprise.

### ii.  Paramount

78.    The structure of Paramount was very similar to that of Enterprise.   Paramount performed most of its services through third-party vendors, then applied exponential mark-ups to the bills for those services.

79.    Specifically, Paramount engaged third-party abstracters to provide the required title documents; those vendors charged competitive rates such as a flat rate of $100, $50 plus $1 per page, or other comparable amounts.   Paramount also engaged "readers" to review the title documents, at a rate of approximately $15-20 per title report.

80.    Paramount would then prepare its bill for the services performed by the third-party vendors, and would apply a substantial mark-up despite having added little or no additional value.

81.    Notably, Fannie Mae imposed maximums of either $250 or $275 for title searches at all times relevant, and regardless of the specifics of each title search project, Paramount invariably charged the Fannie Mae maximum for all of its title searches.   In addition, in order to generate additional revenue above the Fannie Mae maximum, Paramount charged a $35 "document retrieval fee" in connection with the title search for every Fannie Mae loan.

82.    For example, as set forth below, a third-party vendor charged Paramount $75 for a title search; yet Paramount charged $275 for that same service.   *See infra* ¶¶ 109-10. Paramount provided its bills to Rosicki, which submitted them to the Servicers and represented that they were the foreclosure expenses actually incurred, including for Fannie Mae-owned loans.   The Servicers paid the bills and passed on the expenses to Fannie Mae, which paid them.

83.     Following the initial foreclosure search, Paramount continued to make revenue through mark-ups.   Specifically, for title continuation searches, which are updates to the foreclosure search performed during the course of a foreclosure action, Paramount paid its vendor $5-25 to perform the search and then billed the Servicer $125-135 for that search.

84.     With respect to both Enterprise and Paramount, Rosicki was aware that it was violating its obligations to Fannie Mae, yet throughout the relevant time period, it represented, to Fannie Mae as well as to the relevant Servicers, that it was fully in compliance with the Fannie Mae requirements that it had agreed to follow.

85.     Specifically, Rosicki falsely represented that the fees charged by Enterprise and Paramount were the actual, reasonable, and necessary costs incurred in performing service of process and title searches, and that those fees were competitive in the relevant markets.

**Examples of False Claims Paid by Fannie Mae**

86.     The following examples represent a small fraction of the many Fannie Mae loans for which, in connection with foreclosure proceedings, Enterprise and/or Paramount submitted invoices for inflated expenses to Rosicki, and for which Rosicki, in turn, submitted bills for the inflated expenses to the Servicers, which the Servicers paid.   Claims for those inflated expenses were then submitted to Fannie Mae for reimbursement, and were paid by Fannie Mae.

        **i.     Lake Street Property**

87.     Fannie Mae loan number 1706147150 relates to a mortgage held by Fannie Mae on a property on Lake Street in Angola, New York ("Lake Street Property").   A third-party financial institution acted as the Servicer and Rosicki as the firm handling the foreclosure procedures for the Lake Street Property.

88.     Rosicki contracted with Enterprise to effect service of process of the summons and complaint on the two named foreclosure defendants.   However, Enterprise did not serve process on the two named foreclosure defendants, but rather engaged a third-party process server to effectuate service on these defendants.

89.     The process server served the two foreclosure defendants in May 2012, as well as four John Doe defendants.   The process server charged $20 for one named defendant, $10 for the other, and $33.50 for service of all four Doe defendants, or $63.50 in total.

90.     In submitting a bill to Rosicki for service of process, Enterprise inflated the service charges to $50 for attempted service on each named defendant, $125 for service on each named defendant, and $300 total for service of the four Doe defendants, for a total of $650 for the services performed by the process server.

91.     Rosicki contracted with Paramount to perform a title search, with Paramount then engaging a third-party vendor for the performance of this service.   Paramount submitted a bill for the title search to Rosicki that included a charge of $275 for the search, the maximum amount allowed by Fannie Mae, and a $35 document retrieval fee.

92.     Rosicki then submitted claims for reimbursement to the Servicer for the amounts charged by Enterprise and Paramount.

**ii.     Pine Ridge Property**

93.     Fannie Mae loan number 1664158838 relates to a mortgage held by Fannie Mae on a property on Pine Ridge Terrace in Cheektowaga, New York ("Pine Ridge Property").   A third-party financial institution acted as the Servicer and Rosicki as the firm handling the foreclosure procedures for the Pine Ridge Property.

18

94.     Rosicki contracted with Enterprise to effect service of process of the summons and complaint on the two named foreclosure defendants.   However, Enterprise did not serve process on the two named foreclosure defendants, but rather engaged a third-party process server to effectuate service on these defendants.

95.     The process server served one named defendant and attempted service on the other in March 2013 and completed service on the second named defendant in April 2013.   The process server charged Enterprise $20 for service of each of the named defendants and $5 for the attempted service, or $45 in total.

96.     In submitting a bill to Rosicki for service of process, Enterprise included three charges for attempted service, each billed at $50, $75 to serve John Doe defendants, and a charge of $125 for service on each of the named defendants, for a total of $475 for the services performed by the process server.   These charges are more than ten times those billed by the actual process server.

97.     Rosicki contracted with Paramount to perform a title search, with Paramount then engaging a third-party vendor for the performance of this service.   Paramount submitted a bill for the title search to Rosicki that included a charge of $275 for the search, the maximum amount allowed by Fannie Mae, and a $35 document retrieval fee.   Paramount also submitted an inflated charge of $135 for a title continuation search performed by the vendor.

98.     Rosicki then submitted claims for reimbursement to the Servicer for the amounts charged by Enterprise and Paramount.

      **iii.     Creekview Property**

99.     Fannie Mae loan number 1697355670 relates to a mortgage held by Fannie Mae on a property on Creekview Drive in Hamburg, New York ("Creekview Property").   A third-

party financial institution acted as the Servicer and Rosicki as the firm handling the foreclosure procedures for the Pine Ridge Property.

100.    Rosicki contracted with Enterprise to effect service of process of the summons and complaint on the named foreclosure defendant.   However, Enterprise did not serve process on the named foreclosure defendant, but rather engaged a third-party process server to effectuate service on this defendant.

101.    The process server served the named defendant and one John Doe defendant in September 2013.   The process server charged Enterprise $20 for service of the named defendant and $9.50 for the Doe defendant, or $29.50 in total.

102.    In submitting a bill to Rosicki for service of process, Enterprise included a charge of $125 for service of the named defendant and $75 for service of the Doe defendant, for a total of $200 for the services performed by the process server.   These charges are more than six times those billed by the actual process server.

103.    Rosicki contracted with Paramount to perform a title search, with Paramount then engaging with a third-party vendor for the performance of this service.   Paramount submitted a bill for the title search to Rosicki that included a charge of $275 for the search, the maximum amount allowed by Fannie Mae, and a $35 document retrieval fee.   Paramount also submitted an inflated charge of $135 for a title continuation search performed by the vendor.

104.    Rosicki then submitted claims for reimbursement to the Servicer for the amounts charged by Enterprise and Paramount.

### iv.    Ohio Avenue Property

105.    Fannie Mae loan number 1715686478 relates to a mortgage held by Fannie Mae on a property on Ohio Avenue in North Tonawanda, New York ("Ohio Avenue Property").   A

third-party financial institution acted as the Servicer and Rosicki as the firm handling the foreclosure procedures for the Ohio Avenue Property.

106.    Rosicki contracted with Enterprise to effect service of process of the summons and complaint on the two named foreclosure defendants.   However, Enterprise did not serve process on the two named foreclosure defendants, but rather engaged a third-party process server to effectuate service on these defendants.

107.    The process server served the two named defendants and two John Doe defendants in November 2013.   The process server charged Enterprise $20 for service of each of the named defendants and $17.50 for service of the Doe defendants, or $57.50 in total.

108.    In submitting a bill to Rosicki for service of process, Enterprise included a charge of $150 total for service of the named defendants, $150 total for service of the Doe defendants, and $50 for attempted service on one of the named defendants, for a total of $350 for the services performed by the process server.   In addition, Enterprise charged a total of $140 to perform skip traces and address verifications for the named defendants.

109.    Rosicki contracted with Paramount to perform a title search, with Paramount then engaging with a third-party vendor for the performance of this service.   The vendor charged Paramount $75 for the title search and $5 for a title continuation search.

110.    Paramount submitted a bill for the initial title search to Rosicki that included a charge of $275 for the search, the maximum amount allowed by Fannie Mae and over three times the cost charged by the vendor, and a $35 document retrieval fee.   Paramount also submitted a charge of $125 for the title continuation search, which is twenty-five times higher than the cost of the charged by the vendor.

111.    Rosicki then submitted claims for reimbursement to the Servicer for the amounts charged by Enterprise and Paramount.

v.      **Tamarack Street Property**

112.    Fannie Mae loan number 1695290844 relates to a mortgage held by Fannie Mae on a property on Tamarack Street in Buffalo, New York ("Tamarack Street Property").   A third-party financial institution acted as the Servicer and Rosicki as the firm handling the foreclosure procedures for the Tamarack Street Property.

113.    Rosicki contracted with Enterprise to effect service of process of the summons and complaint on the two named foreclosure defendants.   However, Enterprise did not serve process on the two named foreclosure defendants, but rather engaged a third-party process server to effectuate service on these defendants.

114.    The process server served the named defendants, one John Doe defendant, and one additional party in September 2013.   The process server charged Enterprise $20 for service of each of the named defendants, $9.50 for the Doe defendant, and $20 for service of the additional party, or $69.50 in total.

115.    In submitting a bill to Rosicki for service of process, Enterprise included an inflated charge of $125 for service of each of the named defendants, $50 for attempted service on each of the named defendants, and $75 for service of the party that the process server served, for a total of $425 for the services performed by the process server.

116.    Rosicki contracted with Paramount to perform a title search, with Paramount then engaging a third-party vendor for the performance of this service.   Paramount submitted a bill for the title search to Rosicki that included a charge of $275 for the search, the maximum amount allowed by Fannie Mae, and a $35 document retrieval fee.

117.     Rosicki then submitted claims for reimbursement to the Servicer for the amounts charged by Enterprise and Paramount.

### vi.     Hampshire Street Property

118.     Fannie Mae loan number 1693051324 relates to a mortgage held by Fannie Mae on a property on Hampshire Street in Buffalo, New York ("Hampshire Street Property").   A third-party financial institution acted as the Servicer and Rosicki as the firm handling the foreclosure procedures for the Hampshire Street Property.

119.     Rosicki contracted with Enterprise to effect service of process of the summons and complaint on the named foreclosure defendant.   However, Enterprise did not serve process on the named foreclosure defendant, but rather engaged a third-party process server to effectuate service on this defendant.

120.     The process server served the named defendant in April 2012 and charged Enterprise $20 for his services.

121.     In submitting a bill to Rosicki for service of process, Enterprise included a charge of $125 for service of the named defendant, $50 for attempted service, $75 for service of John Doe defendants, and an additional $75 for service of "John and Jane Does- Vacant," for a total of $325 for the services performed by the process server.

122.     Rosicki contracted with Paramount to perform a title search, with Paramount then engaging with a third-party vendor for the performance of this service.   Paramount submitted a bill for the title search to Rosicki that included a charge of $275 for the search, the maximum amount allowed by Fannie Mae, and a $35 document retrieval fee.

123.     Rosicki then submitted claims for reimbursement to the Servicer for the amounts charged by Enterprise and Paramount.

* * * * * * * * * *

124.   The claims that Defendants caused to be submitted to Fannie Mae, for reimbursement of inflated and excessive foreclosure expenses in violation of the applicable standards, represent a common form of false claim: goods and services provided in violation of contract terms.

125.   Defendants' overcharging of Fannie Mae for inflated foreclosure expenses goes fundamentally to the essence of the contractual bargain between Fannie Mae and Rosicki, and deprives Fannie Mae of a significant benefit of that bargain. Such conduct, if known by Fannie Mae, would have influenced its determination to reimburse the inflated foreclosure expenses.

126.   Had Fannie Mae been aware that Rosicki was submitting foreclosure expenses that included substantially inflated markups of invoices for foreclosure-related services where the Rosicki Affiliates added little or no value to the services performed by their third-party vendors, Fannie Mae would not have considered those expenses to be in compliance with the Servicing Guide requirement that all foreclosure expenses submitted by Foreclosure Firms must be "actual, reasonable, and necessary" as a condition of reimbursement by Fannie Mae.

127.   As such, pursuant to the terms of the Servicing Guide, these substantially inflated expenses would not have been reimbursable.

## FIRST CLAIM
### (as against all Defendants)

### Violation of the False Claims Act:   False Claims
### (31 U.S.C. § 3729(a)(1) (2006), and, as amended, 31 U.S.C. § 3729(a)(1)(A))

128.   The Government incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

129.     The Government seeks relief against all Defendants under Section 3729(a)(1)(A) of the False Claims Act (formerly Section 3729(a)(1)).

130.     Between at least May 27, 2009 and March 31, 2012,[1] Defendants, by creating and submitting inflated bills for foreclosure services to Servicers with knowledge that those bills ultimately would be submitted to and paid by Fannie Mae, knowingly caused false claims to be presented for reimbursement by Fannie Mae.

131.     Specifically, Defendants knowingly caused to be submitted bills for marked-up foreclosure expenses that were not actual or reasonable, in violation of Fannie Mae requirements.

132.     Accordingly, Defendants caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1), and, as amended, 31 U.S.C. § 3729(a)(1)(A).

133.     By reason of these false or fraudulent claims that Defendants caused to be presented to Fannie Mae, a Government-Sponsored Entity, Fannie Mae has paid millions of dollars in reimbursements of false and fraudulent foreclosure expenses.

134.     Because Defendants' fraudulent scheme took place contemporaneously with Fannie Mae's receipt of billions of dollars in federal funds pursuant to the SPA, through drawdowns that took place as recently as the first quarter of 2012, and because those funds served a Government interest, namely stabilizing the housing markets, claims for reimbursement of foreclosure expenses made to Fannie Mae constitute "claims" for purposes of the False Claims Act under 31 U.S.C. § 3729(b)(2)(A)(ii).   Accordingly, the United States is entitled to recover treble damages plus a civil monetary penalty for each claim on behalf of Fannie Mae.

---

[1] While Defendants' scheme pre-dates May 27, 2009 by a substantial period, FERA was passed on May 26, 2009, and does not apply retroactively to claims submitted before that date. *See* Pub. L. No. 111-21, § 4(f)(1), 123 Stat. 1617, 1625 (2009).

## SECOND CLAIM
### (as against all Defendants)

### Violation of the False Claims Act:   False Statements
### (31 U.S.C. § 3729(a)(2) (2006), and, as amended, 31 U.S.C. § 3729(a)(1)(B))

135.    The Government incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

136.    The Government seeks relief against all Defendants under Section 3729(a)(1)(B) of the False Claims Act (formerly Section 3729(a)(2)).

137.    Between at least May 27, 2009 and March 31, 2012, Defendants, by creating and submitting inflated bills for foreclosure services to Servicers with knowledge that those bills ultimately would be submitted to and paid by Fannie Mae, knowingly caused to be made false records or statements that were material to getting false or fraudulent claims paid by Fannie Mae.

138.    Specifically, Defendants submitted bills that reflected marked-up expenses that were not reasonable or actual foreclosure expenses, in violation of Fannie Mae requirements.

139.    By reason of these false or fraudulent records or statements that Defendants caused to be created, Fannie Mae has paid millions of dollars in reimbursements of false and fraudulent foreclosure expenses.

140.    Because Defendants' fraudulent scheme took place contemporaneously with Fannie Mae's receipt of billions of dollars in federal funds pursuant to the SPA, through drawdowns that took place as recently as the first quarter of 2012, and because those funds served a Government interest, namely stabilizing the housing markets, claims for reimbursement of foreclosure expenses made to Fannie Mae constitute "claims" for purposes of the False Claims Act under 31 U.S.C. § 3729(b)(2)(A)(ii).   Accordingly, the United States is entitled to recover treble damages plus a civil monetary penalty for each claim on behalf of Fannie Mae.

## THIRD CLAIM
### (as against all Defendants)

### Violation of the False Claims Act:   Reverse False Claims
### (31 U.S.C. § (a)(1)(G))

141.    The Government incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

142.    The Government seeks relief against all Defendants under Section 3729(a)(1)(G) of the False Claims Act, for all false and fraudulent claims that Defendants caused to be submitted from the start of Fannie Mae's quarterly dividend payment obligation pursuant to the Third Amendment to the SPA and continuing to the present.

143.    Because the Third Amendment obligates Fannie Mae to make quarterly dividend payments of its net revenues in excess of a capital reserve, and because any monies that Fannie Mae uses to pay its servicing expenses necessarily results in a decrease to its net revenues, the monies that Fannie Mae paid for reimbursement of Defendants' false and fraudulent foreclosure expenses have decreased the amount of dividend payments to which the United States otherwise would have been entitled and received.

144.    Accordingly, as set forth above, by knowingly causing falsely inflated foreclosure expenses to be submitted to Fannie Mae, specifically by generating bills for marked-up foreclosure expenses that were neither reasonable nor actual, Defendants knowingly caused to be made or used false records and/or statements to conceal, avoid, or decrease obligations to pay or transmit money or property to the United States.

145.    From the start of Fannie Mae's quarterly dividend payment obligation pursuant to the Third Amendment to the SPA and continuing to the present, the Government has incurred

losses in the form of decreased quarterly dividend payments from Fannie Mae because of Defendants' fraudulent conduct.

146.    By virtue of the false records or statements made by Defendants, the Government suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, and a civil penalty as required by law for each violation.

**PRAYER FOR RELIEF**

WHEREFORE, the United States demands judgment against Defendants as follows:

A.     Treble the United States' damages, in an amount to be established at trial,

plus a statutory penalty for each false claim submitted in violation of the

False Claims Act;

B.     Award of costs pursuant to 31 U.S.C. § 3792(a)(3); and

C.     Such further relief as the Court deems proper.


Dated:  New York, New York
        March 27, 2018

                              GEOFFREY S. BERMAN
                              United States Attorney
                              Southern District of New York
                              Attorney for the United States of America


                    By:     /s/ Cristine Irvin Phillips
                              CRISTINE IRVIN PHILLIPS
                              ANDREW E. KRAUSE
                              LAUREN A. LIVELY
                              Assistant United States Attorneys
                              86 Chambers Street, Third Floor
                              New York, New York 10007
                              Telephone Nos. (212) 637-2696/2769/2689
                              Facsimile Nos. (212) 637-2702/2786/2717
                              cristine.phillips@usdoj.gov
                              andrew.krause@usdoj.gov
                              lauren.lively@usdoj.gov