Carol E. Heckman
HARTER SECREST & EMERY LLP
Twelve Fountain Plaza, Suite 400
Buffalo, New York 14202
Telephone No. (716) 844-3720
Facsimile No. (716) 853-1617
CHeckman@hselaw.com

Brian M. Feldman
HARTER SECREST & EMERY LLP
1600 Bausch & Lomb Place
Rochester, New York 14604
Telephone No. (585) 231-1201
Facsimile No. (585) 232-2152
BFeldman@hselaw.com

*Attorneys for Plaintiff-Relator Peter D. Grubea*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA ex rel. PETER D. GRUBEA,

*Plaintiffs,*

v.

ROSICKI, ROSICKI & ASSOCIATES, P.C., PARAMOUNT LAND, INC., THRESHOLD LAND INC., ENTERPRISE PROCESS SERVICE, INC., MCCABE, WEISBERG, & CONWAY, P.C., ATTORNEY OUTSOURCING SUPPORT SERVICES, INC., REO AMERICA ABSTRACT, INC., STEIN, WIENER & ROTH LLP, HAIL ABSTRACT CORP., JOHN DOE LAW PRACTICES A-Z, JOHN DOE TITLE COMPANIES A-Z, JOHN DOE PROCESS SERVICE COMPANIES A-Z, JOHN DOE LEGAL PUBLISHING COMPANIES A-Z, ASTORIA FEDERAL SAVINGS AND LOAN ASSOCIATION, BAYVIEW LOAN SERVICING, LLC, BETHPAGE FEDERAL CREDIT UNION, CENLAR FSB, CUC MORTGAGE CORPORATION, DEUTSCHE BANK TRUST CORPORATION, EVERHOME MORTGAGE COMPANY, EVERBANK FSB, FIDELITY BANK FSB,

**FIRST AMENDED COMPLAINT**

**[UNDER SEAL]**

12 Civ. 7199 (TPG)

ECF Case

**Jury Trial Demanded**

FLAGSTAR BANK, FSB, FRANKLIN CREDIT
MANAGEMENT CORPORATION, GREEN TREE
CREDIT, JAMES B. NUTTER & CO., KONDAUR
CAPITAL CORPORATION, METLIFE BANK, N.A.,
MIDFIRST BANK, MID-ISLAND MORTGAGE
CORP., NATIONSTAR MORTGAGE LLC,
ONEWEST BANK FSB, PHH MORTGAGE
CORPORATION, PNC BANK, FSB, RBS
CITIZENS, N.A., RESIDENTIAL CREDIT
SOLUTIONS, INC., SAXON MORTGAGE
SERVICES, INC., SEATTLE MORTGAGE
COMPANY, SOVEREIGN BANK, SUNTRUST
MORTGAGE, INC., U.S. BANK, N.A., ULSTER
SAVINGS BANK, WALL STREET MORTGAGE
BANKERS, and JOHN DOE LOAN SERVICING
COMPANIES 1-20,

*Defendants.*

Plaintiff-relator Peter D. Grubea ("Relator"), through his attorneys, Harter Secrest &
Emery LLP, alleges upon information and belief as follows:

## INTRODUCTION

1.      Relator brings this action on behalf of the United States of America (the
"Government") against defendants Rosicki, Rosicki & Associates, P.C., Paramount Land, Inc.,
Threshold Land Inc., Enterprise Process Service, Inc., McCabe Weisberg & Conway, P.C.,
Attorney Outsourcing Support Services, Inc., REO America Abstract, Inc., Stein Wiener & Roth
LLP, Hail Abstract Corp., John Doe Law Practices A-Z, John Doe Title Companies A-Z, John
Doe Process Service Companies A-Z, and John Doe Legal Publishing Companies A-Z
(collectively, the "Foreclosure Services Defendants"), as well as Astoria Federal Savings and
Loan Association, Bayview Loan Servicing, LLC, Bethpage Federal Credit Union, Cenlar FSB,
CUC Mortgage Corporation, Deutsche Bank Trust Corporation, Everhome Mortgage Company,
Everbank FSB, Fidelity Bank FSB, Flagstar Bank, FSB, Franklin Credit Management

2

Corporation, Green Tree Credit, James B. Nutter & Co., Kondaur Capital Corporation, MetLife

Bank, N.A., Midfirst Bank, Mid-Island Mortgage Corp., Nationstar Mortgage LLC, OneWest

Bank FSB, PHH Mortgage Corporation, PNC Bank, FSB, RBS Citizens, N.A., Residential

Credit Solutions, Inc., Saxon Mortgage Services, Inc., Seattle Mortgage Company, Sovereign

Bank, SunTrust Mortgage, Inc., U.S. Bank, N.A., Ulster Savings Bank, Wall Street Mortgage

Bankers, and John Doe Loan Servicing Companies 1-20 (the "Bank Defendants").

2.      This is a civil action to recover damages and penalties from the Foreclosure

Services Defendants and the Bank Defendants, on behalf of the Government, for illegal and

excessive claims made by the defendants for reimbursement from Government programs,

including the Federal Housing Administration ("FHA") of the United States Department of

Housing and Urban Development ("HUD"), the Federal National Mortgage Association ("Fannie

Mae"), and the Federal Home Loan Mortgage Corporation ("Freddie Mac").

3.      As set forth below, the Foreclosure Services Defendants developed a business

model by which law firms, such as Rosicki, Rosicki & Associates, P.C., would create subsidiary

corporations to handle and bill for title searches, service of process, and related services.  Under

the Foreclosure Services Defendants' business model, these affiliated subsidiaries, including

Paramount Land, Inc., and Enterprise Process Service, Inc., generated illegal and excessive

charges for foreclosure services, which the law firms passed along to their clients, the Bank

Defendants.  For instance, the Foreclosure Services Defendants regularly charged for service of

process on the New York State Department of Taxation, in the absence of any tax liens, billed

service of process and title searches at excessive rates, added improper document filing fees, and

used their own process server firms as pass-throughs to simply markup charges from other

process servers.  The Foreclosure Services Defendants -- law firms and their subsidiaries -- billed

3

for these services at substantial profits.  Many of these services were wholly unnecessary and performed solely to generate fees.

4.      As set forth below, upon information and belief, the Bank Defendants failed in their obligations to monitor the Foreclosure Services Defendants and other vendors charging excessive fees, and the Bank Defendants repeatedly lied to be included in Government programs to service mortgages.  While in those programs, upon information and belief, the Bank Defendants obtained reimbursement from the Government for the illegal and excessive fees for foreclosure services charged by the Foreclosure Services Defendants and other vendors, such as inflated charges for performing title searches and inflated and unnecessary charges for serving process.  Upon information and belief, the Bank Defendants paid these excessive fees because the Bank Defendants could, and did, seek reimbursement for the charges from the Government.  Upon information and belief, these schemes deprived the Government of millions of dollars.

5.      Relator brings this action seeking damages and penalties on behalf of the Government under the False Claims Act, 31 U.S.C. §§ 3729-3733.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction pursuant to 31 U.S.C. § 3730 and 28 U.S.C. §§ 1331 and 1345.

7.      Venue is appropriate in this judicial district pursuant to 31 U.S.C. § 3732(a) because, *inter alia*, various defendants reside or transact business in this district.  Defendants are likewise subject to personal jurisdiction in this judicial district.

## PARTIES

8.      Plaintiff is the United States of America.

9.      Relator Peter D. Grubea ("Relator" or "Grubea") is an attorney currently residing in Erie County, New York.  At all relevant times, Grubea has practiced law in the State of New York.  His practice consists primarily of advocacy on behalf of consumers in bankruptcy proceedings.  Over the last eighteen (18) years, Grubea has handled approximately 10,000 such cases throughout the State of New York.

10.     Defendant Rosicki, Rosicki & Associates, P.C. (the "Rosicki Firm") is a New York professional corporation with offices in Plainview, Batavia, and Fishkill, New York.  The Rosicki Firm's website characterizes the firm as "the leading mortgage banking law firm in New York."

11.     Defendant Paramount Land, Inc. ("Paramount"), is a New York business corporation with its principal office in Plainview, New York.

12.     Defendant Threshold Land Inc. ("Threshold"), is a New York business corporation, incorporated on May 30, 2003, and dissolved on July 11, 2011, with its principal office in Plainview, New York.  Upon information and belief, Paramount is the successor-in-interest to Threshold.

13.     Defendant Enterprise Process Service, Inc. ("Enterprise"), is a New York business corporation with its principal office in Plainview, New York.

14.     Defendant McCabe, Weisberg & Conway, P.C. (the "McCabe Firm"), is a New York professional corporation with multiple locations throughout the Northeastern United States, including offices at 123 Broad Street, Suite 2080, Philadelphia, Pennsylvania, and at 145 Huguenot Street, Suite 210, New Rochelle, New York.

15.    Defendant Attorney Outsourcing Support Services, Inc. ("AOSS") is a Pennsylvania corporation with its principal office at 123 Broad Street, Suite 2080, Philadelphia, Pennsylvania.

16.    Defendant REO America Abstract, Inc., is a Pennsylvania corporation with its principal office at 123 Broad Street, Suite 2080, Philadelphia, Pennsylvania.

17.    Defendant Stein, Wiener & Roth LLP (the "Stein Firm") is a New York limited liability partnership with its principal office at One Country Road, Carle Place, New York.

18.    Defendant Hail Abstract Corp. is a New York business corporation with its principal office at One Country Road, Carle Place, New York.

19.    Defendants John Doe Law Practices A-Z are law firms, which provided or arranged for foreclosure services for the Banks Defendants, and which caused the Bank Defendants to make claims for illegal or inflated fees from the Government.

20.    Defendants John Doe Title Companies A-Z are title search companies owned or controlled, in whole or in part, by the Rosicki Firm, the McCabe Firm, the Stein Firm, and/or John Doe Law Practices A-Z, which provided or arranged for foreclosure title search services for the Banks Defendants, and which caused the Bank Defendants to make claims for illegal or inflated fees from the Government.

21.    Defendants John Doe Process Service Companies A-Z are process service companies owned or controlled, in whole or in part, by the Rosicki Firm, the McCabe Firm, the Stein Firm, and/or John Doe Law Practices A-Z, which provided or arranged for the services of process and other services within foreclosure proceedings for the Banks Defendants, and which caused the Bank Defendants to make claims for illegal or inflated fees from the Government.

22.     Defendants John Doe Legal Publishing Companies A-Z are companies owned or controlled, in whole or in part, by the Rosicki Firm, the McCabe Firm, the Stein Firm, and/or John Doe Law Practices A-Z, which provided or arranged for the publication of legal notices relating to foreclosure proceedings of the Bank Defendants, and which caused the Bank Defendants to make claims for illegal or inflated fees from the Government.

23.     Defendant Astoria Federal Savings and Loan Association is a savings and loan association with its principal office in Long Island City, New York.  It services Fannie Mae loans and engaged the Foreclosure Services Defendants to provide foreclosure services in those capacities.

24.     Defendant Bayview Loan Servicing, LLC is a Delaware limited liability company with its principal office in Coral Gables, Florida.  It services FHA, Fannie Mae, and Freddie Mac loans and engaged the Foreclosure Services Defendants to provide foreclosure services in those capacities.

25.     Defendant Bethpage Federal Credit Union is a federal credit union with its principal office in Bethpage, New York.  It services FHA loans and engaged the Foreclosure Services Defendants to provide foreclosure services in those capacities.

26.     Defendant Cenlar FSB is a federal savings bank with its principal office in Trenton, New Jersey.  It services FHA loans and engaged the Foreclosure Services Defendants to provide foreclosure services in those capacities.

27.     Defendant CUC Mortgage Corporation is a New York business corporation with its principal office in Albany, New York.  It services FHA, Fannie Mae, and Freddie Mac loans and engaged the Foreclosure Services Defendants to provide foreclosure services in those capacities.

28.     Defendant Deutsche Bank Trust Corporation is a New York business corporation with its principal place of business in New York, New York.  It services Fannie Mae and Freddie Mac loans and engaged the Foreclosure Services Defendants to provide foreclosure services in those capacities.

29.     Defendant Everhome Mortgage Company is a Florida corporation with its principal office in Jacksonville, Florida.  It services FHA loans and engaged the Foreclosure Services Defendants to provide foreclosure services in that capacity.

30.     Defendant Everbank FSB is a federal savings bank with its principal office in Jacksonville, Florida.  It services FHA loans and engaged the Foreclosure Services Defendants to provide foreclosure services in that capacity.

31.     Defendant Fidelity Bank FSB is a federal savings bank with its principal office in Wichita, Kansas.  It services FHA loans and engaged the Foreclosure Services Defendants to provide foreclosure services in those capacities.

32.     Defendant Flagstar Bank, FSB is a federal savings bank with its principal office in Troy, Michigan.  It services FHA, Fannie Mae, and Freddie Mac loans and engaged the Foreclosure Services Defendants to provide foreclosure services in those capacities.

33.     Defendant Franklin Credit Management Corporation is a Delaware corporation with its principal office in Jersey City, New Jersey.  It services FHA, Fannie Mae, and Freddie Mac loans and engaged the Foreclosure Services Defendants to provide foreclosure services in those capacities.

34.     Defendant Green Tree Credit is Delaware limited liability company with its principal office in St. Paul, Minnesota.  It services Fannie Mae and Freddie Mac loans and engaged the Foreclosure Services Defendants to provide foreclosure services in those capacities.

35.     Defendant James B. Nutter & Co. is a Missouri corporation with its principal office in Kansas City, Missouri.  It services Fannie Mae and Freddie Mac loans and engaged the Foreclosure Services Defendants to provide foreclosure services in those capacities.

36.     Defendant Kondaur Capital Corporation is a Delaware limited liability company with its principal place of business in Orange, California.  It services FHA loans and engaged the Foreclosure Services Defendants to provide foreclosure services in that capacity.

37.     Defendant MetLife Bank, N.A. is a national banking association with its principal office in Morristown, New Jersey.  It services FHA loans and engaged the Foreclosure Services Defendants to provide foreclosure services in that capacity.

38.     Defendant Midfirst Bank is a federal savings bank with its principal office in Oklahoma City, Oklahoma.  It services FHA, Fannie Mae, and Freddie Mac loans and engaged the Foreclosure Services Defendants to provide foreclosure services in those capacities.

39.     Defendant Mid-Island Mortgage Corp. is a New York business corporation with its principal office in Westbury, New York.  It services FHA loans and engaged the Foreclosure Services Defendants to provide foreclosure services in those capacities.

40.     Defendant Nationstar Mortgage LLC is a Delaware limited liability company with its principal office in Dallas, Texas.   It services FHA, Fannie Mae, and Freddie Mac loans and engaged the Foreclosure Services Defendants to provide foreclosure services in those capacities.

41.     Defendant OneWest Bank FSB is a federal savings bank with its principal office in Pasadena, California.  It services FHA, Fannie Mae, and Freddie Mac loans.  OneWest Bank FSB is the successor-in-interest to Indymac Mortgage Company, which likewise serviced FHA, Fannie Mae, and Freddie Mac loans and engaged the Foreclosure Services Defendants to provide foreclosure services in those capacities.

9

42.     Defendant PHH Mortgage Corporation is a New Jersey business corporation with its principal office in Mount Laurel, New Jersey.  It services FHA, Fannie Mae, and Freddie Mac loans and engaged the Foreclosure Services Defendants to provide foreclosure services in those capacities.

43.     Defendant PNC Bank, FSB is a federal savings bank with its principal office in Pittsburgh, Pennsylvania.  It services FHA, Fannie Mae, and Freddie Mac loans and engaged the Foreclosure Services Defendants to provide foreclosure services in those capacities.

44.     Defendant RBS Citizens, N.A., is a national banking association with its principal office in Providence, Rhode Island.  It services FHA, Fannie Mae, and Freddie Mac loans and engaged the Foreclosure Services Defendants to provide foreclosure services in those capacities.

45.     Defendant Residential Credit Solutions, Inc., is a Delaware corporation with its principal office in Fort Worth, Texas.  It services FHA, Fannie Mae, and Freddie Mac loans and engaged the Foreclosure Services Defendants to provide foreclosure services in those capacities.

46.     Defendant Saxon Mortgage Services, Inc. is a Texas Corporation with its principal office in Fort Worth, Texas.  It services FHA, Fannie Mae, and Freddie Mac loans and engaged the Foreclosure Services Defendants to provide foreclosure services in those capacities.

47.     Defendant Seattle Mortgage Company is a Washington corporation with its principal office in Seattle, Washington.  It services FHA loans and engaged the Foreclosure Services Defendants to provide foreclosure services in that capacity.

48.     Defendant Sovereign Bank is a Texas corporation with its principal office in Dallas, Texas.  It services FHA, Fannie Mae, and Freddie Mac loans and engaged the Foreclosure Services Defendants to provide foreclosure services in those capacities.

49.     Defendant SunTrust Mortgage, Inc. is a Virginia business corporation with its principal office in Richmond, Virginia.  It services FHA, Fannie Mae, and Freddie Mac loans and engaged the Foreclosure Services Defendants to provide foreclosure services in those capacities.

50.     Defendant U.S. Bank, N.A., is a national banking association with its principal office in Minneapolis, Minnesota.  It services FHA, Fannie Mae, and Freddie Mac loans and engaged the Foreclosure Services Defendants to provide foreclosure services in those capacities.

51.     Defendant Ulster Savings Bank is a New York State-chartered savings bank with its principal office in Kingston, New York.  It services FHA loans and engaged the Foreclosure Services Defendants to provide foreclosure services in those capacities.

52.     Defendant Wall Street Mortgage Bankers is a New York business corporation with its principal office in Lake Success, New York.  It services FHA loans and engaged the Foreclosure Services Defendants to provide foreclosure services in those capacities.

53.     Defendants John Doe Loan Servicing Companies 1-20 are financial institutions, which serviced FHA, Fannie Mae, and/or Freddie Mac loans, and which engaged the Foreclosure Services Defendants to provide foreclosure services in those capacities.

## FACTS

## I.     THE SINGLE FAMILY MORTGAGE INDUSTRY

54.     The single family mortgage industry consists of financial services and other firms that originate, underwrite, securitize, and service mortgages for residential properties designed to house one- to four-family dwellings.

55.     Mortgage origination is the process whereby a lender loans money to a borrower and receives a security interest in property, through a mortgage or comparable device that

11

secures the loan.  Origination generally includes all the steps from receiving a loan application through disbursal of the loan proceeds.

56.     For more than thirty years, mortgages typically have been "pooled" to create an investment vehicle, often denominated as a trust, and interests in the trusts have been sold to investors that own interests in payment streams generated by principal and interest payments by the borrowers.

57.     After mortgages are originated, a "servicer" is responsible for mortgage administration activities, known as "servicing" activities, which generally include collecting payments from borrowers; applying payments made in an agreed-upon order to the borrower's indebtedness; distributing payments after allowable deductions to the investment trust entities for distribution to investors; making advances to cover delinquent mortgage payments and other costs, such as the costs of protecting and maintaining properties that collateralize mortgage loans when borrowers fail to do so; pursuing collections from delinquent borrowers; and pursuing either loss mitigation or foreclosure, as appropriate, to minimize the loss to investors and others when mortgagors become delinquent on mortgage payments.

58.     This case concerns law firms' actions in performing services related to foreclosure, and servicers' actions in pursuing foreclosure.  In particular, this case concerns inflated, unnecessary, and otherwise improper charges for foreclosure-related services.

## II.     GOVERNMENT PROGRAMS

59.     Various Government programs provide for the reimbursement of costs for the servicing of mortgages for single-family residential properties.

60.     These programs reimburse servicers for, *inter alia*, fees paid for foreclosure services, such as performing title searches and for service of process.

61.     As described below, these Government programs include FHA, Fannie Mae, and Freddie Mac.

A.      **The FHA Servicing Program**

62.     FHA is the largest insurer of residential mortgages in the world.  Pursuant to the National Housing Act of 1934, FHA offers various mortgage insurance programs.  Through these programs, FHA insures approved lenders against losses on mortgage loans, including losses incurred in foreclosure proceedings.  FHA mortgage insurance may be granted on mortgages used to purchase homes, improve homes, or to refinance existing mortgages.  FHA's single family mortgage programs cover owner-occupied principal residences.

63.     FHA mortgage insurance programs help low-income and moderate-income families become homeowners by lowering some of the costs of their mortgage loans.  FHA mortgage insurance encourages lenders to make loans to otherwise creditworthy borrowers and projects that might not be able to meet conventional underwriting requirements by protecting the lenders against defaults on mortgages, including the costs of foreclosing on those defaults.

64.     FHA mortgage insurance provides lenders with protection against losses when borrowers default on mortgage loans insured by FHA.  *See generally* 12 U.S.C. § 1710; 24 C.F.R., Part 203.  In the event that a borrower defaults on an FHA-insured mortgage, the holder of the mortgage is able to submit a claim to HUD for the costs associated with the defaulted mortgage.  *See, e.g.*, Form HUD 27011.

> 1.      **FHA Servicers Must Annually Certify Compliance
>         With HUD Rules, Which Include Quality Control
>         for Monitoring Servicing Reimbursement Claims.**

65.     Under HUD rules, only FHA-approved lenders may service FHA-insured loans. 24 C.F.R. § 203.502; Mortgagee Letter 2009-42.  To obtain and maintain FHA approval, a

servicer must submit an annual certification to HUD. *See* HUD Handbook 4060.1, 1-3; HUD Handbook 4060.1, 4-1. The annual certification states, in sum and substance:

> I know or am in the position to know, whether the operations of the above named mortgagee conform to HUD-FHA regulations, handbooks, and policies. I certify that to the best of my knowledge, the above named mortgagee conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that the above-named mortgagee is fully responsible for all actions of its employees including those of its HUD-FHA approved branch offices.

66. Submitting truthful annual certifications to HUD is a condition of obtaining and maintaining status as an FHA-approved servicer and thereby applying for and obtaining insurance benefits to cover servicing-related expenses, including foreclosure costs and fees. The annual certification requires compliance with the eligibility criteria for services, which include compliance with HUD rules concerning servicers' quality control.

67. To qualify for FHA approval, a servicer must create and implement a quality control plan that ensures compliance with HUD rules. *See* 24 C.F.R. § 202.5(h); HUD Handbook 4060.1, 1-15, 3-2(12), 7-1. The development and implementation of a quality control plan is a basic eligibility requirement for FHA-approved servicers. *See* 24 C.F.R. § 202.5(h). HUD has determined that FHA servicing can be offered only if participating servicers have acceptable quality control plans. Accordingly, as a precondition of FHA-approval for servicing, HUD will require each servicer to have an acceptable quality control plan.

68. An FHA-approved servicer must have a fully functioning quality control program from the date of its initial FHA approval until final surrender or termination of its approval. Thus, a servicer must implement and continuously have in place a quality control plan as a condition of receiving and maintaining FHA approval. *See* HUD Handbook 4060.1, 7-1.

69. The purposes of quality control plans include ensuring that the procedures used by servicers in the foreclosure process comply with HUD rules, protecting HUD against

14

unacceptable risk, and guarding HUD against the submission of erroneous or fraudulent claims for FHA insurance benefits. *See* HUD Handbook 4060.1, 7-2.

70.     A mandatory HUD quality control requirement is that servicers review all claims for insurance benefits.  Specifically, HUD rules provide that servicers must determine that insurance claims are properly calculated and claim amounts are fully supported, and must thoroughly review the claim to verify that supporting documentation exists for all information entered on the claim form.  In addition, servicers must ensure that sufficient controls exist to assure that the preparation of insurance claims are complete and accurate, in order to minimize losses to HUD. *See* HUD Handbook 4060.1, 1-15.

71.     Another mandatory HUD quality control requirement is that servicers take steps to ensure that unallowable foreclosure processing fees are not included in insurance claims. Specifically, HUD rules provide that servicers must review all aspects of their operations to ensure that all FHA requirements are met, including FHA rules regarding reimbursement for foreclosure processing fees and charges. *See* HUD Handbook 4060.1, 7-10.  HUD rules further provide that servicers must implement, as a mandatory component of quality control, sufficient controls to ensure that claims for insurance benefits are properly prepared, calculated, supported, and submitted, including claims for foreclosure costs and fees. *See* HUD Handbook 4060.1, 7-12.

### 2.     HUD Rules Permit Reimbursement for Servicing Costs Only to the Extent that the Costs Are Necessary, Reasonable, and Customary in the Geographical Area.

72.     HUD rules authorize the reimbursement to servicers of at least two-thirds of the foreclosure costs or the costs of acquiring a property by other means, including the costs of

conveying title to HUD. *See* HUD Handbook 4330.4, 2-15; *see also* Mortgagee Letter 2011-12 (providing for reimbursement of more than two-thirds of costs).

73.     Servicers may claim such reimbursements by submitting a Single-Family Application for Insurance Benefits, Form HUD 27011. Box 307 of Form HUD 27011 provides for the itemization of foreclosure and/or acquisition, conveyance and other costs. The servicer must sign a certification on the Form HUD 27011 that "the statements and information contained hereon . . . are true and correct." *See* Form HUD 27011.

74.     HUD rules provide that the following costs are allowable:

    a.  Fees that must be paid to public officials;

    b.  Costs that are required by law, such as private service of process;

    c.  Fees and costs that are necessarily incurred and are reasonable and customary in the area.

*See* HUD Handbook 4330.4, 2-15(A).

75.     By contrast, HUD rules expressly provide that any of the following costs are unallowable, and that HUD will not reimburse a servicer for:

    a.  Fees and costs that exceed reasonable and customary fees for the area.

    b.  Costs that are not necessarily incurred or are required because of dilatory service, such as courier service or express mail or property inspection by attorneys.

    c.  Costs that are overhead items such as postage, telephone, duplicating or collection services, all of which should be included in the attorney's or trustee's fees.

*See* HUD Handbook 4330.4, 2-15(B).

16

**B.      The Fannie Mae Servicing Program**

76.      The Federal National Mortgage Association ("Fannie Mae") is a government-sponsored enterprise chartered by Congress with a mission to provide liquidity, stability, and affordability to the United States housing and mortgage markets.  As part of this mission, Fannie Mae invests in residential mortgage-backed securities.  According to public reports, Fannie Mae holds or has securitized approximately 40% of all mortgages within the United States.

77.      Fannie Mae is presently run under a conservatorship by the Government. Specifically, the Federal Housing Finance Agency ("FHFA") is a federal agency created on July 30, 2008, pursuant to the Housing and Economic Recovery Act of 2008 ("HERA"), Pub. L. No. 110-289, 122 Stat. 2654 (2009) (codified at 12 U.S.C. § 4617), to oversee Fannie Mae.  On September 6, 2008, pursuant to HERA, the Director of FHFA placed Fannie Mae into conservatorship and appointed FHFA as conservator.  In that capacity, FHFA has the authority to exercise all rights and remedies of Fannie Mae.

78.      The Government, through the United States Department of the Treasury ("Treasury"), has provided billions of dollars of federal funds to Fannie Mae.  As of September 30, 2011, Treasury had made a gross investment of more than $107 billion in Fannie Mae, with losses of more than $28 billion.  *See* Treasury, Agency Financial Report: Fiscal Year 2011, at 100, *at* http://www.treasury.gov/about/ organizational-structure/offices/Mgt/Documents/ FY%202011%20Treasury%20AFR%20Nov15 %20Final.pdf.

79.      Fannie Mae contracts with companies to service mortgages held or securitized by Fannie Mae.  *See* Fannie Mae Servicing Guide, Part I, at 201.  In the event that a servicer incurs foreclosure fees in servicing a Fannie Mae mortgage, the servicer is able to submit a claim to

17

Fannie Mae for reimbursement of those costs. *See* Fannie Mae Servicing Guide, Part VIII, §

110.03.

80.     Those reimbursements are paid by Fannie Mae to advance Government programs

and interests. As explained above, the Government has provided a substantial portion of the

funds paid by Fannie Mae through the actions of the Treasury.

1.     **To Do Business With Fannie Mae, Servicers Must Monitor Foreclosure Costs, And Are Responsible for Inflated Charges Generated by Entities Affiliated with Servicers' Foreclosure Attorneys.**

81.     Servicers must be approved to do business with Fannie Mae. *See* Fannie Mae

Servicing Guide, Part I, at 100-1.

82.     To qualify for Fannie Mae approval, a servicer must create and implement audit

and control systems to ensure compliance with Fannie Mae's requirements. *See* Fannie Mae

Servicing Guide, Part I, § 301.01; *see also* Fannie Mae Selling Guide, A1-1-01.

83.     Fannie Mae's rules require servicers to retain competent, diligent, local legal

counsel who are highly experienced in conducting foreclosures. Under Fannie Mae's rules, the

servicer is responsible for monitoring all aspects of the performance of its foreclosure attorneys.

*See* Fannie Mae Servicing Guide, Part VIII, § 106.03.

84.     Fannie Mae rules impose heightened requirements on servicers and their attorneys

where the attorneys have an interest in other companies involved in the foreclosure process.

Specifically, Fannie Mae's rules provide:

> The servicer must inquire whether its attorney . . . has any interest in any Affiliated Business Entity that provides services in connection with any foreclosure, bankruptcy, or eviction proceeding if the fees or costs of such services are reimbursable by Fannie Mae under this Guide. An Affiliated Business Entity includes any entity in which any principal of the firm or any employee or family member (including in-laws) of any principal or employee of the firm has a direct or indirect decision-making, ownership, or financial interest.

The servicer must require its attorney . . . to promptly disclose any such relationship or interest, and agree that any fees or expenses for such services do not exceed the customary and reasonable fees for comparable services in their jurisdiction.

The servicer is responsible for monitoring the fees or expenses charged by any Affiliated Business Entity and Fannie Mae will require the servicer to reimburse Fannie Mae for any unreasonable or excessive fees or costs. . . ..

*See* Fannie Mae Servicing Guide, Part VIII, § 106.03.

> **2.      Fannie Mae Rules Permit Reimbursement for Servicing Costs, But Only to the Extent that the Costs Are Necessary, Reasonable, and Customary in the Geographical Area**

85.      Under Fannie Mae rules, both servicers and their foreclosure attorneys have an obligation to "make every effort to reduce foreclosure-related costs and expenses." *See* Fannie Mae Servicing Guide, Part VIII, § 110.03.  In addition, Fannie Mae rules require title costs to be kept to a minimum.  *See* Fannie Mae Servicing Guide, Part VIII, § 110.03.

86.      Fannie Mae reimburses servicers for Fannie Mae's share of foreclosure expenses. *See* Fannie Mae Servicing Guide, Part VIII, § 110.03.  Servicers may claim allowable reimbursements by submitting a Cash Disbursement Request, Form 571, to Fannie Mae.

87.      Fannie Mae rules permit reimbursement of only those costs that are actual, reasonable, and necessary.  *See* Fannie Mae Servicing Guide, Part VIII, § 110.03.

88.      Fannie Mae rules provide that the following costs, if actual, reasonable, and necessary, are allowable:

    a.   Filing costs and other costs required by courts.

    b.   Legally mandated postal costs for certified or registered mail that is required for legal notices;

    c.   Costs of serving summonses and complaints and other legal notices for which the

        law requires personal service.

*See* Fannie Mae Servicing Guide, Part VIII, § 110.03.

    89.    Fannie Mae rules prohibit reimbursement for costs that are either unreasonable or

unnecessary.  *See* Fannie Mae Servicing Guide, Part VIII, § 110.03.

    90.    Fannie Mae rules likewise prohibit reimbursements for costs that are not

customary in the geographical area.  In particular, Fannie Mae rules require foreclosure attorneys

to minimize the costs incurred from third-party vendors by regularly examining the pricing

offered by alternative vendors and negotiating for the best value from the vendor and other

service providers.  *See* Fannie Mae Servicing Guide, Part VIII, § 110.03.  Moreover, where a law

firm contracts with an affiliated entity for services (e.g., title work or service of process), Fannie

Mae rules expressly limit any resulting fees to "customary and reasonable fees for comparable

services in the[] jurisdiction."  *See* Fannie Mae Servicing Guide, Part VIII, § 106.03.

    **C.**    **The Freddie Mac Servicing Program**

    91.    The Federal Home Loan Mortgage Corporation ("Freddie Mac") is a government-

sponsored enterprise chartered by Congress with a mission to provide liquidity, stability, and

affordability to the United States housing and mortgage markets.  As part of this mission,

Freddie Mac invests in residential mortgage-backed securities.

    92.    Freddie Mac is presently run under a conservatorship by the Government.

Specifically, the FHFA is a federal agency created on July 30, 2008, pursuant to HERA, to

oversee Freddie Mac.  On September 6, 2008, pursuant to HERA, the Director of FHFA placed

Freddie Mac into conservatorship and appointed FHFA as conservator.  In that capacity, FHFA

has the authority to exercise all rights and remedies of Freddie Mac.

93.     The Government, through the Treasury, has provided billions of dollars of federal funds to Freddie Mac.  As of September 30, 2011, Treasury had made a gross investment of more than $68 billion in Freddie Mac, with losses of more than $14 billion.  *See* Treasury, Agency Financial Report: Fiscal Year 2011, at 100, *at* http://www.treasury.gov/about/ organizational-structure/offices/Mgt/Documents/FY%202011%20Treasury%20AFR%20Nov15 %20Final.pdf.

94.     Freddie Mac approves companies as servicers for mortgages held or securitized by Freddie Mac.  *See* Freddie Mac Single-Family Seller/Servicer Guide, Vol. I, 4.9.  In the event that a servicer incurs foreclosure fees in servicing a Freddie Mac mortgage, the servicer is able to submit a claim to Freddie Mac for reimbursement of those costs.  *See* Freddie Mac Single-Family Seller/Servicer Guide, Vol. II, 71.19.

95.     Those reimbursements are paid by Freddie Mac to advance Government programs and interests.  As explained above, the Government has provided a substantial portion of the funds paid by Freddie Mac through the actions of the Treasury.

### 1.     Freddie Mac Servicers Must Annually Certify Compliance With Freddie Mac Rules, Which Include Quality Control for Monitoring Servicing Reimbursement Claims

96.     Servicers must be approved to do business with Freddie Mac.  To obtain and maintain Freddie Mac approval, a servicer must submit an annual eligibility certification report to Freddie Mac.  *See* Freddie Mac Single-Family Seller/Servicer Guide, Vol. I, 4.9; Single-Family Form 16SF.  The annual certification states, in sum and substance:

> Seller/Servicer agrees to comply with all of the Guide provisions and requirements, as they may be amended from time to time, as a condition of continuing eligibility.
>
> Seller/Servicer is in compliance with the provision set forth in the Guide, as they have been amended, including, but not limited to: Chapter 4, Seller/Servicer Eligibility . . ..

21

*See* Single-Family Form 16SF; *see also* Freddie Mac Single-Family Seller/Servicer Guide, Vol. I, 4.9.

97.     To qualify for Freddie Mac approval, a servicer must create and implement a quality control program in compliance with Freddie Mac requirements.  *See* Freddie Mac Single-Family Seller/Servicer Guide, Vol. I, 4.2.  The development and implementation of a quality control program that complies with Freddie Mac requirements is a basic eligibility requirement for Freddie Mac servicers.  *See, e.g.*, Freddie Mac, "Minimum Eligibility Requirements," *at* https://ww3.freddiemac.com/ds1/singlefamily/beourcustomer.nsf/ frmEligReq?OpenForm. Accordingly, as a precondition of approval to become a Freddie Mac servicer, Freddie Mac requires each servicer to have an acceptable quality control program.

98.     A mandatory Freddie Mac quality control requirement is that servicers monitor, evaluate, and approve all parties to whom servicing functions are outsourced or assigned, including any foreclosure activities.  *See* Freddie Mac Single-Family Seller/Servicer Guide, Vol. II, 57.2(b).

### 2.     Freddie Mac Rules Permit Reimbursement of Certain Servicing Costs, Only if the Services are Required by Law.

99.     Freddie Mac reimburses servicers for foreclosure expenses.  *See* Freddie Mac Single-Family Seller/Servicer Guide, Vol. II, 71.19.  Servicers may claim allowable reimbursements through Freddie Mac's online Reimbursement System.  *See* Freddie Mac Single-Family Seller/Servicer Guide, Vol. II, Ch. 71.

100.     Freddie Mac permits reimbursement for, *inter alia*, the following costs:

   a.   Filing costs and other costs required by a court.

   b.   Postage for certified or registered mail that is required for legal notices as required by law.

22

      c.   Costs of serving legal notices, when required by law.

*See* Freddie Mac Single-Family Seller/Servicer Guide, Vol. II, 71.19.

## III.    DEFENDANTS' SCHEMES

    101.   Defendants participated in a scheme to charge FHA, Fannie Mae, and Freddie Mac excessive fees for foreclosure services, such as performing title searches and serving process on foreclosure defendants.

    102.   As described in Parts A through D below, the Foreclosure Services Defendants -- law firms and their subsidiaries -- generated substantial profits from their participation in this scheme.  Specifically, the Foreclosure Services Defendants developed a business model by which law firms, such as the Rosicki Firm, the McCabe Firm, and the Stein Firm, would create subsidiary corporations to handle and bill for title searches, service of process, arranging for publication of legal notices, or related services.  Under the Foreclosure Services Defendants' business model, these affiliated subsidiaries, such as Paramount, and Enterprise, generated illegal and excessive charges for foreclosure services, which the law firms passed along to their clients, the Bank Defendants.

    103.   This business model generated substantial profits for the Foreclosure Services Defendants because the Bank Defendants paid for unnecessary fees (*e.g.*, for unnecessary personal service) and excessive fees, well above the market rates charged by the Foreclosure Services Defendants' competitors.  Upon information and belief, the Government ultimately reimbursed the Bank Defendants for many of these unnecessary and excessive fees, through the Government programs described in this Complaint.

    104.   This business model was an important source of revenue for the Foreclosure Services Defendants because Government programs effectively monitored, capped, and limited

23

reimbursements for attorneys' fees.  The Government's focus on attorneys' fees led the foreclosure law firms, like the Rosicki Firm, to find other ways to profit from foreclosure matters.  The business model described allowed the Foreclosure Services Defendants to profit from foreclosure work, despite the limitations on attorneys' fees.

105.    As described in Part E below, upon information and belief, the Bank Defendants' wholesale failure to monitor, audit, and control foreclosure fees created the opportunity for the Foreclosure Services Defendants to overcharge for those fees, which were passed on to the Government.

106.    In particular, upon information and belief, the Bank Defendants' failure to hold the Foreclosure Services Defendants accountable for excessive charges created an incentive and opportunity for the Foreclosure Services Defendants to develop and implement their business model to maximize the frequency and amount of charges for foreclosure activities, such as title work and service of process.

107.    Upon information and belief, this scheme was made possible by the knowing, reckless, and/or deliberately ignorant conduct of the Bank Defendants.  Upon information and belief, these defendants violated their obligations to the Government to monitor and audit the illegal and excessive fees generated by the Foreclosure Services Defendants, such as the Rosicki Defendants.  Instead, upon information and belief, the Bank Defendants presented claims to the Government for reimbursement of these illegal and excessive fees.  The Bank Defendants had few financial incentives to comply with the Government regulations and monitor foreclosure fees because the Bank Defendants regularly passed on these fees.  Upon information and belief, the Government reimbursed the Bank Defendants for most of these fees in situations where the mortgage was ultimately foreclosed upon; and, in most other cases, homeowners reimbursed the

Bank Defendants directly when the mortgage was reinstated, modified, or brought current through bankruptcy proceedings.

108.    Upon information and belief, the Bank Defendants perpetuated this scheme over multiple years by falsely certifying to the Government that they were in compliance with Government quality control rules, which would have identified and stopped the Bank Defendants from making such claims.  Upon information and belief, these false statements resulted in the Bank Defendants continuing to participate as servicers in Government programs and, among other things, continuing to present unallowable claims for illegal and excessive reimbursement for foreclosure services fees.

109.    Upon information and belief, as a result of their wrongful conduct, the Bank Defendants obtained millions of dollars of reimbursements from Government programs, including reimbursements for illegal and excessive foreclosure fees, which they passed onto the Foreclosure Services Defendants.

A.      **The Rosicki Defendants**

110.    The business model of the Rosicki Firm, Enterprise, Threshold, and Paramount (the "Rosicki Defendants") is illustrative of the business model of the Foreclosure Services Defendants.  Likewise, the types and amounts of foreclosure fees the Rosicki Defendants ultimately charged to the Government are illustrative of the fees the Foreclosure Services Defendants ultimately charged to the Government.

111.    The Rosicki Firm and/or its principals have an interest in and control over Paramount (and had an interest in and control over Paramount's predecessor entity, Threshold) and Enterprise.  The Chief Executive Officer of both Paramount (and Threshold before it) and Enterprise is Thomas Rosicki, a principal and named partner of the Rosicki Firm.  The Rosicki

25

Firm contracts with Paramount and Enterprise for the Rosicki Firm's title and service work throughout the State of New York.

112.    Paramount (and Threshold before it) and Enterprise systematically bill the clients of the Rosicki Firm -- and, ultimately the Government -- for services that are unnecessary and that are provided at excessive costs.  These charges violate the rules of the Government programs set forth above.

113.    Enterprise has regularly billed for unnecessary services, including:

a.    Service upon the New York State Department of Taxation and Finance, despite the absence any tax lien;

b.    Service upon judgment debtors with names similar to the foreclosure defendant, even though the judgment debtors' names were irreconcilable with that of the foreclosure defendant (*e.g.*, because of different middle names, disparate locations, etc.);

c.    Ineffective and worthless service upon "John Doe" defendants; and

d.    Services that are part of law firm overhead expenses, such as court filings.

114.    The Rosicki Firm contracts for these unnecessary services from Enterprise for the primary purpose of generating fees for Enterprise.

115.    These services are not reimbursable by Government programs, including FHA, Fannie Mae, and Freddie Mac.  *See, e.g.*, HUD Handbook 4330.4, 2-15(B) (prohibiting reimbursement for services unnecessarily incurred); Fannie Mae Servicing Guide, Part VIII, § 110.03 (prohibiting reimbursement for unnecessary services); Freddie Mac Single-Family Seller/Servicer Guide, Vol. II, 71.19 (permitting reimbursement for required services only).

116.    Similarly, Enterprise regularly bills for services that should be part of the Rosicki Firm's fee, such as delivering pleadings, affidavits, and other filings to court.  These services are properly and customarily provided by law firms, not servicers.  Moreover, these delivery services are often unnecessary because many of the filings could be made by mail.

117.    The Rosicki Firm contracts for these services from Enterprise for the primary purpose of generating fees for Enterprise.

118.    The Rosicki Firm also contracts for these services to avoid performing the work that it is required to perform under the applicable Government program guidelines in order to earn the legal fees that it charges to the Bank Defendants.  Upon information and belief, the Rosicki Firm does not decrease its legal fees in cases where Enterprise handles the work required of the Rosicki Firm.  Accordingly, by offloading the tasks required of the Rosicki Firm onto Enterprise, the Rosicki Firm generates profits in two ways -- (1) by generating fees for Enterprise and (2) by avoiding labor and other overhead expenses that are supposed to be included in the Rosicki Firm's legal fees.

119.    These services are not reimbursable by Government programs, including FHA. *See, e.g.*, HUD Handbook 4330.4, 2-15(B) (prohibiting reimbursement for services which are items of attorney overhead).

120.    In addition to billing for unnecessary services and services included in attorney overhead, both Paramount and Enterprise regularly bill at excessive rates for services including:

a.  Title searches well above market rates (*e.g.*, at $495, despite market rates between $200-$325);

b. Personal service well above market rates (*e.g.*, at $125, despite market rates of approximately $40, and full charges for additional defendants residing at the same address);

c. Delivery upon the New York Secretary of State well above market rates (*e.g.*, at $75, despite market rates of approximately $20);

d. Mailings to "John Doe" defendants at substantial sums (*e.g.*, $50) where the minimal work involved consisted of merely sending a summons and complaint by mail.

121.   The Rosicki Firm contracts for these unnecessary services from Paramount (and Threshold before it) and Enterprise for the primary purpose of generating fees for Paramount (and Threshold before it) and Enterprise.

122.   These services are not reimbursable by Government programs, including HUD and Fannie Mae. *See, e.g.*, HUD Handbook 4330.4, 2-15(B) (prohibiting reimbursement for fees that exceed reasonable and customary fees for the area); Fannie Mae Servicing Guide, Part VIII, § 106.03  (same).

123.   Moreover, Enterprise does not provide many of these services itself.  Instead, with the assent of the Rosicki Firm, Enterprise often contracts with other entities to conduct services, such as service of process, and then simply marks up the bill.  Although the Rosicki Firm could readily contract directly with entities serving process, it chooses to contract with Enterprise instead, in order to generate profits from allowing Enterprise to mark up the services bills of other entities.

124.   Likewise, upon information and belief, the Rosicki Firm contracts with Adelphi Legal Publishing Corp. ("Adelphi") for the publication of legal notices, which Adelphi does not

publish itself.  Instead, upon information and belief, with the assent of the Rosicki firm, Adelphi contracts with legitimate publications for the publication of legal notice, and then Adelphi simply marks up the bill.  Upon information and belief, although the Rosicki Firm could readily contract directly with entities publishing legal notices, it chooses to contract with Adelphi instead, in order to generate profits from allowing Adelphi to mark up the bills of legitimate publications. Upon information and belief, Adelphi is owned and/or controlled by the Rosicki Firm and, prior to using Adelphi, the Rosicki Firm used Whittiker Legal Publishing Corp. ("Whittiker") as part of the same scheme.  Upon information and belief, Whittiker, like Adelphi, is owned and/or controlled by the Rosicki Firm.

125.    Upon information and belief, the Rosicki Defendants billed the Bank Defendants for these unnecessary and excessive charges with the intention, expectation, knowledge, and belief that the Bank Defendants would seek reimbursement from the Government for these charges.

126.    The conduct of the Rosicki Defendants described above caused the Government, through FHA, Fannie Mae, and Freddie Mac, to pay false and fraudulent claims.

**B.    The McCabe Defendants**

127.    Upon information and belief, the McCabe Firm, AOSS, and REO America Abstract (the "McCabe Defendants") have a business model similar to that of the Rosicki Defendants.

128.    Upon information and belief, the McCabe Firm and/or its principals or agents have an interest in and control over AOSS and REO America Abstract.  The Chairman or Chief Executive Officer of AOSS is Terrence McCabe, a principle and named partner of the McCabe Firm, and AOSS shares office space with the McCabe Firm.  REO America Abstract's officers

are all, upon information and belief, spouses of partners of the McCabe Firm:  President Elizabeth McCabe is, upon information and belief, the spouse of partner Terrence McCabe; Secretary Judy Conway is, upon information and belief, the spouse of partner Edward D. Conway; Treasurer Anthony Gairo is, upon information and belief, the spouse of partner Margaret Gairo; and Vice President Weisberg is, upon information and belief, the spouse of partner Marc Weisberg.  REO America Abstract  shares office space with the McCabe Firm.

129.    Upon information and belief, the McCabe Firm contracts with AOSS and REO America Abstract for the McCabe Firm's title and service work for foreclosure proceedings.

130.    Upon information and belief, AOSS and REO America Abstract systematically bill the clients of the McCabe Firm -- and, ultimately the Government -- at excessive rates for services including:

  a.   Title searches well above market rates (*e.g.*, at more than $450, despite market rates between $200-$325);

  b.   Personal service well above market rates (*e.g.*, at more than $200, despite market rates of approximately $40);

131.    Upon information and belief, the McCabe Firm contracts for services at excessive rates from AOSS and REO America Abstract for the primary purpose of generating fees for AOSS and REO Abstract.

132.    These services are not reimbursable by Government programs, including HUD and Fannie Mae.  *See, e.g.*, HUD Handbook 4330.4, 2-15(B) (prohibiting reimbursement for fees that exceed reasonable and customary fees for the area); Fannie Mae Servicing Guide, Part VIII, § 106.03  (same).

30

133.    Moreover, AOSS does not provide many of these services itself.  Instead, with the assent of the McCabe Firm, AOSS often contracts with other entities to conduct services, such as service of process, and then simply marks up the bill.  Although the McCabe Firm could readily contract directly with entities serving process, it chooses to contract with AOSS instead, in order to generate profits from allowing AOSS to mark up the services bills of other entities.

134.    Upon information and belief, the McCabe Defendants billed the Bank Defendants for these unnecessary and excessive charges with the intention, expectation, knowledge, and belief that the Bank Defendants would seek reimbursement from the Government for these charges.

135.    Upon information and belief, the conduct of the McCabe Defendants described above caused the Government, through FHA, Fannie Mae, and Freddie Mac, to pay false and fraudulent claims.

### C.    The Stein Defendants

136.    Upon information and belief, the Stein Firm and Hail Abstract  (the "Stein Defendants") have a business model similar to that of the Rosicki Defendants and the McCabe Defendants.

137.    Upon information and belief, the Stein Firm and/or its principals or agents have an interest in and control over Hail Abstract.  The Chairman or Chief Executive Officer of Hail Abstract is Bernice Stein, who is, upon information and belief, a relative under the control of Howard Stein, a principal and named partner in the Stein Firm.  Hail Abstract shares office space with the Stein Firm.

138.    Upon information and belief, the Stein Firm contracts with Hail Abstract for the Stein Firm's title work for foreclosure proceedings.

31

139.    Upon information and belief, the Stein Defendants systematically bill the clients

of the Stein Firm -- and, ultimately the Government -- at excessive rates for services including:

>       a.    Title searches well above market rates (*e.g.*, at more than $425, despite market
>
>             rates between $200-$325);
>
>       b.    Personal service well above market rates (*e.g.*, at more than $180, despite market
>
>             rates of approximately $40).

140.    The Stein Firm contracts for services at excessive rates from Hail Abstract for the

primary purpose of generating fees for Hail Abstract.

141.    These services are not reimbursable by Government programs, including HUD

and Fannie Mae. *See, e.g.*, HUD Handbook 4330.4, 2-15(B) (prohibiting reimbursement for fees

that exceed reasonable and customary fees for the area); Fannie Mae Servicing Guide, Part VIII,

§ 106.03  (same).

142.    Upon information and belief, the Stein Defendants billed the Bank Defendants for

these unnecessary and excessive charges with the intention, expectation, knowledge, and belief

that the Bank Defendants would seek reimbursement from the Government for these charges.

143.    Upon information and belief, the conduct of the Stein Defendants described above

caused the Government, through FHA, Fannie Mae, and Freddie Mac, to pay false and fraudulent

claims.

**D.      The John Doe Defendants**

144.    The John Doe Defendants have adopted the same business model as the Rosicki

Defendants, the McCabe Defendants, and the Stein Defendants.  In particular, John Doe Law

Practices A-Z have incorporated, own, and/or control, John Doe Title Companies A-Z, John Doe

Service of Process Companies A-Z, and John Doe Legal Publishing Companies A-Z for the

32

primary purpose of billing clients -- and ultimately the Government -- for unnecessary services and for services at excessive rates.

145.    Upon information and belief, the John Doe Defendants, like the Rosicki Defendants, McCabe Defendants, and Stein Defendants, have billed the Bank Defendants for unnecessary and excessive charges with the intention, expectation, knowledge, and belief that the Bank Defendants would seek reimbursement from the Government for such charges.

146.    The conduct of the John Doe Defendants described above caused the Government, through FHA, Fannie Mae, and Freddie Mac, to pay false and fraudulent claims.

**E.      The Bank Defendants**

147.    Upon information and belief, the Bank Defendants failed to comply with the rules and regulations of HUD, Fannie Mae, and Freddie Mac regarding the implementation of quality control, audits, or monitoring of the submission of claims for reimbursement for foreclosure fees, even though those rules were mandatory for the Bank Defendants' continued participation as servicers in HUD, Fannie Mae, and Freddie Mac programs.

148.    Instead, upon information and belief, the Bank Defendants maintained their status as Government-approved servicers in FHA, Fannie Mae, and Freddie Mac programs by making false representations to the Government about their purported compliance with applicable rules and regulations concerning quality control, audits, and the monitoring of the submission of claims for reimbursement for foreclosure fees.  Among other things, the Bank Defendants filed annual certifications with the Government, upon information and belief, falsely stating compliance with these rules.

149.    In addition, upon information and belief, the Banks Defendants repeatedly submitted false claims to the Government for reimbursement for illegal and excessive foreclosure fees from HUD, Fannie Mae, and/or Freddie Mac.

150.    Upon information and belief, the Bank Defendants have submitted such claims despite red flags, indicating that the charges by the Foreclosure Services Defendants were illegal and excessive.

151.    For instance, the Foreclosure Services Defendants now regularly charge for services (such as filing pleadings and delivering papers to court) that they did not regularly bill in past foreclosure cases, when the law firms were not using affiliated companies.  The Foreclosure Services Defendants charge for these services now because they can capture the profits generated and because, by offloading attorney tasks onto affiliated companies, the law firms avoid labor and other overhead expenses that are supposed to be included in their legal fees.

152.    Moreover, the rates charges by the Foreclosure Services Defendants, such as the Rosicki Defendants, increased dramatically over time, despite the related attorneys' fees decreasing or remaining stable.   Those charges have increased because the Foreclosure Services Defendants profit from the higher charges and because the law firms, such as the Rosicki Firm and the John Doe Law Practices, control the decision-making regarding the hiring of foreclosure services entities.

153.    Relator has repeatedly brought the illegal and excessive nature of the Foreclosure Service Defendants' fees to the attention of various Bank Defendants, as well as to their agents, the Rosicki Firm and the other Foreclosure Services Defendants.  Yet, upon information and belief, the Bank Defendants have taken no action.

154.    If the Bank Defendants had conducted quality control, audited their bills, or properly monitored the Foreclosure Services Defendants, they would have readily discovered that the foreclosure services fees were neither reasonable nor customary, as they do not reflect market rates.  Upon information and belief, the Bank Defendants failed to do so, despite their obligations to do so.

155.    Upon information and belief, the conduct of the Bank Defendants described above caused the Government, through FHA, Fannie Mae, and Freddie Mac, to pay false and fraudulent claims.

## FIRST CLAIM

### Violations of the False Claims Act
### (31 U.S.C. § 3729(a)(1)(A))
### Presentation of False Claims

156.    This Complaint incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

157.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, present and/or caused to be presented, to the Government and/or to contractors, grantees, or other recipients of Government funds used to advance Government interests, false and fraudulent claims for payment in connection with claims for FHA insurance benefits and reimbursement and/or reimbursement by Fannie Mae or Freddie Mac by:

   a.  Submitting false annual certifications and making false representations to the Government with respect to the Bank Defendants' qualifications for participation in FHA, Fannie Mae, and/or Freddie Mac servicing programs; and

   b.  Submitting false or fraudulent claims to the Government, including FHA, Fannie Mae, and Freddie Mac, for reimbursement of foreclosure costs.

158.     The Government paid claims and incurred losses, and/or contractors, grantees, or other recipients of Government funds used to advance Government interests paid claims and incurred losses, as a result of Defendants' wrongful conduct.

159.     By reason of such false and/or fraudulent claims, the Government has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

**SECOND CLAIM**

**Violations of the False Claims Act**
**(31 U.S.C. § 3729(a)(1)(B))**
**Use of False Statements**

160.     This Complaint incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

161.     Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to false or fraudulent claims to the Government and/or to contractors, grantees, or other recipients of Government funds used to advance Government interests, in connection with claims for FHA insurance benefits and reimbursement and/or reimbursement by Fannie Mae or Freddie Mac.

162.     The Government paid claims and incurred losses, and/or contractors, grantees, or other recipients of Government funds used to advance Government interests paid claims and incurred losses, as a result of Defendants' wrongful conduct.

163.     By reason of such false and/or fraudulent claims, the Government has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

2108897_1

### THIRD CLAIM

**Violations of the False Claims Act**
**(31 U.S.C. § 3729(a)(1)(C))**
**Conspiracy**

164.    This Complaint incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

165.    The Foreclosure Services Defendants conspired, between and among the Rosicki Defendants, between and among the McCabe Defendants, between and among the Stein Defendants, and between and among each of the John Doe Law Practices A-R and their respective affiliated John Doe Title Companies A-Z, John Doe Process Service Companies A-Z, and John Doe Legal Services Companies A-Z, to commit the violations set forth in the preceding claims.

166.    The Government paid claims and incurred losses, and/or contractors, grantees, or other recipients of Government funds used to advance Government interests paid claims and incurred losses, as a result of the Foreclosure Services Defendants' wrongful conduct.

167.    By reason of such false and/or fraudulent claims, the Government has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

WHEREFORE, Relator, on behalf of himself, and acting on behalf of, and in the name of, the Government, respectfully demands and prays that the Court enter judgment against Defendants as follows:

1.  On the First, Second, and Third Claims under the False Claims Act, a judgment in the amount of the damage to the Government, trebled as required by law, with civil

2108897_1

penalties as required by law, together with all such further relief as may be just and proper;

2. On the First, Second, and Third Claims under the False Claims Act, a judgment awarding Relator the maximum amount available under 31 U.S.C. § 3730(d) for bringing this action, namely twenty-five percent (25%) of the proceeds of the action by judgment or settlement if the Government intervenes in the matter (or pursues its claim through any alternative remedy available to the Government), or, alternatively, thirty-five percent (35%) of the proceeds of the action by judgment or settlement of the causes of action, if the Government declines to intervene;

3. On the First, Second, and Third Claims under the False Claims Act, a judgment awarding Relator all reasonable expenses that were necessarily incurred in prosecution of this action, plus all reasonable attorneys' fees and costs, as provided by 31 U.S.C. § 3730(d); and

4. Awarding such other relief for the Government and Relator as this Court deems just and proper.

Dated:    February 28, 2013                              Respectfully submitted,

                                                         HARTER SECREST & EMERY LLP

                                                         By: _____
                                                             Carol E. Heckman
                                                             Twelve Fountain Plaza, Suite 400
                                                             Buffalo, New York 14202
                                                             Telephone No. (716) 844-3720
                                                             Facsimile No. (716) 853-1617
                                                             CHeckman@hselaw.com

                                                             Brian M. Feldman
                                                             1600 Bausch & Lomb Place
                                                             Rochester, New York 14604
                                                             Telephone No. (585) 231-1201
                                                             Facsimile No. (585) 232-2152
                                                             BFeldman@hselaw.com

                                                         *Attorneys for Relator Peter D. Grubea*

To:   Preet Bharara
      United States Attorney for the
      Southern District of New York

          Attention:

          Pierre Armand, Deputy Chief, Civil Frauds Unit
          86 Chambers Street, Third Floor
          New York, New York  10007
          Telephone No. (212) 637-2724
          Facsimile No. (212) 637-2717
          Pierre.Armand@usdoj.gov

          Sarah North, Assistant United States Attorney
          86 Chambers Street, Third Floor
          New York, New York  10007
          Telephone No. (212) 637-2639
          Facsimile No. (212) 637-2717
          Sarah.North@usdoj.gov