**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.* PETER D. GRUBEA,<br><br>        Plaintiff,<br><br>        v.<br><br>ROSICKI, ROSICKI & ASSOCIATES, P.C.,<br>PARAMOUNT LAND, INC., THRESHOLD LAND INC.,<br>ENTERPRISE PROCESS SERVICE, INC., MCCABE,<br>WEISBERG, & CONWAY, P.C., ATTORNEY<br>OUTSOURCING SUPPORT SERVICES, INC., REO<br>AMERICA ABSTRACT, INC., CENLAR FSB,<br>CITIGROUP INC., CITIBANK, N.A., CITIMORTGAGE,<br>INC., DITECH FINANCIAL LLC, EVERHOME<br>MORTGAGE COMPANY, EVERBANK FSB,<br>FLAGSTAR BANK, FSB, GREEN TREE CREDIT,<br>JAMES B. NUTTER & CO., METLIFE BANK, N.A.,<br>NATIONSTAR MORTGAGE LLC, ONEWEST BANK<br>FSB, PHH MORTGAGE CORPORATION, PNC BANK,<br>FSB, SUNTRUST MORTGAGE, INC., U.S. BANK N.A.,<br>and WELLS FARGO & CO.,<br><br>        Defendants. | No. 12 Civ. 7199 (JSR) |
| UNITED STATES OF AMERICA<br>*ex rel.* PETER D. GRUBEA,<br><br>        Plaintiff,<br><br>        v.<br><br>BANK OF AMERICA CORPORATION, BANK OF<br>AMERICA, N.A., J.P. MORGAN CHASE & CO., and<br>JPMORGAN CHASE BANK N.A.,<br><br>        Defendants. | No. 13 Civ. 1467 (JSR) |

**MEMORANDUM OF LAW IN SUPPORT OF THE SERVICER DEFENDANTS'**
**MOTION TO DISMISS THE COMPLAINT**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND .................................................................................................................... 4

I.      The Two Distinct Groups of Defendants ................................................................... 4

II.     The Contractual and Regulatory Background............................................................. 4

          A.     The Process for Seeking Reimbursement of Expenses........................... 5

          B.     Standards for Fees and Costs ................................................................. 6

          C.     Quality Control Requirements ............................................................... 7

          D.     Annual Certifications to HUD and Freddie Mac .................................... 9

III.    The Government's Investments in the GSEs ............................................................ 10

ARGUMENT ....................................................................................................................... 11

I.      The Complaint Should Be Dismissed for Failure to Plead Fraud With Particularity ....... 12

          A.     The Complaint Does Not Plead Any Scheme with Particularity ......................... 13

          B.     The Complaint Does Not Plead the Submission of Claims with Particularity ..... 14

II.     The Complaint Fails to Adequately Allege Falsity............................................................ 16

          A.     The Complaint Fails to Allege Factual Falsity ................................................... 16

          B.     The Complaint Fails to Allege Legal Falsity ..................................................... 20

III.    The Complaint Fails to Adequately Allege Materiality.................................................... 22

IV.    The Complaint Fails to Adequately Allege Scienter ....................................................... 26

V.     The Complaint Fails to Adequately Allege Reverse False Claims.................................... 29

          A.     Relator Does Not Allege an "Obligation" Under the FCA................................. 29

          B.     Relator Does Not Plausibly Allege That the Servicer Defendants Acted "Knowingly" ..................................................................................................... 31

          C.     Relator Fails to Adequately Allege Fraudulent Concealment ............................ 32

VI.    The Complaint Fails to Allege That Reimbursement Claims Submitted to the GSEs Were Paid with U.S. Treasury Funds ................................................................... 32

VII.   The Complaint Fails to Allege a "Nationwide" Scheme ................................................. 38

VIII.  The Complaint Should be Dismissed Under the Public Disclosure Bar to the Extent it Alleges Liability for Claims Submitted Prior to March 2010.................. 40

CONCLUSION.................................................................................................................... 45

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                          **Page(s)**

*Apotex* v. *Acorda Therapeutics, Inc.*,
   823 F.3d 51, 60 (2d Cir. 2016)................................................................5

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87, 98 (2d Cir. 2007)................................................................5

*Colorado ex rel. Suthers v. Aronowitz & Mecklenburg, LLP*,
   No. 2014-cv-32765, at 3 (Denver Dist. Ct. July 14, 2014).....................44

*Coyne v. Amgen, Inc.*,
   717 F. App'x 26, 29 (2d Cir. 2017) ........................................................23

*Fellows v. CitiMortgage, Inc.*,
   710 F. Supp. 2d 385, 389 n.1 (S.D.N.Y. 2010)........................................5

*Garg* v. *Covanta Holding Corp.*,
   478 F. App'x 736, 741 (3d Cir. 2012) .......................................34, 36, 37

*Grabcheski v. Am. Int'l Grp., Inc.*,
   687 F. App'x 84, 87 (2d Cir. 2017) ........................................................23

*Hutchison v. Deutsche Bank Secs. Inc.*,
   647 F.3d 479, 481 (2d Cir. 2011).........................................................10

*In re Garland Corp.*,
   8 B.R. 826, 831 (Bankr. D. Mass. 1981) .............................................20

*In re Nat. Gas Royalties*,
   562 F.3d 1032, 1042-43 (10th Cir. 2009) .............................................42

*Judd Burstein, P.C. v. Long*,
   No. 15 Civ. 5295, 2017 WL 3535004, at *7 (S.D.N.Y. Aug. 16, 2017) ................15

*Lyttle v. AT&T Corp.*,
   No. 10 Civ. 1376 (RCM), 2012 WL 6738242, at *20 (W.D. Pa. Nov. 15,
   2012) ....................................................................................................36

*McCrary* v. *Knox Cty., Indiana*,
   200 F. Supp. 3d 782, 792 (S.D. Ind. 2016) ...........................................34

*Mikes v. Straus*,
   274 F.3d 687, 695, 697 (2d Cir. 2001)...........................................11, 16

*New York ex rel. Kurana* v. *Spherion Corp.*,
   No. 15 Civ. 6605 (JFK), 2016 WL 6652735, at *14 (S.D.N.Y. Nov. 10, 2016)....................20

*O'Brien v. Nat'l Prop. Analysts Partners*,
   936 F.2d 674, 676 (2d Cir. 1991)..........................................................................12

*Rafter v. U.S.*,
   Case No. 14-740C (Fed. Cl. Apr. 20, 2018) ..........................................................37

*Shields v. Citytrust Bancorp, Inc.*,
   25 F.3d 1124, 1128 (2d Cir. 1994)........................................................................26

*United Health Servs., Inc. v. U.S. ex rel. Escobar*,
   136 S. Ct. 1989, 1996, 2000-04, 2004 n.6 (2016)......................................... *passim*

*U.S. v. Countrywide Financial Corp.*,
   961 F. Supp. 2d 598, 609 (S.D.N.Y. 2013)...........................................................38

*U.S. v. Empire Educ. Corp.*,
   959 F. Supp. 2d 248, 257, 259 (N.D.N.Y. 2013).................................................14

*U.S. v. Germano*,
   No. 13 Civ. 03126 (KMK), (S.D.N.Y. Feb. 26, 2014), Dkt. No. 12-2 ...................19

*U.S. v. Krizek*,
   111 F.3d 934, 941-43 (D.C. Cir. 1997)................................................................27

*U.S. v. McMahon*,
   No. 11 Civ. 04620 (RMD), 2015 WL 115763, at *9 (N.D. Ill. Jan. 5, 2015).........35

*U.S.* v. *Neifert-White Co.*,
   390 U.S. 228, 233 (1968)......................................................................................37

*U.S. v. New York Med. Coll.*,
   252 F.3d 118, 120 (2d Cir. 2001).........................................................................44

*U.S. v. New York Soc. for the Relief of the Ruptured & Crippled*,
   No. 07 Civ. 292 (PKC), 2014 WL 3905742, at *14, *19 (S.D.N.Y. Aug. 7,
   2014) ...............................................................................................................12, 39

*U.S. v. Prabhu*,
   442 F. Supp. 2d 1008, 1016, 1026, 1032 (D. Nev. 2006)................................16, 19

*U.S. v. Strock*,
   No. 15 Civ. 0887 (FPG), 2018 WL 647471, at *8-12(W.D.N.Y. Jan. 31, 2018).....26

*U.S. v. Visiting Nurse Serv. of New York*,
   No. 14 Civ. 5739 (AJN), 2017 WL 5515860, at *6 (S.D.N.Y. Sept. 26, 2017)......22

*U.S. ex rel. Adams v. Aurora Loan Servs., Inc.*,
   813 F.3d 1259, 1261 (9th Cir. 2016) ....................................................................37

*U. S. ex rel. Chorches as Trustee for Bankr. Estate of Fabula v. Am. Med. Response, Inc.*,
865 F.3d 71, 76, 83, 85-86 (2d Cir. 2017) ............................................................12, 13, 15, 16

*U.S. ex rel Advoc. for Basic Legal Equal. v. U.S. Bank, N.A.*,
No. 13 Civ. 704 (JZ), 2015 WL 2238660, at *11 (N.D. Ohio May 12, 2015) ......................41

*U.S. ex rel Advoc. for Basic Legal Equal. v. U.S. Bank, N.A.*,
816 F.3d 428, 431 (6th Cir. 2016) ...................................................................................41, 43

*U.S. ex rel. Amico v. Deutsche Bank, AG*,
No 15 Civ. 9551 (CM), 2017 WL 2266988, at *4 (S.D.N.Y. May 8, 2017) ..........................40

*U.S. ex rel. Barko v. Halliburton Co.*,
241 F. Supp. 3d 37, 58 (D.D.C. 2017) ..................................................................................18

*U.S. ex rel. Bilotta v. Novartis Pharms. Corp.*,
50 F. Supp. 3d 497, 510 (S.D.N.Y. 2014) .............................................................................15

*U.S. ex rel. Colucci v. Beth Israel Med. Ctr*,
785 F. Supp. 2d 303, 316 (S.D.N.Y. 2011)............................................................................26

*U.S. ex rel. Colucci v. Beth Israel Med. Ctr*,
531 F. App'x 118 (2d Cir. 2013) ...........................................................................................26

*U.S. ex rel. Davern v. Hoovestol, Inc.*,
No. 11 Civ. 6630 (CJS), 2015 WL 6872427, at *9 (S.D.N.Y. Nov. 9, 2015) ........................30

*U.S. ex rel. Doe v. John Doe Corp.*,
960 F.2d 318, 319 (2d Cir. 1992).........................................................................................41

*U.S. ex rel. DRC, Inc. v. Custer Battles, LLC*,
472 F. Supp. 2d 787, 797 (E.D. Va. 2007) ...........................................................................16

*U.S. ex rel. Farmer v. City of Houston*,
523 F.3d 333, 341-42 (5th Cir. 2008) .............................................................................19, 27

*U.S. ex rel. Garbe v. Kmart Corp.*,
824 F.3d 632 (7th Cir. 2016) ................................................................................................35

*U.S. ex rel. Hefner v. Hackensack Univ. Med. Ctr.*,
495 F.3d 103, 110 (3d Cir. 2007).........................................................................................27

*U.S. ex rel. Howard v. Lockheed Martin Corp.*,
14 F. Supp. 3d 982, 993 (S.D. Ohio 2014) ...........................................................................26

*U.S. ex rel. Hussain v. CDM Smith, Inc.*,
No. 14 Civ. 9107 (JPO), 2017 WL 4326523, at *7 (S.D.N.Y. Sept. 27, 2017)......................22

*U.S. ex rel. JDJ & Assocs. LLP v. Natixis,*
No. 15 Civ. 5427 (PKC), 2017 WL 4357797, at *4 n.1 (S.D.N.Y. Sept. 29,
2017) .................................................................................................................42

*U.S. ex rel. Joseph v. Brattleboro Retreat,*
No. 13 Civ. 55 (WKS), 2014 WL 3908432, at *11 (D. Vt. Aug. 10, 2014)..........................32

*U.S. ex rel. Kester v. Novartis Pharm. Corp.,*
23 F. Supp. 3d 242, 253, 255-56, 260-61 (S.D.N.Y. 2014)............................................ *passim*

*U.S. ex rel. Kester v. Novartis Pharms. Corp.,*
43 F. Supp. 3d 332, 367-68 (S.D.N.Y. 2014) ........................................................29

*U.S. ex rel. Kester v. Novartis Pharms. Corp.,*
No. 11 Civ. 8196 (CM), 2015 WL 109934, at *8 (S.D.N.Y. Jan. 6, 2015).....................41, 42

*U.S. ex rel. Kirk v. Schindler Elevator Corp.,*
130 F. Supp. 3d 866, 879 (S.D.N.Y. 2015)...........................................................27

*U.S. ex rel. Kirk v. Schindler Elevator Corp.,*
601 F.3d 94, 103 n.4 (2d Cir. 2010)....................................................................40

*U.S. ex rel. Kirk v. Schindler Elevator Corp.,*
563 U.S. 401 (2011)........................................................................................40

*U.S. ex rel. Kolchinsky v. Moody's Corp.,*
162 F. Supp. 3d 186, 195-96 (S.D.N.Y. 2016) ..................................................11, 21

*U.S. ex rel. Kolchinsky* v. *Moody's Corp.,*
No. 12 Civ. 1399 (WHP), 2017 WL 3841866, at *2 (S.D.N.Y. Sept. 1, 2017).....................22

*U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp.,*
985 F.2d 1148, 1158-59 (2d Cir. 1993) ............................................................41, 45

*U.S. ex rel. Ladas v. Exelis, Inc.,*
824 F.3d 16, 26-27 (2d Cir. 2017) ...................................................................12, 38

*U.S. ex rel. Landis v. Tailwind Sports Corp.,*
160 F. Supp. 3d 253, 272 (D.D.C. 2016) ...............................................................31

*U.S. ex rel. Lisitza v. Par Pharm. Cos., Inc.,*
No. 06 Civ. 6131, 2017 WL 3531679, at *8 (N.D. Ill. Aug. 17, 2017)...................................18

*U.S. ex rel. Mooney v. Americare, Inc.,*
No. 06 Civ. 1806 (FB), 2013 WL 1346022, at *7 (E.D.N.Y. Apr. 3, 2013) ..........................38

*U.S. ex rel. Ortiz v. Mount Sinai Hosp.,*
256 F. Supp. 3d 443, 457-58 (S.D.N.Y. 2017) ......................................................29

*U.S. ex rel. Petras v. Simparel, Inc.*,
 857 F.3d 497, 507 (3d Cir. 2017)......................................................................31

*U.S. ex rel. Ping Chen v. EMSL Analytical, Inc.*,
 966 F. Supp. 2d 282, 294, 296 n.11, 300 (S.D.N.Y. 2013)..............................41, 44

*U.S. ex rel. Roby v. Boeing Co.*,
 100 F. Supp. 2d 619, 625 (S.D. Ohio 2000) ......................................................19

*U.S. ex rel. Rosner v. WB/Stellar IP Owner, L.L.C.*,
 739 F. Supp. 2d 396, 408 (S.D.N.Y. 2010).........................................................45

*U.S. ex rel. Smith v. New York Presbyterian Hosp.*,
 No. 06 Civ. 4056 (NRB) 2007 WL 2142312, at *6 (S.D.N.Y. July 18, 2007)......................13

*U.S. ex rel. Tessler v. City of New York*,
 No. 14 Civ. 6455 (JMF), 2016 WL 7335654, at *1-2, *3 n.2 (S.D.N.Y. Dec.
 16, 2016) ...............................................................................................14, 38

*U.S. ex rel. Tessler v. City of New York*,
 712 F. App'x 27, 29 (2d. Cir. 2017) .........................................................12, 14, 15

*U.S. ex rel. Thomas v. Siemens AG*,
 708 F. Supp. 2d 505, 514 (E.D. Pa. 2010) ..............................................................30

*U.S. ex rel. Todd* v. *Fid. Nat'l Fin., Inc.*,
 No. 12 Civ. 666 (SLB), 2014 WL 4636394, at *10-11 (D. Colo. Sept. 16,
 2014) ..........................................................................................................35

*U.S. ex rel. Vallejo v. Investronica, Inc.*,
 2 F. Supp. 2d 330, 336-37 (W.D.N.Y. 1998).......................................................32

*U.S. ex rel. Watkins v. KBR, Inc.*,
 106 F. Supp. 3d 946, 968 (C.D. Ill. 2015) .............................................................18

*U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*,
 525 F.3d 370, 376 (4th Cir. 2008) .......................................................................16

*U.S. ex rel. Wood v. Allergan, Inc.*,
 246 F. Supp. 3d 772, 783 (S.D.N.Y. 2017).........................................................16

*Washington State Dep't of Social & Health Servs., v. Guardian Estate of Keffeler*,
 537 U.S. 371, 384-85 (2003) ............................................................................33

*Wood ex rel. U.S. v. Applied Research Assocs., Inc.*,
 328 F. App'x 744, 748 (2d Cir. 2009) ..................................................................29

**Statutes**

12 U.S.C. § 1716(b) ..................................................................................................... 34

12 U.S.C. § 1452 ........................................................................................................... 34

31 U.S.C. § 3729(a) ........................................................................................... 11, 33, 34

31 U.S.C. § 3729(a)(1)(A) .................................................................................... 15, 16

31 U.S.C. § 3729(a)(1)(B) .................................................................................... 15, 23

31 U.S.C. § 3729(a)(1)(G) .............................................................................. 30, 31, 32

31 U.S.C. § 3729(b)(1)(A) ......................................................................................... 26

31 U.S.C. § 3729(b)(2)(A)(ii) ..................................................................................... 35

31 U.S.C. § 3729(b)(2)(A)(ii)(I) ................................................................................. 36

31 U.S.C. § 3729(b)(4) ............................................................................................... 23

31 U.S.C. § 3730(e) (2009) ........................................................................................ 41

31 U.S.C. § 3730(e)(4) ............................................................................................... 44

Pub. L. No. 111-148, § 10104(j)(2), 124 Stat. 119 ..................................................... 40

**Other Authorities**

24 C.F.R. § 203.402 .................................................................................................. 14

24 C.F.R. § 203.402(f) .............................................................................................. 17

24 C.F.R. § 203.552(a) ............................................................................................... 8

Fed. R. Civ. P. 9(b) ........................................................................................... *passim*

The Servicer Defendants[1] respectfully submit this memorandum of law in support of their motion to dismiss the Third Amended Complaint ("TAC") (No. 12 Civ. 7199, Dkt. 29) and Second Amended Complaint ("SAC") (No. 13 Civ. 1467, Dkt. 28) (together, the "Complaint").

## PRELIMINARY STATEMENT

A Buffalo-based bankruptcy lawyer who is not an insider at any servicer, and who therefore has no particular insight into the practices followed or claims submitted by any mortgage servicer, alleges broadly that sixteen servicers failed to meet regulatory and contractual requirements when they made routine requests to Fannie Mae and Freddie Mac (the "GSEs") and the Department of Housing and Urban Development ("HUD") to be reimbursed for amounts actually paid to law firms for certain foreclosure expenses. Incanting "upon information and belief" more than 300 times in the 91-page main complaint, Relator seeks to proceed with an enormous nationwide case involving alleged misconduct by countless law firms—most of them unnamed, and most with which Relator had absolutely no dealings. The Complaint does not remotely meet the pleading requirements applicable to the False Claims Act ("FCA") and should be dismissed.

*First*, the Complaint is utterly lacking in particularity, as required by Rule 9(b), in the pleading of both a fraudulent scheme and the submission of false claims. It includes no specific allegations concerning any Servicer Defendant's actual policies, practices, or procedures with regard to the review, payment, or reimbursement of foreclosure expenses, engaging instead in improper conclusory and group pleading. And it offers no specifics regarding any reimbursement

---

[1] The "Servicer Defendants" are defendants Bank of America, N.A. ("BOA"), Cenlar FSB, Citigroup Inc., Citibank, N.A., CitiMortgage, Inc. (collectively, "Citi"), Ditech Financial LLC, Everhome Mortgage Company, EverBank FSB (collectively, "EverBank"), Flagstar Bank, FSB, Green Tree Credit, James B. Nutter & Co., J.P. Morgan Chase & Co., and JPMorgan Chase Bank, N.A (collectively, "JPMC"), MetLife Bank, N.A., Nationstar Mortgage LLC, OneWest Bank FSB, PHH Mortgage Corporation, PNC Bank, FSB (which should be identified as PNC Bank, N.A.), SunTrust Mortgage, Inc., U.S. Bank N.A., and Wells Fargo & Co.

claim actually submitted by any Servicer Defendant.  It simply assumes without any asserted basis that if a law firm billed a servicer for an expense, the servicer must have paid that same amount to the law firm, and *then* must have sought reimbursement for the "whole amount" from HUD or the GSEs.

*Second*, the Complaint fails to identify any false statement or claim.  Relator spends nearly twenty pages of the Complaint setting forth the supposed contractual requirements and rules governing mortgage servicing on behalf of HUD or the GSEs.  As explained below, that litany is both incomplete and misleading.  Regardless, Relator cannot and does not point to a single false claim.  The reimbursements sought by the Servicer Defendants are not alleged to be higher than the amounts charged by and paid to the law firms, and are not alleged to have exceeded any objective limit or cap; the Complaint simply asserts that the amounts were "excessive" and "unreasonable."  The claim forms themselves represent only that the amounts were, by way of example on the HUD claim form, "actually paid."  And it is well-established FCA law that standards such as "reasonable" and "customary" cannot give rise to a cause of action.  Nor can Relator make out a claim of legal falsity, because the claim forms neither expressly certify compliance with some legal requirement nor implicitly do so.  They state the amount actually paid and nothing more.

*Third*, the Complaint fails to plead sufficient allegations giving rise to a strong inference of scienter, another requirement of Rule 9(b).  While the Complaint repeatedly uses the term "knowingly" in a conclusory fashion, not once does it provide any basis to conclude that any Servicer Defendant actually knew, or even suspected, that it was seeking excessive reimbursements.  It gives no plausible reason why the Servicer Defendants would knowingly pay excessive amounts, particularly when they were often on the hook for unreimbursed costs and

expenses.  And while the Complaint points to supposed "red flags"—for example, the use by certain law firms of affiliated business entities ("ABEs")—it also acknowledges that their use was well known to both HUD and the GSEs.  *See, e.g.*, TAC ¶¶ 12, 63; SAC ¶¶ 55, 339.

*Fourth*, Relator fails to meet the "strict" requirement of materiality (*United Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 2002 (2016)), given that the total mix of information available to HUD and the GSEs included far more information about market rates than was available to any one of the Servicer Defendants.  As alleged by Relator, HUD and the GSEs nevertheless continued to reimburse servicers for the claims at issue.

*Finally*, Relator's "reverse false claim" theory should be rejected because it is simply a flawed substitute for a direct false claim.  Claims based on foreclosure expenses submitted to the GSEs should be dismissed for several reasons, including because the government has suffered no loss as a result of its investments in the GSEs, but rather has made $87 billion in profits on those investments to date, and stands to make much more.  And because the alleged scheme by the law firms was a matter of public record long before Relator provided his information to the Government, he cannot pursue recovery for claims made before March 2010 (when the Government gained the power to object to any public disclosure defense, as it has said it would do here).

At most, as Relator alleges, this is a breach of contract case: "The [Servicer] Defendants failed to comply with the GSEs' contractual requirements and FHA's rules regarding foreclosure expenses and repeatedly, upon information and belief, submitted overstated claims."  TAC ¶ 148; SAC ¶ 141.  But the FCA is "not . . . a vehicle for punishing garden-variety breaches of contract" with the *in terrorem* effect of treble damages.  *Escobar*, 136 S. Ct. at 2003.  And this is exactly the kind of case where such caution is warranted.  The alleged misconduct was perpetrated, if at all,

by law firms; the Servicer Defendants did not profit from the alleged misconduct and are not alleged to have participated in it. The gravamen of the Complaint is merely that law firms "took advantage of the [Servicer] Defendants' lack of oversight." TAC ¶ 9; SAC ¶ 9. That is, at best, a breach of contract action, nothing more.[2]

After a nearly six-year investigation, the Government declined to intervene as to any Servicer Defendant. That decision was correct, and the Court should now dismiss the case against the Servicer Defendants.

## BACKGROUND

### I.    THE TWO DISTINCT GROUPS OF DEFENDANTS

Relator makes allegations against two very different groups of defendants. The first set includes two foreclosure law firms that allegedly used ABEs to bill the Servicer Defendants for foreclosure expenses (such as service of process and title searches) that were "excessive" and "unreasonable" when compared to "local market rates." The second group includes the Servicer Defendants, which allegedly sought reimbursement from HUD and the GSEs for those actual expenses. At most, the Servicer Defendants are accused of insufficient oversight of their foreclosure law firms. With respect to the Servicer Defendants, the Complaint contains virtually no specific facts and relies almost exclusively on "information and belief," the basis for which is not stated.

### II.    THE CONTRACTUAL AND REGULATORY BACKGROUND

The Complaint purports to set out the contractual and regulatory regime that governs the Servicer Defendants' relationship with HUD and the GSEs. Relator focuses in particular on the rules concerning reimbursement of payments made by servicers to foreclosure law firms for those

---

[2] Of course, the Servicer Defendants do not concede that any Servicer Defendant breached any contract here.

firms' foreclosure expenses.  But Relator's presentation of this regime is both incomplete and misleading.  Below is a simple overview of the relevant contractual and regulatory framework.

## A.     The Process for Seeking Reimbursement of Expenses

The only claims for payment at issue in this case are reimbursement requests submitted by the Servicer Defendants to HUD and the GSEs.  To request reimbursement of foreclosure expenses from HUD, a servicer must submit a "Form 27011."  TAC ¶ 108; SAC ¶ 100.[3]  That form requires each servicer to itemize foreclosure costs on Line 307 under the heading "amount paid."  It also contains a certification that the amounts listed (i) represent expenses "actually paid" by the servicer, and (ii) are "true and correct."  The form contains no other certification or representation.  HUD specifically instructs servicers to itemize "all" expenses paid even though it does not reimburse the full amount of those expenses.[4]  Instead, HUD typically reimburses a servicer for two-thirds of the amount requested on the form, leaving the servicer responsible for the remainder.[5]

---

[3] *Available at* https://www.hud.gov/sites/dfiles/OCHCO/documents/27011.pdf.  On a motion to dismiss, the Court may consider the complaint and "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference . . . and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007) (internal citation omitted).  Accordingly, this Court may rely on the Fannie Mae, Freddie Mac, HUD, and FHA handbooks and guidelines referenced in the Complaint, such as the Fannie Mae Servicing Guide, the Freddie Mac Single-Family Seller/Servicer Guide, the HUD Handbook, and HUD Mortgagee Letters cited below.  *E.g.,* TAC ¶¶ 60, 87, 90-91; SAC ¶¶ 52, 79, 90-91; *see, e.g., Fellows v. CitiMortgage, Inc.,* 710 F. Supp. 2d 385, 389 n.1 (S.D.N.Y. 2010) (relying on the Fannie Mae Servicing Guide referenced in the complaint); *Apotex* v. *Acorda Therapeutics, Inc.*, 823 F.3d 51, 60 (2d Cir. 2016) (taking judicial notice of administrative "Guidance for Industry" document).
[4] *See* FHA Single Family Housing Claim Filing Technical Guide, Part 1.d., p. 14 (Dec. 30, 2016) ("Itemize all disbursements required to vest title to and possession of the Property in the name of the Mortgagee and to convey any evidence of title to the Secretary . . ."), *available at* https://www.hud.gov/sites/documents/SFH_POLI_CLAIMTECH.PDF.
[5] *See* HUD Handbook 4330.4, 2-15(C)(2) ("HUD will calculate the two-thirds allowance based on the amounts entered on the claim form."), *available at* https://www.hud.gov/sites/documents/43304C2HSGH.PDF.

To request reimbursement from Fannie Mae, servicers must submit a Cash Disbursement Request Form ("Form 571").[6]   The Complaint, however, does not mention Form 571—perhaps because it contains no representations or certifications, and thus cannot be the basis of any "false" claim.   Upon submission, a Form 571 is typically reviewed by a Fannie Mae claims processor, who may pay the claim in full or in part, reject the claim, or request additional documentation for expenses "deemed excessive."[7]   Finally, to seek reimbursement from Freddie Mac, servicers use Form 104SF, which states that the information contained therein is "true," and that documentation regarding the amounts listed has been attached.[8]   The form contains no other representations.   In addition to not mentioning Form 571, the Complaint does not mention Form 104SF either.

### B.      Standards for Fees and Costs

Relator *does* allege a certain amount of detail about the servicing contracts, regulations, handbooks, and guides; but ***none*** of those are incorporated into the claim forms that are actually submitted.   Each of HUD, Fannie Mae, and Freddie Mac has issued its own guidance for the reimbursement process, including instructions for seeking reimbursement of foreclosure-related costs.   TAC ¶¶ 6, 64, 94, 109; SAC ¶¶ 6, 56, 86, 101.   The applicable guidelines do not set objective standards for many of these costs, such as for service of process.   Instead, HUD will reimburse costs that are "reasonable and customary in the area"; Fannie Mae will reimburse costs that are "actual, reasonable, and necessary"; and Freddie Mac will reimburse costs that are "reasonable and comparable to those charged in the area where the property is located."   *Id.*

---

[6] *Available at* https://www.fanniemae.com/content/guide_form/571.pdf.

[7] Fannie Mae Form 571 Reference Guide, pp. 6, 14-18 (Nov. 5, 2010), *available at* http://www.motechs.com/Fannie_Mae_Servicing_Guide.pdf.   The current process flow is similar. Servicer Expense Reimbursement Job Aid, p. 4 (Apr. 11 2018), *available at* https://www.fanniemae.com/content/job_aid/servicer-expense-reimbursement-fact-sheet.pdf.

[8] Freddie Mac Single-Family Seller/Servicer Guide, p. F104SF-2 (Dec. 17, 2010) ("Freddie Mac 2010 Guide"), *available at* http://www.freddiemac.com/singlefamily/guide/bulletins/pdf/2010Guide.pdf.

The Complaint contains several conclusory allegations that the Servicer Defendants sought reimbursement for costs that were not "reasonable" or "necessary."  *See, e.g.*, TAC ¶¶ 8, 9, 117, 118, 150-53, 161; SAC ¶¶ 8, 9, 109, 110, 143-46, 154.  It does not, however, even begin to posit any strategy for identifying which costs violate these standards.  Indeed, as HUD has explained, the reimbursement guidelines are flexible and do not set objective limits, precisely to reflect the "wide differences" in foreclosure practices across the country.[9]

Freddie Mac does publish state-specific upper-bound limits for title work, which have increased over time.[10]  And Fannie Mae limits costs in its engagement letters with foreclosure law firms.[11]  But the Complaint does not allege that any of the claims submitted by the Servicer Defendants exceeded any of those limits.  To the contrary, it alleges that certain expenses below that upper bound are unreasonable, demonstrating how subjective that test is.  For example, while the Complaint alleges that $495 for a title search in New York City in 2014 is excessive (*e.g.*, TAC ¶ 221), that amount is well below the allowable limit set by Freddie Mac for title work in New York City, which has been $560 since 2013.[12]

## C.    Quality Control Requirements

The HUD regulations and GSE contracts also require servicers to implement quality control programs.  The rules with respect to each program differ and have changed over time.

---

[9]  HUD Handbook 4000.1, § III-A(2)(r)(ii)(F)(2), *available at* https://www.hud.gov/sites/documents/40001HSGH.PDF.

[10]  *See* Freddie Mac 2010 Guide, Ex. 57A (authorizing reimbursement of $250 for title work in New York in 2010); Freddie Mac Single-Family Seller/Servicer Guide, Ex. 57A (Nov. 15, 2017) ("Freddie Mac 2017 Guide Ex. 57A") (authorizing reimbursement of $510 for title work in New York), *available at* http://www.freddiemac.com/singlefamily/service/pdf/exh57a.pdf.

[11]  *See, e.g.,* Fannie Mae Single-Family Servicing Guide, Part VIII, § 104.01 (June 10, 2011), *available at* https://www.fanniemae.com/content/guide/svc061011.pdf.

[12]  *See* Freddie Mac Single-Family Seller/Servicer Guide, Ex. 57A (Dec. 18, 2013), *available at* http://www.freddiemac.com/singlefamily/guide/bulletins/pdf/2013Guide.pdf; Freddie Mac 2017 Guide Ex. 57A.

Relator generally alleges, upon information and belief, that the Servicer Defendants failed to perform the requisite "quality control functions." TAC ¶ 117; SAC ¶ 109. But he does not include a single particularized allegation about any Servicer Defendant's quality control efforts and therefore also does not describe how any Servicer Defendant's quality control program failed to pass muster. In fact, he mischaracterizes the quality control obligations imposed by HUD and the GSEs in several respects.

For example, Relator alleges that HUD requires the Servicer Defendants to ensure that claims are "properly calculated" and "fully supported." TAC ¶¶ 104-05; SAC ¶¶ 96-97. That is true as far as it goes, but there is no basis to suggest that Servicer Defendants therefore must cross-check costs against a "reasonable and customary" standard. HUD's sole use of the phrase "reasonable and customary," in the quality control context, applies to *fees*, not *costs*.[13] In addition, Relator contends that HUD requires servicers to "review *all* claims for insurance benefits." TAC ¶ 104 (emphasis added); SAC ¶ 96 (emphasis added). That is not correct. Servicers may fulfill their quality control obligations by reviewing a sample of loans on a quarterly basis.[14]

Relator also alleges that Fannie Mae requires servicers to "make every effort to reduce default-related foreclosure expenses," including by "minimiz[ing] the costs incurred from vendors," "examin[ing] the pricing offered by alternative vendors," and "negotiat[ing] for the best value." TAC ¶ 62; SAC ¶ 54. He similarly claims that Freddie Mac requires servicers to "manage the foreclosure process . . . in a cost-effective, expeditious, and efficient manner." TAC ¶ 89; SAC

---

[13] *See* HUD Handbook 4060.1, § 7-12(W) ("fees . . . must comply with the reasonable and customary fees specified by the FHA"), available at https://www.hud.gov/sites/documents/40601C7HSGH.PDF. In any event, this sentence refers to fees charged to borrowers on re-instated loans pursuant to 24 C.F.R. § 203.552(a), not claims submitted to HUD on completed foreclosures. *See* HUD Mortgagee Letter 93-30 (1993), *available at* https://www.hud.gov/sites/documents/93-30ML.TXT.

[14] *See* HUD Handbook 4060.1, § 7-10.

¶ 81 (internal citations omitted).  But nothing about any of this contractual language suggests that servicers must engage in any particular market-based (or other objective) analysis of foreclosure costs as part of quality control.  To the contrary, the GSEs afford servicers broad discretion to fashion their own quality control programs.[15]

Relator further contends, with respect to loans serviced for HUD and the GSEs, that servicers must "monitor," or "ensure" the "compliance" of, their foreclosure counsel and any ABEs those counsel may engage.  TAC ¶¶ 61, 63, 69, 91-93, 106, 481; SAC ¶¶ 53, 55, 61, 83-85, 98, 339.  Relator's conclusion—a "wholesale failure" by the Servicer Defendants "to monitor, audit, and control" foreclosure law firms and their ABEs—is, again, alleged on information and belief.  TAC ¶ 117; SAC ¶ 109.  Indeed, for several Servicer Defendants, Relator has failed to identify a single transaction in which the foreclosure law firm engaged an ABE.

### D.    Annual Certifications to HUD and Freddie Mac

Each Servicer Defendant must submit an annual certification to Freddie Mac that it "agrees to comply with all of the [Freddie Mac Single-Family Seller/Servicer] Guide provisions and requirements" and "is in compliance with the provisions set forth in the Guide," and to HUD that it "conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval."  TAC

---

[15] *See, e.g.*, Fannie Mae Single Family 2012 Servicing Guide, Part I, § 301.01 (Mar. 14, 2012) ("Fannie Mae 2012 Guide") ("Fannie Mae does not specify the particular types of audit and control systems a servicer must have . . ."), *available at* https://www.fanniemae.com/content/guide/svc031412.pdf; Fannie Mae Single-Family Servicing Guide, p. 67 (July 12, 2017), *available at* https://www.fanniemae.com/content/guide/svc071217.pdf ("Most of the policies and standards described in the Servicing Guide are intended to set forth the broad parameters under which the servicer must exercise sound and professional judgment as a mortgage loan servicer in the performance of its duties.  As a result, in most instances Fannie Mae has not set forth absolute requirements[.]"); Freddie Mac Single-Family Seller/Servicer Guide, Ch. 48.1 (Dec. 18, 2012), *available at* http://www.freddiemac.com/singlefamily/guide/bulletins/pdf/2012Guide.pdf ("Freddie Mac 2012 Guide") (requiring servicers to maintain a quality control program "that is acceptable to Freddie Mac," acknowledging that "no specific quality control plan can meet the needs of all Sellers").

9

¶¶ 88, 99; SAC ¶¶ 80, 91.  As for Fannie Mae, Relator includes a generalized allegation of a certification (TAC ¶ 496(a); SAC ¶¶ 354(a)), but no particular certification is alleged anywhere in the Complaint.  Relator alleges in conclusory fashion, "upon information and belief," that these annual certifications were false.  TAC ¶ 496(a); SAC ¶¶ 354(a).  None of the annual certifications contains any language specifically relating to reviewing foreclosure costs for reasonableness— rather, they refer only generally to the wide array of rules, large and small, that servicers are obligated to follow.  And, again, these annual certifications are submitted separately from any requests for payment; none of the relevant claim forms refer to the annual certifications in any way.

III.    **THE GOVERNMENT'S INVESTMENTS IN THE GSES**

As Relator alleges, the United States Treasury made a gross investment of approximately $200 billion in the GSEs from 2008 to 2012 pursuant to Stock Purchase Agreements ("SPAs"). TAC ¶¶ 49, 52, 75, 78; SAC ¶¶ 40, 44, 67, 70.[16]  The government did not invest any additional funds until 2018.  TAC ¶¶ 55, 82; SAC ¶¶ 47, 74.

None of that money was earmarked for payment of foreclosure expenses, as Relator concedes.  TAC ¶¶ 58, 85; SAC ¶¶ 50, 77.  Nor was the capital invested for the purpose of funding foreclosures.  As the SPAs make clear, the government's interest in making these investments was to provide financial stability to the GSEs so they could fulfill their obligations of guaranteeing loans, thereby stabilizing the secondary mortgage market.  *See* Fannie Mae 2017 Form 8-K (Sep.

---

[16] The Complaint alleges that the government invested $165 million in Freddie Mac in 2012.  TAC ¶ 75; SAC ¶ 67.  That is not consistent with the gross investment total set forth elsewhere in the Complaint (TAC ¶ 78; SAC ¶ 70), and it is not consistent with Freddie Mac's public filings.  *See* Freddie Mac 2017 Form 10-K at 3 (Feb. 15, 2018), *available at* http://www.freddiemac.com/investors/financials/pdf/10k_021518.pdf.  *See Hutchison v. Deutsche Bank Secs. Inc.*, 647 F.3d 479, 481 (2d Cir. 2011) (courts may "rely" on "legally required public disclosure documents filed with the SEC" in considering a motion to dismiss).

11, 2008), Ex. 99.3.[17]  In any event, the government did not make these investments for free.  In return, the government received preferred stock with valuable preference and dividend rights and a warrant for 79.9% of the GSEs' common stock.  TAC ¶¶ 53, 80; SAC ¶¶ 46, 72.  Relator alleges that the government's funds "remain invested" in the GSEs, with combined losses of "more than" $101 billion.  TAC ¶¶ 52-53, 78, 80; SAC ¶¶ 43, 46, 70, 72.  That is not consistent with the GSEs' public filings.  By 2014, the GSEs' dividend payments to the Treasury exceeded the government's capital investment, and as of December 31, 2017, the GSEs had repaid *$87 billion more* than Treasury invested.  *See* Fannie Mae 2017 Form 10-K, at 4 (Feb. 14, 2018);[18] Freddie Mac 2017 Form 10-K, at 3.

## ARGUMENT

The FCA imposes civil liability on any person who "knowingly" presents a "false claim" for payment or makes a false statement "material" to a "false claim."  31 U.S.C. § 3729(a).  To state a claim, "[t]he relator must show that a defendant (1) made a claim, (2) to the United States government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment from the federal treasury."  *Mikes v. Straus*, 274 F.3d 687, 695 (2d Cir. 2001), *abrogated by Escobar*, 136 S. Ct. 1989; *U.S. ex rel. Kolchinsky v. Moody's Corp.*, 162 F. Supp. 3d 186, 195 (S.D.N.Y. 2016).

Before turning to the elements of Relator's claims under the FCA, however, the Servicer Defendants respectfully submit that the Complaint must be dismissed as a preliminary matter for failure to state with particularity the circumstances constituting fraud, as Rule 9(b) requires.

---

[17]   *Available at* https://www.sec.gov/Archives/edgar/data/310522/000095013308003096/w67133exv99w3.htm
[18]   *Available at* http://www.fanniemae.com/resources/file/ir/pdf/quarterly-annual-results/2017/10k_2017.pdf.

## I. THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO PLEAD FRAUD WITH PARTICULARITY

The FCA is an antifraud statute, so complaints asserting claims under it must satisfy the heightened pleading requirements of Rule 9(b).  *E.g.*, *U.S. ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 26 (2d Cir. 2017).  Rule 9(b), a relator's complaint "must be supported by more than conclusory statements or hypotheses," and it must set forth "particularized allegations of fact."  *U.S. ex rel. Tessler v. City of New York*, 712 F. App'x 27, 29 (2d. Cir. 2017) (internal citations and quotations omitted).  Moreover, allegations that merely lump all defendants together, rather than specifying the alleged case against each, are facially insufficient under Rule 9(b).  *See, e.g., U.S. v. New York Soc. for the Relief of the Ruptured & Crippled,* No. 07 Civ. 292 (PKC), 2014 WL 3905742, at *19 (S.D.N.Y. Aug. 7, 2014) (rejecting "blanket allegations [of] alleged misconduct of all three defendants" that "fail to distinguish between the defendants' roles in the various alleged schemes").

Courts applying Rule 9(b) in FCA cases have analyzed the alleged frauds in two components:  the alleged fraudulent "scheme" on one hand, and the alleged submission of false claims on the other.  *E.g.*, *U.S. ex rel. Chorches as Trustee for Bankr. Estate of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 83 (2d Cir. 2017).  Rule 9(b) mandates that both of these components be "pled with a high degree of particularity."  *U.S. ex rel. Kester v. Novartis Pharm. Corp.*, 23 F. Supp. 3d 242, 255 (S.D.N.Y. 2014).  Neither component meets that standard here.[19]

---

[19] Notwithstanding that Rule 9(b) allows "malice, intent, knowledge, and other conditions of a person's mind" to be "alleged generally," the law in this Circuit requires FCA relators to "plead the factual basis which gives rise to a strong inference of fraudulent intent."  *Tessler*, 712 F. App'x at 29 (quoting *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991)).  Relator's failure to satisfy this requirement for the scienter element of his claims against the Servicer Defendants is discussed below in Section IV.

### A.      The Complaint Does Not Plead Any Scheme with Particularity

Relator sprinkles the term "scheme" throughout his Complaint and blithely accuses the Servicer Defendants of participating in one, but he offers no particularized facts to support these conclusory assertions.  TAC ¶¶ 11, 113, 120; SAC ¶¶ 105, 112.  To begin with, the so-called "scheme" itself is anything but.  In stark contrast to a case like *Chorches*, where Rule 9(b) was satisfied by allegations that an ambulance company purposely and repeatedly doctored its employees' real-time records to make ambulance trips appear medically necessary and thus eligible for Medicare reimbursement, the Servicer Defendants are accused, at worst, of nothing more than paying insufficient attention to contractual and other obligations to keep an eye on foreclosure costs.  865 F.3d at 76; *see* TAC ¶¶ 8, 11, 117-21, 148-69; SAC ¶¶ 8, 11, 109-13; 141-62.  The fraudulent activity happened, if at all, at the Foreclosure Defendants, fiduciaries who allegedly added secret mark-ups and did unnecessary work to garner improper profits.  *See, e.g.*, TAC ¶¶ 123-25; SAC ¶¶ 115-17.

Even these toothless allegations of a "scheme" by the Servicer Defendants are limited to Relator's "information and belief," without a hint of the basis on which his belief might be based. He never worked at any Servicer Defendant, and he does not allege any facts to flesh out how the scheme worked, to describe any Servicer Defendant's practices for monitoring the foreclosure expenses of its law firms and their vendors, or to establish how such processes violated applicable contractual provisions.  *See* TAC ¶¶ 148-69; SAC ¶¶ 141-62.  In short, the Complaint is missing the "who, what, where, when and how" that Rule 9(b) requires.  *U.S. ex rel. Smith v. New York Presbyterian Hosp.*, No. 06 Civ. 4056 (NRB) 2007 WL 2142312, at *6 (S.D.N.Y. July 18, 2007); *see also U.S. v. Empire Educ. Corp.*, 959 F. Supp. 2d 248, 257, 259 (N.D.N.Y. 2013) (dismissing

FCA claims because relator failed to plead "basic factual details" and only "generally alleged a fraudulent scheme") (internal citations and quotations omitted).[20]

The Second Circuit's recent decision in the highly analogous *Tessler* case confirms the inadequacy of Relator's scheme allegations under Rule 9(b). 712 F. App'x at 29. The allegedly fraudulent scheme there was that New York City, as a matter of "custom and practice," failed to recoup overpayments made to recipients of federal nutrition benefits, even though regulations required the City to do so. *U.S. ex rel. Tessler v. City of New York*, No. 14 Civ. 6455 (JMF), 2016 WL 7335654, at *1 (S.D.N.Y. Dec. 16, 2016). In affirming Judge Furman's dismissal of the case under Rule 9(b), the Second Circuit noted the lack of particularized facts to support the "conclusory" allegation about the city's "custom and practice" of failing to recoup the federal benefits, including Relator's failure to "set forth the origins or details of the custom and practice or identify the employees who purportedly implement it." *Tessler*, 712 F. App'x. at 29.[21] The *Tessler* decision applies foursquare to Relator's claims about the Servicer Defendants' alleged scheme not to monitor foreclosure costs: no details, no names, no origins, and no apparent motive. In short, the Complaint presents no particularized allegations of a scheme to satisfy Rule 9(b).

### B.     The Complaint Does Not Plead the Submission of Claims with Particularity

The other component of the Rule 9(b) inquiry, as noted above, looks at a relator's pleading that claims based on an alleged fraudulent scheme were actually submitted for payment. This is

---

[20] The Complaint implies that there is something inherently nefarious and scheme-like about a law firm using an ABE to handle the mechanics of a foreclosure. TAC ¶ 165; SAC ¶ 158. But the use of ABEs is not, by itself, a prohibited or fraudulent practice. *See, e.g.*, Fannie Mae 2012 Guide, Part VII, §§ 106.01-106.03 (outlining standards related to ABEs for servicer retained law firms); 24 C.F.R. § 203.402 (imposing no limitations on reimbursement for costs incurred by affiliates).
[21] Relator vaguely claims to have learned about the Servicer Defendants' "practices" with respect to foreclosure expenses from unspecified conversations with foreclosure lawyers. TAC ¶ 491; SAC ¶ 349. Judge Furman considered a similar allegation in *Tessler* and deemed it "plainly insufficient under Rule 9(b)." 2016 WL 7335654, at *3 n.2.

"an essential element of causes of action" under 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B). *Kester*, 23 F. Supp. 3d at 253; *accord Tessler*, 712 F. App'x at 29.  As courts have stressed, under the FCA, liability attaches "not to the underlying fraudulent activity or to the government's wrongful payment, but to the claim for payment."  *U.S. ex rel. Bilotta v. Novartis Pharms. Corp.*, 50 F. Supp. 3d 497, 510 (S.D.N.Y. 2014) (internal citations and quotations omitted).  Under Rule 9(b), a relator "must plead the submission of false claims with high enough degree of particularity," and sufficient "factual basis," to establish that "claims were actually submitted to a government program."  *Kester*, 23 F. Supp. 3d at 260.  The Complaint fails on this prong, too.

Although courts have shown flexibility in applying Rule 9(b)'s particularity requirement to claim submissions where relators do not have access to detailed information about a defendant's invoices, the Second Circuit held last year in *Chorches* that Rule 9(b) requires relators to make "plausible allegations creating a ***strong inference*** that ***specific*** false claims were submitted to the government and that the information that would permit further identification of those claims is peculiarly within the opposing party's knowledge."  865 F.3d at 86 (emphasis added).

Relator has not created any such strong inference here.  The closest he comes to pleading the submission of false claims is in his set of examples of allegedly overpriced foreclosure costs, where he alleges—in formulaic fashion, and always "[u]pon information and belief"—that the relevant Servicer Defendant "overstated its reimbursement claim, seeking the whole amount" from either Fannie Mae, Freddie Mac, or FHA.  TAC ¶¶ 170-474; SAC ¶¶ 163-332.  The Complaint supplies no factual foundation for these "information and belief" allegations, so they should be disregarded.  *E.g.*, *Judd Burstein, P.C. v. Long*, No. 15 Civ. 5295, 2017 WL 3535004, at *7 (S.D.N.Y. Aug. 16, 2017) (citing *Chorches*, 865 F.3d at 85); *see also Kester*, 23 F. Supp. 3d at 255-56.  And even accepting Relator's view that the costs billed to the Servicer Defendants were

15

unreasonable, there are no particularized facts to create any inference that the Servicer Defendants sought to recover the "whole amount."

## II.    THE COMPLAINT FAILS TO ADEQUATELY ALLEGE FALSITY

Even if Relator had adequately alleged the actual submission of any claims, the FCA is violated only by the submission of a claim that is "false" or "fraudulent."   31 U.S.C. § 3729(a)(1)(A).  The FCA recognizes two types of false claims:  factually false claims and legally false claims.  *See U.S. ex rel. Wood v. Allergan, Inc.*, 246 F. Supp. 3d 772, 783 (S.D.N.Y. 2017). The Complaint fails to allege either basis.

### A.    The Complaint Fails to Allege Factual Falsity

As an initial matter, the Complaint fails to allege factual falsity.  "A claim is 'factually false' where the party submitting the claim supplies 'an incorrect description of the goods and services provided or a request for reimbursement for goods and services never provided.'"  *Kester*, 23 F. Supp. 2d at 260-61 (quoting *Mikes,* 274 F.3d at 697).  Factual falsity is assessed under an *objective* standard.  *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008) ("To satisfy [the falsity] element of an FCA claim, the statement or conduct alleged must represent an objective falsehood."); *U.S. ex rel. DRC, Inc. v. Custer Battles, LLC*, 472 F. Supp. 2d 787, 797 (E.D. Va. 2007) ("It is well-established that the FCA requires proof of an objective falsehood.").  Accordingly, claims cannot be "false" for FCA purposes where "reasonable persons can disagree regarding whether the service was properly billed to the Government."  *U.S. v. Prabhu*, 442 F. Supp. 2d 1008, 1026, 1032 (D. Nev. 2006).

Here, the Complaint alleges no facts to suggest that the reimbursement claims submitted by the Servicer Defendants were factually false.  The Complaint does not allege that the Servicer Defendants provided an "incorrect description" of the expenses for which they sought reimbursement.  Nor does the Complaint allege that the Servicer Defendants sought reimbursement

for services "never provided."  The Complaint does not allege that the Servicer Defendants themselves falsely inflated the amount of the expense.  And critically, the Complaint does not allege that the Servicer Defendants sought reimbursement for amounts that they did not themselves actually pay.  To the contrary, the very theory of the Complaint is that the Servicer Defendants *did* seek reimbursement for the *precise amounts* that they *actually paid* to the foreclosure law firms.  In fact, the HUD claim form used by servicers to request reimbursement (27011) asks the servicer to attest that the amounts included represent the expenses "actually paid."  The requirement that the servicers itemize amounts "actually paid" notably tracks the regulatory requirement that HUD reimburse the mortgagee for two-thirds of the foreclosure costs "actually paid" by the mortgagee. 24 C.F.R. § 203.402(f).  The claims for reimbursement are therefore facially accurate.

Moreover, even if HUD and the GSEs reserve the right not to reimburse amounts later deemed excessive, that does not render "false" a facially accurate claim.  To the contrary, HUD specifically instructs servicers to itemize 100% of the foreclosure costs actually paid, even though HUD does not reimburse 100% of those costs.  *See* FHA Single Family Housing Claim Technical Guide, Part 1.d.  In other words, HUD expects that servicers will itemize all of their actual costs regardless of whether they are reimbursable.  The claim form used to seek reimbursement from Freddie Mac likewise simply asks the servicer to itemize its costs, requiring only that they certify that the information on the claim form is "true."  There is no statutory, regulatory, or contractual prohibition on a servicer asking to be reimbursed for the full amount of its actual costs.

Relator's argument appears to be that the dollar amounts requested were "false" because those amounts (in Relator's opinion) were higher than they theoretically might have been, given what Relator says are the "local market rates" for those services.  There are at least two problems with that theory: First, servicers are not required to make representations when they submit claims

17

as to "local market rates" or even to the "reasonableness" of the amount requested.  Even if a range

of "local market rates" could be established, reimbursement claims that are facially correct do not

become "unreasonable," let alone "false," simply because they exceed that range to some degree.

*See U.S. ex rel. Barko v. Halliburton Co.*, 241 F. Supp. 3d 37, 58 (D.D.C. 2017) ("[A] certification

that the voucher is 'correct and proper' does not mean that KBR certified that the amount invoiced

was reasonable . . . or even that it was in compliance with the terms of the . . . contract or relevant

regulations."); *see also U.S. ex rel. Lisitza v. Par Pharm. Cos., Inc.*, No. 06 Civ. 6131, 2017 WL

3531679, at *8 (N.D. Ill. Aug. 17, 2017) (rejecting government's theory that a "facially accurate

and non-misleading claim is nevertheless false or fraudulent within the meaning of the FCA" if

there are underlying regulatory violations).   Second, the Complaint does not allege that the

amounts sought exceeded any objective limit.  Even accepting as true that some amounts requested

were higher than they might have been, the Complaint provides no objective measure to determine

those rates, much less a point at which a "reasonable" rate crosses a line into an "unreasonable"

and "excessive" amount.  *See U.S. ex rel. Watkins v. KBR, Inc.,* 106 F. Supp. 3d 946, 968 (C.D.

Ill. 2015) ("Relator has . . . not provided information that can be used to discern how much, if any,

of any individual invoice or voucher submitted to the Government . . . was artificially

inflated . . .").

The examples in the Complaint illustrate the point.  As an example of a supposedly

"unreasonable" amount for title work, the Complaint alleges that one servicer was charged $150

in Colorado, an amount characterized as "well above" market rates given that the law firm

supposedly could have purchased such title work in the local market for $125.  TAC ¶ 416.  But

the Complaint does not say what qualifies as "well above" market rates, much less that there was

a prohibition on seeking reimbursements in amounts "well above" market.  Nor does the Complaint

allege that reimbursement for title work in Colorado was capped at $125, and it fails to identify any objective standard that would define the point between $125 and $150 where a reimbursement claim would cross the line from truth to falsity. *See U.S. ex rel. Roby v. Boeing Co.*, 100 F. Supp. 2d 619, 625 (S.D. Ohio 2000) ("[C]onclusions about which reasonable minds may differ cannot be false."). Similarly, as noted above, while the Complaint alleges that $495 for a title search in New York City in 2014 is excessive (*e.g.*, TAC ¶ 211), that amount is ***well below*** the allowable limit set by Freddie Mac for title in New York City, which has been $560 since 2013. *See* Freddie Mac 2012 Guide, Ex. 57A; Freddie Mac 2017 Guide Ex. 57A. In fact, that amount is also less than what the Manhattan U.S. Attorney's Office itself routinely seeks to recover in New York for a title report when it serves as foreclosure counsel for federal agencies. *See, e.g.,* Affidavit of Amount Due, *U.S. v. Germano*, No. 13 Civ. 03126, (S.D.N.Y. Feb. 26, 2014), Dkt. No. 12-2 (seeking $500 for title report fee). Relator's view that $495 was "too much" in that market, at that time, is at best a matter of opinion, not fact.

Furthermore, to the extent the Complaint alleges "unreasonable" claims for service of process, neither the GSEs nor HUD ever "objectively define[d] what is a reasonable cost" for that service. *U.S. ex rel. Farmer v. City of Houston*, 523 F.3d 333, 341-42 (5th Cir. 2008). Indeed, in explaining to the industry its decision to cap attorneys' fees but not costs, HUD explained that objective caps on costs "would not be practical because procedural requirements and terminology vary in different jurisdictions." HUD Mortgagee Letter 91-14, p. 2 (1991).[22] In the absence of that type of guidance, the Servicer Defendants cannot be faulted, years after the fact, for failing to impose their own cap, or for not having predicted the amount that would be criticized as excessive for the first time in declined *qui tam* litigation. *See Prabhu*, 442 F. Supp. 2d at 1016 (physician

---

[22] *Available at* https://www.hud.gov/sites/documents/91-14ML.TXT.

had not presented "false" claims to the government regarding necessity of medical services because "Medicare has failed to issue specific guidance" regarding the treatment provided, and reasonable persons could disagree about billing requirements); *In re Garland Corp.*, 8 B.R. 826, 831 (Bankr. D. Mass. 1981) ("Unfortunately, no matter how close the Court comes to an objective determination of a reasonable fee, it is still, in the final analysis, a substantially subjective exercise of the highest degree."). Accordingly, the Complaint fails to allege factual falsity.

### B.    The Complaint Fails to Allege Legal Falsity

Nor are the claims alleged by the Relator legally false. A legally false claim may be either express or implied. Express false certification "involves a defendant's express representation of compliance" with a "federal statute, regulation, or contractual provision" when "it is actually not compliant." *New York ex rel. Kurana* v. *Spherion Corp.*, No. 15 Civ. 6605 (JFK), 2016 WL 6652735, at *14 (S.D.N.Y. Nov. 10, 2016). The Complaint does not allege that any reimbursement claims submitted by the Servicer Defendants included an express certification of compliance. To the contrary, the HUD and GSE claim forms contain no reference to any regulation or contract provision obligating servicers to exclude from their claims whatever foreclosure costs might later be challenged as unreasonable.

Relator does allege that the Servicer Defendants were required to annually certify to Freddie Mac that each servicer "agrees to comply with all of the [Freddie Mac Single-Family Seller/Servicer] Guide provisions and requirements" and "is in compliance with the provisions set forth in the Guide," and to HUD that "the above named mortgagee conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval."[23] TAC ¶¶ 88, 99; SAC ¶¶ 80, 91. The Complaint alleges in conclusory fashion, "upon information and belief," that these annual

---

[23] As for Fannie Mae, Relator includes a generalized allegation of a certification (TAC ¶ 496(a); SAC ¶¶ 354(a)), but no particular certification is alleged anywhere in the Complaint.

certifications were false.   TAC ¶ 496(a); SAC ¶¶ 354(a).   But there is no allegation that any of these annual certifications were either submitted with the Servicer Defendants' reimbursement claims or somehow incorporated therein.   "[T]he False Claims Act is not intended to reach fraudulent conduct where no claim for payment is made." *Kolchinsky*, 162 F. Supp. 3d at 196. Accordingly, even if the Complaint contained well pleaded allegations that any annual certifications were actually submitted and objectively false, those allegations would not support Relator's claims under the FCA.

Nor has Relator adequately alleged that the Servicer Defendants are liable under a theory of implied false certification.   The Supreme Court recently held that the implied false certification theory of liability consists of two prongs: (1) the claim at issue "does not merely request payment, but also makes specific representations about the goods or services provided," and (2) "the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Escobar*, 136 S. Ct. at 2001. Relator has failed to allege either prong.   *First*, the alleged reimbursement claims "merely request[ed] payment" and the Complaint does not allege that the Servicer Defendants made any "specific representations" on the claim forms about the foreclosure services. *Id.*  Nor could it.  As noted above, the HUD claim form contains a certification that the itemized foreclosure expenses are "actually paid" and "true and correct"—a far cry from the "specific representations about the goods or services provided" in *Escobar*, which went to the nature and quality of medical services, not just how much they cost. *Id.* at 2000.   Representations on the GSE claims are even less "specific": the Fannie Mae claim form contains no representations or certifications, and the Freddie Mac claim form represents only that the information is "true."   Post-*Escobar* cases upholding claims of implied false certification have construed "specific representations" to mean

21

much more than correct dollar amounts.  *See, e.g.*, *U.S. ex rel. Hussain* v. *CDM Smith, Inc.*, No. 14 Civ. 9107 (JPO), 2017 WL 4326523, at *7 (S.D.N.Y. Sept. 27, 2017) (defendant "made specific representations about services" by certifying that "employee X worked on project Y at time Z").[24]

*Second*, the Servicer Defendants' alleged "failure to disclose noncompliance with material statutory, regulatory, or contractual requirements" did not make the representations on the claim forms "misleading half-truths." *Escobar*, 136 S. Ct. at 2001.  The Servicer Defendants represented to HUD that the amount of the foreclosure expenses was "actually paid" and "true and correct"; the Complaint does not allege that the Servicer Defendants sought reimbursement for expenses that were not "actually paid" or not "true and correct" as to amount.  As to Freddie Mac, the Servicer Defendants represented that the foreclosure expense amount was "true" and, again, there is no allegation that the Servicer Defendants sought reimbursement for expenses that were not actually billed to the Servicer Defendants.

For these reasons, Relator cannot bootstrap a false claim case here by pointing to Servicer Defendant certifications, whether express or implied.

## III.   THE COMPLAINT FAILS TO ADEQUATELY ALLEGE MATERIALITY

Relator's claims also fail for the additional, independent reason that he does not allege that the purported misrepresentations were "material" to the government's decision to pay.  Under the

---

[24] It is not clear whether Relator is trying to allege a fraudulent inducement theory of FCA liability. There is no mention of inducement in the pleading. *See, e.g.*, *U.S. ex rel. Kolchinsky* v. *Moody's Corp.*, No. 12 Civ. 1399 (WHP), 2017 WL 3841866, at *2 (S.D.N.Y. Sept. 1, 2017) (argument "inadequately presented" where relator "only alluded opaquely to fraudulent inducement").  In any event, Relator has not come close to pleading the elements of fraudulent inducement with particularity.  "To plausibly allege a fraudulent inducement claim, a relator must demonstrate that the defendant made fraudulent statements to the government and that this fraudulent conduct induced the government to enter into some form of contract with the defendant." *U.S. v. Visiting Nurse Serv. of New York*, No. 14 Civ. 5739 (AJN), 2017 WL 5515860, at *6 (S.D.N.Y. Sept. 26, 2017).  There is no well pleaded allegation that the Servicer Defendants made any fraudulent statements when they entered their contracts with the GSEs and HUD, nor that any such statements induced the GSEs and HUD to contract with the Servicer Defendants.

FCA, a false statement is actionable only if it is "material" to the false or fraudulent claim for payment. 31 U.S.C. § 3729(a)(1)(B). For purposes of the FCA, a statement is material only if it has a "natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). In assessing materiality, courts look to "the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Grabcheski v. Am. Int'l Grp., Inc.*, 687 F. App'x 84, 87 (2d Cir. 2017) (internal citations omitted). The materiality requirement is "rigorous" and "demanding," and can be satisfied only by alleging particularized facts. *Escobar*, 136 S. Ct. at 1996, 2003, 2004 n.6.

"[T]o be material[,] the government must have made the payment as a result of the defendant's alleged misconduct." *Coyne v. Amgen, Inc.*, 717 F. App'x 26, 29 (2d Cir. 2017) (internal citations and quotations omitted). It is insufficient to allege merely that the government would have the option of refusing payment of the claim if it knew about the defendant's non-compliance. *Escobar*, 136 S. Ct. at 2003. In addition, the materiality standard requires not only that the alleged non-compliance be material to the government, but also that the defendant ***knows*** that the requirement is material to the government. *Id.* at 1996. As the Supreme Court has stressed, courts should scrutinize the allegations under this demanding standard at the motion to dismiss stage. *See id.* at 2004 n.6.

Here, the Servicer Defendants' allegedly excessive claims for the reimbursement of foreclosure expenses are not material. Evidence of materiality can include "evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on non-compliance with the particular statutory, regulatory, or contractual requirement." *Escobar*, 136 S. Ct. at 2003. But the Complaint does not describe any instance of HUD or the GSEs rejecting or reducing a claim for reimbursement of foreclosure expenses as "excessive" or

"unreasonable" as compared to "market rates," or because a servicer failed to comply with any regulatory or contractual requirement to "monitor" these types of expenses.  Nor does it describe any instance of HUD or the GSEs disciplining or excluding a servicer from their respective lending programs for submitting a claim with "above-market" foreclosure expenses or for failing to determine local market rates.

Further, a servicer can hardly be said to *know* that a particular amount is excessive when HUD and the GSEs set no allowable limit on an expense category, or when the actual expense falls below an allowable limit.  While Relator alleges that the amounts exceeded a range that Relator himself considers the "market rate" in the local area, the Complaint does not allege that either HUD or the GSEs adopted those same market rates or that they agree that these costs submitted by the Servicer Defendants are too high at all.  To the contrary, the very theory of the Complaint is that HUD and the GSEs have been regularly and fully reimbursing all of the Servicer Defendants for all of these expenses, at the alleged rates, for years.  When HUD and the GSEs paid these claims, they knew the *amounts* they were paying, the *service* they were paying for, and the precise *location* of the foreclosed property—all of that information is included on the claim forms.  Indeed, as part of the claims process, Fannie Mae manually reviews expense claims submitted to it for reimbursement.  *See* Fannie Mae Form 571 Reference Guide, p. 6 (Fannie Mae representative can reject, approve, or partially pay claim).[25]  For its part, HUD performs routine audits of servicers' claim files.  HUD Handbook 4000.1, § V.C.2.b.iii (describing the scope of HUD's mortgagee reviews, including of servicing programs); *id.* at V.C.3.b.iii (describing HUD's individual loan reviews).

---

[25] *See* Evaluation of Fannie Mae's Servicer Reimbursement Operations for Delinquency Expenses, p. 11 fig. 4, FHFA-OIG (Sept. 18, 2013), *available at* https://www.fhfaoig.gov/Content/Files/EVL-2013-012.pdf (Fannie Mae manually reviewed 80% of claims in 2012).

In addition, the GSEs knew which law firms the servicers used in the various jurisdictions because the GSEs either *required* the servicers to use those firms (until 2013) or *approved* of them (after 2013).[26]   Given this level of transparency, and because HUD and the GSEs deal with servicers in every market, HUD and the GSEs actually have far *greater* knowledge of "local market rates" than any one servicer possibly could.   Their routine reimbursement of claims in these amounts—day after day and year after year—renders completely implausible any allegation that the servicers *knew* that HUD and the GSEs would consider these amounts to be excessive.

Finally, the Complaint fails to adequately allege the materiality of any alleged falsity in the Servicer Defendants' annual compliance certifications.   "[A] misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material *to the government's payment decision* to be actionable under the False Claims Act."   *Escobar*, 136 S. Ct. 2002 (emphasis added).   But nothing in the Complaint suggests that HUD or the GSEs ever considered the accuracy of a servicer's annual certifications, or considered a servicer's overall compliance with program requirements, when making the payment decision.   Nor is there any allegation that HUD or the GSEs "consistently refuse[] to pay claims in the mine run of cases" of servicers who submit false annual certifications or operate out of compliance with respect to foreclosure costs. *See Escobar*, 136 S. Ct. at 2004; *U.S. v. Strock*, No. 15 Civ. 0887 (FPG), 2018 WL 647471, at *8- 12 (W.D.N.Y. Jan. 31, 2018) (compliance certification not material where government failed to

---

[26] *See* Fannie Mae 2012 Guide, Part VI, § 501.01 (describing Fannie Mae's "Retained Attorney Network"); Fannie Mae, *Servicing Guide* Announcement SVC-2012-22 at 2-3 (Nov. 9, 2012), available at   https://www.fanniemae.com/content/announcement/svc1222.pdf   (describing new method of Fannie Mae approving law firms); Freddie Mac 2010 Guide at Ch. 2.24(b) & Ch. 66.69 (describing benefits of using Freddie Mac's "designated counsel," including not needing to screen pre-approved counsel or obtain pre-approval of expenses that exceed established guidelines); Freddie Mac Bulletin No. 2012-25 (Nov. 9, 2012), *available at* http://www.freddiemac.com/ singlefamily/guide/bulletins/pdf/bll1225.pdf (describing new method of Freddie Mac approving law firms).

allege that, as a matter of course, it refused to pay because of non-compliance).  Moreover, as referenced in the Complaint, the annual compliance certifications at issue are so broad and far-reaching as to actually undermine any suggestion of materiality: Freddie Mac requires mortgagees to attest to their compliance with *"all"* Guide provisions, including all amendments (TAC ¶ 88; SAC ¶ 80) (emphasis added), and HUD asks whether the mortgagee "conforms to *all* HUD-FHA regulations necessary to maintain HUD-FHA approval."  TAC ¶ 99; SAC ¶ 91 (emphasis added).  The extraordinary breadth of those certifications renders it implausible that HUD or the GSEs would refuse to pay a claim for non-compliance with any one program requirement.  As the Supreme Court put it in rejecting a similarly broad proposition, "[t]he False Claims Act does not adopt such an extraordinarily expansive view of liability."  *Escobar*, 136 S. Ct. at 2004.

## IV.  THE COMPLAINT FAILS TO ADEQUATELY ALLEGE SCIENTER

Nor does the Complaint adequately allege scienter.  To survive a motion to dismiss, a *qui tam* relator must allege facts sufficient to establish that the defendant acted "knowingly."  31 U.S.C. § 3729(b)(1)(A).  Thus, a relator must "allege facts that give rise to a strong inference of fraudulent intent," and can do so "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).  "Simple negligence and innocent mistakes do not meet the level of scienter required by the FCA."  *U.S. ex rel. Howard v. Lockheed Martin Corp.*, 14 F. Supp. 3d 982, 993 (S.D. Ohio 2014) (internal citation omitted); *U.S. ex rel. Colucci v. Beth Israel Med. Ctr.*, 785 F. Supp. 2d 303, 316 (S.D.N.Y. 2011), *aff'd* 531 F. App'x 118 (2d Cir. 2013) (the FCA is intended to punish "wrongdoing," not honest mistakes).  The Supreme Court has stressed that the scienter standard is a "rigorous" one and that complaints may be dismissed at the pleading stage for failure to adequately allege this element.  *Escobar*, 136 S. Ct. at 2001.

Here, Relator does not allege "actual knowledge" on the part of the Servicer Defendants, nor could he.  The Servicer Defendants are not alleged to have received any excess profits from their purported scheme to fall short in their monitoring of foreclosure costs; and, as noted, the Servicer Defendants are frequently responsible for unreimbursed costs (including one-third of costs submitted to HUD), so they had nothing to gain by paying more than title searches and the like were worth.  *See* HUD Handbook 4330.4, 2-15(C)(2).

In addition, although "reckless disregard" can be sufficient under the FCA, neither negligence nor mere lack of oversight establishes "reckless disregard."  Instead, only an "aggravated form of gross negligence"—"gross negligence-plus"—is sufficient.  *U.S. v. Krizek*, 111 F.3d 934, 941-43 (D.C. Cir. 1997).  "The mere failure of a system to catch an error does not establish recklessness." *U.S. ex rel. Hefner v. Hackensack Univ. Med. Ctr.*, 495 F.3d 103, 110 (3d Cir. 2007).  Nor does the failure to conduct adequate quality control meet this rigorous scienter standard.  *See U.S. ex rel. Kirk v. Schindler Elevator Corp.*, 130 F. Supp. 3d 866, 879 (S.D.N.Y. 2015) ("[R]ecognizing the need for better quality control does not constitute 'reckless disregard' within the meaning of the FCA.").  But that is all the Servicer Defendants' alleged scheme consists of.

Furthermore, the Complaint could not allege that the Servicer Defendants knew the amounts were "excessive" or "unreasonable" when HUD and the GSEs did not provide an objective standard.  *Farmer*, 523 F.3d at 341 (finding evidence of scienter for alleged overbilling of HUD insufficient where HUD never "objectively define[d] what is a reasonable cost").  And where the GSEs *did* set an objective limit, such as when Freddie Mac set a limit for title work, there was no indication given by the GSEs that seeking reimbursement in amounts *below* that limit would later be deemed "excessive" or "unreasonable."

Finally, Relator's allegations that the Servicer Defendants ignored various red flags also fail to adequately allege scienter.  First, Relator alleges that the Servicer Defendants ignored new charges from vendors for services such as filing pleadings and delivering papers to court that were not regularly billed in the past.  TAC ¶ 155; SAC ¶ 148.  Relator, however, includes no specific allegations that charges for these costs are unallowable.  In fact, they are not included in the GSEs' lists of unallowable costs.  Fannie Mae 2012 Guide, Part VIII, § 106.04 (listing non-reimbursable costs); Freddie Mac 2012 Guide, Ch. 71.24 (same).   Second, Relator alleges that the Servicer Defendants ignored increasing charges for costs over time, despite attorneys' fees decreasing or remaining the same.  TAC ¶ 156; SAC ¶ 149.  Yet, as noted above, Freddie Mac has actually increased its allowable limits for title work in New York State from $250 to $510 from 2010 to 2017.  Relator then claims to have "repeatedly brought the illegal and excessive nature of affiliates' fees to the attention of various Bank Defendants" without specifying which Servicer Defendants were notified, much less when, how, or what they were notified about.  TAC ¶ 157; SAC ¶ 150.

While Relator suggests subpoenas from the Manhattan U.S. Attorney's Office in 2013 should have been a "red flag" (TAC ¶ 158; SAC ¶ 151), it should suffice to note that (1) the mere fact that the government is investigating is not evidence of a violation of law, and (2) following its investigation, the Government *declined* to intervene in this action against the Servicer Defendants. Finally, Relator claims that law firms' use of unaffiliated vendors with no geographic proximity to the site of a foreclosure should have been a red flag (TAC ¶ 160; SAC ¶ 153), without specifying that the Servicer Defendants were even aware of the geographic proximity issue, much less identifying any HUD or GSE rules or regulations requiring law firms to use vendors who are headquartered near the site of a foreclosure.

## V.     THE COMPLAINT FAILS TO ADEQUATELY ALLEGE REVERSE FALSE CLAIMS

To prove a reverse false claim, a relator must show: "(1) proof that the defendant made a false record or statement (2) at a time that the defendant had a presently-existing 'obligation' to the government," i.e., a "duty to pay money or property."[27]  *U.S. ex rel. Kester v. Novartis Pharms. Corp.*, 43 F. Supp. 3d 332, 367 (S.D.N.Y. 2014) (internal citations omitted).  Here, as explained above, none of the statements made by the Servicer Defendants was false.  In any event, the Complaint does not allege a pre-existing duty to pay money to the government.

### A.     Relator Does Not Allege an "Obligation" Under the FCA

As this Court has explained, the FCA requires an allegation that the defendant had "a *presently-existing* 'obligation' to the government—a duty to pay money or property." *Kester*, 43 F. Supp. 3d at 368 (internal citations and quotations omitted) (emphasis added).  Relator's claims fail as a matter of law because they do not allege that any Servicer Defendant had an "established duty" to reimburse HUD, Fannie Mae, or Freddie Mac.

Regarding Freddie Mac, Relator points to nothing—contractual, statutory, or otherwise— that purportedly required the Servicer Defendants to reimburse Freddie Mac.  *See* TAC ¶¶ 72-94; SAC ¶¶ 64-85.  Instead, Relator presumes that each Servicer Defendant immediately incurred an "obligation" under the FCA each time it received a purported overpayment from Freddie Mac, and that any failure to refund an overpayment is a reverse false claim.  *See* TAC at ¶ 479; SAC ¶ 337. Courts, however, including this one, repeatedly have held that a defendant's mere failure to refund false claims is not actionable as a reverse false claim.  *See U.S. ex rel. Ortiz v. Mount Sinai Hosp.*, 256 F. Supp. 3d 443, 457-58 (S.D.N.Y. 2017) (collecting cases and holding that a defendant's

---

[27] The heightened pleading standard of Rule 9(b) applies to claims alleging reverse false claims. *See Wood ex rel. U.S. v. Applied Research Assocs., Inc.*, 328 F. App'x 744, 748 (2d Cir. 2009).

failure to repay fraudulently-obtained payments is not a reverse false claim); *U.S. ex rel. Davern v. Hoovestol, Inc*., No. 11 Civ. 6630 (CJS), 2015 WL 6872427, at *9 (S.D.N.Y. Nov. 9, 2015) (same).  As one court has explained, the purpose of a reverse false claim cause of action is to ensure that a person who makes a false statement to avoid paying money owed to the government is equally liable under the FCA as if that person had submitted a false claim to receive money. *U.S. ex rel. Thomas v. Siemens AG*, 708 F. Supp. 2d 505, 514 (E.D. Pa. 2010).  Accordingly, the reverse false claim provision of the FCA is intended to address conduct that otherwise would escape liability under the FCA, not to provide a duplicate basis to assert a false statement claim under the Act.  *Id*.  Here, regarding Freddie Mac, Relator merely alleges that the Servicer Defendants failed to refund payments they were not entitled to receive.  That purported conduct is not separately actionable under 31 U.S.C. § 3729(a)(1)(G).

Relator's allegations regarding Fannie Mae and HUD fare no better.  According to Relator, the Servicer Defendants had an "existing obligation" to repay the alleged overpayments pursuant to their agreements with Fannie Mae and HUD.  *See* TAC, ¶¶ 71, 112; SAC ¶¶ 63, 104.  Relator is wrong.  Relator has selectively quoted from the Fannie Mae Servicing Guide and a HUD Handbook to imply that those provisions are self-executing.  They are not.  When viewed in their totality, those provisions demonstrate that refunds are due only when HUD or Fannie Mae requests them.  Specifically, the Fannie Mae Servicing Guide provides: "The servicer is responsible for monitoring the fees or expenses charged by any ABE and Fannie Mae ***will require*** the servicer to reimburse Fannie Mae for any unreasonable or excessive fees or costs."  Fannie Mae 2012 Guide, Part VIII, § 106.03 (emphasis added).  Similarly, the HUD Handbook provides that HUD will review claim files and the servicer will be required to issue refunds for any overpayments identified by HUD.  *See* HUD Handbook, 4330.4, § 1-16 ("HUD or its agent may conduct a review of the

claim file at any time within three years after the claim is paid. . . . It is the responsibility of the Servicing Mortgagee to remit any overpayments identified on claim payments made by HUD. . . . Mortgagees must promptly reimburse HUD for any amount overpaid because of incorrect, unsupported or inappropriate information provided by the mortgagee."). Refunds that are due only upon demand are not "obligations" under the FCA, and Relator never alleges that HUD or the GSEs ever demanded a refund. Accordingly, his reverse false claims counts fail as a matter of law. *See, e.g., U.S. ex rel. Landis v. Tailwind Sports Corp.*, 160 F. Supp. 3d 253, 272 (D.D.C. 2016) ("unless the relevant legal instrument imposes a self-executing obligation to render money or property to the United States," there is no "obligation" for purposes of reverse false claims liability).

### B.   Relator Does Not Plausibly Allege That the Servicer Defendants Acted "Knowingly"

The reverse false claim counts also should be dismissed because Relator does not adequately allege scienter. To support a reverse false claim, Relator must allege facts showing that the Servicer Defendants *knowingly* concealed or *knowingly* and improperly avoided an obligation to reimburse the government. 31 U.S.C. § 3729(a)(1)(G). Relator has not alleged that, *with respect to any purported refunds they owed*, the Servicer Defendants acted knowingly. Indeed, the Complaint is devoid of a single allegation supporting an inference that the Servicer Defendants knew of any particular overpayment that had gone unreimbursed. He simply speculates in a conclusory fashion that "[n]one of the [Servicer] Defendants, upon information and belief, complied with [the] obligation" "to return retained overpayments." TAC ¶¶ 479-83; SAC ¶¶ 337-41. Because Relator has failed to allege knowledge of such an obligation, he cannot plausibly allege that any Servicer Defendant *knowingly* avoided or concealed any obligation to repay. *See U.S. ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 507 (3d Cir. 2017) ("under the

FCA['s] plain language, the . . . defendants could not have 'knowingly and improperly avoid[ed] or decrease[d] an obligation' to pay . . . at the time of their alleged misconduct because the obligation did not yet exist") (quoting 31 U.S.C. § 3729(a)(1)(G)).

### C.   Relator Fails to Adequately Allege Fraudulent Concealment

Relator also does not allege with particularity any act of concealment or avoidance by the Servicer Defendants related to any amounts they allegedly should have refunded.  The Complaint fails to specify, for example, who sought to conceal or avoid reimbursing HUD, Fannie Mae, or Freddie Mac, and when and where that alleged fraudulent conduct occurred.  *See U.S. ex rel. Vallejo v. Investronica, Inc.*, 2 F. Supp. 2d 330, 336-37 (W.D.N.Y. 1998) (dismissing FCA complaint that did not allege "the exact dates the representations were made, the place where the alleged fraud took place, and the identity of the person making the representations").  Instead, Relator alleges only generally that the Servicer Defendants, ***as a whole***, "wrongfully concealed such overpayments and avoided repaying them."  TAC ¶ 485; SAC ¶ 343.  That allegation is "too nonspecific to meet the heightened pleading requirements of Rule 9(b)."  *U.S. ex rel. Joseph v. Brattleboro Retreat*, No. 13 Civ. 55 (WKS), 2014 WL 3908432, at *11 (D. Vt. Aug. 10, 2014).

## VI.   THE COMPLAINT FAILS TO ALLEGE THAT REIMBURSEMENT CLAIMS SUBMITTED TO THE GSES WERE PAID WITH U.S. TREASURY FUNDS

Even if Relator could allege an FCA violation with respect to HUD, he has not pleaded any entitlement to relief under the FCA with respect to the GSEs, because the Servicer Defendants' requests for reimbursement do not meet the statutory definition of "claim."

As a result of the 2009 amendment to the FCA, the statute now covers requests or demands for payment made to non-governmental "contractors, grantees, or other recipients."  The GSEs are not alleged to be government "contractors" or "grantees."  Even if they are considered "other

recipients" within the meaning of the statute,[28] the FCA applies only if the requests or demands

that are made to such third parties meet two additional requirements.  *First*, the statute does not

apply unless the money or property that is the subject of the demand to the third party "is to be

spent or used on the Government's behalf or to advance a Government program or interest."  31

U.S.C. § 3729(a).  *Second*, the FCA will not cover a request or demand to third parties unless the

U.S. government "provides or has provided," or "will reimburse" the third party for, "any portion

of the money or property" that is "requested or demanded."  *Id.*  Relator has not pleaded allegations

sufficient to meet either prong.  Nor could Relator, given that the GSEs are concededly private

entities; the transactions at issue are day-to-day operational matters pursuant to long-time contracts

with the GSEs that were in place long before the government invested capital into those entities;

and the government has not lost a penny on those investments—in fact, it has made $87 billion.

On the first prong of the definition, the money that the Servicer Defendants requested from

the GSEs as reimbursement for certain foreclosure expenses was not "spent or used on the

---

[28] Because the GSEs are neither government "contractor[s]" nor "grantee[s]," claims made to them fall within the scope of the FCA only if they qualify as "other recipient[s]."  31 U.S.C. § 3729(a). They do not.  It is a well-established interpretive canon that "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words."  *Washington State Dep't of Social & Health Servs., v. Guardian Estate of Keffeler*, 537 U.S. 371, 384-85 (2003) (internal citations omitted).  Here, however, GSEs are in no way "similar in nature" to government contractors or grantees.  When the government provides funds to a government "contractor" or "grantee," it typically earmarks specific funds to cover specific work on specific projects.  In those contexts, it is therefore clear when the defendant has made a "request or demand" for at least a portion of federal money, and when the government in turn provides the defendant a portion of the money "requested or demanded."  *Id.*  And in those contexts, the amount requested or demanded typically aligns dollar for dollar with the "amount of damages which the Government sustains." 31 U.S.C. § 3729(a).  But as the Complaint itself acknowledges, "Treasury did not earmark" the funds it provided to Fannie Mae and Freddie Mac.  TAC ¶¶ 58, 85; SAC ¶¶ 50, 77.  Here, the government made a general capital injection in return for valuable rights.  For that reason, there is no way to identify the money "requested or demanded" and no obvious relation between any claim and any loss that the "Government" sustains.

Government's behalf or to advance a Government program or interest." *Id.* The GSEs are not the government. 12 U.S.C. §§ 1716(b), 1452. The government does not have a program of foreclosing on homes, and Relator does not allege that the government has any particular interest in doing so. The fact that the government injected capital into the GSEs, allegedly in order to serve the governmental interest of keeping these private entities afloat, does not mean that every day-to-day commercial interaction with the GSEs advances a government interest, particularly when there is no allegation that those routine dealings in any way threatened the GSEs' financial stability.

Nor has Relator satisfied the second prong—that the government "provides or has provided any portion of the money or property requested or demanded." 31 U.S.C. § 3729(a). Relator alleges that the U.S. Treasury invested capital in the GSEs under SPAs, and that the GSEs generally used "some portion of the funds provided by Treasury's investment" to "pay foreclosure expense claims." TAC ¶¶ 58, 85; SAC ¶¶ 50, 77. Beyond these conclusory assertions, however, Relator offers no detail as to which reimbursement claims, submitted by which Servicer Defendant, at what point in time, for how much, were paid by the GSEs with money or property of which the U.S. government "provided any portion."

Under the better reasoned case law on this subject, a relator must show that the government "provide[d] at least a portion of the *specific* 'money or property requested' or reimburse[d] the grantee for that *specific* demand." *Garg* v. *Covanta Holding Corp.*, 478 F. App'x 736, 741 (3d Cir. 2012) (emphasis added); *see also, e.g.*, *McCrary* v. *Knox Cty., Indiana*, 200 F. Supp. 3d 782, 792 (S.D. Ind. 2016) (no FCA liability where county "receive[d] some federal funds" that were not "t[ied]" to specific project); *U.S.* v. *McMahon*, No. 11 Civ. 04620 (RMD), 2015 WL 115763,

at *9 (N.D. Ill. Jan. 5, 2015) (no FCA liability where HUD provided $200 million to housing authority but relator did not show that "HUD funding made its way into Defendants' hands").[29]

Relator's allegations about the government's investments in the GSEs do not satisfy this requirement of a specific nexus between the Servicer Defendants' reimbursement demands and the government's money.  The GSEs, again, are not government entities; they are independent, for-profit companies, with public investors, that happened to receive additional capital from the government during an emergency bailout.  As one court has held, the "fact that Freddie Mac must rely on injections of federal capital . . . does not change the equally relevant fact that Freddie Mac still generates revenue pursuant to its operation within the secondary mortgage market." *U.S. ex rel. Todd* v. *Fid. Nat'l Fin., Inc.*, No. 12 Civ. 666 (SLB), 2014 WL 4636394, at *10-11 (D. Colo. Sept. 16, 2014) (dismissing FCA cause of action for failure to satisfy the statutory definition of "claim"); *see also* Fannie Mae Form 2012 10-K (Apr. 2, 2013) at 66 (positive net revenues from 2008 to 2012);[30] Freddie Mac 2012 Form 10-K (Feb. 28, 2013) at 83 (positive net interest income from 2008 to 2012).[31]  Given that the GSEs generate cash from multiple sources, Relator cannot satisfy the statutory requirement that the government have "provided any portion of the money or property" that the Servicer Defendants "requested or demanded."

---

[29] The Servicer Defendants acknowledge that the case law is not uniform on this requirement of a specific nexus between the government's money and the demand made upon a third party.  The Servicer Defendants respectfully submit, however, that the cases requiring such a nexus are more faithful to the statutory definition of "claim" under 31 U.S.C. § 3729(b)(2)(A)(ii), and further note that the cases that have not required a nexus have involved requests for reimbursement that, unlike those here, fell clearly within the purpose of the federal grant. *See, e.g.*, *U.S. ex rel. Garbe* v. *Kmart Corp.*, 824 F.3d 632 (7th Cir. 2016) (pharmacy requested reimbursement of prescription costs from third-party sponsors of Medicare plans).

[30] *Available at* http://www.fanniemae.com/resources/file/ir/pdf/quarterly-annual-results/2012/10k_2012.pdf.

[31] *Available at* https://www.sec.gov/Archives/edgar/data/1026214/000119312513084154/d477952d10k.htm.

Consistent with this requirement that money be "provided" by the government, courts have also required that demands to third parties "cause economic loss to the government" in order to qualify as "claims" under the statute. *Garg*, 478 F. App'x at 741 (internal citation omitted). Where, as here, "a relator is relying upon the definition of the term 'claim' that requires that money be 'provided' by the government, then the money must actually be provided by the government such that the false claim causes financial loss to the government." *Lyttle v. AT&T Corp.*, No. 10 Civ. 1376 (RCM), 2012 WL 6738242, at *20 (W.D. Pa. Nov. 15, 2012).

The reimbursement requests that the Servicer Defendants have made to the GSEs have not cost the government a penny. The U.S. Treasury, as the "Purchaser" under SPAs with Fannie Mae and Freddie Mac, invested capital in return for preferred stock with generous preference and dividend rights and a warrant for 79.9% of the GSEs' common stock. With each infusion of Treasury capital under the SPAs, the amount invested was added, dollar-for-dollar, to Treasury's preference right. And, indeed, that deal, far from causing financial loss to taxpayers, has generated enormous returns for the government: as of December 31, 2017, the GSEs have repaid *$87 billion more* than Treasury invested.[32] And directly belying any notion that anyone has absconded with government money through GSE reimbursement of foreclosure costs, GSE stockholders have recently sued the government for confiscating billions of dollars of their money. *See Rafter v. U.S.*, Case No. 14-740C (Fed. Cl. Apr. 20, 2018). Relator has not plausibly shown "economic loss" and thus cannot state a claim under 31 U.S.C. § 3729(b)(2)(A)(ii)(I).

Perhaps recognizing that the government's massive profits on the GSEs undercut the claims alleged here, Relator offers a sweeping alternative argument about loss: the Servicer Defendants' reimbursement demands give rise to FCA liability, Relator alleges, because any "false

---

[32] *See* Fannie Mae 2017 Form 10-K at 4; Freddie Mac 2017 Form 10-K at 3.

claim paid by [the GSEs] decreases the dividend paid to Treasury" under the terms of the SPA as amended in 2012.  TAC ¶¶ 58, 85; SAC ¶¶ 50, 77.  But even in more straightforward FCA cases involving demands upon the government itself, the government does not "provide" funds under the statute—or "reimburse" funds—unless it "pay[s] out sums of money."  *U.S.* v. *Neifert-White Co.*, 390 U.S. 228, 233 (1968).  And in *Garg*, the Third Circuit rejected the relator's theory that the federal government "provided" money to a state agency by allowing it to issue bonds that were exempt from federal tax, holding that the FCA applies only where the federal government "pay[s] out money."  478 F. App'x at 741.  By the same token, a reduction in dividend payments from the GSEs *to the government* is not a "paying out" *by the government*, and thus does not support an FCA claim.  This is particularly so when the dividends earned by the government today are far in excess of its capital investment.

These requirements that requests or demands upon a third party have a connection to money the government "provided" and cause the government a loss not only jibe with the statutory language, they also make practical sense.  If recovery were available for "fraud against anyone who happens to receive money from the federal government," the "scope of the FCA would be enormous."  *Garg*, 478 F. App'x at 741.  Relator's theory could encompass fraud against students who earn Pell Grants or accept government loans, and indeed most Americans benefit from at least some form of federal tax break.  Nothing in the statutory text, case law, or legislative history suggests the FCA was meant to reach that far.  Relator's allegations concerning the demands for reimbursement that Servicer Defendants presented to the GSEs should be dismissed.[33]

---

[33] In *U.S. ex rel. Adams* v. *Aurora Loan Servs., Inc.*, the Ninth Circuit observed in dicta that claims to the GSEs could give rise to FCA liability, although "relators raised no argument on that point in the district court, nor here on appeal."  813 F.3d 1259, 1261 (9th Cir. 2016).  Likewise, in *U.S. v. Countrywide Financial Corp.*, this Court noted that the FERA amendment "*arguably* extends the FCA to false claims made to" the GSEs, although the claims were dismissed for failure to meet

## VII.   THE COMPLAINT FAILS TO ALLEGE A "NATIONWIDE" SCHEME

The Complaint should also be dismissed to the extent it attempts to allege a "pattern and practice of impermissible overcharges of foreclosure expenses procured by law firms nationwide." TAC ¶ 475; SAC ¶ 333.  In doing so, the Complaint makes two leaps of imagination—from two law firms in Western New York to a majority of foreclosure firms across the country, and from allegedly improper use of ABEs to use of vendors as to whom no affiliation exists or is alleged.

The Complaint alleges no facts to fill in these gaps, but only a handful of vague and general allegations that purportedly connect the conduct of the Foreclosure Defendants to unrelated and generally unnamed law firms throughout the country.  *See* TAC ¶ 162; SAC ¶ 155 ("The [Servicer] Defendants' failures as described above were national in scope."); TAC ¶ 163; SAC ¶ 156 ("the affiliate model exists throughout the country"); TAC ¶ 165; SAC ¶ 158 ("On information and belief, the majority of the [Servicer] Defendants' law firms handling foreclosure actions have engaged in similar affiliate schemes.").   These conclusory allegations are insufficient to extrapolate the alleged Rosicki/McCabe scheme nationwide.  *See Ladas*, 824 F.3d at 26-27 ("conclusory statements" and "hypotheses" do not satisfy Rule 9(b)); *U.S. ex rel. Mooney v. Americare, Inc.*, No. 06 Civ. 1806 (FB) (VVP), 2013 WL 1346022, at *7 (E.D.N.Y. Apr. 3, 2013) (requiring "representative samples of the broader class of claims to enable the defendant to infer with reasonable accuracy the precise claims at issue") (internal citation and quotation omitted).

Nor does the handful of "example" loans cited in the Complaint suffice to allege a "nationwide" scheme.  To extrapolate from a sample to a larger universe, a complaint must allege sufficient examples that are "representative . . . of the broader class of claims." *Tessler*, 2016 WL

---

the Rule 9(b) particularity requirement.  961 F. Supp. 2d 598, 609 (S.D.N.Y. 2013) (emphasis added).  This Court also recognized that "[p]rior to May 20, 2009, the False Claims Act did not encompass [FCA] claims when made to entities like Fannie Mae and Freddie Mac."  *Id.*

7335654, at *2; *Relief of the Ruptured & Crippled*, 2014 WL 3905742, at *14 (examples of false claims "should be illustrative, such that a materially similar set of claims could have been produced with a reasonable probability by a random draw from the total pool of all claims") (internal citations and quotations omitted).  The Complaint utterly fails that test.  For several Servicer Defendants, the "examples" do not involve the Foreclosure Defendants, and there are no allegations to support extrapolating the Foreclosure Defendants' alleged scheme to other law firms. Nor has Relator alleged that the fraudulent scheme occurred during a particular time period, making it impossible to determine whether the "example" claims are temporally representative of the overall scheme.  In fact, Relator does not specify the date or year in which *any* "example" claim was submitted.  *See, e.g.*, SAC ¶ 219 (claim allegedly submitted "sometime after February 2013").  Finally, while Relator alleges that the Servicer Defendants (collectively) submitted "thousands" of fraudulent claims to HUD, Freddie Mac, and Fannie Mae, for most Servicer Defendants Relator identifies only *one* "example" claim submitted by each Servicer Defendant to HUD, Freddie Mac, and Fannie Mae.  Such a small sample of non-representative loans is insufficient to enable the Servicer Defendants to ascertain with "reasonable accuracy the precise claims at issue" from the thousands of claims each Servicer Defendant submitted nationwide.  If merely alleging one or two non-representative examples sufficed to plead that each defendant engaged in a nationwide scheme to defraud, the "representative" claim requirement would be practically meaningless.

Further, the Complaint fails to allege any scheme to defraud based on fees charged by non-affiliates of foreclosure law firms and fails to offer an explanation of why a law firm would knowingly pass along an inflated charge from an unaffiliated vendor.  Incredibly, although the crux of Relator's allegations against the Foreclosure Defendants is that those firms fraudulently

used ABEs (*see* TAC ¶¶ 122-147; SAC ¶¶ 114-140), the majority of Relator's "illustrative" examples do not relate to the use of ABEs at all.[34]   To the extent the Complaint alleges that other firms engaged in over-billing, or that any firm knowingly defrauded HUD or the GSEs for no apparent financial gain, those allegations relate to a different scheme than the one in which the Foreclosure Defendants were purportedly involved.   As explained above, the Complaint fails to allege a scheme by the Foreclosure Defendants as to ABE fees, and it certainly does no more.   The Complaint's unexplained and unsupported attempts to extrapolate the alleged conduct of the Foreclosure Defendants to other law firms and unaffiliated vendors should be dismissed.

## VIII.   THE COMPLAINT SHOULD BE DISMISSED UNDER THE PUBLIC DISCLOSURE BAR TO THE EXTENT IT ALLEGES LIABILITY FOR CLAIMS SUBMITTED PRIOR TO MARCH 2010

Finally, the Court should dismiss the Complaint under the FCA's public disclosure bar to the extent it alleges liability for claims submitted prior to March 2010.[35]

The purpose of the public disclosure bar is to prevent "parasitic lawsuits" by individuals, such as Relator, who "learn of the fraud through public channels and seek remuneration although they contributed nothing to the exposure of the fraud."   *See U.S. ex rel. Doe v. John Doe Corp.*,

---

[34] For example, the Complaint alleges that the Aronowitz Firm "purchased . . . title work from unaffiliated title companies."  *See* TAC ¶¶ 193, 201, 224, 238, 245, 298, 314, 321, 344, 352, 360, 395, 416, 439, 440, 447, 448, 464-65, 471; SAC ¶¶ 217, 269.   The Complaint similarly fails to allege the fraudulent use of affiliate vendors by the Stern Firm, the Shapiro Firm, the Baum Firm, the Fein Such Firm, and the Medved Firm.   TAC ¶¶ 217, 255; SAC ¶¶ 183, 204 (Stern); TAC ¶¶ 231, 388; SAC ¶¶ 165, 230, 262, 314 (Shapiro); TAC ¶ 250 (Baum); TAC ¶¶ 291, 409; SAC ¶¶ 246, 281 (Fein Such); TAC ¶¶ 382, 423; SAC ¶¶ 211, 275 (Medved).

[35] Congress amended the FCA's public disclosure bar effective March 23, 2010, to allow the Government to oppose dismissal of an action on this basis.  *See* Act of Mar. 23, 2010, Pub. L. No. 111-148, § 10104(j)(2), 124 Stat. 119.   At the April 17, 2018 conference in this matter, the United States Attorney's Office announced that it opposed dismissal on that basis.  *See* Apr. 17, 2018 Hr'g Tr. at 21:5-20.   Because the March 2010 amendment is not retroactive, however, the Government's opposition does not preclude dismissal of claims concerning pre-March 2010 conduct.   *See U.S. ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 103 n.4 (2d Cir. 2010), *rev'd and remanded*, 563 U.S. 401 (2011); *U.S. ex rel. Amico v. Deutsche Bank, AG*, No 15 Civ. 9551 (CM), 2017 WL 2266988, at *4 (S.D.N.Y. May 8, 2017).

960 F.2d 318, 319 (2d Cir. 1992).  To that end, and prior to its amendment in 2010, the bar divested

courts of jurisdiction over an action "based upon the public disclosure of allegations or

transactions" in certain sources, including the "news media," unless (a) the action is brought by

the Attorney General or (b) the relator qualifies as an "original source."  31 U.S.C. § 3730(e)

(2009).  Under that standard, courts are required to dismiss an action that is based "in any part"

upon facts "substantially similar" to those disclosed pre-complaint in the news.  *See U.S. ex rel.*

*Ping Chen v. EMSL Analytical, Inc.*, 966 F. Supp. 2d 282, 296 and n.11 (S.D.N.Y. 2013); *see also*

*U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1158 (2d Cir. 1993).[36]

The ultimate question is whether the information disclosed pre-complaint was enough to "set the

government squarely on the trail of a specific and identifiable defendant's participation" in the

alleged fraud without Relator's assistance.  *See U.S. ex rel. Kester v. Novartis Pharms. Corp.*, No.

11 Civ. 8196 (CM), 2015 WL 109934, at *8 (S.D.N.Y. Jan. 6, 2015).  When a relator "strings

together information [he or she] could have gleaned from news reports, government publications,

court filings [and] publicly available documents," as Relator does here, the complaint must be

dismissed.  *See U.S. ex rel Advoc. for Basic Legal Equal. v. U.S. Bank, N.A.,* No. 13 Civ. 704 (JZ),

2015 WL 2238660, at *11 (N.D. Ohio May 12, 2015), *aff'd* 816 F.3d 428 (6th Cir. 2016).

Here, the "scheme" Relator purports to allege—one of foreclosure law firms overcharging,

and using affiliates to overcharge, servicers for expenses—had been *exhaustively* reported in the

national press for nearly two decades before Relator commenced this action in 2012.[37]   For

---

[36] The Court may take judicial notice of the fact of "press coverage, prior lawsuits, [and] regulatory filings" on a motion to dismiss raising this defense.  *See, e.g.*, *Ping Chen*, 966 F.2d at 294.

[37] *See, e.g.*, Declaration of Andrew W. Schilling ("Decl."), Ex. A, Robert Johnson & John D. McKinnon, *Florida Bar to Study Foreclosure Charges*, Wall St. J. (Sept. 9, 1998) ("Foreclosure Charges") (describing lawsuits alleging inflated foreclosure-related costs charged by law firms through their subsidiaries and paid by GSEs); Decl. Ex. B, Gretchen Morgenson & Jonathan D. Glater, *Foreclosure Machine Thrives on Woes*, N.Y. Times (Mar. 30, 2008) ("small army" of law

example, the *Wall Street Journal* reported in September 1998 allegations that "foreclosure attorneys presented bills with inflated charges for items such as title research [and] the serving of process papers . . . . [with] the work performed by subsidiaries of [the attorneys'] own firms" and that this was happening because the "foreclosure attorneys' clients are commercial lenders or government agencies such as [Fannie Mae]" which were "generally much more flexible in allowing lawyers to bill for expenses" as opposed to attorneys' fees, which were pre-set.[38]  Many articles specifically identified servicers that are named in this action as clients of the law firms that were being investigated.[39]  Even if the prior public disclosures do not specifically identify every single Servicer Defendant, those disclosures bar Relator's claims because they "provide enough information about the participants in the scheme such that the defendant is identifiable" to the government.  *Kester*, 2015 WL 109934, at *8; *see also In re Nat. Gas Royalties*, 562 F.3d 1032, 1042-43 (10th Cir. 2009) (*qui tam* action against hundreds of defendants was properly dismissed because prior disclosures "named a significant percentage of industry participants as wrongdoers and indicated that others in the industry were very likely engaged in the same practices.").

---

firms known as "foreclose mills" charging dubious foreclosure expenses); Decl. Ex. C, Andy Kroll, *Fannie and Freddie's Foreclosure Barons*, Mother Jones (Aug. 4, 2010) ("Foreclosure Barons"); Decl. Ex. D, Paige St. John, *Plaintiffs Seek Class Action Status for Case Against Tampa, Fla., Law Firm*, Tallahassee Democrat (May 8, 1999); Decl. Ex. E, Aldo Svaldi & Greg Griffin, *Foreclosing on the American Dream*, Denver Post (Dec. 26, 2006).  Public disclosures post-dating March 2010 are still relevant to assessing whether the pre-amendment public disclosure bar applies to pre-amendment conduct.  *See, e.g.*, *U.S. ex rel. JDJ & Assocs. LLP v. Natixis*, No. 15 Civ. 5427 (PKC), 2017 WL 4357797, at *4 n.1 (S.D.N.Y. Sept. 29, 2017).

[38] Foreclosure Charges, at 1.

[39] *See* Foreclosure Charges (describing scheme in which Florida law firm passed along excessive costs to servicers including SunTrust); Decl. Ex. F, David McLaughlin, *Foreclosure Fortune Buys Bugatti, Yacht for Attorney*, Bloomberg (Oct. 19, 2010) ("Foreclosure Fortune") (referencing Wells Fargo, BOA, and JPMC as clients of Stern law firm being investigated for wrongful foreclosure practices); Decl. Ex. G, Richard Wilner, *Liening on NY Homeowners*, New York Post (Feb. 28, 2010) (referencing JPMC, BOA, Wells Fargo, U.S. Bank, Citibank, and OneWest as clients of Baum law firm being investigated for wrongful foreclosure practices).

Furthermore, Relator's specific claims as to the Servicer Defendants—that they failed "to monitor" and conduct sufficient "quality control" over vendor invoices[40]—is entirely duplicative of publicly-disclosed information. In April 2011, federal regulators publicly launched enforcement actions against a number of mortgage servicers, including several of the Servicer Defendants (BOA, Citi, EverBank, JPMC, MetLife Bank, PNC, U.S. Bank, and Wells Fargo), charging them with "fail[ing] to sufficiently oversee outside counsel and other third-party providers handling foreclosure-related services" and "fail[ing] to devote to [their] foreclosure processes adequate oversight [and] internal controls."[41] These regulatory actions, and the ensuing consent orders, were widely publicized. *See, e.g.*, *U.S. ex rel. Advoc. for Basic Legal Equal., Inc.*, 816 F.3d at 431 (affirming dismissal of a servicing-related *qui tam* action against servicer under the public disclosure bar based on OCC consent order). Indeed, Relator *himself* publicly disclosed these allegations about the Rosicki defendants on his own website before filing this action.[42]

---

[40] *See* TAC ¶¶ 11, 117, 149-51; SAC ¶¶ 11, 109, 142-44.

[41] *See* OCC News Release, *OCC Takes Enforcement Action Against Eight Servicers for Unsafe and Unsound Foreclosure Practices* (Apr. 13, 2011), *available at* https://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47.html (includes consent orders cited below); Consent Order at 3, *In the Matter of U.S. Bank* (Apr. 13, 2011); Consent Order at 3, *In the Matter of Bank of America* (Apr. 13, 2011); Consent Order at 3, *In the Matter of Citibank* (Apr. 13, 2011); Consent Order at 3, *In the Matter of EverBank* (Apr. 13, 2011), *available at* https://www.occ.gov/static/ots/misc-docs/consent-orders-97664.pdf; Consent Order at 3, *In the Matter of JPMorgan Chase Bank* (Apr. 13, 2011); Consent Order at 3, *In the Matter of MetLife Bank* (Apr. 13, 2011); Consent Order at 3, *In the Matter of PNC Bank* (Apr. 13, 2011); Consent Order at 3, *In the Matter of Wells Fargo Bank* (Apr. 13, 2011); *see also* Decl. Ex. H, Federal Reserve System, Office of the Comptroller of the Currency, Office of Thrift Supervision, *Interagency Review of Foreclosure Policies and Practices* at p. 3 (Apr. 2011). These actions were widely reported in the news media. *See, e.g.*, Decl. Ex. I, Diana Olick, *Federal Regulators Hit Banks on Mortgage Practices*, CNBC (Apr. 13, 2011) (reporting that mortgage servicers will "have to overhaul oversight of third-party vendors . . . who provide foreclosure services"); Decl. Ex. J, Julie Schmit & Paul Davidson, *Major Banks Told to Review Foreclosures*, USA Today, Apr. 13, 2011 ("[M]ortgage servicers agreed to make changes that will include . . . [i]ncreasing supervision of third-party vendors.").

[42] Decl. Ex. K, Peter D. Grubea, *Has Rosicki & Rosicki Associates Handled a Foreclosure Against You?*, Peter Grubea Attorneys (Mar. 26, 2012) ("Grubea Blog Post"); Decl. Ex. L, Jonathan D.

Because the allegations were all publicly disclosed prior to this suit, the Court must dismiss the allegations concerning pre-March 2010 transactions by the Servicer Defendants unless Relator qualifies as an "original source." *See* 31 U.S.C. § 3730(e)(4). He does not. The pre-March 2010 version of the statute requires a relator to have "direct and independent knowledge of the information" alleged in the complaint, meaning "knowledge obtained from actually viewing source documents, or first-hand observation of the fraudulent activity that provides the grounds for the *qui tam* suit." *Ping Chen*, 966 F. Supp. 2d at 300; *see also U.S. v. New York Med. Coll.*, 252 F.3d 118, 120 (2d Cir. 2001) (relator is not an original source "if a third party is the source of the core information upon which the *qui tam* complaint is based") (internal citation and quotation omitted). Here, Relator alleges no such "direct and independent" knowledge. Rather, he alleges that he is a bankruptcy attorney in New York and spoke with foreclosure lawyers in that state. *See* TAC ¶¶ 488, 490; SAC ¶¶ 346, 348. He does not allege having worked for any Servicer Defendant, Foreclosure Defendant, HUD, or GSE. Relator does not identify any direct or independent knowledge of the transactions referenced in the Complaint concerning New York properties, let alone the transactions concerning Colorado and Florida properties. Indeed, Relator did not raise a single allegation concerning Colorado until *after* the Colorado Attorney General launched litigation against foreclosure law firms in the state, and many of Relator's allegations appear to have been taken directly from filings in the Colorado Attorney General action, not from any "direct and independent knowledge" on the part of Relator.[43] And as to transactions regarding

---

Epstein, *Foreclosure Accusations Prompt Suit*, The Buffalo News (Aug. 11, 2012); Decl. Ex. M, Martha Neil, *Foreclosure Law Firm Sues Bankruptcy Attorney Who Questioned its 'Systematic Overbilling,'* ABA Journal (Aug. 13, 2012).

[43] *Compare, e.g.*, Decl. Ex. N, Compl., *Colorado ex rel. Suthers v. Aronowitz & Mecklenburg, LLP*, No. 2014-cv-32765, at 3 ¶ 8 (Denver Dist. Ct. July 14, 2014) (alleging Aronowitz firm charged "$250 to $275 for title search reports when the market rate is $100" and "$35 for a tax search/tax certification when the actual cost is $10 or less"), *with* TAC ¶¶ 471, 194 (alleging

properties in New York, it is clear that Relator has no direct and independent knowledge but instead solicited such information by advertising his lawsuit on his website—"investigative" efforts which, as a matter of law, do not make Relator an original source.[44]  *See U.S. ex rel. Rosner v. WB/Stellar IP Owner, L.L.C.*, 739 F. Supp. 2d 396, 408 (S.D.N.Y. 2010) (relator not an "original source" despite "investigative efforts" that included interviewing Section 8 tenants and reviewing their leases to determine that defendants were impermissibly charging market rents); *see also Kreindler*, 985 F.2d at 1159 (attorney-relator was not an "original source" when he merely conducted "research and investigations" based on information from a "third party").  Because Relator does not qualify as an "original source," his pre-March 2010 claims should be dismissed.

## CONCLUSION

For all of the foregoing reasons, the Court should dismiss the Complaint as against the Servicer Defendants in its entirety.  Dismissal should be with prejudice because further amendment would be futile.

---

Aronowitz firm "charged $250-275 for title work" when market rate is "$100 to $125" and charged "$35 for a title tax search" when market rate is "$10 or less").

[44] *See* Grubea Blog Post ("If you are facing a foreclosure by the Rosicki Firm or if you have reinstated or modified a mortgage that was in a foreclosure handled by the Rosicki Firm within the past six years, we would like to hear from you.").

Dated:  April 27, 2018
        New York, New York

Respectfully submitted,

BUCKLEY SANDLER LLP

By:    /s/ Andrew W. Schilling
       Andrew W. Schilling
       Ross E. Morrison
       John B. Williams III
       Brian J. Wegrzyn
       1133 Avenue of the Americas, Suite 3100
       New York, New York 10036
       Tel: (212) 600-2330
       Fax: (212) 600-2405
       aschilling@buckleysandler.com
       rmorrison@buckleysandler.com
       jwilliams@buckleysandler.com
       bwegrzyn@buckleysandler.com

       *Attorneys for Defendants Cenlar FSB, Ditech Financial LLC f/k/a Greentree Servicing LLC, Green Tree Credit, Flagstar Bank, FSB, MetLife Bank, N.A., Nationstar Mortgage LLC, PHH Mortgage Corp., SunTrust Mortgage, Inc., and U.S. Bank N.A.*

DEBEVOISE & PLIMPTON LLP

By:    /s/ Matthew L. Biben
       Matthew L. Biben
       Courtney M. Dankworth
       David Sarratt
       919 Third Avenue
       New York, New York 10022
       Tel. (212) 909-6000
       Fax: (212) 909-6836
       mlbiben@debevoise.com
       cmdankwo@debevoise.com
       dsarratt@debevoise.com

       *Attorneys for Defendants EverHome Mortgage Company and EverBank FSB*

TROUTMAN SANDERS LLP

By:   /s/ Amy Pritchard Williams
         Amy Pritchard Williams
         301 S. College Street, Suite 3400
         Charlotte, NC 28202
         Tel. (704) 998-4102
         Fax: (704) 998-4051
         amy.williams@troutman.com

By:   /s/ Stephen G. Rinehart
         Stephen G. Rinehart
         875 Third Avenue
         New York, NY 10022
         Tel. (212) 704-6000
         Fax: (212) 704-6288
         stephen.rinehart@troutman.com

         *Attorneys for James B. Nutter & Co.*

ALSTON & BIRD LLP

By:   /s/ Edward T. Kang
         Edward T. Kang
         Kelley C. Barnaby
         950 F Street, NW
         Washington, D.C. 20004-1404
         Tel. (202) 239-3728
         Fax: (202) 654-4918
         edward.kang@alston.com
         kelley.barnaby@alston.com

         *Attorneys for James B. Nutter & Co.*

WACHTELL, LIPTON, ROSEN & KATZ

By:   /s/ Jonathan M. Moses
       Jonathan M. Moses
       John F. Lynch
       Kevin M. Jonke
       Leah S. Rizkallah
       51 West 52nd Street
       New York, New York 10019
       Tel. (212) 403-1000
       Fax: (212) 403-2000
       jmmoses@wlrk.com
       jlynch@wlrk.com
       kmjonke@wlrk.com
       lsrizkallah@wlrk.com

       *Attorneys for PNC Bank, N.A.*

MAYER BROWN LLP

By:   /s/ Daniel Stein
       Daniel Stein
       1221 Avenue of the Americas
       New York, New York 10020
       Tel. (212) 506-2646
       Fax: (212) 849-5573
       dstein@mayerbrown.com

       *Attorneys for Citigroup Inc., Citibank, N.A., and CitiMortgage, Inc.*

MORGAN, LEWIS & BOCKIUS LLP

By:    /s/ Kelly A. Moore
      Kelly A. Moore
      101 Park Avenue
      New York, New York 10178
      Tel. (212) 309-6000
      Fax: (212) 309-6001
      kellymoore@morganlewis.com

By:    /s/ Eric W. Sitarchuk
      Eric W. Sitarchuk (*pro hac vice*)
      1701 Market St.
      Philadelphia, PA 19103
      Tel. (215) 963-5000
      Fax: (215) 963-5001
      eric.sitarchuk@morganlewis.com

      *Attorneys Defendants J.P. Morgan Chase & Co.*
      *and JPMorgan Chase Bank N.A.*

SHEARMAN & STERLING LLP

By:    /s/ Adam S. Hakki
      Adam S. Hakki
      John Nathanson
      Jeffrey J. Resetarits
      599 Lexington Avenue
      New York, New York 10022-6069
      Tel. (212) 848-4000
      Fax: (646) 848-4924
      adam.hakki@shearman.com
      john.nathanson@shearman.com
      jeffrey.resetarits@shearman.com

      *Attorneys for Defendant Bank of America, N.A.*

WINSTON & STRAWN LLP

By:    /s/ Luke A. Connelly
       Luke A. Connelly
       200 Park Avenue
       New York, New York 10166
       Tel. (212) 294-6882
       Fax: (212) 294-4700
       lconnelly@winston.com

       *Attorneys for Defendant Wells Fargo & Co.*

BOIES SCHILLER FLEXNER LLP

By:    /s/ Damien Marshall
       Damien Marshall
       Randall W. Jackson
       Mario O. Gazzola
       575 Lexington Avenue
       New York, New York 10022
       Tel. (212) 446-2300
       Fax: (212) 446-2350
       dmarshall@bsfllp.com
       rjackson@bsfllp.com
       mgazzola@bsfllp.com

       *Attorneys for Defendant OneWest Bank, a*
       *Division of CIT Bank, N.A.*

## **FILER'S ATTESTATION**

I, Andrew W. Schilling, attest that all other signatories listed, and on whose behalf this document is submitted, concur in the document's content and have authorized its filing and the placement of their electronic signatures above.

By:    /s/ Andrew W. Schilling
       Andrew W. Schilling