UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* PETER D. GRUBEA, <br><br>                        Plaintiff, <br><br>    v. <br><br> ROSICKI, ROSICKI & ASSOCIATES, P.C., *et al.*, <br><br>                    Defendants. | No. 1:12-Civ.-7199 (JSR) |
| UNITED STATES OF AMERICA, <br><br>                    Plaintiff-Intervenor, <br><br>    v. <br><br> ROSICKI, ROSICKI & ASSOCIATES, P.C., PARAMOUNT LAND, INC., THRESHOLD LAND INC., and ENTERPRISE PROCESS SERVICE, INC., <br><br>                    Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF
## THE ROSICKI DEFENDANTS' MOTION TO DISMISS

**McLaughlin & Stern, LLP**
260 Madison Avenue
New York, New York 10016
 (212) 448-1100
*Attorneys for Defendants*
*Rosicki, Rosicki & Associates, P.C.,*
*Paramount Land, Inc.,*
*Threshold Land Inc., and*
*Enterprise Process Service, Inc.*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT .................................................................................................. 1

BACKGROUND ......................................................................................................................... 5

    A.    The Rosicki Defendants' Relationship with the GSEs and FHA ................................ 6

    B.    The Allegations in the Complaints ............................................................................. 9

ARGUMENT ............................................................................................................................. 11

  I.    The Complaints Do Not Adequately Allege that Any Request for Payment
       Submitted to the GSEs Was a "Claim" Under the False Claims Act. ........................... 11

    A.    The GSEs Are Not Officers, Employees, or Agents of the United States. ................. 12

    B.    The Complaints Do Not Allege a Sufficient Nexus Between Any Claims the
         Servicers Submitted to the GSEs and Government Funds Provided to the GSEs. ...... 13

  II.    The Government Has Failed To Plead a False Claim with the Particularity
        Required by Rule 9(b). .................................................................................................. 17

  III.   The Complaints Do Not Adequately Plead that Any Claims Submitted by the
        Servicers Were "False or Fraudulent" Under the Implied Certification Theory. ............. 20

  IV.  The Complaints Do Not Adequately Plead that the Alleged Overcharges Were
        Material to Fannie Mae's Payment Decisions, Much Less that the Rosicki
        Defendants Knew They Were Material. .......................................................................... 26

  V.    The Complaints Do Not Adequately Plead "Reverse False Claims." ........................... 34

    A.    The Complaints Do Not Show that Fannie Mae Had an "Obligation To Pay or
        Transmit Money to the Government." ........................................................................ 35

    B.    The Complaints Do Not Plead a Nexus Between the Rosicki Defendants' Conduct
        and Any Funds Owed to the Government ................................................................. 37

  VI.  The Relator's Conspiracy Claim Must Be Dismissed. .................................................. 39

CONCLUSION .......................................................................................................................... 41

# TABLE OF AUTHORITIES

CASES

*Abbott v. BP Exploration & Prod., Inc.,*
    851 F.3d 384 (5th Cir. 2017) ....................................................................... 30

*Allison Engine v. U.S. ex rel. Sanders,*
    553 U.S. 662 (2008)....................................................................................... 14

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)................................................................................... 5, 27

*Christians of Cal., Inc. v. Clive Christian N.Y., LLP,*
    No. 13-CV-275-KBF, 2015 WL 468833 (S.D.N.Y. Feb. 3, 2015)................. 41

*Coyne v. Amgen, Inc.,*
    No. 17-1522, 2017 WL 6459267 (2d Cir. Dec. 18, 2017)......................... 29, 30

*DiFolco v. MSNBC Cable L.L.C.,*
    622 F.3d 104 (2d Cir. 2010)................................................................. 8, 24, 37

*Garg v. Covanta Holding Corp.,*
    478 F. App'x 736 (3d Cir. 2012) ............................................................. 15, 18

*Gold v. Morrison–Knudsen Co.,*
    68 F.3d 1475 (2d Cir. 1995)......................................................................... 18

*Herron v. Fannie Mae,*
    861 F.3d 160 (D.C. Cir. 2017) ................................................................. 5, 16

*Lightfoot v. Cendant Mortg. Corp.,*
    137 S. Ct. 553 (2017).................................................................................... 5

*Meridian Invs., Inc. v. Fed. Home Loan Mortg. Corp.,*
    855 F.3d 573 (4th Cir. 2017) ........................................................................ 5

*N.Y. ex rel. Khurana v. Spherion Corp.,*
    No. 15-CV-6605, 2016 WL 6652735 (S.D.N.Y. Nov. 10, 2016)................... 23

*Perry Capital LLC v. Mnuchin,*
    864 F.3d 591 (D.C. Cir. 2017)........................................................... 37, 38, 39

*REO Sol., LLC v. United States,*
    125 Fed. Cl. 659 (2016) ................................................................................ 5

*Ricci v. Teamsters Union Local 456,*
    781 F.3d 25 (2d Cir. 2015)............................................................................ 5

*Ruston v. Town Bd. for Town of Skaneateles*,
    610 F.3d 55 (2d Cir. 2010) ........................................................................ 27

*Universal Health Services Inc. v. United States ex rel. Escobar*,
    136 S. Ct. 1989 (2016) ...................................................................... *passim*

*U.S. ex rel. Adams v. Aurora Loan Servs., Inc.*,
    813 F.3d 1259 (9th Cir. 2016) ............................................................. 5, 12

*U.S. ex rel. Aflatooni v. Kitsap Physicians Serv.*,
    314 F.3d 995 (9th Cir. 2002) ................................................................... 23

*U.S. ex rel. Associates Against Outlier Fraud v. Huron Consulting Grp., Inc.*,
    No. 09-cv-1800, 2011 WL 253259 (S.D.N.Y. Jan. 24, 2011) .......................... 20

*U.S. ex rel. Barrick v. Parker-Migliorini Int'l, LLC*,
    878 F.3d 1224 (10th Cir. 2017) ................................................................ 37

*U.S. ex rel. Chorches v. American Medical Response, Inc.*,
    865 F.3d 71 (2017) ................................................................................. 20

*U.S. ex rel. D'Agostino v. ev3, Inc.*,
    845 F.3d 1 (1st Cir. 2016) ....................................................................... 30

*U.S. ex rel. Garbe v. Kmart Corp.*,
    73 F. Supp. 3d 1002 (S.D. Ill. 2014) ......................................................... 40

*U.S. ex rel. Garbe v. Kmart Corp.*
    824 F.3d 632 (7th Cir. 2016) ................................................................... 40

*U.S. ex rel. Grabcheski v. Am. Int'l Grp., Inc.*,
    687 F. App'x 84 (2d Cir. 2017) ................................................................ 30

*U.S. ex rel. Harman v. Trinity Indus. Inc.*,
    872 F.3d 645 (5th Cir. 2017) ................................................................... 30

*U.S. ex rel. Hunt v. Merck-Medco Managed Care, LLC*,
    336 F. Supp. 2d 430 (E.D. Pa. 2004) ........................................................ 40

*U.S. ex rel. Kelly v. Serco, Inc.*,
    846 F.3d 325 (9th Cir. 2017) ................................................................... 30

*U.S. ex rel. Kester v. Novartis Pharm. Corp.*,
    23 F. Supp. 3d 242 (S.D.N.Y. 2014) .................................................... 18, 22

*U.S. ex rel. Kolchinsky v. Moody's Corp.*,
    No. 12-cv-1399, 2018 WL 1322183 (S.D.N.Y. Mar. 13, 2018) ........... 19, 23, 31, 34

*U.S. ex rel. Lacey v. Visiting Nurse Serv. of N.Y.*,
No. 14-cv-5739, 2017 WL 5515860 (S.D.N.Y. Sept. 26, 2017) .................................... 23

*U.S. ex rel. Ladas v. Exelis, Inc.*,
824 F.3d 16 (2d Cir. 2016).................................................................................. 18, 19

*U.S. ex rel. Lissack v. Sakura Glob. Capital Mkts., Inc.*,
377 F.3d 145 (2d Cir. 2004)........................................................................................ 23

*U.S. ex rel. McBride v. Halliburton* Co.,
848 F.3d 1027 (D.C. Cir. 2017) .................................................................................. 30

*U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*,
822 F.3d 650 (2d Cir. 2016)........................................................................................ 25

*U.S. ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*,
612 F.3d 724 (4th Cir. 2010) ...................................................................................... 25

*U.S. ex rel. Payton v Pediatric Servs. of Am., Inc.*,
No. CV416-102, 2017 WL 3910434 (S.D. Ga. Sept. 6, 2017) ........................................ 31

*U.S. ex rel. Petras v. Simparel, Inc.*,
857 F.3d 497 (3d Cir. 2017)........................................................................................ 38

*U.S. ex rel. Petratos v. Genentech Inc.*,
855 F.3d 481 (3d Cir. 2017)........................................................................................ 30

*U.S. ex rel. Phillips v. L-3 Commc'ns Integrated Sys., L.P.*,
No. 10-cv-1784, 2012 WL 3649699 (N.D. Tex. Aug. 24, 2012) .................................... 41

*U.S. ex rel. Potra v. Jacobson Cos.*,
No. 12-cv-01600, 2014 WL 1275501 (N.D. Ga. Mar. 27, 2014) .................................... 41

*U.S. ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*,
274 F. Supp. 2d 824 (S.D. Tex. 2003) .......................................................................... 42

*U.S. ex rel. Scharber v. Golden Gate Nat'l Senior Care LLC*,
135 F. Supp. 3d 944 (D. Minn. 2015) ........................................................................... 42

*U.S. ex rel. Scharff v. Camelot Counseling*,
No. 13-cv-3791-PKC, 2016 WL 5416494 (S.D.N.Y. Sept. 28, 2016) ............................ 31

*U.S. ex rel. Spay v. CVS Caremark Corp.*,
913 F. Supp. 2d 125 (E.D. Pa. 2012) ........................................................................... 40

*U.S. ex rel. Taylor v. Gabelli*,
345 F. Supp. 2d 313 (S.D.N.Y. 2004).......................................................................... 37

*U.S. ex rel. Tessler v. City of New York*,
    No. 14-cv-6455-JMF , 2016 WL 7335654 (S.D.N.Y. Dec. 16, 2016) ............................ 23

*U.S. ex rel. Todd v. Fidelity Nat'l Fin. Inc.*,
    No. 12-cv-666-REB-CBS, 2014 WL 4636394 (D. Colo. Sept. 16, 2014)............. 2, 12, 15

*U.S. ex rel. Vigil v. Nelnet, Inc.*,
    639 F.3d 791 (8th Cir. 2011) ........................................................................................ 41

*United States v. Caremark, Inc.*,
    634 F.3d 808 (5th Cir. 2011) ........................................................................................ 39

*United States v. Countrywide Fin. Corp.*,
    961 F. Supp. 2d 598 (S.D.N.Y. 2013)..................................................................... 13, 14

*United States v. Sanford-Brown, Ltd.*,
    840 F.3d 445 (7th Cir. 2016) ........................................................................................ 30

*United States v. Scan Health Plan*,
    No. 09-cv-5013-JFW, 2017 WL 4564722 (C.D. Cal. Oct. 5, 2017)................................ 31

*United States v. Strock*,
    No. 15-cv-0887-FPG, 2018 WL 647471 (W.D.N.Y. Jan. 31, 2018).............................. 31

*United States v. Wells Fargo Bank, N.A.*,
    972 F. Supp. 2d 593 (S.D.N.Y. 2013).......................................................................... 21

*Wexner v. First Manhattan Co.*,
    902 F.2d 169 (2d Cir. 1990)......................................................................................... 20

## STATUTES

12 U.S.C. § 1716b ................................................................................................................ 5

31 U.S.C. § 3729(a)(1)(G) ................................................................................................. 39

31 U.S.C. § 3729(b)(2)(A) ................................................................................................. 12

31 U.S.C. § 3729(b)(2)(A)(ii) ....................................................................................... 2, 14

31 U.S.C. § 3729(b)(3) ...................................................................................................... 37

31 U.S.C. § 3730(b)(2) ...................................................................................................... 32

**OTHER AUTHORITIES**

Fraud Enforcement and Recovery Act of 2009,
   Pub. L. No. 111-21, § 4(a)(2), 123 Stat. 1617, 1623 (2009)............................................ 12

S. Rep. No. 111-10 (2009) ........................................................................................................ 13

*Bailout Recipients (Detailed View)*, PROPUBLICA.COM, https://goo.gl/56EJA7
   (last visited Apr. 27, 2018) ............................................................................................. 16

Martha Neil, *Foreclosure Law Firm Sues Bankruptcy Attorney Who Questioned Its
   'Systematic Overbilling,"* ABA JOURNAL (Aug. 13, 2012), https://goo.gl/iWfm5V ....... 32

Restatement (Second) of Contracts § 161(b) ............................................................................ 24

Restatement (Second) of Torts § 551(e) & cmt j ...................................................................... 24

Defendants Rosicki, Rosicki & Associates (the "Rosicki firm"), Enterprise Process Service, Inc., Paramount Land, Inc. and Threshold Land, Inc. (collectively, the "Rosicki Defendants") move to dismiss the Complaint of Relator Peter Grubea and the Government's Complaint-in-Intervention pursuant to Rule 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

Relator Peter Grubea asserts claims against the Rosicki Defendants under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* He alleges that the Rosicki firm overcharged its bank servicer clients for foreclosure-related services and that the servicers passed on those excessive charges to the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac"), and the Federal Housing Administration ("FHA"). The Government intervened in this action and asserts claims under the False Claims Act only with respect to allegedly excessive charges passed on to Fannie Mae, having declined to intervene and pursue the Relator's claims related to Freddie Mac and the FHA.

For several reasons, the complaints fail to plead facts sufficient to state a claim under the False Claims Act.

*First*, the complaints' allegations with respect to Fannie Mae and Freddie Mac do not allege any "claims" as defined by the FCA. Fannie Mae and Freddie Mac, so-called Government Sponsored Entities or "GSEs," are private corporations and are not a part of or agents of the U.S. Government. Although a 2009 amendment to the FCA expanded the definition of "claims" to include requests for payment "made to a contractor, grantee or other recipient" of federal funds, the amendment requires a connection between the claims at issue and the funds the non-government intermediary received from the government. *See* 31 U.S.C. § 3729(b)(2)(A)(ii). The

1

allegations here do not set forth *any* meaningful connection between any federal money received by Fannie Mae and Freddie Mac and the money requested or demanded to pay the servicers' claims at issue here. The only court that has ruled on whether requests for payment submitted to the GSEs were "claims" under the FCA held that they were not, precisely because the complaint failed to establish a connection between the federal bailout money the GSEs received and the invoices for mortgage-related expenses at issue. *U.S. ex rel. Todd v. Fidelity Nat'l Fin. Inc.*, No. 12-cv-666-REB-CBS, 2014 WL 4636394, at *9–10 (D. Colo. Sept. 16, 2014).  The result should be no different here.

*Second*, even assuming that the FCA extends to claims made to Fannie Mae and Freddie Mac, the Government's complaint should be dismissed for failure to plead any false or fraudulent claim with the particularity required by Rule 9(b).  The Government alleges only that the Rosicki firm "submitted bills for inflated expenses to the Servicers" and that "claims for those inflated expenses were then submitted to Fannie Mae for reimbursement."  Gov't Compl. ¶ 86.  The complaint contains no details of the requisite "who", "what", "when", "where" and "how" of the claims allegedly submitted.  Although the pleading standard under Rule 9(b) may sometimes be relaxed for a relator when information about the claims submitted is peculiarly within the knowledge of the opposing party, the Government is not entitled to a relaxed pleading standard. Any potentially actionable claims in this case would have been submitted by the servicers, not by the Rosicki Defendants.  The Rosicki Defendants do not have knowledge of or access to those claims.  And the Government is in a far superior position to identify those claims, especially since Fannie Mae has been in federal conservatorship since 2008.

*Third*, the complaints also fail to plead that any requests for reimbursement by the servicers for foreclosure-related expenses paid to the Rosicki Defendants were "false" or "fraudulent."  The

2

complaints do not allege that the servicers' requests for reimbursement contained any misrepresentations or false express certifications. Instead, the complaints rely on the most aggressive version of the "implied certification" theory to contend that by submitting claims that did no more than request payment for certain expenses, the servicers implicitly certified that the foreclosure-related services at issue fully complied with all applicable legal requirements.

That argument cannot be squared with the Supreme Court's decision in *Universal Health Services Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016). The Court there held that a claim may be deemed false under the implied certification theory when it includes affirmative representations that, under the circumstances, amount to misleading half-truths—facts that the complaints do not allege are present here. And even if the implied certification theory could be extended to claims—like those at issue here that do not include any misleading representations— the plaintiff would have to plead with particularity facts showing that the defendant's conduct went to the very "essence" of the transaction. Neither of the complaints here satisfies that requirement.

*Fourth*, the complaints fail to plead with particularity facts sufficient to establish that the Rosicki firm's alleged billing practices were material to the GSEs' or the FHA's payment decisions or that the firm knew those practices were material, as required by *Escobar*. The complaints conspicuously avoid alleging that Fannie Mae, Freddie Mac or the FHA were unaware of the challenged billing practices or that the Rosicki firm did anything to conceal those practices from the entities. And there is ample reason to believe that Fannie Mae, which performed regular audits of the Rosicki firm, was aware of the challenged practices; yet Fannie Mae never claimed that it was being defrauded or even that the Rosicki firm had committed a simple breach of contract. Especially under these circumstances, the Government and the Relator had to plead specific facts

3

to show that the alleged billing practices were material and that the Rosicki Defendants knew they were material.  They failed to do so.

*Fifth*, the "reverse false claim" allegations should be dismissed because they fail to state a claim for relief.  The complaints allege that Fannie Mae and Freddie Mac were obligated under the terms of their federal bailout to make dividend payments to the U.S. Treasury and that the allegedly inflated charges submitted by the Rosicki Defendants and passed on by the servicers reduced the amount of those dividend payments.  But the complaints overlook that the GSEs' boards of directors had discretion concerning whether or not to pay any dividends.  That discretion means that the GSEs did not have an established "obligation" to make payments to the Government, which is a prerequisite for a "reverse false claims" violation.  Moreover, the complaints do not allege the required nexus between the Rosicki Defendants' alleged conduct and any obligation of the GSEs to pay dividends to the Government.  The overbroad theory advanced by the Government and the Relator would make the False Claims Act apply to any fraud perpetrated against anyone who owes money to the Government.  No court has ever interpreted the "reverse false claims" provision so expansively.

*Finally*, the Relator's conspiracy claim must be dismissed.  The Relator has failed to plead an underlying violation of the False Claims Act, so his conspiracy claim necessarily fails.  And in any event, the Relator alleges that the supposed conspirators were affiliated corporate entities under common control, which would make them legally incapable of conspiring with one another.

For all these reasons, as explained further below, the complaints should be dismissed.

# BACKGROUND[1]

This case involves an alleged fraud on Fannie Mae, Freddie Mac, and the FHA.  Since 1968, Fannie Mae has been "a Government-sponsored private corporation."  *Lightfoot v. Cendant Mortg. Corp.*, 137 S. Ct. 553, 557 (2017) (quoting 12 U.S.C. § 1716b).  In 1970, as an alternative to Fannie Mae, Congress created Freddie Mac, "a private, federally chartered corporation."  *Meridian Invs., Inc. v. Fed. Home Loan Mortg. Corp.*, 855 F.3d 573, 575 (4th Cir. 2017).  Both Fannie Mae and Freddie Mac "are private companies, albeit companies sponsored or chartered by the federal government."  *U.S. ex rel. Adams v. Aurora Loan Servs., Inc.*, 813 F.3d 1259, 1260 (9th Cir. 2016).  The FHA is an agency within the U.S. Department of Housing and Urban Development that administers a mortgage-default insurance program.  *See REO Sol., LLC v. United States*, 125 Fed. Cl. 659, 660 (2016).

Fannie Mae and Freddie Mac "buy residential mortgages from banks, repackage them for sale as mortgage-backed securities, and guarantee those securities by promising to make investors whole if borrowers default."  *Herron v. Fannie Mae*, 861 F.3d 160, 163 (D.C. Cir. 2017); *see also* Gov't Compl. ¶ 11.  Fannie Mae and Freddie Mac have been in federal conservatorship since 2008.  *See* Gov't Compl. ¶¶ 13–14.

The GSEs, Fannie Mae and Freddie Mac, engage financial institutions, called servicers, to perform or oversee various actions in connection with residential mortgages owned by the GSEs.  *Id.* ¶ 25; Relator Compl. ¶ 4.  Among other things, the servicer is responsible for pursuing foreclosure when a borrower becomes delinquent on his or her payments.  Gov't Compl. ¶ 25.  The

---

[1] Because this is a motion to dismiss, the complaints' well-pleaded factual allegations—but not their legal conclusions—are presumed true for the limited purpose of the Court's ruling on this motion.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Ricci v. Teamsters Union Local 456*, 781 F.3d 25, 26 (2d Cir. 2015).  The Rosicki Defendants dispute the allegations.

servicer is charged with retaining a law firm to handle the foreclosure, which it must select from among a network of approved law firms.  *Id.* ¶¶ 26–30.

A.      **The Rosicki Defendants' Relationship with the GSEs and FHA**

At least as early as 1998, the Rosicki law firm was approved to handle foreclosures on Fannie Mae-owned mortgages.  *Id.* ¶ 51.  When the Rosicki firm is retained to represent a servicer in connection with a foreclosure on a Fannie Mae mortgage, the firm is required to enter into a retention agreement with Fannie Mae as well as the servicer.  *Id.* ¶¶ 29-30, 39-40.  The Rosicki firm executed a retention agreement with Fannie Mae to join its list of approved foreclosure firms called the Retained Attorney Network.  *Id.* ¶¶ 27-28; *see* Agreement between Fannie Mae and Rosicki, Rosicki & Associates dated April 17, 1998, attached as Exhibit A to the Declaration of Daniel J. Horwitz (hereafter "Horwitz Decl.").  After Fannie Mae terminated the Retained Attorney Network, the Rosicki firm executed another limited retention agreement with Fannie Mae to perform work on Fannie Mae-owned mortgages. Gov't Compl. ¶ 30; *see* Federal National Mortgage Association, Mortgage Default Counsel Retention Agreement dated April 26, 2013, attached as Exhibit B to the Horwitz Decl.  The complaints do not allege that the Rosicki firm entered into any agreements with Freddie Mac or the FHA.

When a servicer hired the Rosicki firm to handle foreclosure proceedings on a mortgage owned by the GSEs or insured by the FHA, the Rosicki firm would bill the servicer for its legal fees and foreclosure-related expenses, and the servicer would pay the firm's bills.  Gov't Compl. ¶¶ 32–33; Relator Compl. ¶ 136.  The servicer could then ask the GSEs or the FHA to reimburse any foreclosure-related expenses for which it had paid the Rosicki firm.  Gov't Compl. ¶ 34; Relator Compl. ¶ 119.  The Rosicki firm never submitted any bills to Fannie Mae, Freddie Mac, or the FHA for foreclosure actions, nor did it ever receive payment from Fannie Mae, Freddie Mac, or the FHA for foreclosure-related services.

The principals of the Rosicki firm own a process service company called Enterprise Process Service, Inc. and a real estate title company called Paramount Land, Inc. and previously owned a title company called Threshold Land, Inc. (the "Rosicki Affiliates").  Gov't Compl. ¶¶ 8–9.  The Rosicki firm used the Rosicki Affiliates to perform certain foreclosure-related tasks in connection with Fannie Mae-owned and Freddie Mac-owned mortgages and FHA-insured mortgages, for which it then billed the servicers.  The Government acknowledges that when the Rosicki firm incorporated Enterprise in 1998, it notified Fannie Mae of the relationship between the Rosicki firm and Enterprise.  *Id.* ¶ 51.  The Rosicki Defendants' use of affiliates is typical of foreclosure firms nationwide.  Relator Compl. ¶ 164; *see also* Gov't Compl. ¶ 49.  The Relator alleges that 75% of law firms handling Fannie Mae foreclosures use affiliate vendors.  Relator Compl. ¶ 164.

The complaints allege that, pursuant to the firm's retention agreements with Fannie Mae, the Rosicki firm was required to follow Fannie Mae's Servicing Guide (the "Servicing Guide").  Gov't Compl. ¶¶ 25, 27, 30; *see also, e.g.*, Relator Compl. ¶¶ 62–68.  The Servicing Guide is well over 1,000 pages long. *See* Fannie Mae Single Family 2012 Servicing Guide, attached as Exhibit C to the Horwitz Decl. Among other things, it provided that the servicer and the law firm were required to "make every effort to reduce foreclosure-related costs and expenses in a manner that is consistent with all applicable laws."  Gov't Compl. ¶ 36 (quoting Servicing Guide, Part VIII, § 110.03 (2012)).  The Servicing Guide also provided that Fannie Mae would only reimburse servicers for foreclosure-related expenses that were "actual, reasonable, and necessary."  *Id.* ¶ 37 (quoting Servicing Guide, Part VIII, § 110.03).  Fannie Mae also specified maximum allowable amounts for various foreclosure-related expenses.  *See* Horwitz Decl. Ex. B at 22.  There is no allegation that the amounts charged by the Rosicki firm ever exceeded those caps.  Because the Servicing Guide and retention agreements are incorporated by reference in and integral to the

complaints, the Court may consider them in deciding this motion to dismiss.  *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

The Servicing Guide and retention agreements also emphasized that timeliness and quality of service were critical to the Rosicki firm's representation.  The retention agreement stated that the Attorney Network's goal was to "expedite foreclosure" in order "to enable Fannie Mae to take title to, and possession of, a marketable property as efficiently as the legal process allows." Horwitz Decl. Ex. A at 1.  The firm was also directed to conduct foreclosure proceedings "diligently, expeditiously, and properly."  *Id.* at 1, 6. Consistent with that direction, the Servicing Guide provided that the servicer was to expedite foreclosure proceedings to the greatest extent allowable in most circumstances and manage and monitor the retained attorney on foreclosures matters to ensure, among other things, "timeline performance." Horwitz Decl. Ex. C at 923 (Servicing Guide, Part VIII, §§ 103–106).  The Servicing Guide also instructed attorneys that in additional to cost, third-party vendors should be selected based on "quality, reliability, and timeliness of the services provided."  *Id.* at 603, 865 (Servicing Guide, Part VII, § 501; Part VIII, §§ 106.05).

The Rosicki firm's handling of Fannie Mae-related foreclosures was subject to strict oversight.  The servicer was "responsible for managing and monitoring all aspects of the [Rosicki firm's] performance."  *Id.* at 855 (Servicing Guide, Part VIII, § 106.01).  Fannie Mae was also entitled to "communicate directly with the attorneys and monitor and/or audit the attorneys' handling of its cases."  *Id.*  In addition, Fannie Mae's retention agreement with the Rosicki firm gave Fannie Mae the right to review and audit any of the firm's invoices, even after payment by the servicer, and to examine from time to time the firm's books, records, and case files pertaining to its work on Fannie-owned mortgages.  Horwitz Decl. Ex. A at 6.

Fannie Mae urged its servicers to use two or more law firms in each jurisdiction. Horwitz Decl. Ex. C at 852 (Servicing Guide Part VIII, § 106). Fannie Mae reserved the right to monitor the concentration of legal work among the law firms in its network and to suspend new referrals or reassign cases "in order to limit risks arising from the concentration of legal work relating to Fannie Mae's delinquent mortgage loans with a single law firm in a jurisdiction." *Id.*

**B.     The Allegations in the Complaints**

In September 2012, the Relator filed the initial complaint in this *qui tam* action against the Rosicki Defendants, John Doe Law Practices, John Doe Title Companies, John Doe Process Service Companies, and a large number of servicers. In 2013, the Relator filed a First Amended Complaint, in which several law firms and servicers were added as defendants, and a Second Amended Complaint in 2014, adding more servicer defendants. The Government filed its Complaint in Intervention on March 27, 2018, intervening only with respect to the Rosicki Defendants and only in regard to claims submitted to Fannie Mae, and the case was unsealed. On April 3, 2018, the Relator filed his Third Amended Complaint.

Neither the Government nor the Relator alleges that the Rosicki firm (or any of the Rosicki Defendants) submitted any false claims directly to the GSEs or the FHA. Instead, the Government's complaint alleges that the Rosicki firm submitted excessive bills for foreclosure-related services to its servicer clients, who in turn sought reimbursement for those foreclosure-related expenses from Fannie Mae. The thrust of the Government's allegations is that the Rosicki firm's bills for foreclosure-related expenses were not "actual, reasonable, and necessary," in violation of the requirements in Fannie Mae's Servicing Guide; and that, therefore, the Rosicki firm caused the servicers to submit false claims to Fannie Mae in violation of 31 U.S.C. § 3729(a)(1)(A) or made false statements that were material to the servicers' false claims to Fannie Mae in violation of 31 U.S.C. § 3729(a)(1)(B).

The Government's allegations center on the Rosicki firm's use of the Rosicki Affiliates to obtain certain foreclosure-related services, specifically, title searches and service of process.  The Government alleges that the Rosicki Affiliates "carried out these functions by engaging third-party vendors," rather than performing the services themselves, and then applied "exponential mark-ups" to those vendors' bills that "exceeded market rates."  Gov't Compl. ¶ 2.  The Rosicki Affiliates submitted the allegedly marked-up bills to the Rosicki firm for payment.  *Id.* ¶ 32.  The Rosicki firm in turn "submitted bills for the inflated expenses to the Servicers, which the Servicers paid."  *Id.* ¶ 86.  The servicers then allegedly submitted "[c]laims for those inflated expenses . . . to Fannie Mae for reimbursement, and were paid by Fannie Mae."  *Id.*; *see also id.* ¶ 76.

The Government's complaint includes conclusory allegations that the Rosicki firm "represented to the Servicers that the [Rosicki Affiliates'] bills reflected the cost of the services incurred" and that the fees charged were "actual, reasonable, and necessary" and "competitive in the relevant markets."  *Id*. ¶¶ 68, 85.  The Government does not, however, explain how the Rosicki firm supposedly made such a representation.  The Government's complaint does not allege that the Rosicki firm, when submitting requests for payment to the servicers, certified compliance with any statutory, regulatory, or contractual requirement—or, indeed, that it made *any* affirmative statements at all.  Nor does it allege that any claims submitted to Fannie Mae by the servicers included any express certifications or specific representations about the services provided by the Rosicki Defendants or that those services were provided in compliance with any contractual or other provision.  The Government does not allege that Fannie Mae reimbursed any of the servicers for any payment made to the Rosicki firm for services that were not, in fact, performed.

The Relator's complaint similarly alleges that the Rosicki Affiliates billed the Rosicki firm for unreasonable and unnecessary expenses that the Rosicki firm then submitted to its servicer

clients, which then sought reimbursement of those expenses from the GSEs and the FHA.  *See* Relator Compl. ¶¶ 122–37. Like the Government, the Relator does not allege that the Rosicki firm's requests for payment to the servicers included any affirmative representations or express certifications.  Nor does the Relator offer any particulars about any claims the servicers submitted to the GSEs or the FHA.  Notably, although the Relator (unlike the Government) alleges the submission of false claims not only to Fannie Mae but also to Freddie Mac and the FHA, he does not allege that the Rosicki Defendants owed any statutory, regulatory, or contractual duty to Freddie Mac or the FHA.

## ARGUMENT

**I.      The Complaints Do Not Adequately Allege that Any Request for Payment Submitted to the GSEs Was a "Claim" Under the False Claims Act.**

In order for the Government or the Relator to state a claim under 31 U.S.C. § 3729(a)(1)(A) or (B), they must allege a "false or fraudulent claim."  In relevant part, the FCA defines "claim" as a "request or demand . . . for money or property" that either:

> (i) is presented to an officer, employee, or agent of the United States; or
>
> (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—
>
>> (I) provides or has provided any portion of the money or property requested or demand; or
>>
>> (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . .

31 U.S.C. § 3729(b)(2)(A).

The complaints do not adequately allege that any request for payment the servicers may have submitted to the GSEs qualifies as a "claim" under either prong of the statutory definition

and, therefore, the Government and the Relator have failed as a matter of law to plead the existence of a "false or fraudulent claim."

### A.  The GSEs Are Not Officers, Employees, or Agents of the United States.

The Government has conceded, and courts have agreed, that Fannie Mae and Freddie Mac are private entities and that their federal conservatorships do not make them "officers, employees, or agents of the United States" for purposes of the False Claims Act.  *See, e.g.*, *Adams*, 813 F.3d at 1260-61 ("The district court properly held that a claim presented to Fannie Mae or Freddie Mac is not presented to an 'officer, employee or agent' of the United States.  And that's because Fannie Mae and Freddie Mac are private companies, albeit companies sponsored or chartered by the federal government. . . . The United States filed a helpful and well-reasoned amicus brief agreeing with this conclusion."); *see also Todd*, 2014 WL 4636394, at *9–10 (dismissing FCA claims because, even "post-conservatorship," Freddie Mac did not qualify as "a government actor").

This Court, too, has recognized that before the enactment of the Fraud Enforcement and Recovery Act of 2009 ("FERA"), when the definition of "claim" was limited to requests or demands for payment submitted to federal officers, employees, and agents, "the False Claims Act did not encompass such claims when made to entities like Fannie Mae and Freddie Mac."  *United States v. Countrywide Fin. Corp.*, 961 F. Supp. 2d 598, 609 (S.D.N.Y. 2013) (Rakoff, J); *see* Pub. L. No. 111-21, § 4(a)(2), 123 Stat. 1617, 1623 (2009).  The Court also observed that the Government had "implicitly conced[ed]" that "false claims allegedly made . . . to Fannie Mae and Freddie Mac before the amendment to the False Claims Act on May 20, 2009, cannot occasion liability under that Act."  *Id.* at 608.  The Government makes the same implicit concession here: it does not allege that any false claims were presented to an officer, employee, or agent of the United States, and its demand for relief is limited to conduct occurring after FERA's effective date.  *See* Gov't Compl. ¶¶ 130 & n.1, 137.

12

The Relator's complaint is ambiguous on this point, but to the extent the Relator is claiming that reimbursement requests submitted to the GSEs qualify as claims to "an officer, employee, or agent of the United States," he is incorrect as a matter of law.

**B.      The Complaints Do Not Allege a Sufficient Nexus Between Any Claims the Servicers Submitted to the GSEs and Government Funds Provided to the GSEs.**

In 2009, Congress amended the definition of "claim" to allow the False Claims Act to reach requests for payment that are presented to a "contractor, grantee, or other recipient" of federal funds—but *only* if two conditions are met: (1) "the money or property" requested "is to be spent or used on the Government's behalf or to advance a Government program or interest," and (2) the Government "provides," "has provided" or "will reimburse . . . any portion of the money or property which is requested."  31 U.S.C. § 3729(b)(2)(A)(ii).

Although this Court has stated in passing that the 2009 amendment "arguably extends the FCA to false claims made to Fannie Mae and Freddie Mac," *Countrywide*, 961 F. Supp. 2d at 609, the Court did not analyze or decide that question.  The amendment does not encompass requests for payment made to the GSEs because there is no meaningful connection between the federal bailout funds that were provided to the GSEs and the funds the GSEs used to pay the claims at issue.

By enacting the 2009 amendment, Congress sought to ensure that Government grant or contract funds were protected whether they were in the hands of the Government or in the hands of a contractor or grantee.  *See* S. Rep. No. 111-10 at 9-11 (2009).  The amendment accordingly requires a close nexus between the federal fund provided to the contractor or grantee and the funds sought by the claimant. The paradigmatic case to which the amendment applies is that of a subcontractor that submits false claims to a prime contractor operating under a federal procurement contract.  *See id.* at 9-10 (stating that Congress sought to overturn the result in *Allison Engine v.*

*U.S. ex rel. Sanders*, 553 U.S. 662 (2008), and ensure that the FCA would apply "when a subcontractor in a large Government contract knowingly submits a false claim to a general contractor and gets paid with Government funds").

The expanded definition of "claim" does not mean that the False Claims Act applies to any fraud allegedly committed against any private entity that receives federal funds. The Third Circuit recognized as much when it rejected a claim that the FCA applied to a state utility that "effectively received a direct financial subsidy from the federal government" because it was allowed to issue tax-exempt bonds. *Garg v. Covanta Holding Corp.*, 478 F. App'x 736, 740–41 (3d Cir. 2012). The court explained:

> The FCA requires more than fraud against anyone who happens to receive money from the federal government. Were that the case, the scope of the FCA would be enormous. . . . Rather, the plain language of the FCA requires that there be some greater nexus between the alleged fraud and the government funds. The FCA does not apply to fraud against *any* federal grantee; it requires that *the specific money or property claimed* must be intended to 'be spent or used on the Government's behalf or to advance a Government program or interest.' Furthermore, the federal government must also provide at least a portion of the specific 'money or property requested' or reimburse the grantee for that specific demand.

*Id.* at 741 (emphasis in original) (citations omitted).

Only one court has ruled on whether requests for payment submitted to Fannie Mae or Freddie Mac post-conservatorship qualify as "claims" under the False Claims Act, and it answered in the negative. *See Todd*, 2014 WL 4636394, at *10–11. In *Todd*, the court dismissed FCA claims where requests for payment were submitted to Freddie Mac for allegedly defective title searches. The court reasoned that the expanded definition of claim "requires a connection between government funds and the funds used to pay a false claim" and the plaintiff had "not alleged the requisite nexus." *Id.* at *10 (citing *Garg*, 478 F. App'x at 741). The court rejected the plaintiff's argument that the required nexus existed simply because Freddie Mac had "received billions in

14

[federal] funds," observing that "Plaintiff alleges only that Freddie Mac received a sizeable amount of government funding; he has not alleged that government money is the sole source of funds available to Freddie Mac, nor has he specified how Freddie Mac allocated its revenue such that Defendants' invoices were paid with at least a portion of government money." *Id.* at *11.

The allegations here are no better. Neither the Government nor the Relator pleads any facts that support an inference either that the Government provided the GSEs with bailout money to fund foreclosure-related expenses or that the GSEs used federal funds to reimburse the servicers for such expenses. That is no surprise. The federal bailout of the GSEs was not designed to have taxpayers pay the GSEs' ordinary operating costs, such as foreclosure costs. Rather, it was an emergency measure to shore up the confidence of the financial markets in Fannie Mae and Freddie Mac and cover losses that the entities had sustained when the GSEs "bought risky mortgages and got caught up in the housing bubble." *Herron*, 861 F.3d at 163 (citation omitted). Treasury accomplished this by committing the federal bailout money "to keep [the GSEs] from defaulting" on debts owed to investors, who had purchased mortgage-backed securities from the GSEs and whom the GSEs had guaranteed to make whole if borrowers defaulted. *Id.* Thus, the bailout money was focused on paying back investors in the GSE's securities.

The Government has previously told this Court that Treasury funds received by Fannie Mae and Freddie Mac were used primarily to cover those entities' losses related to purchasing mortgages from banks, repackaging them for sale as mortgage-backed securities and guaranteeing those securities—not foreclosure-related expenses and other ordinary business costs. The Government averred:

> As of December 31, 2012, Treasury has provided more than $187 billion in support to the GSEs [*i.e.*, government-sponsored entities, such as Fannie Mae]. These federal funds have been used primarily to cover losses from single-family mortgages purchased and

> guaranteed by the GSEs between 2004 and 2008, but have also been
> used to purchase mortgages sold in 2009 from lenders including
> Defendants, and to reimburse losses incurred by the GSEs as a result
> of their guaranteeing those mortgages.

Amended Compl., *Countrywide*, No. 1:12-cv-1422-JSR, ECF No. 40, ¶ 29 (S.D.N.Y. Jan. 11,

2013), attached as Exhibit D to the Horwitz Decl.

The Government nonetheless alleges that because the servicers supposedly billed Fannie

Mae for certain foreclosure-related expenses "contemporaneously with Fannie Mae's receipt of

billions of dollars in federal funds," the False Claims Act applies to the servicers' requests for

payment with no showing of any nexus between the federal funds and the payments at issue other

than the coincidence of timing.  Gov't Compl. ¶ 134.  The Relator makes the same argument with

regard to both Fannie Mae and Freddie Mac.  Relator Compl. ¶¶ 58, 85.  In short, the Government

and the Relator seek a ruling that whenever a private entity receives a bailout from the

Government, the False Claims Act applies to *all* claims submitted to that entity—just as if the

bailout had transformed it into a federal agency.

That theory proves far too much.  If it were correct, the draconian False Claims Act, with

its provisions for treble damages plus per-claim penalties, would apply to any claim paid by an

entity that had received federal funds, regardless of the subject matter of the claim and regardless

of the lack of any nexus between the federal funding and the claim.  That theory would make the

Act apply to a wide range of conduct with no meaningful connection to the federal fisc—including

any fraud perpetrated against any of the nearly 1,000 private firms that received bailout funds

during and after the 2008 financial crisis.  *See Bailout Recipients (Detailed View)*,

PROPUBLICA.COM, https://goo.gl/56EJA7 (last visited Apr. 27, 2018).

That sweeping theory is inconsistent with the text and purpose of the False Claims Act.

The Court should instead follow the Third Circuit's holding that the Government must "provide at

least a portion of the specific 'money or property requested' or reimburse the grantee for that specific demand" in order for the FCA to apply.  *Garg*, 478 F. App'x at 741.  Because the complaints here do not allege the required nexus, they do not plausibly plead the existence of a "claim" within the meaning of the Act.  Therefore, the claims under § 3729(a)(1)(A) and (B), to the extent they involve requests for payment submitted to Fannie Mae and Freddie Mac, must be dismissed.[2]

## II.    The Government Has Failed To Plead a False Claim with the Particularity Required by Rule 9(b).

A complaint under the False Claims Act must comply with Rule 9(b), which requires that the plaintiff "state with particularity the specific statements or conduct giving rise to the fraud claim." *Gold v. Morrison–Knudsen Co.*, 68 F.3d 1475, 1477 (2d Cir. 1995).  Even if claims submitted to Fannie Mae fall within the scope of the Act, the Government's complaint must be dismissed because it fails to plead even a single false claim with particularity.

To satisfy Rule 9(b), an FCA complaint must ordinarily "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *U.S. ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 25 (2d Cir. 2016).  In other words, the complaint must "set forth the who, what, when, where and how of the alleged fraud." *U.S. ex rel. Kester v. Novartis Pharm. Corp.*, 23 F. Supp. 3d 242, 252 (S.D.N.Y. 2014) (internal quotation marks omitted).  A plaintiff "cannot circumscribe the Rule 9(b) pleading requirements by alleging a fraudulent scheme in detail and concluding that, as a result of the fraudulent scheme, false claims must have been submitted.  He must also plead the 'claim' submission element with particularity." *Id.* at 253 (internal citation omitted); *see also*

---

[2] To the extent the Relator's allegations involve requests for payment submitted to the FHA, the Relator's claims fail for other reasons, as discussed below.

*U.S. ex rel. Kolchinsky v. Moody's Corp.*, No. 12-cv-1399, 2018 WL 1322183, at *2 (S.D.N.Y. Mar. 13, 2018) ("Plaintiffs must allege the false claims themselves with sufficient particularity . . . . [M]erely alleging a fraudulent underlying scheme with particularity is not enough.") (internal quotation marks omitted).  The particularity requirement has at least three purposes: "to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit."  *Ladas*, 824 F.3d at 25 (internal quotation marks omitted).

The Government's complaint falls far short of satisfying Rule 9(b).  Because the Rosicki firm did not itself submit any claims to Fannie Mae, to hold the firm liable under § 3729(a)(1)(A) or (B) the Government must prove that a servicer submitted a false claim to Fannie Mae.  The Government's complaint, however, does not identify with particularity even a single allegedly false claim submitted by a servicer.  It alleges that servicers ordinarily "submit claims to Fannie Mae for reimbursement of foreclosure expenses using a Cash Disbursement Request, Form 571." Gov't Compl. ¶ 34.  But it does not point to any specific false claim that was submitted in that fashion.

This shortcoming is especially evident in the section of the Government's complaint titled "Examples of False Claims Paid by Fannie Mae."  *See* Gov't Compl. 17–23.  Each of the examples alleges that the Rosicki firm "submitted claims for reimbursement" to an unspecified "third-party financial institution" that was acting as a servicer for a mortgage.  *Id.* ¶¶ 87, 92, 93, 98, 99, 104, 105, 111, 112, 117, 118, 123.  And there is a single, sweeping allegation that in all of the examples, "[c]laims for those inflated expenses were then submitted to Fannie Mae for reimbursement."  *Id.* ¶ 86.  But there is no detail provided about any claim allegedly submitted to Fannie Mae—not the "who" (the identity of the servicer that submitted the claim), the "what" (the content of the claim),

the "where," the "when," or the "how." The Government cannot meet its burden by providing examples of instances where the Rosicki firm allegedly overbilled servicers without connecting those allegations to specific claims made to Fannie Mae by specific servicers.

The Second Circuit's decision in *U.S. ex rel. Chorches v. American Medical Response, Inc.*, 865 F.3d 71 (2017), does not excuse the Government's deficient pleading. In that case, the court affirmed that Rule 9(b) applies to complaints under the FCA and that it is "generally rigid." *Id.* at 81 (internal quotation marks omitted). It held, however, that in some circumstances, a relator can satisfy Rule 9(b) by pleading "on information and belief . . . that fraudulent claims were submitted," without identifying any specific false claims. *Id.* at 82. In such a case, the relator must "mak[e] plausible allegations creating a strong inference that specific false claims were submitted to the government *and that the information that would permit further identification of those claims is peculiarly within the opposing party's knowledge*." *Id.* at 86 (emphasis added); *see also id.* at 81–82 (pleading on information and belief is allowed only "when facts are peculiarly within the opposing party's knowledge"). The Second Circuit's holding is thus similar to this Court's prior observation that in an FCA case, the "requirements of Rule 9(b) may be relaxed when a plaintiff is not in a position to know specific facts until after discovery and the opposing party has particular knowledge of the facts." *U.S. ex rel. Associates Against Outlier Fraud v. Huron Consulting Grp., Inc.*, No. 09-cv-1800, 2011 WL 253259, at *2 (S.D.N.Y. Jan. 24, 2011) (Rakoff, J.) (citing *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990)).

The Government cannot make the showing required to invoke that relaxed Rule 9(b) pleading standard. The Government cannot show that it is unable to identify the details of any allegedly false claims submitted to Fannie Mae by the servicers. Nor can it show that details about any such claims are particularly within the knowledge of the Rosicki defendants. The opposite is

19

true.  Because the Federal Housing Finance Agency ("FHFA"), a government agency, is Fannie Mae's conservator, the Government has access to Fannie Mae's records.  The Rosicki defendants, by contrast, do not have access to those records.  Nor do they have access to the records of the servicers that supposedly submitted the claims.  The Government is thus in a far better position than the Rosicki defendants to provide the details of any allegedly false claims the servicers may have submitted to Fannie Mae.  Moreover, the Government has been investigating the allegations at issue for five years, during which time it had plenty of opportunity to obtain the information required to comply with Rule 9(b).  Relator Comp. ¶ 158.

As another court in this District held in a case where the Government alleged that a bank had submitted false claims to the FHA: "Because the Government is empowered to investigate allegations of fraud before bringing suit and had access to all of the relevant facts before filing its complaint, it may not be allowed to rely on information and belief."  *United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593, 619 n.17 (S.D.N.Y. 2013).  The Government, in short, cannot "hide behind the relaxed pleading standard courts sometimes apply to *qui tam* relators who rely on inferences rather than facts."  *Id.* (internal quotation marks omitted).  Because the Government has failed to plead any false or fraudulent claim with the particularity required by Rule 9(b), its claims under § 3729(a)(1)(A) and (B) must be dismissed.

## III.   The Complaints Do Not Adequately Plead that Any Claims Submitted by the Servicers Were "False or Fraudulent" Under the Implied Certification Theory.

Even assuming *arguendo* that one or both complaints had adequately pleaded that a servicer submitted claims that included allegedly improper foreclosure-related charges billed by the Rosicki Defendants, neither complaint adequately pleads that any such claims were "false or fraudulent" as required by the False Claims Act.  The Rosicki firm did not itself submit claims to the GSEs or the FHA, so any liability would have to be premised on the notion that claims

20

submitted to the GSEs or the FHA by the servicers were false or fraudulent.  Because the complaints do not contain well-pleaded allegations that any claims submitted by the servicers were false or fraudulent, the claims against the Rosicki defendants under § 3729(a)(1)(A) and (B) must be dismissed.

"It is well-recognized that the submission of a false claim is the *sine qua non* of a False Claims Act violation."  *Kester*, 23 F. Supp. 3d at 253 (quotation marks omitted).  A claim may be "factually false" when it includes "an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided."  *Id.* at 260–61.  A claim may also be false if it contains an "express false certification" of compliance with a statutory, regulatory, or contractual term.  *Id.* at 261.

The Government and the Relator do not allege that any claims submitted by the servicers were factually false.  There is no allegation in the complaints that the servicers requested payment for services that the Rosicki Defendants did not provide.  Nor is there an allegation in the complaints that the servicers incorrectly described the services provided.  In addition, the Government and the Relator do not allege that the claims contained express false certifications.  It is therefore apparent that the Government and the Relator are relying on the theory of "implied false certification"—the notion that a claim that is truthful on its face can nonetheless be deemed false because the claimant did not comply with a statutory, regulatory, or contractual term.  *See Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016).

In *Escobar*, the Supreme Court held that "the implied certification theory can be a basis for liability, at least where two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or

contractual requirements makes those representations misleading half-truths." *Id.* at 2001. Several courts in this District have interpreted *Escobar* as holding that implied certification liability will exist *only* when both conditions are met. *See, e.g., U.S. ex rel. Lacey v. Visiting Nurse Serv. of N.Y.*, No. 14-cv-5739, 2017 WL 5515860, at *6 (S.D.N.Y. Sept. 26, 2017); *Kolchinsky*, 2017 WL 3841866; *U.S. ex rel. Tessler v. City of New York*, No. 14-cv-6455-JMF, 2016 WL 7335654, at *4 (S.D.N.Y. Dec. 16, 2016); *see also N.Y. ex rel. Khurana v. Spherion Corp.*, No. 15-CV-6605, 2016 WL 6652735, at *15 (S.D.N.Y. Nov. 10, 2016) (same under New York False Claims Act).

Neither the Government nor the Relator alleges that the two conditions set forth in *Escobar* are satisfied with respect to any claims the servicers submitted to the GSEs or FHA. They do not allege that such claims contained any "specific representations about the goods or services provided," let alone that any such specific representations amounted to "misleading half-truths." *Escobar*, 136 S. Ct. at 2000-2001. In fact, neither complaint says *anything at all* about the content of any claims the servicers presented. That is a striking failure given that the False Claims Act "focuses on the submission of a claim, and does not concern itself with whether or to what extent there exists a menacing underlying scheme." *U.S. ex rel. Lissack v. Sakura Glob. Capital Mkts., Inc.*, 377 F.3d 145, 154 n.9 (2d Cir. 2004) (quoting *U.S. ex rel. Aflatooni v. Kitsap Physicians Serv.*, 314 F.3d 995, 1002 (9th Cir. 2002)).

The Government does allege that the servicers submitted claims to Fannie Mae "using a Cash Disbursement Request, Form 571." Gov't Compl. ¶ 34. The Court thus can consider Form 571 because the Government's complaint incorporates it by reference and because it is integral to the allegations in both complaints. *See DiFolco*, 622 F.3d at 111. And a review of Form 571 confirms that it does not contain any specific representations that could constitute misleading half-

truths. *See* Horwitz Decl. Ex. E. It just provides blanks for the servicer to fill in the amount of reimbursement it is seeking for various foreclosure-related expenses. *Id.*

The Government and the Relator must therefore be relying on a much more aggressive form of the "implied certification" theory than the one the Supreme Court accepted in *Escobar*. Specifically, they must be asking this Court to hold that even claims that contain no affirmative representations whatsoever—claims that "do [no] more than merely demand payment"—may be deemed to "implicitly represent" that the claimant has complied with all applicable requirements. *Escobar*, 136 S. Ct. at 2000.

One might call that theory "pure" implied certification because, lacking any even arguably misleading representations in the claim, it relies entirely on implication to deem the claim false. Pure implied certification rests on the startling notion that a court can "deem" a request for payment to contain a misrepresentation that it does not contain, and that nobody told the claimant it would be read as if it contained, as a basis for imposing liability under the FCA that is "essentially punitive in nature." *Id.* at 1996. Pure implied certification thus raises serious concerns about fairness and notice. It also threatens to transform nearly every breach of contract into an FCA violation, despite the Supreme Court's admonition that the False Claims Act is not "a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Id.* at 2003; *see also U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 662 (2d Cir. 2016) (even a "willful and intentional" breach of contract is not fraud unless the promisor signed the contract with fraudulent intent); *U.S. ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 728 (4th Cir. 2010) (a plaintiff may not "shoehorn what is, in essence, a breach of contract action into a claim that is cognizable under the False Claims Act").

The Second Circuit has not considered the validity of the pure implied certification theory after *Escobar*.  Even assuming that the validity of that theory is technically an open question after *Escobar*, the Supreme Court's reasoning makes clear that it is not a viable theory of liability under the False Claims Act.  The *Escobar* Court held that, because Congress did not define "what makes a claim false or fraudulent," courts must presume that the False Claims Act incorporates "the common-law meaning of fraud."  136 S. Ct. at 1999.  Under the common law, a party that makes a bare request for payment, unaccompanied by any specific representations, is *not* implicitly representing compliance with all applicable legal requirements.  Instead, the common law reads into that request only a narrowly limited set of implied representations about matters that go to the heart of transaction.  A party's nondisclosure of a fact is thus deemed equivalent to a representation that the fact does not exist only if the fact "goes to the basis, or essence, of the transaction."  Restatement (Second) of Torts § 551(e) & cmt j; *see also* Restatement (Second) of Contracts § 161(b).  Even a fact that is undoubtedly *material* to the other party does not necessarily go to the "essence" of the transaction.  To the contrary, the common law recognizes that some facts "may serve as important and persuasive inducements to enter into the transaction, but not go to its essence.  These facts may be material, but they are not basic."  Restatement (Second) of Torts § 551 cmt j.

Neither the Government nor the Relator alleges any facts (let alone with the particularity required by Rule 9(b)) sufficient to establish that the statements in Fannie Mae's Servicing Guide requiring foreclosure-related expenses to be "reasonable" and necessary" and requiring law firms and servicers to "make every effort to reduce default-related legal expenses" went to the "essence" of the transaction between Fannie Mae and the servicers.  Even as to the narrow category of expenses related to foreclosures, the Servicing Guide makes clear that Fannie Mae had many

concerns other than cost, such as the "quality, reliability, and timeliness of the services provided." Ex. C at 603, 865 (Servicing Guide, Part VII, § 501; Part VIII, § 106.05); *see* p. 8, *supra*. Moreover, the question of whether the conduct alleged here went to the "essence" of the bargain between Fannie Mae *and the servicers*—which is the critical question in determining whether *the servicers'* claims to Fannie Mae can be deemed false—must be considered in light of the servicers' entire relationship with Fannie Mae, of which foreclosures and foreclosure-related expenses were only a very small part.  Indeed, the Servicing Guide that governed that relationship runs well over 1,000 pages, only a few of which address foreclosure-related expenses.  Accordingly, there is no basis on which the Court could find that the alleged marking up of foreclosure-related expenses went to the "essence" of the bargain between Fannie Mae and the servicers such that bare requests by the servicers seeking payment from Fannie Mae for those expenses should be deemed implicitly false.

The Government cannot satisfy its pleading burden with its conclusory allegation that the Rosicki Defendants' "overcharging of Fannie Mae for inflated foreclosure expenses goes fundamentally to the essence of the contractual bargain between Fannie Mae and Rosicki."  Gov't Compl. ¶ 125.  There are at least two significant problems with that allegation.  First, it is a statement of a legal conclusion, not a well-pleaded factual allegation; it is therefore "not entitled to the assumption of truth."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *see Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010).  And it is not supported by any well-pleaded factual allegations.  Second, it refers to the bargain between Fannie Mae and the Rosicki firm, but the Rosicki firm did not submit any claims to Fannie Mae.  To impose liability on the Rosicki Defendants under § 3729(a)(1)(A) or (B), the Government must show that *the servicers'* claims to Fannie Mae were false.  And the Government cannot make that showing based on a pure

implied certification theory without pleading (and ultimately proving) that the Rosicki firm's alleged conduct went to the essence of the bargain between Fannie Mae *and the servicers*.

Nor can the Government meet its pleading burden by alleging that the "actual, reasonable, and necessary" requirement was a "condition of reimbursement by Fannie Mae."  Gov't Compl. ¶ 126; *see also* Relator Compl. ¶ 65.  The Supreme Court explicitly held that noncompliance with a contractual requirement is not automatically material "merely because" the requirement is designated a "condition of payment."  *Escobar*, 136 S. Ct. at 2003.  And as noted above, whether a requirement goes to the "essence" of the bargain is an even more demanding standard than materiality.  A fortiori, then, designation as a condition of payment or reimbursement is not sufficient to establish that an alleged violation of that condition goes to the essence of the transaction.

For the same reasons, the Relator has failed to plead that any claims the servicers submitted to Freddie Mac or the FHA were false under the implied certification theory.  Because the Government and the Relator have not pleaded an adequate basis for deeming "false or fraudulent" any claim that was submitted by the servicers, their claims against the Rosicki Defendants under § 3729(a)(1)(A) and (B) must be dismissed.

## IV.  The Complaints Do Not Adequately Plead that the Alleged Overcharges Were Material to Fannie Mae's Payment Decisions, Much Less that the Rosicki Defendants Knew They Were Material.

Even if the Court concludes that the Government and the Relator have adequately pleaded that actionable "claims" were submitted to Fannie Mae by the servicers, and even if the Court is prepared to adopt the pure implied certification theory to deem those claims "false or fraudulent," the complaints should still be dismissed because they do not allege facts sufficient to show that the alleged violations—marking up certain charges for services provided by third-party vendors, without any allegation that the amounts charged exceeded the maximum allowable

26

charges for those services set by Fannie Mae—were material to Fannie Mae's payment decisions. And even if the Rosicki Defendants' alleged billing practices are determined now, after the fact, to have been material (or more precisely, plausibly material at the pleading stage), the complaints certainly do not allege facts sufficient to show that the Rosicki Defendants *knew* they were material.

"A misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act." *Escobar*, 136 S. Ct. at 1996. Even assuming arguendo that the False Claims Act applies to claims submitted to the GSEs rather than to the Government, the Government would have to show that the Rosicki Defendants' alleged billing practices were material to Fannie Mae's payment decisions. Because the False Claims Act is about fraud, not breach of contract, the materiality requirement is "rigorous" and "demanding." *Id.* at 1994, 1995, 2002, 2003, 2004 n.6. And the materiality requirement must be at least as rigorous and demanding when the alleged "misrepresentation about compliance" was not actually made but rather is "implied" by the mere submission of the request for payment.

Importantly, conduct is not material just because it allegedly failed to comply with a provision in the Servicing Guide that Fannie Mae designated a "condition of payment." *Id.* at 2003. "Nor is it sufficient for a finding of materiality" that Fannie Mae "would have [had] the option to decline to pay if it knew of" the conduct at issue. *Id.* Rather, to demonstrate materiality, the Government and the Relator must show that Fannie Mae likely would have refused to pay the servicers' claims had it known of the Rosicki Defendants' alleged billing practices; otherwise, the Rosicki Defendants cannot be said to have defrauded Fannie Mae into paying the servicers' claims by making misrepresentations (real or implied) about those billing practices. *See id.* at 2002

27

("Under any understanding of the concept, materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation."   (brackets and quotation marks omitted)); *see also, e.g.*, *Coyne v. Amgen, Inc.*, No. 17-1522, 2017 WL 6459267, at *2 (2d Cir. Dec. 18, 2017) (summary order).

That demanding standard might be satisfied if Fannie Mae "routinely refuse[d] to pay claims" based on billing practices like those alleged in the complaints.  *Escobar*, 136 S. Ct. at 2003–04.  On the other hand, if Fannie Mae paid claims "despite its actual knowledge" of the Rosicki Defendants' alleged conduct or similar conduct by other law firms, that would be "very strong evidence" of immateriality.  *Id.* at 2003.  Following *Escobar*, many courts of appeals have held that if a recipient continued to pay claims after becoming aware of the claimant's alleged noncompliance with applicable statutory, regulatory, or contractual provisions, that is strong evidence that the alleged noncompliance was not material to payment.  *See U.S. ex rel. Harman v. Trinity Indus. Inc.,* 872 F.3d 645, 665-68 (5th Cir. 2017); *U.S. ex rel. Petratos v. Genentech Inc.,* 855 F.3d 481, 490 (3d Cir. 2017); *Abbott v. BP Exploration* & *Prod., Inc.,* 851 F.3d 384, 386-388 (5th Cir. 2017); *U.S. ex rel. McBride v. Halliburton* Co., 848 F.3d 1027, 1034 (D.C. Cir. 2017); *U.S. ex rel. Kelly v. Serco, Inc.,* 846 F.3d 325, 334 (9th Cir. 2017); *U.S. ex rel. D'Agostino v. ev3, Inc.,* 845 F.3d 1, 7-8 (1st Cir. 2016); *United States v. Sanford-Brown, Ltd.,* 840 F.3d 445, 447-48 (7th Cir. 2016).

Moreover, for False Claims Act liability to attach, it is not enough for the alleged conduct to have been material; the defendant must also have *known* it was material.  *See Escobar*, 136 S. Ct. at 1996 ("What matters is not the label the Government attaches to a requirement, but whether the defendant knowingly violated a requirement *that the defendant knows is material to the Government's payment decision*." (emphasis added)).

*Escobar* rejected the argument that materiality is too fact-intensive for courts to address on a motion to dismiss. *See id.* at 2004 n.4. In doing so, the Court made clear that "False Claims Act plaintiffs must . . . plead their claims with plausibility and particularity under Federal Rules of Civil Procedure 8 and 9(b) by, for instance, pleading facts to support allegations of materiality." *Id.* The Second Circuit has recognized that in FCA cases, "[m]ateriality must be pleaded with particularity under Rule 9(b)." *U.S. ex rel. Grabcheski v. Am. Int'l Grp., Inc.*, 687 F. App'x 84, 87 (2d Cir. 2017) (affirming dismissal of complaint because relator "failed to allege with particularity facts that demonstrate" materiality); *see also Coyne*, 2017 WL 6459267, at *2 (affirming dismissal of FCA complaint for failure to "present concrete allegations from which the court may draw the reasonable inference that the misrepresentations . . . caused . . . the reimbursement decision"). Other district courts in this Circuit have likewise dismissed FCA complaints for failure to plead facts showing that the conduct alleged was material to payment. *See, e.g.*, *U.S. ex rel. Scharff v. Camelot Counseling*, No. 13-cv-3791-PKC, 2016 WL 5416494, at *8 (S.D.N.Y. Sept. 28, 2016); *Kolchinsky*, 2017 WL 3841866, at *2–3; *United States v. Strock*, No. 15-cv-0887-FPG, 2018 WL 647471, at *9–10 (W.D.N.Y. Jan. 31, 2018).

The complaints here do not adequately plead that the Rosicki Defendants' alleged marking up of certain costs charged by third-party vendors, without any allegation that the amounts charged exceeded Fannie Mae's maximum limits for those charges, was material to Fannie Mae's decision to pay the servicers' claims—much less that the Rosicki Defendants knew the alleged billing practices were material. The complaints do not allege that Fannie Mae ever denied a claim based on conduct similar to that alleged in the complaints. The allegations that Fannie Mae labeled the Servicing Guide provisions the Rosicki Defendants allegedly violated as conditions of reimbursement, *see* Gov't Compl. ¶ 126; Relator Compl. ¶ 64, are insufficient under *Escobar*,

which holds that a provision so designated is not necessarily material to payment.  *See* 136 S. Ct. at 2003.  And the Government's conclusory allegation that the alleged overcharging "would have influenced [Fannie Mae's] decision to reimburse the inflated foreclosure expenses," Gov't Compl. ¶ 125, does not even satisfy Rule 8, let alone Rule 9(b).  An FCA complaint "must do something more than simply state that compliance is material."  *U.S. ex rel. Payton v Pediatric Servs. of Am., Inc.*, No. CV416-102, 2017 WL 3910434, at *10 (S.D. Ga. Sept. 6, 2017); *see United States v. Scan Health Plan,* No. 09-cv-5013-JFW, 2017 WL 4564722, at *6 (C.D. Cal. Oct. 5, 2017) (dismissing FCA complaint that included "only conclusory allegations that the [defendants'] conduct was material").

Indeed, the Government—despite its unfettered access to Fannie Mae—fails to allege that Fannie Mae was unaware of the Rosicki Defendants' alleged billing practices.  The allegations that one would expect to see if the Government had any basis to claim that the Rosicki Defendants defrauded Fannie Mae are conspicuously absent:

- Far from contending that the Rosicki firm deceived Fannie Mae about the firm's use of affiliates to provide foreclosure-related services, the Government admits that the Rosicki firm told Fannie Mae about this fact.  *See* Gov't Compl. ¶ 51.

- Although the Government complains about the Rosicki Affiliates' use of third-party vendors to perform services for which the Affiliates billed the Rosicki firm (and for which the Rosicki firm in turn billed the servicers), the Government's complaint carefully avoids alleging that the Rosicki Defendants ever lied to Fannie Mae about this fact or took any action to conceal it or, indeed, even that Fannie Mae was unaware of it.

- For all the Government's focus on the Rosicki Affiliates' allegedly excessive "mark ups" of fees they paid to third-party vendors, the Government likewise does not allege that the Rosicki Defendants ever lied to Fannie Mae about this fact or sought to conceal it or, again, even that Fannie Mae was unaware of it.

The Government's failure to allege that Fannie Mae was deceived about any of this is no accident.  As the Government knows, Fannie Mae had a right to audit the Rosicki firm's financial

records. *See* Horwitz Decl. Ex. A at 6; *see also* pp. 8–9, *supra* (citing provisions of Servicing Guide and retention agreement regarding audits). During those audits, Fannie Mae would have been able to review both the invoices the Rosicki Affiliates received from third parties and the invoices the Affiliates submitted to the Rosicki firm. Fannie Mae had every reason and opportunity to be aware of the Rosicki Defendants' billing practices.

Moreover, the Relator claims that he provided information supporting his allegations to the Government "before filing this action" in September 2012. Relator Compl. ¶ 18; *see also* 31 U.S.C. § 3730(b)(2) (at the time of filing a *qui tam* suit, a relator must disclose to the Government "substantially all material evidence and information" in his possession). The Government could— and likely did—share the Relator's allegations and information with Fannie Mae, which was in federal conservatorship. It would have been easy for Fannie Mae, if it had been concerned about the Relator's allegations—if those allegations had told Fannie Mae anything it did not already know—to have conducted targeted audits of the Rosicki firm to investigate the alleged markups.

In addition, the Relator claims that various "red flags" should have alerted the servicers to problems with the Rosicki Defendants' billing practices. Relator Compl. ¶ 154. The supposed red flags include "new charges" for foreclosure-related services that vendors had previously provided for free and "rates" for foreclosure-related services that "increased dramatically over time." *Id.* ¶¶ 155–56. Those circumstances, however, if true, would have been just as apparent to Fannie Mae as they were to the servicers. After all, the Government claims that servicers billed Fannie Mae using Form 571, which includes an itemized breakdown of foreclosure-related costs. And Fannie Mae also would have observed these so-called "red flags" during its audits. The Relator also claims that in 2013 and 2014, the Government conducted a well-publicized investigation into alleged foreclosure-related overcharges to the GSEs and that the Acting Inspector General of the

31

FHFA, Fannie Mae's and Freddie Mac's conservator, participated in the investigation.  *See* Compl. ¶¶ 158–59.

Further, as early as 2012, the Relator made highly publicized allegations about the Rosicki firm's allegedly improper billing practices.  He alleges that he "repeatedly brought the illegal and excessive nature of affiliates' fees to the attention of various Bank Defendants, as well as to their agents, and the Rosicki Firm."  Relator Compl. ¶ 157.  As was widely reported at the time, in March 2012, the Relator stated on his website that he was "investigating the billing practices" of the Rosicki firm, that he "believe[d] that the charges imposed" were "unfairly high," and that he was soliciting plaintiffs for a suit against the Rosicki firm—all of which prompted the Rosicki firm to sue the Relator for defamation.  *See, e.g.*, Martha Neil, *Foreclosure Law Firm Sues Bankruptcy Attorney Who Questioned Its 'Systematic Overbilling,"* ABA JOURNAL (Aug. 13, 2012), https:// goo.gl/iWfm5V.

There is thus ample reason to believe that Fannie Mae was aware of the Rosicki Defendants' billing practices.  At a bare minimum, Fannie Mae must have deliberately chosen not to look into the Relator's well-publicized claims.  Again, Fannie Mae had the right to audit the Rosicki firm, and there is no allegation that the Rosicki Defendants took any steps to impede any such audits.  *Cf. Kolchinsky*, 2017 WL 3841866, at *3 (dismissing complaint for failure to plead materiality and observing that "the government's continued payment for [credit] ratings after public reports of their inaccuracy . . . suggests that any inaccurate ratings were 'minor or insubstantial' to the decision to pay for them").

Yet despite all this, the complaints do not allege that Fannie Mae ever expressed any concern that the Rosicki Defendants were perpetrating a fraudulent scheme by marking up charges from third-party vendors or that it ever took any steps to prevent the Rosicki Defendants from

doing so.  The Rosicki firm was approved to perform work on Fannie Mae-owned mortgages even after the Government began its investigation into the Relator's allegations.  Gov't Compl.¶ 30; Relator Compl. ¶ 158.  The reality is that Fannie Mae continued to pay claims that included the Rosicki Defendants' foreclosure-related expenses for more than five years after the Relator filed his initial complaint.  Fannie Mae only terminated its relationship with the Rosicki firm earlier this month, after the Government's decision to intervene in this case.

That Fannie Mae evidently did not believe it was being defrauded is not surprising.  When Fannie Mae reimbursed servicers for legal fees and costs incurred in connection with foreclosures, it was not single-mindedly focused on minimizing costs—particularly when those costs are not alleged to have exceeded the maximum Fannie Mae had set.  Instead, Fannie Mae was buying a package of professional services, and the quality, reliability, and timeliness of those services were important considerations in its payment decisions.  *See* p.8, *supra* (describing provisions in Servicing Guidelines requiring foreclosure firms to act with expedition and to ensure that foreclosures are accomplished effectively).

Especially under these circumstances, it was incumbent on the Government and the Relator to provide more than conclusory assertions regarding materiality.  They were required to offer particularized, concrete factual allegations demonstrating that the conduct alleged was material to Fannie Mae's payment decisions and that the Rosicki Defendants knew it was material to those decisions.  They failed to do so.  Instead, the Government's complaint betrays the reality that at most this might be a breach-of-contract claim, which the Government has dressed up as a fraud claim, presumably to take advantage of the uniquely draconian remedies available under the False Claims Act.  The Government thus repeatedly complains that the Rosicki firm billed the servicers for fees that "significantly exceeded competitive market rates."  Gov't Compl. ¶ 73; *see also id.*

¶¶ 2, 77.  That is the opposite of a fraud allegation: Fannie Mae obviously knew what amounts it was being asked to pay, and Fannie Mae—given its size and role in the mortgage system—would know better than anyone whether a given fee was reasonable or excessive. Indeed, the Servicing Guidelines required bank servicers to use multiple law firms in each jurisdiction, which means that Fannie Mae possessed comparative information on law firm fees and expenses. *See* Horwitz Decl. Ex. C at 852 (Servicing Guide Part VIII, § 106); *see also* p. 9, *supra*.  If Fannie Mae had thought that any costs were excessive in light of the overall package of services it was receiving, it would have spoken up.

Because the complaints do not adequately plead that the Rosicki Defendants' alleged conduct was material or that the Rosicki Defendants knew it was material, they must be dismissed.[3]

## V.   The Complaints Do Not Adequately Plead "Reverse False Claims."

The complaints also allege violations of 31 U.S.C. § 3729(a)(1)(G), the so-called "reverse false claims" provision of the FCA.  Unlike § 3729(a)(1)(A) and (B), § 3729(a)(1)(G) does not require the submission of a false or fraudulent claim.  Rather, it imposes liability on a person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  The complaints do not adequately plead that the Rosicki Defendants violated § 3729(a)(1)(G) for two reasons.  First, they do not show that Fannie Mae or Freddie Mac had an

---

[3] The point that the Government and the Relator did not sufficiently plead materiality or knowledge thereof with respect to claims submitted to Fannie Mae applies *a fortiori* to the Relator's allegations concerning claims submitted to Freddie Mac and the FHA.  As with Fannie Mae, the Relator's allegations do not show that either Freddie Mac or the FHA was deceived about the Rosicki Defendants' alleged billing practices or that those practices were material to those entities' payment decisions.  Moreover, there is no allegation in the complaints that the Rosicki Defendants had any contractual relationship with Freddie Mac or the FHA.

"obligation" within the meaning of the False Claims Act.  Second, they do not show a sufficient nexus between the Rosicki Defendants' alleged conduct and any such obligation.

### A. The Complaints Do Not Show that Fannie Mae Had an "Obligation To Pay or Transmit Money to the Government."

The False Claims Act defines an "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment."  31 U.S.C. § 3729(b)(3).  Under that definition, "a duty to pay must be formally 'established' before liability can arise . . . .  In other words, there is no liability for obligations to pay that are merely potential or contingent."  *U.S. ex rel. Barrick v. Parker-Migliorini Int'l, LLC*, 878 F.3d 1224, 1231 (10th Cir. 2017); *see also U.S. ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 338 n.141 (S.D.N.Y. 2004) (reverse false claims "depend, in part, on the nature of the defendants' obligation to pay the Government—a contingent, speculative, or potential obligation is not actionable").

According to the Government and the Relator, the relevant "obligation to pay or transmit money or property to the Government" is "Fannie Mae's quarterly dividend payment obligation pursuant to the Third Amendment to the [Senior Preferred Stock Purchase Agreement with the Treasury Department]."  Gov't Compl. ¶ 142; *see* Relator Compl. ¶ 512.  The Third Amendment, attached as Exhibit F to the Horwitz Decl., was agreed to in August 2012.  Gov't Compl. ¶ 20.  It provided that beginning in the first quarter of 2013, Fannie Mae would pay Treasury a quarterly dividend equal to the amount by which Fannie Mae's net worth exceeded a "capital reserve" buffer that started at $3 billion and decreased to zero over time.  *See id.*; Relator Compl. ¶¶ 50-51; Horwitz Decl. Ex. F at 4; *see also Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 602 (D.C. Cir.

2017) (discussing Third Amendment). The Court can consider the Third Amendment because it is incorporated by reference in and integral to the complaints. *See DiFolco*, 622 F.3d at 111.[4]

The Government and the Relator overlook language in the Third Amendment that qualifies Fannie Mae's "obligation" to make quarterly dividend payments. Like Fannie Mae's other agreements with the Treasury Department, the Third Amendment provides that Treasury has a right to receive dividends only "when, as and if declared by [Fannie Mae's] Board of Directors, *in its sole discretion*." Horwitz Decl. Ex. F at 3 (emphasis added). Because Fannie Mae's Board of Directors had discretion as to whether or not to make any dividend payment, Fannie Mae did not have an "obligation" within the meaning of the False Claims Act.

In very similar circumstances, the Third Circuit held that where a company's contractual promise to pay dividends to the Small Business Administration was "contingent on the Board's declaration of dividends," it was not an "obligation" for purposes of the False Claims Act because it was "dependent on a future discretionary act." *U.S. ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 505–06 (3d Cir. 2017). The court concluded that the "reverse FCA claim" failed because the supposed obligation to pay dividends "did not exist when the defendants' alleged misconduct occurred" and "would never materialize if the Board never exercised its discretion to declare the dividends." *Id.* at 506.

The D.C. Circuit reached a similar conclusion when it examined claims brought by Fannie Mae stockholders. *See Perry Capital*, 864 F.3d at 631. The plaintiffs claimed that their stock certificates entitled them to receive dividends from Fannie Mae and that FHFA had breached the

---

[4] The Relator makes similar allegations concerning Freddie Mac's obligation to pay dividends under a parallel amendment to its agreement with Treasury. *See* Relator Compl. ¶¶ 76–77. The Relator's "reverse false claim" allegations regarding Freddie Mac fail for the same reasons as the allegations concerning Fannie Mae.

obligation to pay those dividends.  The plaintiffs' stock certificates provided that the stockholders were entitled to receive dividends "when, as and if declared by the Board of Directors, in its sole discretion"—the same qualification that applies to Treasury's right to receive dividends under the Third Amendment.  *Id.*  The court agreed with FHFA that the plaintiffs had "no enforceable right to dividends because the certificates afford [Fannie Mae] complete discretion to declare or withhold dividends."  *Id.*

Because Fannie Mae's payment of dividends to Treasury was contingent upon the Board's discretionary decision whether to declare them or not, Fannie Mae did not have an established "obligation" to pay money to the Government within the meaning of the False Claims Act.  All claims under § 3729(a)(1)(G) must therefore be dismissed.

### B.   The Complaints Do Not Plead a Nexus Between the Rosicki Defendants' Conduct and Any Funds Owed to the Government.

Even if the Third Amendment created an "obligation" to pay dividends within the meaning of the False Claims Act, the Government and the Relator have not adequately pleaded that anything the Rosicki Defendants did was "material to," "avoid[ed]," or "decrease[d]" that obligation.  31 U.S.C. § 3729(a)(1)(G).  That language requires some reasonably close nexus between the alleged act or statement and the purported underpayment.  In short, there must be a known obligation to pay money to the Government that is tied to the defendant's specific conduct.  So far as the Rosicki Defendants are aware, no court has ever found liability for a reverse false claim without such a nexus.

A few courts have recognized the possibility of "indirect reverse false claims," where the defendant makes "a false statement that will cause a third party to impair its obligation to the federal government."  *United States v. Caremark, Inc.*, 634 F.3d 808, 814–17 (5th Cir. 2011).  For example, the Fifth Circuit held that Caremark could be liable for making false statements to state

Medicaid agencies that certain individuals were not covered by Caremark insurance because those false statements caused the state agencies to pay for those individuals' medical care using funds that they otherwise would have had to return to the federal government. *See id.* All of these cases involved a known obligation to pay money to the Government tied to the specific services provided by the defendant—typically, medical services provided in the context of a federal healthcare program where the defendant knew the federal government was the ultimate payor. *See U.S. ex rel. Hunt v. Merck-Medco Managed Care, LLC*, 336 F. Supp. 2d 430, 444–45 (E.D. Pa. 2004) (allegation that defendant pharmacy benefit manager caused health plan to underpay Government pleaded a reverse false claim in light of defendant's "unique relationship with the Government," where contract between defendant and health plan "explicitly disclose[d] that the Government and its employees [were] the ultimate beneficiaries"); *see also, e.g.*, *U.S. ex rel. Garbe v. Kmart Corp.*, 73 F. Supp. 3d 1002, 1012 n.4 (S.D. Ill. 2014), *rev'd in part on other grounds*, 824 F.3d 632 (7th Cir. 2016); *U.S. ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125 (E.D. Pa. 2012).

The complaints here do not plead a sufficient nexus between the Rosicki Defendants' alleged conduct and Fannie Mae's dividend payments. The Government and the Relator contend that from 2013 forward, any improper conduct that had the effect of reducing Fannie Mae's net worth by any amount "necessarily . . . decreased the amount of dividend payments" that Fannie Mae made to the Government and therefore amounted to a "reverse false claim." Gov't Compl. ¶¶ 142–46; *see* Relator Compl. ¶¶ 512–13. That argument is wildly overbroad. By that logic, § 3729(a)(1)(G) would apply to any fraud that affects any person or entity that owes money to the Government, no matter how attenuated the relationship between the defendant's conduct and the victim's obligation. A contractor that overcharged Fannie Mae for lawn maintenance would similarly "decrease the amount of dividend payments" that Fannie Mae could make to the

Government.  Even a private citizen's fraud against another private citizen would violate the False Claims Act, because it would reduce the victim's net income and thus her federal income tax.  The handful of cases recognizing "indirect reverse false claims" where a defendant was alleged to have engaged in conduct with a close and direct connection to another party's obligation to pay money to the Government do not support the sweeping theory advanced here.

Because the complaints do not allege a reasonably close nexus between the Rosicki Defendants' billing practices and Fannie Mae's dividend payments, the claims against the Rosicki Defendants under § 3729(a)(1)(G) must be dismissed.

## VI.    The Relator's Conspiracy Claim Must Be Dismissed.

The Relator asserts a conspiracy claim against the Rosicki Defendants under 31 U.S.C. § 3729(a)(1)(C).  He alleges a conspiracy "between and among the Rosicki Firm, Paramount, Threshold, and Enterprise to commit the violations set forth in the preceding claims," that is, the alleged violations of § 3729(a)(1)(A) and (B).  Relator Compl. ¶ 504.

Because, for the reasons set forth above, the Relator's complaint does not sufficiently plead that the Rosicki Defendants' billing practices violated § 3729(a)(1)(A) and (B), the complaint also does not state a claim for conspiracy to commit such violations.  *See, e.g.*, *U.S. ex rel. Vigil v. Nelnet, Inc.*, 639 F.3d 791, 801 (8th Cir. 2011) (because complaint failed to state an FCA claim, it also failed "to state an actionable conspiracy claim"); *U.S. ex rel. Potra v. Jacobson Cos.*, No. 12-cv-01600, 2014 WL 1275501, at *4 (N.D. Ga. Mar. 27, 2014) (dismissing conspiracy claim where underlying FCA claim dismissed); *U.S. ex rel. Phillips v. L-3 Commc'ns Integrated Sys., L.P.*, No. 10-cv-1784, 2012 WL 3649699, at *8 (N.D. Tex. Aug. 24, 2012) (same).

The Relator's conspiracy claim also fails for another reason: entities "in the same corporate family . . . cannot conspire with each other as a matter of law."  *Christians of Cal., Inc. v. Clive Christian N.Y., LLP*, No. 13-CV-275-KBF, 2015 WL 468833, at *9 (S.D.N.Y. Feb. 3, 2015).  The

conspiracy the Relator alleges is "between and among" the Rosicki firm and the Rosicki Affiliates.

Relator Compl. ¶ 504.  But the Relator also alleges that "[t]he Rosicki Firm and/or its principals"

have or had "control over" the Rosicki Affiliates.  *Id.* ¶ 122.  Affiliated corporate entities under

common control cannot conspire with one another any more than a person can conspire with

herself.   Relator's conspiracy claim therefore fails as a matter of law.   *See, e.g.*, *U.S. ex rel.*

*Scharber v. Golden Gate Nat'l Senior Care LLC*, 135 F. Supp. 3d 944, 967 (D. Minn. 2015)

(dismissing FCA conspiracy claim because "a parent company and subsidiary/affiliated companies

cannot conspire with each other"); *U.S. ex rel. Brooks v. Lockheed Martin Corp.*, 423 F. Supp. 2d

522, 528 (D. Md. 2006) (dismissing FCA conspiracy claim because defendants, a "parent

corporation and its wholly owned subsidiaries," were "legally incapable of forming a conspiracy

with one another"); *U.S. ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 274 F. Supp.

2d 824, 856 (S.D. Tex. 2003) ("Because Plaintiff alleges that the pertinent agreement here was

among various 'components' and 'subsidiaries' of the same 'parent,' . . . she has not stated a claim

for conspiracy under the FCA.").

**CONCLUSION**

For the reasons set forth above, the Rosicki Defendants respectfully request that this Court

dismiss the complaints with prejudice.

Dated: New York, New York
         April 27, 2018

                                        MCLAUGHLIN & STERN, LLP

                                        By:    /s/ Daniel J. Horwitz
                                               Daniel J. Horwitz, Esq.
                                               Tracy A. Burnett, Esq.
                                               260 Madison Avenue
                                               New York, New York 10016
                                               dhorwitz@mclaughlinstern.com
                                               tburnett@mclaughlinstern.com
                                               Telephone: (212) 448-1100
                                               Fax: (212) 448-0066

                                               *Attorneys for Defendants*
                                               *Rosicki, Rosicki & Associates, P.C.,*
                                               *Paramount Land, Inc.,*
                                               *Threshold Land Inc., and*
                                               *Enterprise Process Service, Inc.*