# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel. | : | |
| PETER D. GRUBEA, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Case No.  12 Civ. 7199 (JSR) |
| v. | : | |
| | : | |
| ROSICKI, ROSICKI & ASSOCIATES, P.C., et al., | : | |
| | : | |
| Defendants. | : | |

# MEMORANDUM OF LAW IN SUPPORT OF
# MOTION TO DISMISS THE THIRD AMENDED COMPLAINT
# BY DEFENDANT, MCCABE, WEISBERG & CONWAY, P.C.

**TABLE OF CONTENTS**

I. Factual Background ......................................................................................................1

   A.  Parties ..........................................................................................................1

      1.  Defendants ......................................................................................1

      2.  Relator ............................................................................................2

   B.  Servicers' Contracts ....................................................................................4

      1.  Fannie Mae ....................................................................................4

      2.  Freddie Mac ...................................................................................4

      3.  FHA-Insured Loans ......................................................................5

   C.  Examples Involving MWC ..........................................................................6

      1.  Katsura Court Property ..................................................................6

      2.  Columbia Street Property ..............................................................6

      3.  O'Brien Avenue Property ..............................................................7

   D.  This Action ..................................................................................................8

      1.  Continued Reimbursements ...........................................................8

      2.  Contentions Against Rosicki ..........................................................9

      3.  Contentions Against MWC .............................................................9

      4.  The Government Intervened Against Rosicki .................................11

II.  Arguments of Law .....................................................................................................11

   A.  Standard .....................................................................................................11

   B.  The Court Lacks Jurisdiction .....................................................................13

   C.  No Fraud .....................................................................................................17

   D.  No "Knowing" Conduct ..............................................................................19

   E.  No False Claims (First and Second Claims) ..............................................20

      1.  Not Factually False ........................................................................20

      2.  Not Legally False ...........................................................................20

      3.  Not Material ...................................................................................22

      4.  No Particularity ..............................................................................23

   F.  No Conspiracy (Third Claim) .....................................................................23

   G.  No Reverse False Claims (Fifth Claim) .....................................................24

   H.  Joinders ......................................................................................................24

III.  Conclusion ...............................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..................................................................................................11-12

*Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*,
62 F.3d 69 (2d Cir. 1995) (per curiam)..................................................................12

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..................................................................................................11-12

*Bishop v. Wells Fargo & Co.*,
870 F.3d 104 (2d Cir. 2017)....................................................................................12

*Brass v. American Film Technologies, Inc.*,
987 F.2d 142 (2d Cir. 1993).....................................................................................13

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002).....................................................................................12

*Cortec Indus., Inc. v. Sum Holding L.P.*,
949 F.2d 42 (2d Cir. 1991).......................................................................................12

*DiVittorio v. Equidyne Extractive Indus.*,
822 F.2d 1242 (2d Cir. 1987)...................................................................................12

*Gold v. Morrison-Knudsen Co.*,
68 F.3d 1475 (2d Cir. 1995).....................................................................................12

*Huntington Hosp. v. Thompson*,
319 F.3d 74 (2d Cir. 2002).......................................................................................17-18

*Kramer v. Time Warner, Inc.*,
937 F.2d 767 (2d Cir. 1991).....................................................................................13

*Roth v. Jennings*,
489 F.3d 499 (2d Cir. 2007).....................................................................................13

*Sacred Heart Med. Ctr. v. Sullivan*,
958 F.2d 537 (3d Cir. 1992).....................................................................................18

*Schindler Elevator Corp. v. United States ex rel. Kirk*,
563 U.S. 401, 131 S. Ct. 1885, 179 L. Ed. 2d 825 (2011)...................................14

*United States ex rel. Chorches v. Am. Med. Response, Inc.*,
865 F.3d 71 (2d Cir. 2017)...................................................................................12

*United States ex rel. Colucci v. Beth Isr. Med. Ctr.*,
785 F. Supp. 2d 303 (S.D.N.Y. 2011)............................................................ 17, 19

*United States ex rel. Doe v. John Doe Corp.*,
960 F.2d 318 (2d Cir. 1992)............................................................................13-16

*United States ex rel. Doe v. Taconic Hills Cent. Sch. Dist.*,
8 F. Supp. 3d 339 (S.D.N.Y. 2014)......................................................................19

*United States ex rel. Dick v. Long Island Lighting Co.*,
912 F.2d 13 (2d Cir. 1990)..................................................................................14

*United ex rel. Hussain v. CDM Smith, Inc.*,
2017 U.S. Dist. LEXIS 159538 (S.D.N.Y. Sept. 27, 2017)..............................20-21

*United States ex rel. Ladas v. Exelis, Inc.*,
824 F.3d 16 (2d Cir. 2016)..................................................................................24

*United States ex rel. Quinn v. Omnicare, Inc.*,
382 F.3d 432 (3d Cir. 2004)................................................................................17

*United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*,
944 F.2d 1149 (3d Cir. 1991))........................................................................14-16

*United States ex rel. Youssef v. Tishman Constr. Corp.*,
2017 U.S. Dist. LEXIS 15823 (E.D.N.Y. Feb. 2, 2017).......................................21

*Universal Health Servs. v. United States ex rel. Escobar*,
136 S. Ct. 1989, 195 L. Ed. 2d 348 (2016) .........................................................21

*Wang v. FMC Corp.*,
975 F.2d 1412 (9th Cir. 1992) .............................................................................19

**Statutes**

31 U.S.C. § 3729(b)(1) ........................................................................................19

31 U.S.C. § 3729(a)(1)(C) ...................................................................................23

31 U.S.C. § 3730(e)(4)(A) ...................................................................................13

**Other Authorities**

48 CFR 31.000 *et seq.*............................................................................................21

48 CFR 31.201-3(a) ..............................................................................................21

48 CFR 31.201-3(b) ..............................................................................................21

Fed. R. Civ. P. 9(b) ...........................................................................................11-12

Fed. R. Civ. P. 12(b)(6)......................................................................................11-12

## I.      Factual Background

This is a *qui tam* action against mortgage servicers, law firms and vendors arising from the reimbursement of costs incurred by law firms during the prosecution of foreclosure actions for their servicer-clients.  The claims against defendant, McCabe, Weisberg & Conway, P.C. ("MWC"), are based on the contention MWC contracted with defendants, Attorney Outsourcing Support Services, Inc. ("AOSS") and REO America Abstract, Inc. ("REO"), to provide title searches and personal service above market rates.  3d Am. Compl. [Doc. 29] ¶ 141.  MWC was reimbursed for the foreclosure costs by the servicers who then submitted the costs to the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac") and the Federal Housing Administration ("FHA") for reimbursement.  3d Am. Compl. ¶¶ 146-47.  The claims asserted against MWC are for presentation of false claims, 31 U.S.C. § 3729(a)(1)(A) (first claim), use of false statements, 31 U.S.C. § 3729(a)(1)(B) (second claim), conspiracy, 31 U.S.C. § 3729(a)(1)(C) (third claim), and reverse false claims, 31 U.S.C. § 3729(a)(1)(G) (fifth claim).   After investigation, the United States did not intervene in the claims asserted against MWC, AOSS, REO or the servicers.

### A.      Parties

### 1.      Defendants

MWC was a law firm and professional corporation.  3d Am. Compl. ¶ 23.  MWC provided legal services to many of the servicer-defendants.  AOSS was a Pennsylvania corporation that provided services including personal service.  3d Am. Compl. ¶ 24.  A principal of MWC was the CEO of AOSS.  3d Am. Compl. ¶ 139.  REO was a Pennsylvania corporation that provides services including title searches.  3d Am. Compl. ¶ 25.  The spouses of MWC's principals were "upon information and belief" officers of REO.  3d Am. Compl. ¶ 139.

Defendant, Rosicki, Rosicki & Associations, P.C. ("Rosicki"), is a New York law firm. 3d Am. Compl. ¶ 19.  Defendants, Paramount Land, Inc. ("Paramount"), Threshold Land, Inc. ("Threshold"), and Enterprise Process Service, Inc. ("Enterprise") (collectively "Rosicki Affiliates"), provide service and title search services to Rosicki.  3d Am. Compl. ¶¶ 20-22, 122. The principal of Rosicki is an officer of the Rosicki Affiliates.  3d Am. Compl. ¶ 122.

MWC, AOSS and REO are not affiliated with Rosicki or the Rosicki Affiliates.  MWC and Rosicki are separate and unrelated foreclosure law firms that provide legal services in New York and each have affiliated entities.  The remaining defendants are Fannie Mae, Freddie Mac and FHA-insured mortgage servicers.  3d Am. Compl. ¶¶ 26-39.

### 2.     Relator

Relator, Peter D. Grubea ("Grubea"), is a New York attorney who represented consumers in bankruptcy proceedings.  3d Am. Compl. ¶ 18.  As a debtors' attorney, Grubea has and continues to represent clients against the servicers (as creditors).  *See* 3d Am. Compl. ¶¶ 488-89. Grubea claimed he "discovered a pattern of foreclosure-related proofs-of-claims presenting unreasonable costs" during "the course of his bankruptcy practice[.]"  3d Am. Compl. ¶ 489. Grubea alleged the claims included "foreclosure fees beyond any reasonable sum, as well as fees for unnecessary work" and servicers would reduce their claims when "he challenged servicers on these costs[.]"  3d Am. Compl. ¶ 489.  Grubea did not allege any of the challenged proofs-of-claims were prepared or submitted by MWC on behalf of a servicer-client.  Grubea offered no factual support for the suggestion servicers compromised their claims against debtors in consumer bankruptcies because Grubea's clients challenged the title and personal service costs.

Grubea claimed he "studied market rates for foreclosure fees" and determined servicers and law firms were "claiming supra-market rates." 3d Am. Compl. ¶ 489. Grubea did not include factual allegations or attach materials to the pleadings describing, substantiating or quantifying his assertions about the market rates. Grubea did not allege that his purported rate comparison depended on insider or non-public information. Grubea did not even identify the "market" he claimed he studied, what law firms or servicers he used for comparison or the source of the law firm and servicer fee information he relied on.

Grubea did not allege he ever worked for any of the defendants, a creditor's bankruptcy or foreclosure law firm, a title or process service vendor, Fannie Mae, Freddie Mac, the FHA or Housing and Urban Development ("HUD"). Grubea did not allege he provided legal services to any of the defendants, a servicer, vendor or foreclosure lawyer. Grubea alleged only that he had "communications" with a partner at Steve J. Baum, P.C., with lawyers at Rosicki, and with "partners of other firms throughout the country with affiliate vendors." 3d Am. Compl. ¶ 492. Grubea claimed he "obtained non-public information about the affiliate vendor business model of such law firms and related practices of servicers" from these "conversations[.]" 3d Am. Compl. ¶ 491. Grubea alleged he repeatedly communicated his theory of overcharging to "various" servicer-defendants and to Rosicki. 3d Am. Compl. ¶ 157.

Grubea did not allege he had communications with anyone affiliated with MWC, AOSS or REO. Grubea did not claim he obtained non-public information about the business models or practices of MWC, AOSS or REO. The few allegations related to the businesses of MWC, AOSS and REO were made "upon information and belief" or included information available on MWC's website, letterhead or a search on the Pennsylvania Department of State website. *See,*

*e.g.,* 3d Am. Compl. ¶¶ 139, 141-43, 146-47, 304-08, 327-31, 402-04; https://www.corporations. pa.gov/search/corpsearch.  Grubea did not contend he raised any complaints about foreclosure costs to MWC, AOSS or REO.

### B.   Servicers' Contracts

### 1.   Fannie Mae

The servicers have a contract with Fannie Mae that incorporates the Fannie Mae Servicing Guide.  3d Am. Compl. ¶ 60.  Fannie Mae permits the servicers to seek reimbursement of costs incurred during foreclosure proceedings that "are actual, reasonable, and necessary."  3d Am. Compl. ¶ 64.  Servicers may retain law firms who have affiliated entities that provide services in connection with foreclosures.  3d Am. Compl. ¶ 63.  The servicer can submit the costs incurred through affiliated entities provided "such services do not exceed the customary and reasonable fees for comparable services in their jurisdiction."  3d Am. Compl. ¶ 63 (quoting Fannie Mae Servicing Guide).  Grubea identified no contract provision or Fannie Mae guideline requiring law firms to conduct title searches or effect service at their own expense or to decrease attorneys' fees if an affiliated entity performed title searches or personal service.

### 2.   Freddie Mac

The servicers have a contract with Freddie Mac that incorporates the Freddie Mac Single-Family Seller/Servicer Guide ("Freddie Mac Servicer Guide").  3d Am. Compl. ¶ 87.  Freddie Mac permits servicers to seek reimbursement of costs incurred during foreclosures that are "reasonable and comparable to those customarily charged in the area where the property is located."  3d Am. Compl. ¶ 94 (quoting Freddie Mac Servicer Guide).  Servicers may seek reimbursement for costs incurred through a law firm's affiliated entity provided the law firm "disclose[s] whether the firm has a process to select and regularly review costs and performance

of vendors of related sources to ensure competitive pricing and high quality." 3d Am. Compl. ¶ 92 (quoting Freddie Mac Servicer Guide). Grubea identified no contract provision or Freddie Mac guideline requiring law firms to conduct title searches or effect service at their own expense or to decrease attorneys' fees if an affiliated entity performed title searches or personal service.

The Freddie Mac Servicer Guide provides "Approved Attorney Fees and Title Expenses" in Exhibit 57A. Gairo Decl. at Ex. "A," p. E57A-1 to E57A-4. Effective September 1, 2013, the approved cost for title work was $510 in New York and $560 in New York City. Gairo Decl. at Ex. "A" at p. E57A-2. An additional $75 is permitted if title becomes stale due to a bankruptcy delay. Gairo Decl. at Ex. "A" at p. E57A-3. The Approved Attorney Fees and Title Expenses permit charges for attorneys' fees in addition to title expenses. Gairo Decl. at Ex. "A."

### 3. FHA-Insured Loans

Servicers must certify they will comply with HUD regulations to service FHA-insured loans. 3d Am. Compl. ¶¶ 98-99. Servicers can be reimbursed for foreclosure "[c]osts that are required by law, such as private service of process" and "[f]ees and costs that are necessarily incurred and are reasonable and customary in the area." 3d Am. Compl. ¶¶ 107-09 (quoting HUD Handbook). HUD will not reimburse for costs caused by "dilatory service, such as courier service or express mail or property inspection by attorneys" or "overhead items such as postage, telephone, duplicating or collection services[.]" 3d Am. Compl. ¶ 110 (quoting HUD Handbook). Grubea identified no HUD regulation or guideline requiring law firms to conduct title searches or effect service at their own expense or to decrease attorneys' fees if an affiliated entity performed title searches or personal service.

### C.    Examples Involving MWC

### 1.    Katsura Court Property

Freddie Mac held a mortgage on property on Katsura Court, Penfield, New York and contracted with Flagstar to service it.  3d Am. Compl. ¶ 302.  Flagstar retained MWC to handle the foreclosure.  3d Am. Compl. ¶ 303.  Grubea alleged "upon information and belief" MWC retained REO to provide title searches, and REO charged $450.  3d Am. Compl. ¶¶ 306-07.  Grubea claimed MWC retained and was invoiced by AOSS for service of process:

> 304.    Upon information and belief, the McCabe Firm contracted with its affiliate service-of-process vendor, AOSS, to bill for service of process on the foreclosure defendants.
>
> 305.    Upon information and belief, AOSS invoiced the McCabe Firm for service on defendants at the Katsura Court Property at an amount above market rates, which were between $20-$40 per person.  Upon information and belief, AOSS hired another process service company to serve each person at market rates and simply marked up those invoices.

3d Am. Compl. ¶¶ 304-05.  Grubea alleged no factual information about service, such as the number of individuals and lienholders, whether service was in-state or out-of-state or the process used or required by statute.

The affidavits of service filed in the foreclosure action reflect service was completed by Servium New York Process Service, LLC ("Servium"), an entity not affiliated with MWC.  Gairo Decl. at Ex. "B."  The invoice by Servium to MWC reflects a charge of $550.  Gairo Decl. at Ex. "C."  The invoice by MWC to Flagstar reflects a charge of $550 for service of process.  Gairo Decl. at Ex. "D."

### 2.    Columbia Street Property

Freddie Mac held a mortgage on property on Columbia Street in Hamburg, New York and contracted with PNC to service it.  3d Am. Compl. ¶ 325.  PNC retained MWC to handle the

foreclosure. 3d Am. Compl. ¶ 326. Grubea alleged "upon information and belief" MWC

retained REO to provide title searches, and REO charged $450. 3d Am. Compl. ¶¶ 329-30.

Grubea claimed MWC retained and was invoiced by AOSS for service of process:

> 327.   Upon information and belief, the McCabe Firm contracted with its affiliate service-of-process vendor, AOSS, to bill for service of process on the foreclosure defendants.

> 328.   Upon information and belief, AOSS invoiced the McCabe Firm for service on defendants at the Katsura Court Property[sic] at an amount above market rates, which were between $20-$40 per person. Upon information and belief, AOSS hired another process service company to serve each person at market rates and simply marked up those invoices.

3d Am. Compl. ¶¶ 327-28.

The affidavits of service filed in the foreclosure action reflect service was completed by

Supreme Process Serving, LLC ("Supreme"), an entity not affiliated with MWC, on February 2,

2010. Gairo Decl. at Ex. "E." MWC did not substitute as counsel for PNC until January 11,

2012. Gairo Decl. at Ex. "F." Steven J. Baum, P.C. was counsel prior to MWC. Gairo Decl. at

Ex. "F." Grubea did not identify when the title searches he complained about were completed.

### 3.   O'Brien Avenue Property

The FHA insured a mortgage on property on O'Brien Avenue, in the Bronx, New York,

which was serviced by Flagstar. 3d Am. Compl. ¶ 400. Flagstar retained MWC to handle the

foreclosure. 3d Am. Compl. ¶ 401. Grubea claimed MWC retained and was invoiced by AOSS

for service of process:

> 402.   Upon information and belief, the McCabe Firm contracted with its affiliate service-of-process vendor, AOSS, to bill for service of process on the foreclosure defendants.

403.    Upon information and belief, AOSS invoiced the McCabe Firm for service on defendants at the O'Brien Avenue Property at an amount above market rates, which were between $20-$40 per person.  Upon information and belief, AOSS hired another process service company to serve each person at market rates and simply marked up those invoices.

3d Am. Compl. ¶¶ 402-03.  Grubea alleged no factual information about service, such as the number of individuals and lienholders, whether service was in-state or out-of-state or the process used or required by statute.

The affidavits of service filed in the foreclosure action reflect service was completed by Servium.  Gairo Decl. at Ex. "G."  The invoice by Servium to MWC reflects a charge of $520. Gairo Decl. at Ex. "H."  The invoice by MWC to Flagstar reflects a charge of $520 for service of process.  Gairo Decl. at Ex. "I."

**D.    This Action**

**1.    Continued Reimbursements**

This action was commenced on September 24, 2012.  Compl. [Docs 2, 25].  The servicers learned of the investigation by the Government in 2013.  3d Am. Compl. ¶ 158.  On July 1, 2014, the United States Attorney for the Southern District of New York issued a press release indicating a servicer "had 'accepted responsibility for failing to create or maintain systems to review fees and charges submitted by outside counsel and other third-party providers'" which were "'then submitted to FHA and Fannie Mae for reimbursement[.]'"  3d Am. Compl. ¶ 159. Grubea alleged the servicers continued to submit and obtain reimbursement for foreclosure-related expenses after July 2014.  3d Am. Compl. ¶ 159.  Grubea did not allege Fannie Mae, Freddie Mac or the FHA stopped reimbursing servicers for personal service or title search charges after this action was commenced or the July 2014 press release.  3d Am. Compl. ¶ 159.

### 2. Contentions Against Rosicki

Rosicki and the Rosicki Affiliates were originally-named defendants. Grubea alleged Enterprise billed for unnecessary personal service on the tax department where no tax lien existed and on judgment debtors with names similar to, but distinguishable from, foreclosure defendants; ineffective and worthless service on "Joe Doe" defendants; and services that were part of firm overhead like delivering pleadings, affidavits and filings to court. 3d Am. Compl. ¶¶ 124-27. Grubea asserted Paramount and Enterprise billed excessive rates for title searches, personal service, delivery on the New York Secretary of State and mailings to "Joe Doe" defendants. 3d. Am. Compl. ¶ 131. Grubea alleged Enterprise did not provide services but marked up the bills of third parties and passed the stepped-up costs to Rosicki to submit to servicers for reimbursement. 3d Am. Compl. ¶ 134. Rosicki used non-party affiliated entities, Adelphi Legal Publishing Corp and Whittiker Legal Publishing Corp, for publication of legal notices that allegedly provided no direct services and marked up bills of other publishers. 3d Am. Compl ¶ 135.

### 3. Contentions Against MWC

MWC was not added as a defendant until the first amended complaint on February 28, 2013. 1st Am. Compl. [Docs 4, 27]. Grubea's claims against MWC are limited to the contention MWC contracts with AOSS and REO "for services at excessive rates" to generate fees for AOSS and REO. 3d Am. Compl. ¶ 142. In his first amended complaint, Grubea defined "excessive rates for services" as:

> a. Title searches well above market rates (e.g., at more than $450, despite market rates between $200-$325); and
> b. Personal service well above market rates (e.g., at more than $200, despite market rates of approximately $40).

1st Am. Compl. ¶ 130.

9

Without explanation, Grubea reduced his contention of "market rates":

    a.  Title searches well above market rates (e.g., at more than $450, despite market rates between $100-$250); and

    b.  Personal service well above market rates (e.g., at more than $200, despite market rates of approximately $20-$40).

3d. Am. Compl. ¶ 141.  Grubea provided no substantiation for his opinion the services were charged above market rates or how the rates charged by MWC were not consistent with the requirements of Fannie Mae, Freddie Mac or the FHA/HUD.

Grubea baldly asserted MWC profited by offloading unidentified "tasks" to REO and AOSS and improperly sought reimbursement for "[t]hese services".  3d Am. Compl. ¶¶ 143-44.  Grubea did not identify any service provided by AOSS or REO other than personal service and title searches or what purported work MWC offloaded.  3d Am. Compl. ¶ 143.  Without any factual predicate or support from the "examples" included in the third amended complaint, Grubea accused AOSS of marking up bills with MWC's assent:

    145.    Moreover, AOSS does not provide many of these services itself.  Instead, with the assent of the McCabe Firm, AOSS often contracts with other entities to conduct services, such as service of process, and then simply marks up the bill before seeking reimbursement.  Although the McCabe Firm could readily contract directly with entities serving process, it chooses to contract with AOSS instead, in order to generate profits from allowing AOSS to mark up the services bills of other entities.

3d Am. Compl. ¶ 145.

Grubea did not allege MWC marked up charges it incurred from AOSS or REO.  Grubea did not contend the personal service and title searches MWC ordered were not actually performed or were unnecessary in a foreclosure proceeding generally or in the specific "examples" provided in the third amended complaint.  As it related to MWC, AOSS and REO, Grubea only contended the amounts AOSS and REO charged for personal service and title searches were above market rates.  3d Am. Compl. ¶ 141.

### 4.       The Government Intervened Against Rosicki

On March 27, 2018, the United States filed a complaint-in-intervention against Rosicki

and the Rosicki Affiliates.  Inter. Compl. [Doc 22].  The Government alleged Rosicki and the

Rosicki Affiliates did not observe the corporate form or operate as bona fide separate entities.

Inter. Compl. ¶¶ 48-62.  The Government contended Rosicki "created a system in which

Enterprise and Paramount acted as vehicles for marking up foreclosure expenses as much as

possible, while adding as little operating expenses as possible, in order to maximize revenue[.]"

Inter. Compl. ¶ 64.  The Government provided specific examples it claimed reflected the Rosicki

Affiliates "exponentially" marked up the invoices of third parties, charged amounts above the

Fannie Mae max allowable rates and charged for services it never provided (*i.e.*, "document

retrieval fee").  *See, e.g.,* Inter. Compl. ¶¶ 66-67, 75, 81, 83, 86-123.  The Government also

contended Rosicki submitted "bills for its foreclosure-related expenses to courts for judicial

approval . . . [with] substantially lower costs for service of process than the actual bills . . .

submitted to the Servicers for comparable work."  Inter. Compl. ¶ 74.

## I.       Arguments of Law

### A.       Standard

Grubea's claims must satisfy the pleading requirements of *Federal Rules of Civil*

*Procedure* 9(b) and 12(b)(6).  To survive a motion to dismiss under *Rule* 12(b)(6), "a complaint

must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 555 (2007)).  The complaint must include "more than labels and conclusions" or

"a formulaic recitation of the elements of a cause of action."  *Twombly*, 550 U.S. at 555.  A

complaint must provide "more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Ashcroft*, 556 U.S. at 678 (*citing Twombly*, 550 U.S. at 555). A complaint must include facts to plausibly support the legal sufficiency of the claims asserted.

False Claim Act ("FCA") claims must satisfy the heightened pleading standard of *Rule* 9(b). *Gold v. Morrison-Knudsen Co.*, 68 F.3d 1475, 1476-77 (2d Cir. 1995). "Rule 9(b) pleadings cannot be based upon information and belief." *DiVittorio v. Equidyne Extractive Indus.*, 822 F.2d 1242, 1247 (2d Cir. 1987). The only exception is "facts peculiarly within the opposing party's knowledge, in which event the allegations must be accompanied by a statement of facts upon which the belief is based." *Id.* "[T]hose who *can* identify examples of actual [FCA] claims *must* do so at the pleading stage." *United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 86 (2d Cir. 2017) (emphasis in original). Fraud allegations that do not inform each defendant of its role in the alleged fraudulent activity or specify time, place, speaker and content of the alleged misrepresentations should be dismissed. *DiVittorio*, 822 F.2d at 1247-1248.

The Court may consider the complaint and documents outside the complaint that are "integral" to the complaint. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002). The complaint includes "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Id.* at 152 (quoting *Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)). The Court may consider a document if the complaint "relies heavily upon its terms and effect" even if not incorporated by reference. *Id.* at 153 (quoting *Audiotext Network*, 62 F.2d at 72). A plaintiff is deemed to have actual notice of materials the plaintiff relied on in bringing the suit or framing the complaint. *Id.* (citing *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991)). When fraud is

alleged, the Court may examine the documents a plaintiff claimed contained the alleged non-disclosure or misrepresentation "to see whether that representation was made" or take judicial notice of public records integral to a fraud complaint.  *Roth v. Jennings*, 489 F.3d 499, 509-10 (2d Cir. 2007) (citing *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991); *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)).

MWC otherwise incorporates by reference the standard for a motion to dismiss pursuant to *Rules* 9(b) and 12(b)(6) included in the joint memorandum of law by the servicer-defendants at Doc. 124.

## B.    The Court Lacks Jurisdiction

Grubea's claims depend on whether this Court has subject matter jurisdiction.  Pursuant to 31 U.S.C. § 3730(e)(4)(A), the Court must dismiss a *qui tam* action

> unless opposed by the Government, if the same allegations or transactions as alleged in the action or claim were publicly disclosed –
>
> (i)      in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
> (ii)     in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
>
> (iii)    from the news media,
>
> unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A).   The purpose of the public disclosure bar is to minimize "the potential for parasitic lawsuits by those who learn of the fraud through public channels and seek remuneration although they contributed nothing to the exposure of the fraud[.]"  *United States ex rel. Doe v. John Doe Corp.*, 960 F.2d 318, 319 (2d Cir. 1992).

Information equally available to a stranger to the fraud as to the relator is publicly disclosed.  *See, e.g., Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 408, 131 S. Ct. 1885, 179 L. Ed. 2d 825 (2011) ("[A]nyone could have filed the same FOIA requests and then filed the same suit.").  "[A]llegations of fraud are publicly disclosed when they are placed in the 'public domain.'"  *Doe,* 960 F.2d at 322 (quoting *United States ex rel. Dick v. Long Island Lighting Co.*, 912 F.2d 13, 18 (2d Cir. 1990)).  Information is in the public domain if it is available to members of the public with no prior knowledge of the alleged fraud.  *Id.* at 322-23.

The public disclosure bar "distinguishes between information hidden in files or disclosed in private and information produced [for] . . .  general use[.]"  *Id.* at 322 (quoting *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1154 (3d Cir. 1991)).  In *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149 (3d Cir. 1991) (adopted by the Second Circuit), the Third Circuit found public disclosure where the relator was a lawyer who learned about the fraud while representing a client in litigation.  *Doe*, 960 F.2d at 322-23.  During discovery, Prudential produced memoranda that suggested fraud against the federal government, which were later filed of record with the court.  *Id.* at 322.  "Armed with these discovery materials, the attorney brought a qui tam action against Prudential."  *Id.*  The Third Circuit affirmed dismissal for lack of jurisdiction:

> We read section 3730(e)(4) as designed to preclude *qui tam* suits based on information that would have been equally available to strangers to the fraud transaction had they chosen to look for it as it was to the relator.  Information gleaned in litigation and on file in the clerk's office falls in this category. . . . There would have been no reason to bar *qui tam* suits by persons who learned the information through reading a Government report purchased from the Government Printing Office or available in a public library but permit such suits if the information was learned through reading court records.

*Stinson*, 944 F.2d at 1155-56.

The Third Circuit also rejected the attorney's argument his knowledge of the industry and background made it possible to detect the scheme and therefore he was the "original source":

> [T]he relator must possess substantive information about the particular fraud, rather than merely background information which enables a putative relator to understand the significance of a publicly disclosed transaction or allegation.

*Stinson*, 944 F.2d at 1160-61.  The attorney was not a "whistleblowing insider" or a "close observer[] or otherwise involved in the fraudulent activity."  *Id.* at 1161 (citations omitted).

In *Doe*, the Second Circuit dismissed a *qui tam* action by a lawyer who learned about the alleged fraud while representing a client being investigated for the scheme.  960 F.2d at 319.  During the investigation, "innocent employees" who knew nothing about the scheme were questioned and interviewed.  *Id.* at 322-23.  The revelation of the alleged fraud to the offending corporation's innocent employees during the investigation was sufficient public disclosure to bar the claim.  *Id.* at 323-24.

Grubea is not a whistleblowing insider or close observer.  *See Stinson*, 944 F.2d at 1161.  Grubea is a stranger to the alleged fraudulent activity.  Grubea's source of information was litigation where he appeared as an advocate.  Any member of the general public could have searched court records and corporation databases, googled foreclosure service vendors, law firms and affiliated entities and studied the results.  Grubea had no superior access or private information about MWC, AOSS or REO and relied on material available for general use.

Grubea asserted substantially the same allegations in bankruptcy proceedings that he now asserts in this action.  Grubea alleged he discovered the complained about activity by objecting to servicers' "proofs-of-claims presenting unreasonable costs".  3d Am. Compl. ¶ 489.  He alleged the "claims included foreclosure fees beyond any reasonable sum, as well as fees for unnecessary work."  3d Am. Compl. ¶ 489.  Grubea took credit in his pleadings for successfully

challenging unreasonable costs and fees for unnecessary work and achieving reductions for his clients. The allegations of improper foreclosure costs were accessible to the general public through court searches and therefore in the public domain.

Without particularity, Grubea suggested he engaged in an investigation by alleging conversations with Baum, Rosicki, lawyers other than MWC and servicers to learn non-public information. Grubea alleged no contact with MWC, AOSS or REO. No allegation indicated Grubea conducted any investigation into MWC, AOSS or REO.

Grubea's pleadings also suggest he revealed his theory to innocent employees. Grubea did not contend all of his communications were with allegedly complicit lawyers or partners. Grubea publicly disclosed to the extent his conversations included actual insiders without prior awareness of the purported fraud.

Grubea is no different from the enterprising lawyers in *Stinson* and *Doe* whose claims were dismissed. Grubea developed a theory and applied it, as any member of the public could have done. His experience as a consumer bankruptcy attorney does not satisfy the "original source" criteria. *See Stinson*, 944 F.2d at 1160-61. Grubea has not established a basis to overcome the public disclosure bar.

Permitting lawyers like Grubea to prosecute *qui tam* actions against their opponents in litigation using material obtained in the litigation presents public policy concerns greater than just fostering "parasitic lawsuits" for remuneration. *Doe,* 960 F.2d at 319. If this action is not dismissed, then discovery will proceed. Grubea will gain access to confidential business material and conceivably invade the attorney-client relationship between the creditors and creditors' counsel he opposes as debtor's counsel. The FCA was designed to uncover fraud by rewarding and protecting insiders who revealed it, not to reward enterprising lawyers who are

16

strangers to the alleged fraud.   Accordingly, MWC's motion to dismiss the third amended complaint should be granted and Grubea's claims against MWC dismissed with prejudice.

### C.    No Fraud

Grubea asserted claims for presentation of false claims, 31 U.S.C. § 3729(a)(1)(A) (first claim), use of false statements, 31 U.S.C. § 3729(a)(1)(B) (second claim), conspiracy, 31 U.S.C. § 3729(a)(1)(C) (third claim), and reverse false claims, 31 U.S.C. § 3729(a)(1)(G) (fifth claim). Grubea's claims are based on the contention MWC contracted with AOSS and REO to provide title searches and personal service above market rates and submitted those supra-market costs to servicers for reimbursement.  Grubea challenged the rates charged by REO and AOSS but not the factual basis for the claims submitted by MWC to servicers.

FCA liability cannot be imposed based on a rate challenge in absence of a clear obligation to charge at a specific rate.  Taking "advantage of the uncertainty in the regulations to maximize . . . billings . . . is not fraud."  *United States ex rel. Colucci v. Beth Isr. Med. Ctr.*, 785 F. Supp. 2d 303, 314-15 (S.D.N.Y. 2011) (finding no fraud where there was "no specific provision" requiring providers "only be reimbursed for their actual costs.") (citing *United States ex rel. Quinn v. Omnicare, Inc.,* 382 F.3d 432, 434, 445 (3d Cir. 2004) (holding no FCA liability could be imposed "in light of the absence of a clear obligation to credit Medicaid . . . at a specific rate.")).  "[M]aximiz[ing ]reimbursements" is also not fraud.  *Id*. at 315.

There are numerous government programs that reimburse providers based on a schedule like Freddie Mac and Fannie Mae.  In *Huntington Hosp. v. Thompson*, 319 F.3d 74, 76 (2d Cir. 2002), the Second Circuit discussed a DRG reimbursable cost schedule provided by Medicare. The reimbursable amounts were based on regional or national averages of costs to treat certain illnesses, not a specific cost to any particular hospital.  *Id.*

> When a hospital's actual operating costs exceed its federally prescribed limit for the given DRG, the hospital must absorb the difference. Conversely, if a hospital's costs are lower than the federal rates, the hospital retains the difference.

*Id.* (quoting *Sacred Heart Med. Ctr. v. Sullivan*, 958 F.2d 537, 541 (3d Cir. 1992). It is not a false claim merely because the full allowable amount is retained.

At their core, Grubea's claims against MWC (as distinguished from Rosicki) are a challenge to whether and what extent a scheduled allowable cost can be retained. The claims against MWC are limited to whether the best rate was achieved, whereas the claims against Rosicki allege charges for services never performed or in excess of the cost allowances in addition to a complaint the best rate was not achieved. There is a clear factual demarcation that is further highlighted by the Government's decision to intervene against Rosicki but not MWC.

The title costs identified in the third amended complaint were within the allowable amounts permitted by Freddie Mac. Freddie Mac decided the $510 (New York) and $560 (New York City) cost allowances were reasonable and customary for the area. To the extent Grubea believes those rates were above market rates or excessive, his quarrel is with Freddie Mac. MWC cannot be faulted for seeking reimbursement for the actual amount it paid to REO for title searches that is consistent with the amounts Freddie Mac agreed to pay for title searches.

Grubea identified no example of actual personal service charges by AOSS in the third amended complaint. However, the personal service charges falsely attributed to AOSS disprove Grubea's theory of fraud. The charges by Servium and Supreme, entities not affiliated with MWC, were in excess of the amounts Grubea contended were market rates. The examples Grubea cited as support for his claims reveal there was no scheme.

Grubea did not identify a specific contractual provision or guideline that prohibited MWC from seeking reimbursement for the allowable amounts.  At best, Grubea alleged MWC "took advantage of the uncertainty" or maximized its reimbursements, which is not fraud, as a matter of law. *See Colucci*, 785 F. Supp. 2d at 314-15.  Grubea's claims against MWC are rate challenges that cannot form the basis for FCA liability.  Accordingly, MWC's motion to dismiss the third amended complaint should be granted and Grubea's claims against MWC dismissed with prejudice.

> **D.     No "Knowing" Conduct**

Grubea's claims require knowing conduct by MWC.  A violation of the FCA requires the defendant acted "knowingly" in presenting the claim for payment, making or using a false record, conspiring to present a false claim or avoiding an obligation to pay.  31 U.S.C. § 3729(b)(1); *United States ex rel. Doe v. Taconic Hills Cent. Sch. Dist.*, 8 F. Supp. 3d 339, 350 (S.D.N.Y. 2014); *Colucci*, 785 F. Supp. 2d at 315-16.  "In the absence of a clear obligation . . ., FCA liability is not appropriate, for the FCA is intended to punish only 'wrongdoing,' not honest mistakes." *Colucci*, 785 F. Supp. 2d at 316 (quoting *Wang v. FMC Corp.*, 975 F.2d 1412, 1419 (9th Cir. 1992)).  The relator must establish the defendant "knew it was not permitted to bill" for the disputed amounts. *Doe*, 8 F. Supp. 3d at 351.  Allegations a defendant "took advantage of a lack of clarity . . . to maximize . . . reimbursements" is "insufficient to plead the 'knowing' conduct element" of an FCA claim. *Colucci*, 785 F. Supp. 2d at 317.

Grubea has not alleged circumstances showing MWC knew or should have known it could not be reimbursed for actual amounts it paid to vendors.  Grubea has not established MWC knowingly submitted false claims.  Accordingly, MWC's motion to dismiss the third amended complaint should be granted and Grubea's claims against MWC dismissed with prejudice.

### E.    No False Claims (First and Second Claims)

MWC incorporates by reference the elements and standards for claims under 31 U.S.C. §

3729(a)(1)(A) (presentation of false claims) and 31 U.S.C. § 3729(a)(1)(B) (use of false

statements); the application of *Universal Health Servs. v. United States ex rel. Escobar*, 136 S.

Ct. 1989, 195 L. Ed. 2d 348 (2016); and standards for factual falsity, legal falsity and materiality

(31 U.S.C. § 3729(b)(4)) as presented in the joint memorandum of law by the servicer-

defendants at Doc. 124.

### 1.    Not Factually False

Grubea has not established a factually false claim.  Grubea did not allege MWC

submitted a claim with an incorrect description of services or for services never provided or for

amounts other than what MWC actually paid to AOSS and REO.  The pleadings reflect REO

charged title search costs within the allowable fees permitted by Freddie Mac for the three

identified Freddie Mac mortgage examples.  While Grubea alleged "upon information and

belief" AOSS "marked up" third party invoices with MWC's "assent", the public records and

actual invoices included with this motion reveal the factually-bald examples are demonstrably

false and should not be credited by the Court.  *See* 3d Am. Compl. ¶¶ 145, 304-05, 327-28, 402-

03.  No factually false claim exists.

### 2.    Not Legally False

Whether Grubea has established a legally false claim depends on whether MWC

expressly or impliedly certified compliance with contractual requirements material to payment.

Grubea did not allege MWC expressly certified compliance.

> To assert an implied certification claim after *Escobar*, a plaintiff must allege that (1) the
> defendant made specific representations about goods or services, (2) the defendant failed
> to disclose noncompliance with a legal or contractual requirement, (3) the omission

renders the representation misleading with respect to the goods or services provided, (4) the omission is material to the government's payment decision, and (5) the defendant acted knowingly.

*United States ex rel. Hussain v. CDM Smith, Inc.*, 2017 U.S. Dist. LEXIS 159538 *19 (S.D.N.Y. Sept. 27, 2017) (citing *Escobar*, 136 S. Ct. at 1999-2004; *Bishop v. Wells Fargo & Co.*, 870 F.3d 104 (2d Cir. 2017)).  Grubea must establish a knowing failure to disclose noncompliance by MWC.

The Federal Acquisition Regulation (FAR) governs how executive agencies of the United States acquire goods or services by contract with appropriated funds.  *See* 48 CFR 31.000 *et seq.* "The FAR establishes uniform policies and procedures for all executive agencies in order to produce consistent costs, quality, and timeliness in Government acquisitions."  *United States ex rel. Youssef v. Tishman Constr. Corp.*, 2017 U.S. Dist. LEXIS 15823 *5 (E.D.N.Y. Feb. 2, 2017).  Under FAR, "[a] cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business."  48 CFR 31.201-3(a).

> What is reasonable depends upon a variety of considerations and circumstances, including—
>> **(1)**  Whether it is the type of cost generally recognized as ordinary and necessary for the conduct of the contractor's business or the contract performance;
>> **(2)**  Generally accepted sound business practices, arm's length bargaining, and Federal and State laws and regulations;
>>
>> **(3)**  The contractor's responsibilities to the Government, other customers, the owners of the business, employees, and the public at large; and
>> **(4)**  Any significant deviations from the contractor's established practices.

48 CFR 31.201-3(b).

Grubea can only establish an implied certification claim if the title search and personal service costs were noncompliant with the Fannie Mae, Freddie Mac and/or FHA/HUD guidelines for reimbursement.  Grubea's claims depend on whether the title search and personal service

costs were "actual, reasonable and necessary" (Fannie Mae); "reasonable and comparable to those customarily charged in the area where the property is located" (Freddie Mac); or "necessarily incurred and are reasonable and customary in the area" (FHA / HUD).  See 3d Am. Compl. ¶¶ 64, 94, 107-09.  Grubea has not contended the costs submitted to servicers by MWC for reimbursement were not actual or not necessary.  Grubea appears to challenge only whether the costs were reasonable.

Grubea's contention that title search and personal service costs are not reasonable because they are above market rates is not supported by the legal definition of reasonable applied by the government.  Reasonable does not mean at cost.  The title search charges identified by Grubea in the third amended complaint are consistent with the Freddie Mac allowable rates.  The personal service charges Grubea complained about vis a vis AOSS were actually charges by a non-affiliated entity and unquestionably at arm's length.  Grubea has not alleged the title searches and personal service costs incurred by MWC and submitted to the servicers for reimbursement do not meet the regulatory definition of reasonable.

Grubea cannot establish MWC was noncompliant with the Fannie Mae, Freddie Mac and/or FHA/HUD guidelines without showing the title searches and personal service costs were not reasonable.  MWC was compliant with the guidelines and therefore had no noncompliance to disclose.  MWC omitted no information material to payment that can form a basis for an implied certification claim.  Grubea cannot establish a legally false claim.

### 3.    Not Material

Grubea cannot establish materiality.  Fannie Mae, Freddie Mac and the FHA are deemed to be aware of the claims in this action for approaching six (6) years.  The world became aware in July 2014 when the Government's lawyers issued a press release alleging an acknowledgment

of liability by a servicer.  Nevertheless, Fannie Mae, Freddie Mac and the FHA continue to reimburse the servicers for the costs the servicers reimbursed MWC that MWC paid to REO and AOSS.  Grubea's allegations of noncompliance cannot be material to payment because Fannie Mae, Freddie Mac and the FHA have continued to pay.

### 4.      No Particularity

Grubea's third amended complaint is devoid of any factual basis for his contention the title search and personal service costs charged by REO and AOSS were well above market rates. Grubea provided no measure or comparative data against which to scrutinize his contentions of supra-market rates or excessive costs.  Grubea's own examples were demonstrably false and did not bear out his theory.  Grubea must do more than cast "a formulaic recitation of the elements of a cause of action" based exclusively "upon information and belief" to adequately plead, much less state, legally sufficient FCA claims.  *See Twombly*, 550 U.S. at 555; *Ashcroft*, 556 U.S. at 678.  Grubea's claims cannot survive a motion dismiss based on theories and assumptions absent legal or factual support.  Accordingly, the first and second claims of the third amended complaint should be dismissed with prejudice.

### F.      No Conspiracy (Third Claim)

Grubea's claim for conspiracy (third claim) is based on the contention MWC, REO and AOSS "conspired" to commit false claims.  3d Am. Compl. ¶ 505.  A defendant is liable under 31 U.S.C. § 3729(a)(1)(C) if he "conspires to commit a violation of subparagraph (A) [or] (B)" of Section 3729(a)(1).  31 U.S.C. § 3729(a)(1)(C).  Dismissal of an FCA conspiracy claim is appropriate where the complaint "fail[ed] to identify a specific statement where [defendants] agreed to defraud the government."  *United States ex rel. Ladas v. Exelis, Inc.,* 824 F.3d 16, 27 (2d Cir. 2016).  Grubea's claim for conspiracy fails absent proof of a false claim.

Grubea has not alleged an overt act by MWC, AOSS or REO in furtherance of a conspiracy.  There is no contention of an agreement between or among MWC, AOSS or REO to defraud the government.  Grubea's conspiracy claim appears based only on the fact that MWC has affiliated entities.  The mere existence of affiliated entities is not a fraud, conspiracy or even noncompliance with the contracts and guidelines upon which Grubea depends for his claims.  Fannie Mae and Freddie Mac expressly permit affiliated entities when appropriately disclosed.  Grubea has not established a conspiracy claim.  Accordingly, the third claim of the third amended complaint should be dismissed with prejudice.

### G.     No Reverse False Claims (Fifth Claim)

Grubea asserted a claim for reverse false claims (fifth claim) against MWC.  MWC incorporates by reference the elements and standards for claims under 31 U.S.C. § 3729(a)(1)(G) (reverse false claims) as presented by the servicer-defendants in their joint memorandum of law at Doc. 124.

Grubea did not allege MWC misrepresented or concealed information to avoid paying an obligation to the government.  A reverse false claim does not apply, as a matter of law, as asserted by Grubea.  Accordingly, the fifth claim of the third amended complaint should be dismissed with prejudice.

### H.     Joinders

MWC joins and incorporates by reference as if fully set forth herein the arguments by the servicer-defendants included in Argument Sections VI and VIII of their joint memorandum of law at Doc. 124.  MWC joins and incorporates by reference as if fully set forth herein the argument by REO and AOSS set forth in Section I-D of their memorandum of law at Doc. 135.

II.      **Conclusion**

The motion to dismiss the third amended complaint by defendant, McCabe, Weisberg &

Conway, P.C., should be granted and the claims against defendant, McCabe, Weisberg &

Conway, P.C., dismissed with prejudice.

Respectfully Submitted,

By: /s/ Candidus K. Dougherty
    Jeffrey B. McCarron
    Candidus K. Dougherty
    SWARTZ CAMPBELL LLC
    50 S. 16th St., 28th Fl.
    Philadelphia, PA 19102
    (215) 299-4296
    cdougherty@swartzcampbell.com

Date: April 27, 2018