UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA *ex rel.* PETER D.
GRUBEA,

                Plaintiff,

      v.

ROSICKI, ROSICKI & ASSOCIATES, P.C., *et al.*,

            Defendants.

12 Civ. 7199 (JSR)

UNITED STATES OF AMERICA,

             Plaintiff-Intervenor,

      v.

ROSICKI, ROSICKI & ASSOCIATES, P.C.,
ENTERPRISE PROCESS SERVICE, INC., and
PARAMOUNT LAND, INC.,

            Defendants.

## MEMORANDUM OF LAW OF PLAINTIFF-INTERVENOR UNITED STATES OF AMERICA IN OPPOSITION TO THE ROSICKI DEFENDANTS' MOTION TO DISMISS

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
86 Chambers Street, Third Floor
New York, New York 10007

*Attorney for Plaintiff-Intervenor*
*United States of America*

CRISTINE IRVIN PHILLIPS
ANDREW E. KRAUSE
LAUREN A. LIVELY
Assistant United States Attorneys
– Of Counsel –

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS .......................................................................................................1

ARGUMENT ...........................................................................................................................4

I.  The Claims Submitted to Fannie Mae by the Servicer Defendants for Rosicki's Inflated Foreclosure Expenses Were "Claims" Within the Meaning of the FCA ..............4

    A.  Fannie May is an "Other Recipient" of Federal Funds.............................................4

    B.  The Substantial Funds Paid by Treasury to Fannie Mae Need Not Be Traceable to the Foreclosure Expenses...................................................................5

II.  The Government's Claims Are Pleaded with Sufficient Particularity...............................7

III. The Government Has Adequately Pleaded That Rosicki's Claims Were False and Fraudulent Under an Implied False Certification Theory...................................................10

    A.  The Inflated Foreclosure Expenses That Rosicki Caused to Be Submitted Constituted Misleading Half-Truths Regarding the Actual Cost of the Foreclosure-Related Services .......................................................................11

    B.  Under *Escobar*, an Omission of a Material Fact Regarding Compliance With a Statutory, Regulatory, or Contractual Term That Materially Impacts the Claim Submitted Can Be Sufficient to Constitute Implied Certification.........13

IV. The Government Has Adequately Pleaded That Rosicki's Conduct Satisfies the FCA's Materiality Requirement..................................................................................16

    A  A Holistic Analysis of Materiality as Directed by *Escobar* Demonstrates that the Rosicki Defendants' Conduct Was Material Under the FCA .........................16

        1.  The Rosicki Defendants' Conduct Rendered the Inflated Claims Ineligible for Payment .................................................................17

        2.  The Rosicki Defendants' Mark-up Scheme Went to the Essence of the Bargain Underlying Each of the Relevant Claims ..............................18

        3.  The Rosicki Defendants' Remaining Arguments Regarding the Actual Payment of False Claims and Fannie Mae's Actual Knowledge of the Fraudulent Scheme Are Unavailing..........................................................19

    B.  Rosicki Knew or Should Have Known that Causing Inflated Foreclosure Expenses to Be Submitted and Paid Was Material to Fannie Mae.......................22

V.     The Rosicki Defendants Violated the Reverse False Claims Provision of the FCA .........24

     A.     The Reverse False Claim Provision of the FCA ......................................................24

     B.     Fannie Mae's Quarterly Dividend Payment Under the Third Amendment Is an Obligation to the Government for Purposes of the FCA .............................25

     C.     The Rosicki Defendants Can Be Liable for a Reverse False Claim Based on Fannie Mae's Obligation to Make Payments to the Government ...................27

CONCLUSION ...................................................................................................................29

STATEMENT OF INTEREST ...........................................................................................29

     A.     The Relator's Complaint Should Not Be Dismissed Under the Public Disclosure Bar ........................................................................................................29

     B.     The Servicer Defendants Offer an Overly Restrictive Interpretation of the Reverse False Claim Provision of the FCA ......................................................31

     C.     Failure of a Quality Control Program Can Be Actionable Under the FCA ..........32

     D.     Broad Disclaimers or Qualifications to Annual Certifications Do Not Automatically Preclude FCA Liability ..................................................................33

     E.     The Consent Orders Cited by OneWest Bank Do Not Preclude the Government from Pursuing Claims Under the FCA ........................................34

# TABLE OF AUTHORITIES

**CASES**                                                                         **PAGE**

*Avco Corp. v. U.S. Dep't of Justice*,
   884 F.2d 621 (D.C. Cir. 1989) ...................................................................... 29

*Bishop v. Wells Fargo & Co.*,
   870 F.3d 104 (2d Cir. 2017) ......................................................................... 11

*Castro v. City of Los Angeles*,
   797 F.3d 654, *reh'g en banc granted*, 809 F.3d 536 (9th Cir. 2015) .............. 20

*Espinoza ex rel. JPMorgan Chase & Co. v. Dimon*,
   797 F.3d 229 (2d Cir. 2015) ........................................................................... 8

*Feldman v. City of New York*,
   808 F. Supp. 2d 641 (S.D.N.Y. 2011) ............................................................. 8

*Graham County Soil and Water Conservation Dist. v. U.S. ex rel. Wilson*,
   559 U.S. 280 (2010) ...................................................................................... 30

*FHFA v. HSBC N. Am. Holdings, Inc.*,
   33 F. Supp. 3d 455 (S.D.N.Y. 2014) ............................................................. 20

*Kane ex rel. U.S. v. Healthfirst, Inc.*,
   120 F. Supp. 3d 370 (S.D.N.Y. 2015) ........................................................... 25

*Kungys v. United States*,
   485 U.S. 759 (1988) ...................................................................................... 16

*Mikes v. Straus*,
   274 F.3d 687 (2d Cir. 2001) ................................................................. *passim*

*Neder v. United States*,
   527 U.S. 1 (1999) .......................................................................................... 16

*New York ex rel. Khurana v. Spherion Corp.*,
   No. 15 Civ. 6605 (JFK), 2016 WL 6652735 (S.D.N.Y. Nov. 10, 2016) ........... 14

*Perry Capital LLC v. Mnuchin*,
   864 F.3d 591 (D.C. Cir. 2017) ........................................................... 25, 27, 28

*United States v. Caremark, Inc.*,
   634 F.3d 808 (5th Cir. 2011) ............................................................. 25, 27, 28

*United States v. Countrywide Fin. Corp.*,
    961 F. Supp. 2d 598 (S.D.N.Y. 2013) .............................................................. 5

*United States v. Movtady*,
    13 F. Supp. 3d 325 (S.D.N.Y. 2014) ............................................................ 132

*United States v. Neifert-White Co.*,
    390 U.S. 228 (1968) ........................................................................................ 14

*United States v. Public Warehousing Co.*,
    No. 1:05-CV-2968-TWT, 2017 WL 1021745 (N.D. Ga. Mar. 16, 2017) ........ 21

*United States v. Quicken Loans, Inc.*,
    239 F. Supp. 3d 1014 (E.D. Mich. 2017) ...................................................... 18

*United States v. Raymond & Whitcomb Co.*,
    53 F. Supp. 2d 436 (S.D.N.Y. 1999) .............................................................. 33

*United States v. Wells Fargo Bank, N.A.*,
    972 F. Supp. 2d 593 (S.D.N.Y. 2013) ............................................................ 33

*United States ex rel. Adams v. Aurora Loan Servs., Inc.*,
    813 F.3d 1259 (9th Cir. 2016) ......................................................................... 5

*United States ex rel. Bahrani v. Conagra, Inc.*,
    465 F.3d 1189 (10th Cir. 2006) ..................................................................... 26

*United States ex rel. Bilotta v. Novartis Pharm. Corp.*,
    50 F. Supp. 3d 497 (S.D.N.Y. 2014) ................................................................ 8

*United States ex rel. Brown v. Pfizer, Inc.*,
    Civ. No. 05-6795, 2017 WL 1344365 (E.D. Pa. Apr. 12, 2017) ..................... 22

*United States ex rel. Chorches v. American Medical Response, Inc.*,
    865 F.3d 71 (2d Cir. 2017) ....................................................................... 9, 10

*United States ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*,
    839 F.3d 242 (3d Cir. 2016) ........................................................................... 28

*United States ex rel. Doe v. John Doe Corp.*,
    960 F.2d 318 (2d Cir.1992) ............................................................................ 31

*United States ex rel. DRC, Inc. v. Custer Battles*,
    562 F.3d 295 (4th Cir. 2009) ........................................................................... 5

*United States ex rel. Eisenstein v. City of New York,*
    556 U.S. 928 (2009) ........................................................................................... 29

*United States ex rel. Escobar, et al. v. Universal Health Services, Inc.,*
    842 F.3d 103 (1st Cir. 2016) ............................................................ 18, 21, 23

*United States ex rel. Forcier v. Computer Sciences Corp., et al.,*
    No. 12 Civ. 1750 (DAB), 2017 2017 WL 3616665 (S.D.N.Y. Aug. 10, 2017) ............... 13

*United States ex rel. Garbe v. Kmart Corp.,*
    968 F. Supp. 2d 978 (S.D. Ill. 2013) ................................................................ 15

*United States ex rel. Health v. AT&T, Inc.,*
    791 F.3d 112 (D.C. Cir. 2015) ............................................................................ 9

*United States ex rel. Hunt v. Merck-Medco Managed Care, L.L.C.,*
    336 F. Supp. 2d 430 (E.D. Pa. 2004) .............................................................. 27

*United States ex rel. Kirk v. Schindler Elevator Corp.,*
    601 F.3d 94 (2d Cir. 2010) .................................................................................. 5

*United States ex rel. Kester v. Novartis Pharm. Corp.,*
    23 F. Supp. 3d 242 (S.D.N.Y. 2014) ................................................................. 9

*United States ex rel. Kester v. Novartis Pharm. Corp.,*
    No. 11 Civ. 8196, 2015 WL 109934 (S.D.N.Y. Jan. 6, 2015) ......................... 31

*United States ex rel. Koch v. Koch Indus., Inc.,*
    57 F. Supp. 2d 1122 (N.D. Okla. 1999) .......................................................... 27

*United States ex rel. Kolchinsky v. Moody's Corp.,*
    No. 12 Civ. 1399 (WHP), 2018 WL 1322183 (S.D.N.Y. Mar. 13, 2018) ....................... 13

*United States ex rel. Lacey v. Visiting Nurse Serv. of N.Y.,*
    No. 14 Civ. 5739, 2017 WL 5515860 (S.D.N.Y. Sept. 26, 2017) ............................ 12, 14

*United States ex rel. Ladas v. Exelis, Inc.,*
    824 F.3d 16 (2d Cir. 2016) .............................................................................. 7, 8

*United States ex rel. Landis v. Tailwind Sports Corp.,*
    51 F. Supp. 3d 9 (D.D.C. 2014) ....................................................................... 25

*United States ex rel. Longhi v. Lithium Power Techs., Inc.,*
    575 F.3d 458 (5th Cir. 2009) ........................................................................... 16

*United States ex rel. Marcus v. Hess*,
    317 U.S. 537 (1943) ............................................................................. 5, 15

*United States ex rel. Mateski v. Raytheon Co.*,
    816 F.3d 565 (9th Cir. 2016) ................................................................ 31

*United States ex rel. Pervez v. Beth Israel Med. Ctr.*,
    736 F. Supp. 2d 804 (S.D.N.Y. 2010).................................................. 5

*United States ex rel. Petras v. Simparel, Inc.*,
    857 F.3d 497 (3d Cir. 2017)................................................................... 27

*United States ex rel. Poteet v. Medtronic, Inc.*,
    552 F.3d 503 (6th Cir. 2009) ................................................................ 30

*United States ex rel. Tessler v. City of New York*,
    No. 14 Civ. 6455 (JMF), 2016 WL 7335654 (S.D.N.Y. Dec. 16, 2016).......................... 14

*United States ex. rel. Williams v. City of Brockton*,
    No. 12-cv-12193-IT, 2016 WL 7429176 (D. Mass. Dec. 23, 2016) ................................ 18

*United States ex rel. Wood v. Allergan, Inc.*,
    246 F. Supp. 3d 772 (S.D.N.Y. 2017)................................................... *passim*

*United States ex rel. Yesudian v. Howard University*,
    153 F.3d 731 (D.C. Cir. 1998) ............................................................. 6

*Universal Health Services, Inc. v. United States ex rel. Escobar, et al.*,
    136 S. Ct. 1989 (2016)....................................................................... *passim*

**STATUTES**

28 U.S.C. § 517 ............................................................................................. 29

31 U.S.C. § 3729 ...................................................................................... *passim*

31 U.S.C. § 3730 ....................................................................................... 29, 30

Pub. L. No. 111-21 § 4 (2009) .................................................................... 16

**RULES**

Fed. R. Civ. P. 9(b) ..................................................................................... 7, 9

**OTHER**

155 Cong. Rec. S1679-01, 2009 WL 275706 ............................................... 5

S. Rep. No. 99-345 ........................................................................................ 14

S. Rep. No. 111-10 ........................................................................... 3, 6, 19, 32

## PRELIMINARY STATEMENT

Plaintiff the United States of America ("United States" or "Government"), by its attorney,

Geoffrey S. Berman, United States Attorney for the Southern District of New York, respectfully

submits this memorandum of law in opposition to the motion by defendants Rosicki, Rosicki &

Associates, P.C. ("Rosicki"), Enterprise Process Service, Inc. ("Enterprise") and Paramount

Land, Inc. ("Paramount," and collectively, the "Rosicki Defendants") to dismiss the United

States' Complaint-in-Intervention ("Complaint" or "Compl.").

The Rosicki Defendants' motion challenges the Government's claims, brought pursuant

to three sections of the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"), by raising standard

legal arguments pertaining to falsity, scienter, and materiality, as well as a catch-all argument

regarding particularity.  But as set forth below, the allegations in the Government's complaint

satisfy each of the pleading requirements for FCA claims, and the Rosicki Defendants' motion

should be denied in its entirety.

Additionally, the Government respectfully submits a Statement of Interest, included as

the final section of this memorandum of law, setting forth the Government's positions regarding

certain arguments raised by one or more mortgage servicing entities ("Servicer Defendants") in

their motions to dismiss the complaints filed by relator Peter D. Grubea ("Relator").[1]

## STATEMENT OF FACTS

As set forth in the Complaint, the Rosicki Defendants engaged in a fraudulent scheme in

their provision of foreclosure-related services for properties owned by the Federal National

Mortgage Association ("Fannie Mae").  Rosicki is a law firm specializing in mortgage

---

[1] The Government declined to intervene as to Relator's claims against the Servicer Defendants in this action and in Relator's companion action.  *See* Dkt. No. 33; 13 Civ. 1467 (JSR) Dkt. No.  31.

foreclosures throughout New York State whose principals also own Enterprise, a process service company, and Paramount, a title search company. *See* Compl. ¶ 2. Rosicki nominally employed Enterprise and Paramount to effect service of process and perform title searches, respectively, for foreclosures that Rosicki handled on behalf of mortgage servicers, including for loans owned by Fannie Mae. *See id.* But in fact, Enterprise and Paramount hired third-party vendors to perform the services, and then marked up the invoices submitted by the third-party vendors by exponential amounts (up to 750%), despite adding little or no value to the services the vendors performed. *See id.* ¶¶ 2, 75, 80. For example, Enterprise charged $125 for service of process that was performed by a third-party vendor that charged Enterprise $20, and Paramount charged $275 for a title search performed by third-parties for $75. *See id.* ¶¶ 71-72, 82.

Enterprise and Paramount billed Rosicki for these inflated expenses. *See id.* ¶ 2. Rosicki, with full knowledge of the fraudulent mark-ups, then billed the same amounts to the servicers that had engaged Rosicki to effect the foreclosures, including the Servicer Defendants. *See id.* The servicers paid the invoices for the inflated expenses submitted by Rosicki, and then sought and received reimbursement for those expenses from Fannie Mae. *See id.* As a result of the Rosicki Defendants' fraudulent scheme, Fannie Mae paid millions of dollars in reimbursement claims for the falsely inflated foreclosure expenses. *See id.*

The Rosicki Defendants' fraudulent conduct started no later than May 27, 2009, the date the FCA was amended via the Fraud Enforcement and Recovery Act of 2009 ("FERA"). *See id.* ¶ 23. Those amendments extended FCA liability to claims made to certain recipients of federal funds that were not otherwise officers, employees, or agents of the United States. *See id.*; 31 U.S.C. § 3729(b)(2)(A)(ii). Congress enacted the FERA amendments to "help protect

Americans from future frauds that exploit economic assistance programs intended to restore and rebuild our economy."  Compl. ¶ 24 (citing S. Rep. No. 111-10 at 1-2 (2009)).

Meanwhile, in 2008, against the backdrop of the precipitous decline in the American housing market that threatened the viability of Fannie Mae, Congress created the Federal Housing Finance Agency ("FHFA") to act as Fannie Mae's.  *See id.* ¶¶ 12-13.  Shortly thereafter, the U.S. Department of the Treasury ("Treasury") entered into a Senior Preferred Stock Purchase Agreement ("SPA") with Fannie Mae, pursuant to which Treasury provided, as of the date of the Complaint, approximately $116 billion (the "Treasury funds") to Fannie Mae.  *See id.* ¶¶ 15, 19. Treasury provided these funds to ensure that Fannie Mae remained financially viable, which served the Government interest in stabilizing the housing market.  *See id.* ¶ 16.  In exchange for this infusion of tax dollars, which Fannie Mae received through quarterly draw-downs, *see id.* ¶ 134, Fannie Mae agreed to make a quarterly dividend payment to Treasury.  *See id.* ¶ 17.

On August 17, 2012, after amending the SPA on two prior occasions, Fannie Mae and Treasury agreed to amend the agreement a third time ("Third Amendment").[2]  *See id.* ¶¶ 18, 20. Among other things, the Third Amendment changed the nature of Fannie Mae's quarterly dividend payment—beginning January 1, 2013—to the amount by which Fannie Mae's net worth for each quarter exceeds a specified capital reserve.  *See id.* ¶ 20.  For each quarter during which this formulation of the dividend has been in effect and for which the prescribed dividend amount has exceeded zero, Fannie Mae has remitted the required quarterly dividend payment to

---

[2] The senior preferred stock certificates were further modified by a December 21, 2017 letter agreement between Fannie Mae and Treasury.  *See* https://www.fhfa.gov/Media/ PublicAffairs/Documents/GSEletteragreementfnm12-21-2017.pdf (last visited May 7, 2018). For ease of reference, the Third Amendment and the December 21, 2017 letter agreement, which collectively address Fannie Mae's payment obligations to the Government from January 1, 2013 through the present, will be referred to in this memorandum of law as the Third Amendment.

Treasury.  *See* Fannie Mae Quarterly and Annual Results, *available at* http://www.

fanniemae.com/portal/about-fm/investor-relations/quarterly-annual-results.html (last visited May

7, 2018) ("News Release" links for each quarter beginning in 2013 describe dividend payments).

Fannie Mae's dividend payment obligation remains in effect.  *See* Compl. ¶ 21.

## ARGUMENT

**I.**     **The Claims Submitted to Fannie Mae by the Servicer Defendants for Rosicki's Inflated Foreclosure Expenses Were "Claims" Within the Meaning of the FCA**

**A.**     **Fannie Mae Is an "Other Recipient" of Federal Funds**

In order to qualify as a "claim" under the FCA, the relevant "request or demand . . . for

money or property" must be presented to one of several enumerated categories of individuals or

entities: "(i) . . . an officer, employee, or agent of the United States; or (ii) . . . a contractor,

grantee or other recipient, if the money or property is to be spent or used on the Government's

behalf or to advance a Government program or interest" so long as the Government either

"provides or has provided any portion of the money or property requested or demanded" or "will

reimburse such contractor, grantee or other recipient for any portion of the money or property

which is requested or demanded."  31 U.S.C. § 3729(b)(2)(A).

Although Fannie Mae is not "an officer, employee, or agent of the United States," 31

U.S.C. § 3729(b)(2)(A)(i), the United States may bring FCA claims on behalf of Fannie Mae

because Fannie Mae is, at a minimum, an "other recipient" of Government funds by virtue of the

FHFA conservatorship and the SPA, pursuant to which Treasury has provided the Treasury funds

to Fannie Mae.  *See* Compl. ¶ 15.  The Government provided billions of dollars in Treasury

funds to serve an important Government interest—stabilizing the housing market following the

mortgage crisis of 2007 and 2008—thus rendering Fannie Mae as an "other recipient" of federal

funds in accordance with 31 U.S.C. § 3729(b)(2)(A)(ii).  *See id.* ¶ 16; *see also U.S. ex rel. Adams*

*v. Aurora Loan Servs., Inc.*, 813 F.3d 1259, 1260 (9th Cir. 2016) (recognizing that "a properly pled claim under § 3729(b)(2)(A)(ii) could give rise to FCA liability" for Fannie Mae); *United States v. Countrywide Fin. Corp.*, 961 F. Supp. 2d 598, 609 (S.D.N.Y. 2013) (opining that § 3729(b)(2)(A)(ii) "arguably extends the FCA to false claims made to Fannie Mae").[3]

**B.      The Substantial Funds Paid by Treasury to Fannie Mae Need Not Be Traceable to the Foreclosure Expenses**

An FCA claim may be premised on claims paid by a recipient of Government funds without specifically showing that those funds were used to satisfy the claims. *See, e.g.*, *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 543-44 (1943), *superseded by statute as recognized by United States ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94 (2d Cir. 2010); *United States ex rel. Pervez v. Beth Israel Med. Ctr.*, 736 F. Supp. 2d 804, 806 (S.D.N.Y. 2010) (claims to Medicaid may serve as the basis of an FCA case even though Medicaid is partially funded by states and localities). The "claim" requirement is satisfied so long as the Government provides "any portion" of the demanded money. *See* 31 U.S.C. § 3729(b)(2)(A)(ii). It is sufficient to show that a claim was paid by an entity that receives a substantial amount of federal money and has a strong nexus to the Government. *See, e.g.*, *United States ex rel. DRC, Inc. v. Custer Battles*, 562 F.3d 295, 303-05 (4th Cir. 2009) (claims paid by an international organization funded in part by the Government were covered by the FCA, and it was "err[or]" to look to "each source of funds separately to determine whether a request for payment therefrom

---

[3] The Servicer Defendants argue that categorizing Fannie Mae as an "other recipient" under § 3729(b)(2)(A) is inconsistent with canons of statutory construction. *See* Servicer Mem. at 33 n.28. This argument relies on a single case that does not pertain to the FCA, and is inconsistent with Congressional intent in passing the FERA amendments, which was to cast a broad net to redress fraud involving government funds expended as part of the economic recovery efforts. *See* 155 Cong. Rec. S1679-01, 2009 WL 275706 (Sen. Leahy, introducing the bill) (urging clarification of the FCA "in order to protect from fraud the Federal assistance and relief funds expended in response to our current economic crisis").

constitutes a 'claim'"); *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 738-39 (D.C. Cir. 1998) (claim submitted to university that received substantial federal funding was covered under the FCA because funding created a "sufficiently close nexus" between university and the Government).  Here, the structure of the SPA underscores the strong connection between the Fannie Mae's payment of fraudulent claims and governmental losses; it provides that Fannie Mae can draw each quarter from Treasury its "deficiency amount"—*i.e.*, the "amount, if any, by which . . . the total liabilities of [Fannie Mae] exceed . . . the total assets of Seller"—up to a specified limit.  *See* SPA at 2, 4 § 2.2.  Thus, every dollar added to the Fannie Mae's bottom line by fraud is potentially passed along to the government, which is then contractually obligated to—and in fact repeatedly did—cover billions of the Fannie Mae's net worth shortfall amounts.

Further, the Rosicki Defendants' argument that the Treasury funds must be traceable to the funds paid by Fannie Mae for its inflated foreclosure expenses runs counter to the purpose of the FERA amendments, which extended FCA liability to, among other things, claims made to recipients of federal funds for the purpose of "improv[ing] enforcement of mortgage fraud, securities fraud, financial institution fraud, and other frauds related to federal assistance and relief programs, [and] for the recovery of funds lost to these frauds."  *See* S. Rep. No. 111-10 at 1. If, in bringing an FCA case based on a false claim made to other recipients of federal funds, the Government had to meet a new and onerous pleading requirement of tracing the destination of those funds, FERA's purpose would be defeated.[4]

---

[4] The Rosicki Defendants argue that Fannie Mae did not pay claims for foreclosure expenses with any portion of the Treasury funds; yet they support this factual supposition with only unsupported speculation regarding the manner in which Fannie Mae conducted business following its receipt of the Treasury funds.  *See* Def. Mem. at 15-16.

Finally, the Rosicki Defendants' arguments regarding potential Government overreach ring hollow.  *See* Def. Mem. at 16.  The Rosicki Defendants ignore not only the legislative intent of FERA but also the unique connection between Fannie Mae and the Government (as a result of the FHFA conservatorship) and the substantial cash infusion made by Treasury to Fannie Mae in the face of the worst recession in a generation.  *See* Compl. ¶¶ 12-16.  Adopting a definition of "claim" that allows the Government to prosecute fraud on behalf of a taxpayer-supported entity that is in federal conservatorship is hardly opening the door to unfettered FCA litigation; rather, it serves the exact purpose that Congress intended.[5]

## II.   The Government's Claims Are Pleaded with Sufficient Particularity

The specific and detailed allegations in the Complaint more than satisfy the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure.  Under Rule 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  A complaint alleging violations of the FCA must specify the fraudulent statements at issue, the speaker, the circumstances surrounding the statements, and the reasons why they are fraudulent.  *See United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 25 (2d Cir. 2016).  "The purpose of Rule 9(b) is threefold—it is designed to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit."  *Id.* (citation omitted).  Whether allegations are adequately particularized as required by Rule 9(b) is

---

[5] Notwithstanding that Fannie Mae has an ongoing obligation to repay billions of dollars in loan principal to Treasury, the Government nonetheless takes the conservative position in the Complaint that it has "provided" the relevant funds only during quarters in which Fannie Mae took draw-downs from Treasury.  *See* Compl. ¶¶ 134, 140.  This limiting principle further undercuts the Rosicki Defendants' arguments that recognizing the payment demands made to Fannie Mae in this action as "claims" will drastically expand of the scope of the FCA.

"case-and context-specific." *Espinoza ex rel. JPMorgan Chase & Co. v. Dimon*, 797 F.3d 229, 236 (2d Cir. 2015).

In addition to detailing the Rosicki Defendants' fraudulent scheme, the Complaint includes six specific examples of claims for which Rosicki falsely inflated the cost of the foreclosure services ostensibly performed by Enterprise and Paramount. *See* Compl. ¶¶ 87-123. Each of the properties at issue is identified by a unique Fannie Mae loan number and the street and town where the property is located; in addition, and the Complaint specifies the amounts that the Rosicki Defendants overcharged mortgage servicers for different services, and that the mortgage servicers passed on to Fannie Mae for reimbursement. *See id*. The inclusion of this detailed information contravenes any argument that the Government has no specified the false claims at issue. *See, e.g., United States ex rel. Bilotta v. Novartis Pharm. Corp.*, 50 F. Supp. 3d 497, 510-11 (S.D.N.Y. 2014). The Government does not allege that the Rosicki Defendants directly submitted false claims, but rather that they caused to be presented false claims for payment and caused to be made false records or statements. *See* 31 U.S.C. §§ 3729(a)(1)(A), (B); *see also Feldman v. City of New York*, 808 F. Supp. 2d 641, 650 (S.D.N.Y. 2011) ("It is well-established that the FCA reaches claims that are rendered false by one party, but submitted to the government by another."). The Government has provided the Rosicki Defendants with "fair notice" of their fraudulent actions at issue, *Ladas*, 824 F.3d at 25, by focusing on the inflated claims that Rosicki submitted to mortgage servicers with the knowledge that those expenses would be passed to Fannie Mae.

Further, the Rosicki Defendants' contention that the Government has failed to connect their fraudulently inflated submissions to the servicers to the claims made by the servicers to Fannie Mae is inaccurate. For each of the six examples provided in the Complaint, the

Government alleges that Rosicki submitted the false expenses to a third-party servicer.  *See* Compl. ¶¶ 87, 92, 93, 98, 99, 104, 105, 111, 112, 117, 118, 123.  Because the Rosicki Defendants' fraudulent actions were consistent across servicers, the Government chose not to identify by name the relevant third-party servicers, against which it did not intervene or file suit.[6] The Government, however, alleges that the specific inflated expenses detailed in the Complaint were submitted to Fannie Mae using a Cash Disbursement Request, Form 571, thus making clear what the false claims were and that they were actually submitted to, and paid by, Fannie Mae. *See* Compl. ¶¶ 34, 86; *cf. U.S. ex rel. Kester v. Novartis Pharm. Corp.*, 23 F. Supp. 3d 242, 255 (S.D.N.Y. 2014) (holding that plaintiff failed to plead that defendant "submitted a false claim *in this specific instance*") (emphasis in original).

Contrary to the Rosicki Defendants' assertions, the Government does not rely upon an inference that false claims must have been submitted to Fannie Mae, and the Rosicki Defendants' discussion of the circumstances under which Rule 9(b) can be satisfied by pleading "on information and belief," as set forth in *U.S. ex rel. Chorches v. American Medical Response, Inc.*, 865 F.3d 71 (2d Cir. 2017), is inapposite.  *See* Def. Mem. at 19-20.  Nevertheless, the Second Circuit's analysis in that action is instructive.  In holding that Rule 9(b) can be satisfied through particularized factual allegations leading to a strong inference that false claims were submitted to the Government, the court stated, "[t]he point of Rule 9(b) is to ensure that there is sufficient substance to the allegations to both afford the defendant the opportunity to prepare a response and to warrant further judicial process."  *Chorches*, 865 F.3d at 87 (quoting *U.S. ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 125 (D.C. Cir. 2015)).  The court then noted that the

---

[6] Should the Court determine that the identities of the specific servicers to whom Rosicki submitted the claims set forth in the Complaint are required to satisfy the pleading requirements of Rule 9(b), the Government is prepared to amend its Complaint to add that information.

complaint "provide[d] ample details as to the nature of the alleged scheme, as well as to particular instances in which the scheme was . . . allegedly carried out." *Id*. These details gave the defendant "fair and adequate" notice of the false claims at issue. *Id.*

Here too, the Rosicki Defendants cannot plausibly argue that the Complaint fails to provide notice of the allegations concerning their creation of false claims and records such that more information regarding the servicers is required. The Rosicki Defendants were well aware that the inflated costs Rosicki presented to the servicers then were submitted to Fannie Mae; indeed, through its Servicing Guide, retention agreement, and trainings, Fannie Mae conveyed directly to Rosicki the need to keep foreclosure expenses actual, reasonable, and necessary so that Fannie Mae would not be overcharged. *See* Compl. ¶¶ 35-44. Moreover, the Government has provided ample information regarding the manner in which the Rosicki Defendants orchestrated their fraudulent scheme, including examples of six specific loans identified by unique Fannie Mae loan number, and further alleging that these particular fraudulently inflated expenses were submitted to, and paid by, Fannie Mae. Accordingly, the Complaint affords the Rosicki Defendants fair notice of the actions that the Government alleges caused false claims to be submitted to, and paid by, Fannie Mae, and the Government has met its burden to plead with particularity the false claims at issue.

## III.   The Government Has Adequately Pleaded That Rosicki's Claims Were False and Fraudulent Under an Implied False Certification Theory

The Supreme Court has made clear that FCA liability can be based on an implied false certification theory. *See Universal Health Services, Inc. v. United States ex rel. Escobar, et al.*, 136 S. Ct. 1989, 1999 (2016). The fraudulent conduct perpetrated by the Rosicki Defendants satisfies the FCA's falsity requirement under two different interpretations of implied false certification. First, the conduct of the Rosicki Defendants as alleged in the Complaint

constituted "half-truths—representations that state the truth only so far as it goes, while omitting qualifying information," and as such "can be actionable misrepresentations." *Escobar*, 136 S. Ct. at 2000. Alternatively, under the principle endorsed in this Circuit by *Mikes v. Straus*, 274 F.3d 687 (2d Cir. 2001), which *Escobar* did not overturn,[7] Rosicki's submission of inflated foreclosure expenses to the servicers constituted implied false certifications even if the Court concludes that those invoices did not constitute affirmative misrepresentations. Under either interpretation, the Court should reject the Rosicki Defendants' falsity arguments.

> **A.    The Inflated Foreclosure Expenses That Rosicki Caused to Be Submitted Constituted Misleading Half-Truths Regarding the Actual Cost of the Foreclosure-Related Services**

As alleged in the Complaint, the Rosicki Defendants caused false claims to be submitted for Fannie Mae reimbursement by passing off foreclosure expenses submitted by its affiliates, Enterprise and Paramount, as the actual and reasonable costs of the foreclosure-related services performed, thereby masking the enormous mark-ups applied by Enterprise and Paramount to services that were actually rendered by third-party vendors. Those foreclosure expenses as billed by Rosicki were classic examples of misleading half-truths: they were true "so far as it goes," *Escobar*, 136 S. Ct. at 2000, in that Rosicki was in fact billed by, and paid, Enterprise and Paramount for the amounts passed on to the servicers. *See* Compl. ¶¶ 76, 82. But Rosicki improperly utilized Enterprise and Paramount as vehicles for mark-ups—inflating, for example,

---

[7] Although Escobar abrogated two core principles from *Mikes*, *see Bishop v. Wells Fargo & Company*, 870 F.3d 104, 106 (2d Cir. 2017), nothing in *Escobar* limits the applicability of the implied certification theory to claims that make affirmative representations about the nature of the services provided. In fact, *Escobar* expressly declined to address whether the implied certification theory applies to naked claims for payment, *see* 136 S. Ct. at 2000, a question that *Mikes* answered in the affirmative, *see United States ex rel. Wood v. Allergan, Inc.*, 246 F. Supp. 3d 772, 816 (S.D.N.Y. 2017) (noting that "the *Escobar* Court expressly refrained from defining the outer limit of implied certification claims").

a $20 process service bill into a $125 bill for the same service. *See id.* ¶¶ 71-72. Upon receiving the corresponding claims from the servicers for reimbursement of these foreclosure expenses, a reasonable payor "would probably—but wrongly—conclude" that the expenses were the actual expenses incurred by the Rosicki Defendants, rather than a product of fraudulent mark-ups. *Escobar*, 136 S. Ct. at 2000. The claims at issue thus fall within the scope of half-truths expressly deemed actionable in *Escobar*.

In arguing that the Government's claims fail to meet the FCA's falsity requirement, the Rosicki Defendants incorrectly maintain that the Complaint pleads insufficient facts regarding the claims submitted by the servicers to Fannie Mae. *See* Def. Mem. at 22. In fact, the Complaint repeatedly alleges that the servicers submitted claims for reimbursement to Fannie Mae for the inflated foreclosure expenses billed to them by Rosicki, and that Fannie Mae paid those claims. *See* Compl. ¶¶ 69, 76, 82, 86. The misleading representations made with those claims (which Rosicki caused to be made) are entirely analogous to the representations made by the defendant in *Escobar*. There, the "misleading half-truths" consisted merely of billing codes associated with a specific procedure, for which the defendant was seeking reimbursement. *See* 136 S. Ct. at 2001; *see also United States ex rel. Lacey v. Visiting Nurse Serv. of N.Y.*, No. 14 Civ. 5739 (AJN), 2017 WL 5515860, at *8 (S.D.N.Y. Sept. 26, 2017). In this matter, the servicers listed the relevant expenses on Fannie Mae's Cash Disbursement Request, Form 571, *see* Compl. ¶ 34, and represented that those expenses were incurred either in serving process or obtaining the necessary title search, based upon the representations that Rosicki made to them. *See id.* ¶¶ 69, 76, 82, 86.

The falsities promulgated by the Rosicki Defendants are even more directly related to the representations in the corresponding claims than the analogous fraudulent conduct in *Escobar*.

12

There, the defendant failed to disclose that the purveyors of the services being billed lacked necessary qualifications, *see* 136 S. Ct. at 2001, while in this case, it was not disclosed that the very expenses for which the servicers were seeking reimbursement had been fraudulently inflated. *See* Compl. ¶¶ 69, 76, 82, 86. As in *Escobar*, the Court here should determine that by identifying Rosicki's false representations and detailing the manner in which they were submitted to Fannie Mae via the servicers, the Government has adequately pleaded the falsity of the Rosicki Defendants' conduct under the implied certification theory.

### B.   Under *Escobar*, an Omission of a Material Fact Regarding Compliance With a Statutory, Regulatory, or Contractual Term That Materially Impacts the Claim Submitted Can Be Sufficient to Constitute Implied Certification

Even if the Court concludes that the claims at issue do not constitute misleading half-truths, those claims are still false under an implied certification theory. *Escobar* left open the question of "whether all claims for payment implicitly represent that the billing party is legally entitled to payment." 136 S. Ct. at 2000; *see Allergan*, 246 F. Supp. 3d at 816. In the absence of contravening precedent, it remains established in the Second Circuit that falsity may arise from the mere submission of a claim for payment without a specific representation about the goods or services provided; that, coupled with a defendant's noncompliance with a material payment requirement, is sufficient to establish a defendant's liability under an implied certification theory. *See Mikes*, 274 F.3d 687; *see also Allergan*, 246 F. Supp. 3d at 816 (concluding that *Mikes* remains controlling law in this Circuit on the issue of implied false certification without an affirmative representation).[8]

---

[8] Only one post-*Escobar* decision in this District has held that an affirmative misrepresentation is required for an implied false certification. *See United States ex rel. Forcier v. Computer Sciences Corp., et al.*, No. 12 Civ. 1750 (DAB), 2017 WL 3616665, at *12-13 (S.D.N.Y. Aug. 10, 2017). One other decision appears to mis-cite the holding of *Escobar* on this issue without relying on it. *See U.S. ex rel. Kolchinsky v. Moody's Corp.*, No. 12 Civ. 1399 (WHP), 2018 WL

13

A broad construction of the FCA's falsity requirement is consistent with the statutory framework and purpose of the FCA.  As recognized by the Supreme Court, "[t]he original False Claims Act was passed in 1863 as a result of the investigations of the fraudulent use of government funds during the Civil War.  Debates at the time suggest that the Act was intended to reach all types of fraud, without qualification, that might result in financial loss to the Government."  *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968).  Congress has made clear that the term "false or fraudulent claim" in the FCA should be construed broadly.  *See* S. Rep. No. 99-345 at 9 (1986) ("The False Claims Act is intended to reach *all* fraudulent attempts to cause the Government to pay out sums of money or to deliver property or services.") (emphasis added).  Likewise, the Second Circuit has explicitly noted that "a false claim may take many forms, the most common being a claim for goods or services not provided, or provided in violation of contract terms, specification, statute or regulation."  *Mikes*, 274 F.3d at 697 (quoting S. Rep. No. 99-345, at 9).

The negative impact that curtailing implied certification would have on the purpose of the FCA is well-demonstrated here.  As alleged in the Complaint, the Rosicki Defendants systematically inflated the bills for foreclosure expenses and masked those inflations by routing the bills through Enterprise and Paramount.  Yet the Rosicki Defendants contend that without an affirmative misrepresentation, such conduct cannot be held accountable under the FCA.  *See* Def.

---

1322183, at *2 (S.D.N.Y. Mar. 13, 2018).  The Rosicki Defendants err in arguing that the courts in *Lacey* and *Khurana* rejected the possibility of implied false certification without an affirmative misrepresentation, *see* Def. Mem. at 22; neither did so.  *See Lacey*, 2017 WL 5515860, at *8; *New York ex rel. Khurana v. Spherion Corp.*, No. 15 Civ. 6605 (JFK), 2016 WL 6652735, at *15 (S.D.N.Y. Nov. 10, 2016).  Furthermore, although Judge Furman required some affirmative representation about the relevant services provided in *Tessler v. City of New York,* No. 14 Civ. 6455 (JMF), 2016 WL 7335654, at *4 (S.D.N.Y. Dec. 16, 2016), his later decision in *Allergan* expressly adopts *Mikes*' holding and finds implied certification may exist without an affirmative misrepresentation.  *See* 246 F. Supp. 3d at 816.

Mem. at 23.  Thus, while the Supreme Court recognized in *Escobar* that an FCA claim could be maintained without an affirmative misrepresentation if a defendant delivered guns that "do not shoot" even if it was not an express requirement that the guns "actually shoot," 136 S. Ct. at 2001, under the Rosicki Defendants' theory of implied certification, the Government's claims cannot stand without an affirmative misrepresentation, notwithstanding the fact that Fannie Mae similarly has not received the benefit of the bargain for which it paid the requested claim.  *See also Allergan*, 246 F. Supp. 3d at 816 ("[C]ourts have held that a claimant who requests payment from the Government implies that it has held up its end of the bargain . . . .").  Such an illogical outcome, in contravention of *Mikes*, runs contrary to the purpose of the FCA and the Court should reject it.

The Rosicki Defendants also attempt to narrow the implied certification theory by positing that a request for payment without an affirmative misrepresentation only implicitly represents compliance with facts that go "to the basis, or essence of the transaction."  Def. Mem. at 24 (quoting Restatement (Second) of Torts § 551(e) & cmt j).  Even assuming that this is the proper standard, there is no question that submitting claims to Fannie Mae for reimbursement of foreclosure expenses that inflate the cost of those expenses by as much as 750%, *see* Compl. ¶ 75, "goes to the basis, or essence, of the transaction," regardless of whether the Court views the relevant party to that transaction as Rosicki or the servicers.  *See* Section IV.A.2, *infra*.  It is difficult to imagine an aspect of any transaction that is more fundamental than whether the value of the services rendered has been significantly inflated.  *See* Compl. ¶ 125; *see also Hess*, 317 U.S. at 543-45 (upholding FCA liability against defendants who engaged in "fraudulent [collusive] bidding" that led to "swollen estimate[s]" for construction projects funded by the Government); *U.S. ex rel. Garbe v. Kmart Corp.*, 968 F. Supp. 2d 978, 985 (S.D. Ill. 2013) ("it is

obvious here that reporting false amounts [to Medicaid] would have a natural tendency to influence the Government's action, by inflating the amount of its payment").

IV.   **The Government Has Adequately Pleaded That Rosicki's Conduct Satisfies the FCA's Materiality Requirement**

   A.   **A Holistic Analysis of Materiality as Directed by *Escobar* Demonstrates that the Rosicki Defendants' Conduct Was Material Under the FCA**

*Escobar* reaffirmed that the proper test for determining materiality in FCA cases is whether the conduct at issue has "a natural tendency to influence, or [is] capable of influencing, the payment or receipt of money or property."  136 S. Ct. at 2002 (citing 31 U.S.C. § 3729(b)(4)); *Neder v. United States*, 527 U.S. 1, 16 (1999); *Kungys v. United States*, 485 U.S. 759, 770 (1988)).  This approach is consistent with the statutory text of the FCA, which was amended in 2009 to expressly incorporate the "natural tendency" test, thereby rejecting a more onerous "outcome materiality" standard that some courts had adopted.  *See* Pub. L. No. 111-21 at § 4 (2009).  As courts have previously observed, Congress "had ample opportunity to adopt the outcome materiality standard in FERA," but instead "embraced the [natural tendency] test as stated by the Supreme Court and several courts of appeals."  *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 470 (5th Cir. 2009).

Under *Escobar*, assessing materiality under the FCA is not a mechanical process.  *See id.* at 2003.  Thus, while "the Government's decision to expressly identify [compliance with a regulatory] provision as a condition of payment is relevant," it is "not automatically dispositive" for purposes of materiality.  *Id.*  Instead, courts should follow a "holistic approach" to assess the tendency or capacity of the misrepresentation or omission to affect the Government's decision-making.  *See Allergan*, 246 F. Supp. 3d at 817-18; *see generally Escobar*, 136 S. Ct. at 2002–04.

16

To guide courts in making this holistic assessment, the Supreme Court identified several factors relevant to materiality, including whether the relevant rule is deemed a condition of payment, but also including whether the defendant's misrepresentation or omission goes to the "very essence of the bargain" versus being "minor or insubstantial," and how the Government has reacted to the same or similar types of misconduct when it had "actual knowledge" of them. *Escobar*, 136 S. Ct. at 2002-04. Importantly, the Supreme Court made clear that no one factor is dispositive, and a trial court must evaluate the totality of the circumstances to determine whether a particular misrepresentation or omission is material. *See id.* at 2001. Here, the totality of the factors weighs in favor of concluding that the Rosicki Defendants' conduct was material to Fannie Mae, particularly at the pleading stage.

> **1.      The Rosicki Defendants' Conduct Rendered the Inflated Claims Ineligible for Payment**

As set forth in the Complaint, the foreclosure expenses that the Rosicki Defendants caused to be presented to Fannie Mae through their mark-up scheme were a classic form of false claim: goods and services provided in violation of contract terms. *See* Compl. ¶ 124; *see also Mikes*, 274 F.3d at 697. Specifically, the expenses were out of compliance with the Servicing Guide requirement that all such expenses be "actual, reasonable and necessary." *Id.* ¶ 126. As pleaded in the Complaint, had Fannie Mae known about the inflated nature of the expenses, "these substantially inflated expenses would not have been reimbursable." *Id.* ¶ 127. Under the test set forth in *Escobar*, this factor weighs in favor of a conclusion that the Rosicki Defendants' conduct was material to Fannie Mae. *See* 136 S. Ct. at 2003.

17

### 2. The Rosicki Defendants' Mark-up Scheme Went to the Essence of the Bargain Underlying Each of the Relevant Claims

As numerous courts have recognized, applying the "essence of the bargain" factor involves an assessment of the "centrality," of the representation to the "contractual relationship." *U.S. ex rel. Escobar v. Universal Health Services, Inc.*, 842 F.3d 105, 112 (1st Cir. 2016); *see also United States v. Quicken Loans, Inc.*, 239 F. Supp. 3d 1014, 1040 (E.D. Mich. 2017) (requirement for mortgage lenders to certify compliance with Federal Housing Administration requirements is material under *Escobar* because "the certification requirement goes to the essence of the bargain" between lender and U.S. Department of Housing and Urban Development ("HUD")); *U.S. ex rel. Williams v. City of Brockton*, No. 12-cv-12193-IT, 2016 WL 7429176, at *7 (D. Mass. Dec. 23, 2016).

Where contractors make representations about key features of their products or services—*e.g.*, their guns are reliable, while knowing this is not so—courts can reasonably find the misrepresentations material because they go to the "very essence of the bargain" between seller and buyer. *Escobar*, 136 S. Ct. at 2003 n.5; *accord Quicken Loans*, 239 F. Supp. 3d at 1040. Here, the Rosicki Defendants represented that Enterprise and Paramount were providing market rate foreclosure services to generate the bills at issue, when in fact they were exponentially inflating the actual costs for services generated by third-party vendors. It is hard to see how paying significantly more for a service than the value actually received, where the inflated payments totaled millions of dollars, could be viewed as "minor or insubstantial" to the entity receiving the claim. *Escobar*, 136 S. Ct. at 2003 n.5. This factor, accordingly, also supports a conclusion that the Rosicki Defendants' conduct was material to Fannie Mae.

18

Nor can the Rosicki Defendants obfuscate the nature of the "bargain" by claiming that the relationship between Fannie Mae and the servicers is the appropriate framework.[9]  Rosicki had a separate contractual relationship with Fannie Mae that pertained entirely to the provision of legal services in furtherance of executing foreclosures on Fannie Mae-owned properties.  *See* Compl. ¶ 31.  The fact that Rosicki was not the entity actually submitting the claims is not relevant; Rosicki was the entity that caused false claims to be submitted and false statements to be made, *see* 31 U.S.C. §§ 3729(a)(1)(A), (a)(1)(B), and those false claims and statements were central to the contractual relationship between Rosicki and Fannie Mae.  Were the Rosicki Defendants' theory to be correct, any government subcontractor could be insulated from FCA liability, no matter the fraudulent nature of its conduct, so long as the scope of its services was substantially less than the work performed by the contractor who submitted the payment claims to the Government.  This flawed outcome is specifically what Congress changed in expanding the scope of the FCA through the FERA amendments to reach subcontractor fraud.  *See* S. Rep. No. 111-10 at 9-10.

> ### 3.   The Rosicki Defendants' Remaining Arguments Regarding the Actual Payment of False Claims and Fannie Mae's Actual Knowledge of the Fraudulent Scheme Are Unavailing

Rather than apply the natural tendency test to the facts at issue, the Rosicki Defendants attempt to argue that the only appropriate measure of materiality is whether Fannie Mae actually paid the false claims, while speculating—without support—that Fannie Mae must have known of the fraudulent conduct at issue.  *See* Def. Mem. at 27.  As an initial matter, if the Supreme Court had intended materiality to turn solely on whether a qualifying recipient of Government funds

---

[9] Even if this were the proper focus for the Court, such analysis still would reveal that submitting exponentially inflated bills to Fannie Mae was material.

would *actually* have denied payment had it known of the fraud, it would not have adopted a multi-pronged materiality inquiry in *Escobar*, nor would it have identified in *Escobar* other factors relevant to the materiality inquiry.  *See Escobar*, 136 S. Ct. at 2003–04; *see supra* at 17. The Rosicki Defendants' reliance upon this single factor is further evidence that all the other *Escobar* factors support a finding of materiality, as set forth above.

The Rosicki Defendants' arguments also are based upon the flawed supposition that Fannie Mae actually knew it was being presented with their inflated foreclosure expenses.  *See* Def. Mem. at 32-34.  In identifying the factors relevant to materiality, the Supreme Court linked the relevance of the Government's response to "its *actual knowledge* that certain requirements were violated."  *Escobar*, 136 S. Ct. at 2003-04 (emphasis added).  This link is crucial because "mere awareness of allegations concerning [a defendant's misconduct] is different from knowledge of actual [misconduct]."  *Escobar*, 842 F.3d at 112; *see also FHFA v. HSBC N. Am. Holdings, Inc*., 33 F. Supp. 3d 455, 481 (S.D.N.Y. 2014) ("Knowledge of conditions creating a risk of falsity, however, is not actual knowledge of falsity"); *Castro v. City of Los Angeles*, 797 F.3d 654, 673 (9th Cir.), *reh'g en banc granted*, 809 F.3d 536 (9th Cir. 2015) ("The law has long recognized a distinction between *constructive* knowledge, (*i.e.*, what a reasonable person should have known in a given situation) and *actual* knowledge (*i.e.*, what a particular person did in fact know in the same situation)") (emphasis in original).

The Complaint contains no assertion that Fannie Mae was aware of the Rosicki Defendants' mark-up scheme; rather, the Government pleaded that that the Rosicki Defendants' conduct, "if known by Fannie Mae, would have influenced its determination to reimburse the inflated foreclosure expenses."  Compl. ¶ 125.  The Rosicki Defendants nonetheless argue that Fannie Mae must have known about the fraud for some undefined time period before the

Government filed its Complaint, *see* Def. Mem. at 30-34, and conclude that because Fannie Mae did not take action against Rosicki prior to the filing of the Complaint, Fannie Mae "evidently did not believe it was being defrauded." *Id.* at 33.  But the Rosicki Defendants' unsubstantiated speculation regarding what Fannie Mae must have known about its mark-up scheme falls far short of demonstrating what Fannie Mae actually knew at any given time before the Government filed its Complaint.  The Rosicki Defendants' argument relies upon such unavailing factors as Fannie Mae's general right to audit Rosicki, *see id.* at 30-31, information stated publicly by the Relator on a website, *see id.* at 31-32, and surmise about what the Government disclosed to Fannie Mae in the course of its investigation, *see id.* at 31.[10]  Such facts not only are beyond the scope of the Complaint and therefore improper to consider as part of a motion to dismiss, but also are wholly insufficient to demonstrate that Fannie Mae had actual knowledge "that Rosicki was submitting foreclosure expenses that included substantially inflated mark-ups," where the Government has specifically pleaded the opposite.  Compl. ¶ 126.

Fundamentally, the Rosicki Defendants cannot impute knowledge of their fraudulent scheme to Fannie Mae based upon disparate facts and unsupported theories outside the four corners of the Complaint.  And absent "actual knowledge" of fraud, the fact that an agency does not terminate payments to a contractor is not "strong evidence"—let alone dispositive proof— that the alleged fraud is immaterial as a matter of law.  *See Escobar*, 136 S. Ct. at 2003-04; *accord Escobar*, 842 F.3d at 112; *Public Warehousing Co.*, 2017 WL 1021745, at *6; *U.S. ex*

---

[10] Where the Government chooses to investigate potentially fraudulent conduct, the "appropriate time to impute knowledge is at the end of an investigation, not at the beginning."  *See United States v. Public Warehousing Co.*, 1:05-CV-2968-TWT, 2017 WL 1021745, at *6 (N.D. Ga. Mar. 16, 2017).  As the Rosicki Defendants' motion acknowledges, shortly after the Government filed its Complaint, Fannie Mae terminated Rosicki as an approved foreclosure law firm.  *See* Def. Mem. at 33.

*rel. Brown v. Pfizer, Inc.*, Civ. No. 05-6795, 2017 WL 1344365, at *11-12 (E.D. Pa. Apr. 12, 2017).

> **B.    Rosicki Knew or Should Have Known that Causing Inflated Foreclosure Expenses to Be Submitted and Paid Was Material to Fannie Mae**

The Court also should dispense with the Rosicki Defendants' argument that they were unaware, and could not have been aware, that applying exponential mark-ups to their foreclosure expenses—conduct that not only violates the Fannie Mae Servicing Guide but also is obviously fraudulent and goes to the essence of the parties' bargain—was material to Fannie Mae. Materiality under the natural tendency test can be satisfied in one of two ways: (1) by showing that "a reasonable man would attach importance to [the misrepresented information] in determining his choice of action in the transaction"; or (2) demonstrating that "the defendant knew or had reason to know that the recipient of the representation attaches importance to the specific matter 'in determining his choice of action,' even though a reasonable person would not." *Escobar*, 136 S. Ct. at 2002-03 (quoting the Restatement (Second) of Torts § 538 at 80). Contrary to the Rosicki Defendants' arguments, the facts at issue satisfy this portion of the natural tendency test under either the objective "reasonable man" standard or the subjective "knew or should have known" standard.

With respect to the objective test, the Complaint details the reasons why the Rosicki Defendants' violation of these Servicing Guide provisions mattered to Fannie Mae:  the conduct deprived Fannie Mae of the benefit of its bargain and cause it to pay far more for foreclosure expenses than it should have.  *See* Compl. ¶ 125.  In short, Fannie Mae paid significantly more for the Rosicki Defendants' services than what they were worth due to the mark-up scheme, and the collective payments for these services totaled millions of dollars that, per the terms of the Servicing Guide, should not have been reimbursed.  *See* Compl. ¶¶ 126-27.  Any reasonable

entity in Fannie Mae's position would object to being overcharged through a mark-up scheme—a fact that should have been readily apparent to the Rosicki Defendants.

With respect to the subjective test, the Complaint sets forth the specific provisions of the Servicing Guide that the Rosicki Defendants were contractually obligated to follow, but did not: foreclosure expenses had to be "actual" and "reasonable," *see id.* ¶ 37, and foreclosure law firms were required to "make every effort to reduce foreclosure-related costs and expenses," *id.* ¶ 36, and to keep title expenses "at a minimum," *id.* ¶ 38. These provisions were not ambiguous, nor could there have been any question that the Rosicki Defendants' conduct violated both the letter and the spirit of these obligations. The Complaint also alleges that Fannie Mae made Rosicki aware of these obligations, not only through the Servicing Guide but also "directly in periodic trainings and email surveys." *Id.* ¶ 41. Further, the Complaint states that Rosicki was compelled to respond to questions regarding its practices with respect to these rules not only from Fannie Mae, but also from the servicers that employed Rosicki to work on Fannie Mae loans. *See id.* ¶¶ 84-85. Accordingly, the Rosicki Defendants knew or should have known that their challenged conduct was material to Fannie Mae.

Further supporting the Rosicki Defendants' actual knowledge are the allegations in the Complaint regarding lying and concealment by Rosicki with respect to the mark-up scheme. Among other things, the Complaint details a letter that Rosicki sent to Fannie Mae disclosing its plan to incorporate Enterprise and utilize the entity for process service, in which Rosicki represented that "the fees will be the same reasonable and usual ones which the FannieMae (*sic*) servicers have been incurring to date." *Id.* ¶¶ 51, 53. This representation was proven entirely false by the Rosicki Defendants' conduct in perpetrating the mark-up scheme. Moreover, the Complaint alleges that throughout the relevant time period, Rosicki falsely represented to both

Fannie Mae and the servicers "that it was fully in compliance with the Fannie Mae requirements"—specifically, "that the fees charged by Enterprise and Paramount were the actual, reasonable, and necessary costs incurred" and "competitive in the relevant markets."  Compl. ¶ 85.  The Rosicki Defendants were well aware that these requirements were material to Fannie Mae, and misrepresented their adherence to the rules in order to conceal their fraudulent conduct.

For all the reasons discussed above, the Rosicki Defendants' conduct satisfies the FCA's materiality requirement under the natural tendency test.

## V.     The Rosicki Defendants Violated the Reverse False Claims Provision of the FCA

In fraudulently causing Fannie Mae to pay millions of dollars for inflated foreclosure expenses, the Rosicki Defendants also caused a reduction in the amount of money Fannie Mae was required to pay to the Government pursuant to the terms of the Third Amendment.  *See* Third Amendment, Dkt. No. 133-6.  Accordingly, the Rosicki Defendants are liable under the "reverse false claims" provision of the FCA for improperly decreasing Fannie Mae's obligation to the Government, and the Government has adequately pleaded these claims.

### A.     The Reverse False Claim Provision of the FCA

Pursuant to 31 U.S.C. § 3729(a)(1)(G), FCA liability attaches to an entity that "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  The statute does not require that the obligation in question to pay or transmit money to the Government be the defendant's obligation—rather, the provision applies when a defendant has decreased "an obligation" to the Government.  *See United States v.*

24

*Caremark, Inc.*, 634 F.3d 808, 817 (5th Cir. 2011); *U.S. ex rel. Landis v. Tailwind Sports Corp.*, 51 F. Supp. 3d 9, 60 (D.D.C. 2014).

The term "obligation" is defined as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of an overpayment." 31 U.S.C. § 3729(b)(3).[11] As discussed below, Fannie Mae's payment obligation to the Government fits squarely within this definition.

### B. Fannie Mae's Quarterly Dividend Payment Under the Third Amendment Is an Obligation to the Government for Purposes of the FCA

The Third Amendment to the SPA between Fannie Mae and the Treasury Department was a modification of an earlier contractual agreement, pursuant to which Fannie Mae paid Treasury a quarterly dividend of $1 billion plus 10 percent of the total amount of funds drawn from Treasury from the billions of dollars in emergency capital that was made available to Fannie Mae beginning in 2008. *See Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 598 (D.C. Cir. 2017). By contrast, beginning in 2013, "the Third Amendment requires Fannie [Mae] . . . to pay quarterly to Treasury a dividend equal to [its] net worth—however much or little that might be." *Id.* at 602. As the D.C. Circuit explained, "the Third Amendment reorganized [Fannie Mae's] financial operations in a manner that ensures that *quarterly dividend obligations* are met without drawing upon Treasury's commitment . . . ." *Id.* at 609 (emphasis added). Fannie Mae's course of conduct for more than five years makes clear that the dividend payment provision of

---

[11] The definition of "obligation" was added to the statute as part of the FERA amendments. *See Kane ex rel. U.S. v. Healthfirst, Inc.*, 120 F. Supp. 3d 370, 380 (S.D.N.Y. 2015). The amendments also added the second basis for reverse false claim liability—for knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money to the Government—to 31 U.S.C. § 3729(a)(1)(G). *Id.*

the Third Amendment constitutes an obligation to the Government.  For each quarter during which the Third Amendment has been in effect and for which the prescribed dividend amount has exceeded zero, Fannie Mae has remitted the required quarterly dividend payment to Treasury.  The quarterly dividend provision of the Third Amendment is "an established duty . . . arising from an express or implied contractual . . . relationship," and fits squarely within the meaning of "obligation" set forth in 31 U.S.C.§ 3729(b)(3); *see U.S. ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1204 (10th Cir. 2006) ("a contractual obligation falls within the scope" of a reverse false claim).

The Rosicki Defendants maintain that the quarterly dividend payment is not an "obligation" because the Fannie Mae Board of Directors retains discretion as to whether to declare the dividend.  *See* Def. Mem. at 36; Dkt. 133-6 at 4.  But even in the event that the Board of Directors were to elect not to declare a dividend for a given quarter—a counterfactual hypothetical, given that this has never occurred in more than five years—the payment obligation to the Government would not disappear.  Section 2(b) of the Fannie Mae Senior Preferred Stock Certificates—a section not modified by the Third Amendment—provides that to the extent dividends on the Senior Preferred Stock are not paid, the dividends "shall accrue and shall be added to the Liquidation Preference [retained by the Government] pursuant to Section 8, whether or not there are funds legally available for the payment of such dividends and whether or not dividends are declared."  Senior Preferred Stock Certificate, *available at* https://www.fhfa.gov/Conservatorship/Documents/Senior-Preferred-Stock-Agree/2008-9-7_SPSPA_FannieMae_Certificate_N508.pdf (last visited May 7, 2018).  Thus, even if the Board of Directors exercises its discretion and does not declare dividends for a particular quarter, the Government is still entitled to the dividend amount, just in a different form.

This structure is not remotely similar to the fact pattern confronted by the Third Circuit in *U.S. ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497 (3d Cir. 2017). *See* Def. Mem. at 36. In *Simparel*, a one-time dividend payment requirement could have been triggered by a board of directors' declaration or by a liquidation of the company. 857 F.2d at 506. Critically, however, neither of these events ever materialized—indeed, the relator "never allege[d] that the Board declared the dividends or had an inclination to do so," *id.* at 506 n.50, and never "knew when [the board declaration or liquidation] would have materialized," *id.* at 506. Here, Fannie Mae's obligation to the Government plainly did materialize—dividend payments pursuant to the Third Amendment were made repeatedly, routinely, and in accordance with the specific schedule set forth in the Third Amendment. Nor is it instructive to consider the *Perry Capital* analysis of the dividend rights of Fannie Mae stockholders other than Treasury. *See* Def. Mem. at 36-37. Unlike the senior preferred stockholders, other stockholders were guaranteed to capture dividend payments in an alternative way if the Board of Directors did not make dividend payments in any given period. In contrast, for the Government, no matter what action was taken by the Board of Directors, Fannie Mae's payment obligation remained intact.

## C.   The Rosicki Defendants Can Be Liable for a Reverse False Claim Based on Fannie Mae's Obligation to Make Payments to the Government

As the Rosicki Defendants appropriately concede, liability for a reverse false claim may attach where, as here, the defendants' conduct "cause[s] a third party to impair its obligation to the federal government." *Caremark*, 634 F.3d at 817; *see* Def. Mem. at 37-38; *U.S. ex rel. Hunt v. Merck-Medco Managed Care, L.L.C.*, 336 F. Supp. 2d 430, 444 (E.D. Pa. 2004) ("If Medco's actions had the predictable consequence of depriving the Government of money it was owed, then Medco was acting (or failing to act) within the ambit" of the reverse false claim provision); *United States ex rel. Koch v. Koch Indus., Inc.*, 57 F. Supp. 2d 1122, 1128-29 (N.D. Okla. 1999).

The Rosicki Defendants attempt to narrow the scope of the reverse false claim provision by reading into it a requirement that there be a "reasonably close nexus" between the defendants' fraudulent conduct and the decreased obligation by the third-party to the Government.  *See* Def. Mem. at 37.  There is no support offered for this proposition, and it is inconsistent with the FERA amendments regarding reverse false claims, which "broadened the scope to which reverse false claims liability would attach."  *U.S. ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 839 F.3d 242, 253 (3d Cir. 2016).  In any event, the fraudulent billing activities of the Rosicki Defendants with respect to Fannie Mae are as connected to Fannie Mae's payment obligations to the Government as the indirect reverse false claims examples in the Rosicki Defendants' brief.  In *Caremark*, for example, the defendant's fraudulent conduct triggered a series of payment decisions that were part of a complex intergovernmental process.  The defendants made unlawful insurance coverage representations for individual customers, forcing payments to be made by state Medicaid agencies, which then would receive reimbursements from the federal Government that never should have been paid.  *See* 634 F.3d at 817.  Here, the Rosicki Defendants' false and fraudulent billing for individual mortgage foreclosure actions led to overpayments by Fannie Mae as part of its role as "central player[] in the United States' housing mortgage market," *Perry Capital LLC*, 864 F.3d at 598; these overpayments in turn improperly reduced the amount owed by Fannie Mae to the Government in accordance with the Third Amendment payment obligation.  Just as Caremark was a regular participant in aspects of the large and complex Medicaid program, so too were the Rosicki Defendants regular participants in an aspect of Fannie Mae's wide-ranging role in the housing market.  Allowing the Government's claims to proceed under these circumstances will not create a slippery slope of expansive reverse false claim liability just as these other years-old cases did not.

## CONCLUSION

For the foregoing reasons, the Rosicki Defendants' motion to dismiss should be denied in its entirety, and the Government's claims against the Rosicki Defendants should proceed.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## STATEMENT OF INTEREST

The Government respectfully submits this Statement of Interest in accordance with 28 U.S.C. § 517 ("Statement") to address certain issues raised by the Servicer Defendants. Although the Government has declined to intervene as to the Relator's claims against the Servicer Defendants, the Government remains the real party in interest in the Relator's cases against these defendants. *See United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 934 (2009). Since the FCA is the "government's primary litigative tool for the recovery of losses sustained as the result of fraud against the government," *Avco Corp. v. U.S. Dep't of Justice*, 884 F.2d 621, 622 (D.C. Cir. 1989), the Government has a significant interest in how decisions by the courts, even in declined actions, may shape future enforcement of that statute. Accordingly, this Statement addresses five discrete issues raised in the submissions of the Servicer Defendants in their motions to dismiss the Relator's complaints.

### A.     The Relator's Complaint Should Not Be Dismissed Under the Public Disclosure Bar

Pursuant to 31 U.S.C. § 3730(e)(4)(A), the Government has filed notices of opposition to the dismissal of the Relator's complaint for any claims that accrued on or after March 23, 2010, and therefore those claims cannot be dismissed. *See* Dkt. No. 148; 13 Civ. 1467 (JSR) Dkt. No. 65.[12] The Government's opposition to the dismissal of claims before that date is not dispositive,

---

[12] The amendment to the FCA public disclosure bar that took effect on March 23, 2010 bars the dismissal of an action on the ground of public disclosure if the Government opposes such a

but the Government maintains a strong interest in the application of the public disclosure bar regardless of the time period, and is in the best position to determine whether a relator has provided it with new, meaningful information.  Here, the Government believes that the Relator's allegations that predate March 23, 2010 are not parasitic, but rather that they prompted and added significant value to the Government's investigation.

Under the pre-2010 public disclosure bar, a relator's action must be dismissed if it is "based on the public disclosure of allegations or transactions" through sources including the media, unless the relator is "an original source of the information." 31 U.S.C. § 3730(e) (1988). In determining whether an action was based on public disclosures, courts consider whether the disclosures were "substantially similar" to the allegations in the relator's complaint, *United States ex rel. Poteet v. Medtronic, Inc.,* 552 F.3d 503, 518 (6th Cir. 2009), such that the public disclosures "put the Federal Government on notice of a potential fraud" and obviated the need for a *qui tam* suit, *Graham Cnty. Soil & Water Conservation Dist.,* 559 U.S. at 291.

Defendants argue that much of the information in the Relator's complaint was disclosed through news articles before Relator commenced this action, and cite an investigation by Treasury regarding unsound mortgage servicing practices distinct from those challenged by Relator.  *See* Servicer Mem. at 40-45.  However, generalized media reports on abuses in the foreclosure process and a federal investigation into unrelated issues concerning mortgage servicing did not put the Government on notice of the particular fraudulent scheme at issue—that certain law firms overcharged for the services performed in effectuating foreclosures through the use of affiliates, with specific servicers subsequently failing to ensure that those costs were

---

motion.  In *Graham County Soil and Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 283 n.1 (2010), the Supreme Court held that the amendment was not retroactive.

reasonable and necessary and not merely the type of costs for which reimbursement could be sought.  *See, e.g., U.S. ex rel. Mateski v. Raytheon Co.*, 816 F.3d 565, 577 (9th Cir. 2016); *see also U.S. ex rel. Kester v. Novartis Pharm. Corp.*, No. 11 Civ. 8196, 2015 WL 109934, at *8 (S.D.N.Y. Jan. 6, 2015) ("[T]he public disclosures must set the government squarely on the trail of a *specific* and *identifiable* defendant's participation in the fraud.") (internal quotation omitted) (emphasis added).

Without the Relator's extensive compilation of information based on his professional experiences and investigation, *see* Relator Compl. ¶¶ 488-93, the Government is unlikely to have begun its inquiry into either the type of fraudulent scheme detailed in its and the Relator's complaint or the specific defendants named in the complaint.  Accordingly, the Relator cannot be categorized as someone who presented a "parasitic lawsuit" and "contributed nothing to the exposure of the fraud."  *Kester*, 2015 WL 109934, at *7 (citing *U.S. ex rel. Doe v. John Doe Corp.,* 960 F.2d 318, 319 (2d Cir.1992)).  The Government thus takes the position that none of Relator's claims should be dismissed pursuant to the public disclosure bar.

### B.    The Servicer Defendants Offer an Overly Restrictive Interpretation of the Reverse False Claim Provision of the FCA

The plain language of the post-FERA FCA makes clear that an "obligation," for purposes of the reverse false claim provision, may arise "from the retention of an overpayment," 31 U.S.C. § 3729(b)(3), and Relator has alleged that the Servicer Defendants have knowingly and improperly retained overpayments for foreclosure-related expenses.  See Relator's Compl. ¶¶ 477-86.  At a minimum, the Relator should be permitted to plead multiple theories of FCA violations in his complaints.  For example, if the Court were to determine that Relator cannot pursue FCA violations pursuant to 31 U.S.C. §§ 3729(a)(1)(A) or (a)(1)(B), this should not preclude Relator from pursuing claims pursuant to 31 U.S.C. § (a)(1)(G).

31

Moreover, the relevant provisions of the HUD Handbook and Fannie Mae Servicing Guide cannot plausibly be read to allow the Servicer Defendants to continue to retain funds they knew to have been obtained through fraud without making any disclosure to HUD and Fannie Mae.  This would run directly contrary to the purpose of the FERA amendment definition of obligation, which intended that "the violation of the FCA for receiving an overpayment may occur once an overpayment is knowingly and improperly retained, without notice to the Government about the overpayment."  S. Rep. No. 111-10, at 14-15.[13]  Accordingly, Relator should be permitted to pursue overlapping (a)(1)(A)/(B) and (a)(1)(G) theories of liability at the pleading stage, to ensure that, if the Servicer Defendants engaged in misconduct, they can be held accountable for the full scope of any such misconduct.

### C.    Failure of a Quality Control Program Can Be Actionable Under the FCA

The Court should reject the Servicer Defendants' argument that their alleged failure to satisfy their obligations under the Fannie Mae, Freddie Mac, and HUD servicing guides and implement an adequate quality control program cannot form the basis for FCA liability.  On the contrary, widespread quality control failures can give rise to FCA liability where a defendant has affirmatively acknowledges its obligation to conduct quality control as a funding condition.  *See generally United States v. Movtady*, 13 F. Supp. 3d 325 (S.D.N.Y. 2014); *United States v. Wells*

---

[13] The third claim of the Complaint, as well as the fourth and fifth claims of Relator's complaints (*see* Dkt. No. 29 in 12 Civ. 7199; Dkt. No. 28 in 13 Civ. 1467), allege a violation of the reverse false claim provision of the FCA based on the fact that the conduct of the defendants decreased the quarterly dividend payment obligations of Fannie Mae and the Federal Home Loan Mortgage Corporation ("Freddie Mac").  *See* Section V, *supra*.  Though the Servicer Defendants do not address this claim in a separate section of their brief, they allude to Relator's allegations about the decrease in the quarterly dividends.  *See* Servicer Mem. at 36-37.  The cases cited there, however, do not address the reverse false claims provision of the FCA.  A reverse false claim does not require the Government to pay out sums of money—indeed, that provision focuses on fraudulent conduct that has impaired the payment of money *to* the Government.  *See* 31 U.S.C. § 3729(a)(1)(G).

*Fargo Bank, N.A.*, 972 F. Supp. 2d 593 (S.D.N.Y. 2013).  Moreover, given Relator's allegations that the Servicer Defendants certified to their compliance with their obligations under the servicing guides—which included implementing a compliant quality control program, *see* Relator's Compl. ¶¶ 61-67, 88-93, 98-106, 151—they cannot argue that there is no set of facts in which their failure to implement such a program constitutes fraud.  *See United States v. Raymond & Whitcomb Co.*, 53 F. Supp. 2d 436, 447 (S.D.N.Y. 1999) ("One who signs a certification cannot choose to remain unaware of the veracity of that certification like the proverbial ostrich who buried its head in the sand so as to see no evil, hear no evil, and speak no evil. Thus, a failure to conduct a proper investigation before making a false statement may be sufficiently reckless to yield [FCA] liability.").  The Court should not adopt the Servicer Defendants' sweeping attempt to exclude quality control failures from FCA liability at the pleading stage.

> ### D.    Broad Disclaimers or Qualifications to Annual Certifications Do Not Automatically Preclude FCA Liability

While there may be circumstances in which disclaimers or qualifications to annual certifications may have some bearing on the ability of the Government or a Relator to pursue FCA violations, the types of broad assertions made by Bank of America, N.A. ("BANA") as riders to its annual certifications to HUD, Fannie Mae, and Freddie Mac cannot serve to absolve BANA of liability, especially at the pleading stage.

In its supplemental memorandum of law, BANA points to addenda to its annual certifications to HUD, Fannie Mae, and Freddie Mac, and asserts that these supplements "negate Relator's claims against BANA."  BANA Mem. at 3.  But these disclosures cannot negate the element of legal falsity, as BANA suggests, because they do not "disclose noncompliance with material statutory, regulatory, or contractual requirements."  *Escobar*, 136 S. Ct. at 2001.  While the Fannie Mae supplement, for example, generally describes ongoing investigations into

"alleged irregularities in the foreclosure practices of residential mortgage servicers," *see* Dkt. 60-2 (ECF pg. 5), it also specifically states that BANA "substantially complies in all material respects" with the Fannie Mae Guide and its Fannie Mae Mortgagee Selling and Servicing Contract.  Nowhere does the document indicate that BANA engaged in the specific improper conduct alleged by Relator.  The fact that BANA included the non-specific qualifications should not be sufficient to render meaningless its overarching certifications of compliance for purposes of evaluating Relator's allegations of scienter.

Moreover, the effect of the qualifications on scienter and materiality depends on a variety of factual circumstances, and is not appropriately resolved on a motion to dismiss.  Among other things, the supplements to the certifications raise questions about what BANA knew with respect to its non-compliance with relevant provisions, why the disclaimer language was drafted in the way that it was, whether the disclaimer itself misrepresented or underrepresented the extent of BANA's knowledge of its non-compliance with applicable provisions, and how or whether HUD, Fannie Mae, and Freddie Mac considered these qualified certifications in their evaluation of BANA's participation in their respective programs.  These and other facts would need to be developed for these scienter- and materiality-based defenses to overcome Relator's complaints.

For all of these reasons, the qualifications to the annual certifications submitted by BANA to HUD, Fannie Mae, and Freddie Mac should not provide a basis to dismiss Relator's claims against BANA at this stage.

### E.   The Consent Orders Cited by OneWest Bank Do Not Preclude the Government from Pursuing Claims Under the FCA

No plausible reading of the consent orders and stipulations entered into between OneWest Bank, its parent company, and various banking regulators could lead to the conclusion that OneWest has been released from FCA liability or any other claims brought by government

34

entities other than the specific parties to the consent orders and stipulations.  First, the bank's

stipulations and consents to the issuance of two 2011 orders by the Office of Thrift Supervision

("OTS") limit the scope of those agreements, making clear that they do not release or discharge

actions or charges "*that may be or have been brought by any governmental entity other than the*

*OTS.*"  Dkt. Nos. 125-1 ¶ 7 (ECF pg. 28) and 125-2 ¶ 8 (ECF pg. 13) (emphasis added).

Similarly, OneWest's stipulation and consent to the issuance of the 2014 order by the

Office of the Comptroller of the Currency specifically states that it does not waive the right of

"any other representative of the United States or an agency thereof, including, without limitation,

the United States Department of Justice, to bring other actions deemed appropriate."  Dkt. No.

125-3 art. IV, ¶ 2 (ECF pg. 7).

Finally, OneWest claims that the 2018 consent assessment order between its parent

company and the Federal Reserve released both OneWest and its parent company "from all

potential liability . . . based on the conduct that is the subject of this Consent Assessment Order

or the 2014 IMB Consent Order."  OneWest Mem. at 3.  But the actual language in the

assessment order specifies that the release is limited to "all potential liability *that has been or*

*might have been asserted by the Board of Governors* based on the conduct that is the subject of

this Consent Assessment Order or the 2014 IMB Consent Order."  Dkt. No. 125-6 ¶ 5 (ECF pg.

7) (emphasis added).  Plainly, this release is only to claims that may have been asserted by the

Federal Reserve, not to all claims that could potentially be filed by or on behalf of any

government entity.  Accordingly, the various consent orders should not be interpreted to preclude

FCA claims against OneWest for the conduct at issue in this litigation.

35

Dated: New York, New York
       May 7, 2018

                      Respectfully submitted,

                      GEOFFREY S. BERMAN
                      United States Attorney
                      Southern District of New York
                      Attorney for Plaintiff-Intervenor
                      United States of America

By:    */s/ Cristine Irvin Phillips*
                      CRISTINE IRVIN PHILLIPS
                      ANDREW E. KRAUSE
                      LAUREN A. LIVELY
                      Assistant United States Attorneys
                      86 Chambers Street, Third Floor
                      New York, New York 10007
                      Telephone Nos. (212) 637-2696/2769/2689
                      Facsimile Nos. (212) 637-2702/2786/2717
                      cristine.phillips@usdoj.gov
                      andrew.krause@usdoj.gov
                      lauren.lively@usdoj.gov