**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. PETER D. GRUBEA,<br><br>         *Plaintiffs,*<br><br>   v.<br><br>ROSICKI, ROSICKI & ASSOCIATES, P.C., PARAMOUNT LAND, INC., THRESHOLD LAND INC., ENTERPRISE PROCESS SERVICE, INC., MCCABE, WEISBERG, & CONWAY, P.C., ATTORNEY OUTSOURCING SUPPORT SERVICES, INC., REO AMERICA ABSTRACT, INC., CENLAR FSB, CITIGROUP, INC., CITIBANK, N.A., CITIMORTGAGE, INC., DITECH FINANCIAL LLC, EVERHOME MORTGAGE COMPANY, EVERBANK FSB, FLAGSTAR BANK, FSB, GREEN TREE CREDIT, JAMES B. NUTTER & CO., METLIFE BANK, N.A., NATIONSTAR MORTGAGE LLC, ONEWEST BANK FSB, PHH MORTGAGE CORPORATION, PNC BANK, FSB, SUNTRUST MORTGAGE, INC., U.S. BANK, N.A., and WELLS FARGO & CO.,<br><br>         *Defendants.* | 12 Civ. 7199 (JSR) |
| UNITED STATES OF AMERICA ex rel. PETER D. GRUBEA,<br><br>Plaintiffs,<br><br>v.<br><br>BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., J.P. MORGAN CHASE & CO., and JPMORGAN CHASE BANK, N.A.,<br><br>Defendants. | 13 Civ. 1467 (JSR) |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTIONS TO DISMISS**

## TABLE OF CONTENTS

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'............................................ i

MOTIONS TO DISMISS ................................................................................................. i

I.      INTRODUCTION ................................................................................................. 1

II.     FACTUAL BACKGROUND .................................................................................. 4

        A.      Defendants Knowingly Overcharged the GSEs and FHA ...................... 4

                1.      The GSEs and FHA Prohibited Unreasonable or Unnecessary Expenses........ 5

                2.      Defendants Violated Those Rules and Overcharged the Government ............ 8

        B.      The Government Provided Funds Paid to the Servicers ....................... 14

III.    LEGAL STANDARD............................................................................................. 15

IV.     ARGUMENT ....................................................................................................... 16

        A.      Each Defendant Submitted or Caused the Submission of False Claims............... 16

                1.      The Overcharges Were False Under the Doctrine of Implied Certification ... 16

                2.      Fraudulent Overcharges are Factually False..................................... 23

                3.      The Servicers Submitted False Claims and Statements, the Foreclosure
                        Defendants Caused the Submission of False Claims and Statements............ 26

        B.      The Overcharges Were Material ........................................................... 27

                1.      Overcharges are Material Under *Escobar*..................................... 28

                2.      Defendants' Other Arguments Lack Merit ..................................... 31

        C.      Defendants Acted "Knowingly" ........................................................... 32

                1.      The Servicer Defendants Acted Recklessly..................................... 33

                2.      The Law Firms and Affiliates Acted Knowingly ........................... 38

        D.      Relator Alleged the Submission of False Claims with Particularity.................... 39

                1.      Relator Alleged the Fraudulent Scheme with Particularity ........... 40

                2.      Relator Alleged Fraudulent Submission of the Claims with Particularity...... 45

        E.      Fraud on Fannie and Freddie is Covered by the False Claims Act...................... 47

                1.      Defendants are Liable under § 3729(a)(1)(A) and (a)(1)(B) ......... 48

i

      2.      Liability For Reducing Net Sweeps Paid by the GSEs Under § (a)(1)(G) ..... 55

F.      The Complaints Plead a Reverse False Claims Theory for Overpayments Received by Defendants ................................................................................... 58

      1.      The FCA Requires the Servicers to Return Overpayments ......................... 59

      2.      The Servicers are Required by Agreement to Return Overpayments ............ 60

      3.      The Complaints Allege Scienter for the Reverse False Claims ..................... 62

G.      The Complaints State a Claim for Conspiracy Against the Law Firms and Their Affiliates ................................................................................................. 63

H.      The Action is Not Barred by Any Public Disclosure ........................................... 65

      1.      There Was No Public Disclosure ................................................................... 66

      2.      Relator Is an Original Source ........................................................................ 68

I.      The Settlements Release Less Conduct than the Servicers Contend ................... 70

      1.      Bank of America's "Riders" Do Not Immunize its Misconduct ................... 70

      2.      The Flagstar Release Is Narrow .................................................................... 72

      3.      The OneWest Release Does Not Come Close to Covering this Fraud .......... 73

V.      CONCLUSION ................................................................................................................ 74

# TABLE OF AUTHORITIES

## Cases

*Abbott v. BP Expl. & Prod., Inc.*,
  851 F.3d 384 (5th Cir. 2017) .................................................................. 29

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................... 15

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................... 15

*Bellevue v. Universal Health Servs. of Hartgrove*,
  867 F.3d 712 (7th Cir. 2017) .................................................................. 68

*Bishop v. Wells Fargo & Co.*,
  870 F.3d 104 (2d Cir. 2017) ................................................................... 20

*Cedric Kushner Promotions, Ltd. v. King*,
  533 U.S. 158 (2001) ............................................................................... 64

*Cooper v. Blue Cross & Blue Shield of Fla., Inc.*,
  19 F.3d 562 (11th Cir. 1994) .................................................................. 66

*Copperweld Corp. v. Indep. Tube Corp.*,
  467 U.S. 752 (1984) ............................................................................... 65

*Espinoza ex rel. JP Morgan Chase & Co. v. Dimon*,
  797 F.3d 229 (2d Cir. 2015) ................................................................... 16

*Garg v. Covanta Holding Corp.*,
  478 F. App'x 736 (3d Cir. 2012) ............................................................ 53

*In re Cardiac Devices Qui Tam Litig.*,
  221 F.R.D. 318 (D. Conn. 2004) ............................................................ 39

*Kane ex rel. U.S. v. Healthfirst, Inc.*,
  120 F. Supp. 3d 370 (S.D.N.Y. 2015) .................................................... 63

*Leshinsky v. Telvent GIT SA*,
  873 F. Supp. 2d 582 (S.D.N.Y. 2012) .............................................. 68, 69

*Meyer v. Kalanick*,
  174 F. Supp. 3d 817 (S.D.N.Y. 2016) .................................................... 63

*Mikes v. Straus,*
    274 F.3d 687 (2d Cir. 2001) ...................................................................... 20

*Moskal v. United States,*
    498 U.S. 103 (1990) ................................................................................... 50

*O'Brien v. Nat'l Prop. Analysts Partners,*
    936 F.2d 674 (2d Cir. 1991) ...................................................................... 32

*Perry Capital LLC v. Mnuchin,*
    864 F.3d 591 (D.C. Cir. 2017) .................................................................. 57

*Ping Chen ex rel. United States v. EMSL Analytical, Inc.,*
    966 F. Supp. 2d 282 (S.D.N.Y. 2013) ....................................................... 67

*Rainwater v. United States,*
    356 U.S. 590. (1958) .................................................................................. 18

*Rose v. Stephens Inst.,*
    Case No. 09-cv-05966-PJH, 2016 WL 5076214 (N.D. Cal. Sept. 20, 2016) ...................... 3, 30

*Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.,*
    843 F.3d 561 (2d Cir. 2016) ...................................................................... 15

*U.S. ex rel. Adams v. Aurora Loan Servs., Inc.,*
    813 F.3d 1259 (9th Cir. 2016) .................................................................. 53

*U.S. ex rel. Adams v. Wells Fargo Bank Nat. Ass'n,*
    2:11-cv-00535-RCJ-PAL, 2013 WL 6506732 (D. Nev. Dec. 11, 2013) ................................. 52

*U.S. ex rel. Advocates for Basic Legal Equality v. U.S. Bank, N.A.,*
    No. 13 Civ. 704 (N.D. Ohio May 12, 2015) ............................................... 68

*U.S. ex rel. Bahrani v. Conagra, Inc.,*
    465 F.3d 1189 (10th Cir. 2006) ................................................................ 62

*U.S. ex rel. Baltazar v. Warden,*
    635 F.3d 866 (7th Cir. 2011) .............................................................. 66, 67

*U.S. ex rel. Barko v. Halliburton Co.,*
    241 F. Supp. 3d 37 (D.D.C. 2017) ............................................................ 18

*U.S. ex rel. Bibby v. Wells Fargo Bank, N.A.,*
    165 F. Supp. 3d 1340 (N.D. Ga. 2015) ...................................................... 43

*U.S. ex rel. Bilotta v. Novartis Pharms. Corp.,*
    50 F. Supp. 3d 497 (S.D.N.Y. 2014) ......................................................... 43

iv

*U.S. ex rel. Boise v. Cephalon, Inc.*,
2015 WL 4461793 (E.D. Pa. July 21, 2015)...................................................................... 62

*U.S. ex rel. Campie v. Gilead Sciences, Inc.*,
862 F.3d 890 (9th Cir. 2017) ............................................................................................. 30

*U.S. ex rel. Chorches v. Am. Med. Response*,
865 F.3d 71 (2d Cir. 2017) .......................................................................................... passim

*U.S. ex rel. Conroy v. Select Med. Corp.*,
3:12-cv-00051 (S.D. Ind.) .................................................................................................. 66

*U.S. ex rel. Cosens v. Yale-New Haven Hosp.*,
233 F. Supp. 2d 319 (D. Conn. 2002) ................................................................................ 66

*U.S. ex rel. Costa v. Baker & Taylor, Inc.*,
No. C-95-1825-VRW, 1998 WL 230979 (N.D. Cal. Mar. 20, 1998)..................................... 27

*U.S. ex rel. Doe v. John Doe Corp.*,
960 F.2d 318 (2d Cir. 1992) ....................................................................................... 67, 69

*U.S. ex rel. Drakeford v. Tuomey*,
792 F.3d 364 (4th Cir. 2015) ............................................................................................. 63

*U.S. ex rel. DRC, Inc. v. Custer Battles*,
562 F.3d 295 (4th Cir. 2009) ............................................................................................. 51

*U.S. ex rel. Ervin & Assocs., Inc. v. Hamilton Secs. Grp., Inc.*,
370 F. Supp. 2d 18 (D.D.C. 2005) ...................................................................................... 33

*U.S. ex rel. Escobar v. Universal Health Servs., Inc.*,
842 F.3d 103 (1st Cir. 2016)............................................................................................... 29

*U.S. ex rel. Farmer v. City of Houston*,
523 F.3d 333 (5th Cir. 2008) ............................................................................................. 37

*U.S. ex rel. Feldman v. City of New York*,
808 F. Supp. 2d 641 (S.D.N.Y. 2011) .......................................................................... 18, 37

*U.S. ex rel. Forcier v. Computer Sciences Corp.*,
183 F. Supp. 3d 510 (S.D.N.Y. 2016) ................................................................................ 42

*U.S. ex rel. Garbe v. Kmart Corp.*,
824 F.3d 632 (7th Cir. 2016) ................................................................................... 3, 26, 27

*U.S. ex rel. Harman v. Trinity Indus., Inc.*,
872 F.3d 645 (5th Cir. 2017) ............................................................................................. 29

*U.S. ex rel. Harris v. Lockheed Martin Corp.*,
   905 F. Supp. 2d 1343 (N.D. Ga. 2012) ..................................................... 64

*U.S. ex rel. Heath v. AT&T, Inc.*,
   791 F.3d 112 (D.C. Cir. 2015) ................................................................... 41

*U.S. ex rel. Heath v. Wisconsin Bell, Inc.*,
   272 F. Supp. 3d 1094 (E.D. Wis. 2017) .................................................... 18

*U.S. ex rel. Hendow v. Univ. of Phoenix*,
   461 F.3d 1166 (9th Cir. 2006) ............................................................... 2, 23

*U.S. ex rel. Howard v. KBR, Inc.*,
   139 F. Supp. 3d 917 (C.D. Ill. 2015) ........................................ 19, 24, 25, 37

*U.S. ex rel. Hunt v. Merck-Medco Managed Care, L.L.C.*,
   336 F. Supp. 2d 430 (E.D. Pa. 2004) ................................................... 55, 61

*U.S. ex rel. Hussain v. CDM Smith Inc.*,
   14-cv-9107 (JPO), 2017 WL 4326523 (S.D.N.Y. Sept. 27, 2017) ............ 24

*U.S. ex rel. Keltner v. Lakeshore Med. Clinic, Ltd.*,
   No. 11-CV-00892, 2013 WL 1307013 (E.D. Wis. Mar. 28, 2013) ....... 60, 63

*U.S. ex rel. Kester v. Novartis Pharms. Corp.*,
   23 F. Supp. 3d 242 (S.D.N.Y. 2014) .......................................... 39, 46, 67

*U.S. ex rel. Kirk v. Schindler Elevator Corp.*,
   130 F. Supp. 3d 866 (S.D.N.Y. 2015) ....................................................... 36

*U.S. ex rel. Kirk v. Schindler Elevator Corp.*,
   563 U.S. 401 (2011) ................................................................................... 66

*U.S. ex rel. Kirk v. Schindler Elevator Corp.*,
   601 F.3d 94 (2d Cir. 2010) ........................................................................ 66

*U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp.*,
   985 F.2d 1148 (2d Cir. 1993) .................................................................... 65

*U.S. ex rel. Landis v. Tailwind Sports Corp.*,
   160 F. Supp. 3d 253 (D.D.C. 2016) ..................................................... 61, 62

*U.S. ex rel. Marcus v. Hess*,
   317 U.S. 537 (1943) ................................................................................... 51

*U.S. ex rel. Millin v. Krause*,
   2018 WL 1885672 (D.S.D. Apr. 19, 2018) ................................................ 64

vi

*U.S. ex rel. Poehling v. UnitedHealth Grp., Inc.*,
  No. CV 16-08697-MWF, 2018 WL 1363487 (C.D. Cal. Feb. 12, 2018) ............................... 30

*U.S. ex rel. Roy v. Anthony*,
  914 F. Supp. 1504 (S.D. Ohio 1994) ..................................................................................... 23

*U.S. ex rel. Spay v. CVS Caremark Corp.*,
  913 F. Supp. 2d 125 (E.D. Pa. 2012) .............................................................................. 43, 60

*U.S. ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*,
  944 F.2d 1149 (3d Cir. 1991) ................................................................................................ 69

*U.S. ex rel. Todd v. Fid. Nat'l Fin., Inc.*,
  1:12-cv-666-REB-CBS, 2014 WL 4636394 (D. Colo. Sept. 16, 2014) ................................. 52

*U.S. ex rel. Watkins v. KBR, Inc.*,
  106 F. Supp. 3d 946 (C.D. Ill. 2015) ................................................................................ 18, 19

*U.S. ex rel. Wood v. Allergan, Inc.*,
  246 F. Supp. 3d 772 (S.D.N.Y. 2017) ............................................................................ passim

*U.S. ex rel. Worthy v. E. Maine Healthcare Sys.*,
  2:14-cv-00184-JAW, 2017 WL 211609 (D. Me. Jan. 18, 2017) ........................................... 31

*U.S. ex rel. Yesudian v. Howard University*,
  153 F.3d 731 (D.C. Cir. 1998) ........................................................................................ passim

*United States ex rel. Barko v. Halliburton Co.*,
  241 F. Supp. 3d 37 (D.D.C. 2017) ........................................................................................ 18

*United States ex rel. Koch v. Koch Indus., Inc.*,
  57 F. Supp. 2d 1122 (N.D. Okla. 1999) ........................................................................... 55, 57

*United States ex rel. Ladas v. Exelis*,
  824 F.3d 16 (2d Cir. 2016) ............................................................................................... 64, 69

*United States ex rel. Petras v. Simparel, Inc.*,
  857 F.3d 497 (3d Cir. 2017) ............................................................................................. 57, 58

*United States ex rel. Springfield Terminal Ry. Co. v. Quinn*,
  14 F.3d 645 (D.C. Cir. 1994) ................................................................................................ 66

*United States ex rel. Tessler v. City of New York,*,
  14-CV-6455 (JMF), 2016 WL 7335654 (S.D.N.Y. Dec. 16, 2016) ....................................... 44

*United States v. Caremark, Inc.*,
  634 F.3d 808 (5th Cir. 2011) ................................................................................................ 55

*United States v. DynCorp Int'l LLC,*
   253 F. Supp. 3d 89 (D.D.C. 2017)..................................................................... passim

*United States v. Huron Consulting Grp., Inc.,*
   843 F. Supp. 2d 464 (S.D.N.Y. 2012) ................................................................... 70

*United States v. Huron Consulting Grp.,*
   No. 09 Civ. 1800 (JSR), 2011 WL 253259 (S.D.N.Y. Jan. 24, 2011)............................. 16, 43

*United States v. King-Vassel,*
   728 F.3d 707 (7th Cir. 2013) ........................................................................... 33, 39

*United States v. Krizek,*
   111 F.3d 934 (D.C. Cir. 1997)............................................................................... 33

*United States v. McNinch,*
   356 U.S. 595 (1958)............................................................................................ 24

*United States v. Prabhu,*
   442 F. Supp. 2d 1008 (D. Nev. 2006).................................................................... 18

*United States v. President & Fellows of Harvard Coll.,*
   323 F. Supp. 2d 151 (D. Mass. 2004) ................................................................... 64

*United States v. Public Warehousing Co.,*
   1:05-cv-2968-TWT, 2017 WL 1021745 (N.D. Ga. Mar. 16, 2017)............................. 32

*United States v. Rachel,*
   289 F. Supp. 2d 688 (D. Md. 2003) ..................................................................... 24

*United States v. Rivera,*
   55 F.3d 703 (1st Cir. 1995)................................................................................. 24

*United States v. Rogan,*
   517 F.3d 449 (7th Cir. 2008) ............................................................................. 30

*United States v. Sanford-Brown, Ltd.,*
   840 F.3d 445 (7th Cir. 2016) ............................................................................. 29

*United States v. Supervalu, Inc.,*
   218 F. Supp. 3d 767 (C.D. Ill. 2016) ............................................................... 27, 43

*United States v. TEVA Pharms. USA, Inc,*
   13 Civ. 3702 (CM), 2016 WL 750720 (S.D.N.Y. Feb. 22, 2016)............................. 16, 39

*United States v. United Healthcare Ins. Co.,*
   848 F.3d 1161 (9th Cir. 2016) ........................................................................... 42

*United States v. Visiting Nurse Serv. of N.Y.*,
    14-cv-5739 (AJN), 2017 WL 5515860 (S.D.N.Y. Sept. 26, 2017) ............................ 16, 17, 42

*United States v. Wells Fargo Bank, N.A.*,
    972 F.Supp.2d 593 (S.D.N.Y. 2013) .................................................................. 42

*Universal Health Servs., Inc. v. U.S. ex rel. Escobar*,
    136 S. Ct. 1989 (2016) .......................................................................... passim

## **Statutes**

12 U.S.C. § 4513(a)(1)(A), (B)(i), (B)(v) .................................................................. 49

18 U.S.C. § 371 .................................................................................................... 64

31 U.S.C. § 3729 .................................................................................................. 26

31 U.S.C. § 3729(a)(1) ........................................................................................ 48

31 U.S.C. § 3729(a)(1)(A) ............................................................................... 19, 48

31 U.S.C. § 3729(a)(1)(B) .................................................................................... 48

31 U.S.C. § 3729(a)(1)(G) ............................................................................... 48, 55

31 U.S.C. § 3729(b)(1)(A)(ii)-(iii) ...................................................................... 32

31 U.S.C. § 3729(b)(1)(B) ................................................................................. 3, 32

31 U.S.C. § 3729(b)(2)(A) .................................................................................... 48

31 U.S.C. § 3729(b)(2)(A)(ii) ................................................................. 48, 49, 50, 52

31 U.S.C. § 3729(b)(3) ......................................................................... 56, 58, 59, 61

31 U.S.C. § 3729(b)(4) ........................................................................................ 27

31 U.S.C. § 3730(e)(4)(A) (2009) ......................................................................... 66

31 U.S.C. § 3730(e)(4)(B) .................................................................................... 68

## **Other Authorities**

155 Cong. Rec. H5686-01, 2009 WL 1373400 ...................................................... 48

155 Cong. Rec. S1679-01, 2009 WL 275706 ......................................................... 48

48 C.F.R. § 1.101 ................................................................................................ 19

48 C.F.R. § 2.101 ...................................................................................................... 19

Fannie Mae Servicing Guide ................................................................... 6, 22, 23, 28

Fed R. Civ. P. 9(b) ............................................................................................ passim

Freddie Mac Single-Family Seller/Servicer Guide ............................................ passim

H. Rep. No. 111-97 ..................................................................................................... 68

HUD Handbook ................................................................................................. passim

S. Rep. No. 110-507 & n.80 ................................................................................ 68, 69

S. Rep. No. 111-10 ...................................................................................... 48, 59, 62

S. Rep. No. 96-615 ..................................................................................................... 33

S. Rep. No. 99-345 ..................................................................................................... 33

I.      INTRODUCTION

Relator Peter Grubea brings this lawsuit on behalf of the United States to recover hundreds of millions of dollars in overcharges billed to and paid by the Federal Housing Administration ("FHA") and two government-sponsored enterprises ("GSEs"), Fannie Mae and Freddie Mac. The fraudulent scheme alleged in this case involves wrongdoing in two stages: First, mortgage-foreclosure law firms across the country, often using thinly-disguised affiliates, submitted egregiously marked-up and inflated charges for expenses such as title searches and service of process. Second, the servicers of those defaulted mortgages—ignoring binding legal obligations to scrutinize and oversee those charges—passed them on with no oversight to the GSEs and FHA. The scope of the fraud is simply staggering.

Beginning in 2012, in lawsuits filed under seal, Relator disclosed this scheme to the Government. Since then, the Government has twice intervened: first against a servicer, and the second time against a mortgage-foreclosure law firm. The servicer was HSBC, which in 2014 paid a $10 million settlement and admitted the central allegations in Relator's Complaint, including that the bank failed to "ensure that the fees and expenses submitted by outside counsel and other third-party providers to HSBC . . . were reasonable, customary, or necessary." *See* Declaration of Cory Buland, Ex. A. The law firm was Rosicki, Rosicki & Associates, which now faces the Government's complaint-in-intervention alleging egregious markups of foreclosure expenses—inflated by up to 750%—that were passed on to Fannie Mae's servicers. In each case, the Government recognized Peter Grubea as an appropriate Relator under the False Claims Act. Far from being mere speculation or guesswork by an uninformed outsider, Relator's core theories of the fraud already have been vindicated by the Government's investigation.

But the misconduct that Relator revealed at HSBC implicates far more than just the Rosicki law firm; and the misconduct Relator uncovered at the Rosicki firm implicates far more

1

than just HSBC as servicer. In fact, Rosicki submitted fraudulent overcharges to over a dozen servicers, and HSBC submitted false claims that it received from multiple law firms. Relator has alleged similar misconduct throughout the stable of firms and servicers that were supposed to be protecting the GSEs and FHA—and, by extension, the taxpayers—against fraudulent overcharges in the foreclosures of GSE owned or federally insured mortgages. Relator's lawsuit is necessary in order to reverse years of false claims, and that is why the Government, far from dismissing Relator's case, is taking the unprecedented step (at least in this District) of opposing dismissal of Relator's Complaints on public disclosure grounds.

While the circumstances of the scheme are unique, Relator's Complaints present a classic overbilling FCA case that is pleaded in detail and backed by decades of caselaw. Defendants' "kitchen sink" arguments for dismissal should be rejected. First, Defendants argue that the Complaints fail to allege falsity. But overcharges in violation of a program's rules and regulations have been recognized for decades as false. *See, e.g.*, *U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1170 (9th Cir. 2006) ("[W]here a private company overcharges under a government contract" it is an "archetypal *qui tam* False Claims action."). Defendants argue that under the Supreme Court's recent decision in *Escobar*, the representations relied on must be in the claims themselves, but that is not the law. *See U.S. ex rel. Wood v. Allergan, Inc.*, 246 F. Supp. 3d 772, 811 (S.D.N.Y. 2017) (after *Escobar*, "falsity may arise from the defendant's submission of a claim for payment that does not include a specific representation about the goods or services provided, coupled with noncompliance with a material payment requirement").

Second, contrary to defendants' arguments, the alleged markups and overcharges were material by definition. Under the FCA, "material" means "having a natural tendency to influence . . . payment"—a definition that squarely applies to the false sums that triggered the

overpayments here.  Not surprisingly then, the caselaw demonstrates that violations of pricing terms are material to government payment decisions. *See, e.g.*, *U.S. ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632, 639 (7th Cir. 2016) (explaining that conduct need only be capable of leading to a recipient getting "more money than it should have gotten" to be material). Defendants claim that the continued payment of claims by the GSEs and FHA should defeat materiality, but courts have observed that the Government's failure to take action is "not terribly relevant to materiality" unless the Government explains that it is still paying in spite of the false statements, which is not the case here.  *Rose v. Stephens Inst.*, Case No. 09-cv-05966-PJH, 2016 WL 5076214, at *6 (N.D. Cal. Sept. 20, 2016).

Third, Defendants claim that the Complaints fail to sufficiently allege scienter, but the FCA "does not require proof of 'a specific intent to defraud' and 'scienter may be alleged generally.'" *Wood*, 246 F. Supp. 3d at 828 (S.D.N.Y. 2017) (quoting § 3729(b)(1)(B) and citing Fed. R. Civ. P. 9(b)). Relator's Complaints plead facts giving a rise to a strong inference of at least recklessness by pleading (a) a duty on the part of the Servicer Defendants to monitor law firm expenses, paying particularly close attention to those using affiliates; (b) red flags warning the Servicer Defendants of the fraudulent billings, including a government investigation into their conduct and the HSBC settlement for the same misconduct; and (c) a nationwide pattern of fraudulent transactions, exemplified by 66 false claims detailed in the Complaints, that Servicer Defendants rubber-stamped and passed along to the GSEs and HUD.

Fourth, Defendants argue that the Complaints fail to satisfy Rule 9(b)'s particularity requirement, even while arguing simultaneously that the particulars of the overcharge scheme were so well known that Relator's pre-2010 claims should be dismissed on public disclosure grounds. Relator's Complaints, which include over 100 pages of specific allegations and

examples of transactions alleged to be false, contain sufficient detail to satisfy Rule 9(b).

Fifth, despite being notified that the Government is opposing dismissal of the Relator's Complaints on public disclosure grounds, Defendants nevertheless claim that the public disclosure bar still applies as to allegations pre-dating the FCA's 2010 amendments. These arguments should be summarily rejected. As reflected by the Government's decision to oppose dismissal, Relator Peter Grubea is not the type of "parasitic" relator the public disclosure bar was designed to eliminate, who learns about a scheme through the press or piggybacks on a pending Government investigation. On the contrary, Relator learned about the Defendants' scheme through his own work on foreclosure cases, admissions made to him by foreclosure firm attorneys, and discussions with those who had witnessed the Defendants' misconduct firsthand, and he furnished that information to the Government, triggering the Government's investigation, not the other way around.

While the Servicer and Foreclosure Defendants attempt to point fingers at each other, each was an essential component of the other's wrongdoing: the law firms could not have submitted false claims absent the servicers' reckless lack of oversight, and the servicers would not have submitted a single false claim absent the law firms' underlying dishonesty. Relator has sufficiently pleaded a case against both groups of defendants, and their motions to dismiss should be denied.

## II.    FACTUAL BACKGROUND

### A.    Defendants Knowingly Overcharged the GSEs and FHA

Fannie Mae and Freddie Mac helped lenders originate mortgage loans by purchasing and guaranteeing them. Similarly, FHA, an arm of the United States Department of Housing and Urban Development ("HUD"), insured approved lenders against losses on mortgage loans. Third

Amended Compl., 12 Civ. 7199 ("TAC"), ¶¶ 4-5.[1] The GSEs and FHA relied on private mortgage servicers to collect payments from borrowers, pursue collections from delinquent borrowers, and execute foreclosures where necessary. *Id.* ¶¶ 4-5. In exchange, the GSEs and FHA would reimburse servicers for the costs associated with foreclosures so long as those expenses were actual, reasonable, and necessary. *Id.* ¶ 6.

> 1.   The GSEs and FHA Prohibited Unreasonable or Unnecessary Expenses

Each of the Servicer Defendants was bound by the rules issued by the GSEs and FHA governing foreclosure expenses. Defendants do not dispute that the Servicer Defendants were bound by these rules—they contractually agreed to the GSEs' rules (and certified their compliance annually, as a condition to participate in the programs) and, for FHA, certified at the beginning of the program (and annually as well) that they would be bound by HUD's rules. *See* TAC ¶¶ 59-60, 86-87, 98. Further, the Foreclosure Defendants[2] do not dispute their knowledge of the rules' requirements; in fact, the Rosicki Defendants submitted with their motion a copy of an agreement directly between the Rosicki firm and Fannie Mae apprising it of these obligations and imposing additional obligations to limit foreclosure expenses. *See* 12 Civ. 7199, Dkt. 133-2.

> a.   Fannie Mae

Fannie Mae's rules provide that every "servicer must attempt to minimize the costs

---

[1] The allegations in both live complaints in 12 Civ. 7199 and 13 Civ. 1467 are substantially identical. Relator's brief will cite to the TAC filed in 12 Civ. 7199 unless additional information only contained in the Second Amended Complaint ("SAC") in 13 Civ. 1467 is being cited.

[2] The "Foreclosure Defendants" are the Rosicki firm and its affiliates, Paramount Land, Inc., Threshold Land, Inc., Enterprise Process Service, Inc. (collectively, the "Rosicki Defendants") and McCabe Weisberg & Conway and its affiliates, Attorney Outsourcing Support Services, Inc. ("AOSS") and REO America Abstract, Inc. ("REO", and together with McCabe and AOSS, the "McCabe Defendants"). The remaining defendants in both 12 Civ. 7199 and 13 Civ. 1467 are collectively referred to as the "Servicer Defendants" or the "Servicers."

incurred from vendors utilized by law firms—such as auctioneers, process servers, title companies, posting companies, and newspapers or other publications—by ensuring that all costs are actual, reasonable, and necessary." TAC ¶ 62 (citing Fannie Mae Servicing Guide E-5-07 (Dec. 13, 2017). Fannie Mae requires that the "servicer and law firm ***must regularly examine*** the pricing offered by alternative vendors and negotiate for the best value from the vendor and other qualified service providers." *Id*. (emphasis added). The servicing guide further specifies

- The servicer must inquire whether its attorney . . . has any interest in any Affiliated Business Entity that provides services in connection with any foreclosure, bankruptcy, or eviction proceeding;

- The servicer must require its attorney . . . to promptly disclose any such relationship or interest, and agree that any fees or expenses for such services do not exceed the customary and reasonable fees for comparable services in their jurisdiction; and

- The servicer is responsible for monitoring the fees or expenses charged by any Affiliated Business Entity and Fannie Mae will require the servicer to reimburse Fannie Mae for any unreasonable or excessive fees or costs.

*Id*. ¶ 63 (quoting Fannie Mae Servicing Guide, Part VIII, § 106.03 (Mar. 14, 2012)); *see also* Fannie Mae Servicing Guide, Part VIII, § 104.03 (Apr. 28, 2010)). Fannie Mae's contracts with the Servicer Defendants permit reimbursement only of those costs that are "***actual, reasonable, and necessary***." *Id*. ¶ 64 (emphasis added).

b.     Freddie Mac

Freddie Mac has similar rules requiring oversight of foreclosure expenses. For example, Freddie Mac requires servicers to monitor, evaluate, and approve all parties to whom foreclosure activities are outsourced or assigned. TAC ¶ 91 (citing Freddie Mac Single-Family Seller/Servicer Guide, Vol. II, 57.2(b) (Jan. 1, 2015)). Freddie Mac requires that servicers ensure that any law firms they retain are free of any "***conflict of interest or potential conflict of interest***." *Id*. ¶ 92 (emphasis added) (quoting Freddie Mac Single-Family Seller/Servicer Guide,

Vol. II, 69.3(y) (June 1, 2013)). Freddie Mac requires servicers to "develop and have in place policies and procedures regarding oversight and compliance of firms" handling foreclosure matters. *Id.* ¶ 93. Servicers "***must have policies and procedures*** reasonably designed to ensure that firms handling Freddie Mac Default Matters are in compliance with . . . the applicable provisions of the Guide, and applicable law," specifically referring to "***compliance monitoring***" including of each law firm's "compliance with the limited retention agreement, including the fee and cost guidelines." *Id.* (emphasis added) (citing Freddie Mac Single-Family Seller/Servicer Guide, Vol. II, 69.11(a) (June 1, 2013).[3] Freddie Mac's contracts permit reimbursement of only those costs that are actual, reasonable, and necessary. *Id.* ¶ 94 (citing, *e.g.*, Freddie Mac Single-Family Seller/Servicer Guide Vol. II, 66.15.2 (October 1, 2011) ("Foreclosure counsel or trustee fees must be reasonable and comparable to those customarily charged in the area where the property is located.")).

c. FHA

FHA's rules require servicers to create and implement a quality control plan that ensures compliance with HUD rules, TAC ¶ 101, including that mortgagees review all claims to ensure that unallowable foreclosure expenses are not included in claims, *id.* ¶ 104-05, and that they "ensure that their contractors, agents, and loan correspondents are acceptable to FHA and operate in compliance with FHA requirements," *id.* ¶ 106. HUD rules expressly provide that the following costs are unallowable, and that HUD will not reimburse a servicer for:

- Fees and costs that exceed reasonable and customary fees for the area;

- Costs that are not necessarily incurred . . . ; and

- Costs that are overhead items such as postage, telephone, duplicating or collection services, all of which should be included in the attorney's or trustee's fees.

---

[3] *Available at*: http://www.freddiemac.com/singlefamily/guide/.

TAC ¶ 110 (quoting HUD Handbook 4330.4, 2-15(B)). HUD rules expressly prohibit servicers from listing any unallowable costs on their applications for FHA benefits as either attorneys' fees or foreclosure-related costs, *id*. ¶ 111, and they obligate servicers to "promptly reimburse HUD for any amount overpaid because of incorrect, unsupported or inappropriate information they provide," *id*. ¶ 112 (quoting HUD Handbook 4330.4, 1-28).

           2.      <u>Defendants Violated Those Rules and Overcharged the Government</u>

                a.      Law Firms

Law firms, including the Foreclosure Defendants, generated illegal and excessive charges for foreclosure costs such as title searches, service of process, the arrangement of publication of legal notices, and related services. TAC ¶ 114. The law firms were motivated to submit these excessive charges because Fannie Mae, Freddie Mac, and FHA monitored, capped, and limited reimbursement for attorneys' fees—***but generally not costs***. *Id.* ¶ 116. By inflating charges for costs, as opposed to fees, law firms were able to profit handsomely from their foreclosure work, despite the strict limitations on attorneys' fees. *Id*.

A key element of the law firms' scheme was to create subsidiary corporations to handle and bill for foreclosure expenses. Affiliated subsidiaries (such as the Rosicki Firm's affiliates, Paramount and Enterprise) generated illegal and excessive charges for foreclosure services, which the law firms then passed along to loan servicers. *Id.* ¶ 114.[4] The scheme frequently involved the affiliated entities hiring third parties to do the work at market rates and then charging the law firms for the identical service at marked-up prices. In other instances, the

---

[4] The Servicer Defendants point out that FHA reimburses servicers for the majority, but not all, of the submitted foreclosure costs. Svc. Br. at 5. The fact is irrelevant to Defendants' liability for claims submitted to FHA—it goes only to the amount of damages and not to liability – and says nothing about Defendants' liability for claims submitted to the GSEs.

affiliate might actually do the work but charge a price well above market rates. The law firms, including the Foreclosure Defendants, were aware of the Fannie Mae, Freddie Mac, and FHA rules limiting fees to necessary and reasonable costs, but overbilled nevertheless. *Id*.

i.    Rosicki

The Rosicki Firm provides a stark example of the law firms' overcharges. Indeed, Rosicki does not challenge that the Government and Relator have pleaded the facts of the scheme as against it in accordance with Rule 9(b).

It is undisputed that during the time period in question, Rosicki had an interest in and controlled two companies, Paramount and Enterprise, that Rosicki used for title and service work throughout the State of New York. *See* TAC ¶ 122. Paramount and Enterprise systematically overbilled for foreclosure services that were not reimbursable by the GSEs or FHA, and as they knew, the overcharges were ultimately submitted to those agencies. *Id*. ¶¶ 123-133. For example, Relator's Complaint notes that Paramount and Enterprise regularly billed at excessive rates or services including: title searches (*e.g.*, at $495, despite market rates between $100-$250); personal service well above market rates (*e.g.*, at $125, despite market rates of approximately $20-$40, and full charges for additional defendants residing at the same address). *Id*. ¶ 131. Moreover, Enterprise often contracted with other companies to conduct these foreclosure services, and then simply marked up the bills before seeking reimbursement. *Id*. ¶ 134. The Government's complaint-in-intervention alleges a number of examples of egregious overcharges involving the Rosicki firm, and notes that senior attorneys at Rosicki were aware of the revenue margins on expenses marked up by Enterprise, "***which ranged from 300% to 750%***." Gov't Compl. ¶ 75 (emphasis added). Relator's Complaints include thirteen different examples of significant overbilling, involving false claims submitted by many of the servicer defendants, involving the Rosicki firm.

ii.      McCabe

As with Rosicki, it is undisputed that the McCabe firm has an interest in and control over two affiliates used for title and service work, AOSS and REO. *Id.* ¶¶ 138-139. Relator's Complaints allege that McCabe used these affiliates to grossly overbill the servicers, and ultimately the GSEs and FHA, for expenses including title search and service of process. Relator's Complaints include several different examples of significant overbilling by the McCabe firm, involving false claims submitted by many of the servicer defendants.

The McCabe firm seeks to convert the motion to dismiss into a motion for summary judgment, presenting highly redacted documents from fly-by-night vendors in support of its argument that it did not use its affiliate AOSS for service of process in some of the examples. McCabe's submission is notably silent about the allegations that it used its affiliate REO to inflate title work in the examples (TAC ¶¶ 306-307; SAC ¶¶ 189-190, 254-255), and says nothing about the two examples provided in the 13 Civ. 1467 Complaint, which Relator has confirmed involved AOSS (SAC ¶¶ 191-192; 255-256). Remarkably, it also points to the highly redacted invoices as evidence of what reasonable market rates for service of process were— including one performed for the Baum Firm, a notorious foreclosure firm shut down in 2011 for foreclosure abuses.[5]

---

[5] Relator is prepared to supplement his Complaint, if necessary, to provide additional examples of McCabe using its affiliates REO and AOSS to service GSE mortgages at indisputably unreasonable rates. Two illustrations include GSE foreclosures where McCabe's REO title affiliate billed between $445-$510 for New York title work (which should have cost $100-$250, *see* TAC ¶ 141(a)), and where its AOSS service affiliate billed $836 for personal service on two defendants, three attempts at service, and mailings (all of which should have cost less than $150, *see* TAC ¶ 141(b), plus the minimal costs of mailing). *See* Declaration of Kaleigh Erin Wood, dated May 7, 2018, ¶¶ 8-23 & Exs. 2-3, 5-6. As alleged in the Complaint, in both cases, McCabe chose not to contract directly with the process server—who charged the going rate of $30 for personal service, *see id.* ¶ 6—but to route service through its affiliate, AOSS, who then

iii.     Other Firms

The Complaints point to dozens of examples concerning other firms' overbilling, including but not limited to the Aronowitz Firm, *see, e.g.,* TAC ¶ 193 ($275 for title work that cost $100-125), Shapiro, Dicaro & Barak, LLC, *id.* ¶ 231 ($1,215 for service of process work, including $75 for personal service on each defendant, where market rates were between $20-40); Fein Such, *id.* ¶ 291 ($450 for title work; market rates were between $100-250 per person); and Medved Dale Decker & Deere, *id.* ¶ 382 (charging $275 for title work that on information and belief was completed by an unaffiliated title company for $100-$125).

As the Servicer Defendants point out, in 2014, after Relator's Complaints were filed, the Colorado Attorney General filed civil enforcement actions against eight different Colorado law firms (including the Aronowitz and Medved firms identified above) specifically charging them with "misrepresenting and inflating the costs they incur for foreclosure-related services to fraudulently obtain tens of millions of dollars in unlawful proceeds." Declaration of Andrew Schilling ("Schilling Decl.") Ex. N ¶ 1, 12 Civ. 7199, Dkt. 126-14.[6] Colorado specifically alleged after "an extensive two-year civil law enforcement investigation" that foreclosure firms

---

aggressively marked up the bill many times over before seeking reimbursement. Relator also could describe conversations with individual process servers who signed certificates of service on behalf of AOSS for McCabe foreclosures, including GSE foreclosure examples. These process servers confirmed that they signed as if they worked for AOSS, but that they were actually independent process servers who charged market rates to AOSS, and that AOSS marked up their prices substantially before passing them on to McCabe.

[6] The Servicer Defendants' brief incorrectly states that Relator did not raise any allegations about Colorado-based law firms until after the Colorado Attorney General's complaint, which was filed on July 14, 2014.  Servicers' Br. 46; *see* Schilling Dec. Ex. N.  In fact, Relator had previously raised allegations about the Colorado-based Aronowitz firm in his disclosure statements filed with the U.S. Attorney's Office, as well as his Second Amended Complaint in 12 Civ. 7199, dkt. 28, and his First Amended Complaint in 13 Civ. 1467, dkt. 23.

in Colorado handling the majority of foreclosures from 2006 onward "unlawfully exploit[ed] the foreclosure process by misrepresenting and inflating the costs they incur." *Id.* ¶¶ 1-4. As to the Aronowitz firm, the Attorney General alleged that the firm and its principals "do this primarily through affiliated vendors, which create invoices for foreclosure services at costs grossly inflated above the actual costs and above what unaffiliated vendors charge for the same services." *Id.* ¶ 2. The Attorney General secured consent judgments against several of the firms as well as about $12 million in settlements.[7]

Relator's Complaints note that firms nationwide use affiliates for title search and service of process work, including the law firm of Steven J. Baum (practiced in New York), Aronowitz & Mecklenberg (in Colorado), Routh, Crabtree & Olsen (on the west coast), Schneiderman & Sherman (in Michigan), and Brock & Scott (in Florida, Georgia, Tennessee, North and South Carolina, Virginia, and Maryland). TAC ¶ 163. Indeed, approximately three quarters of the law firms handling Fannie Mae foreclosures appear to be utilizing affiliate vendors. *Id.* ¶¶ 163-64.

b.      Servicer Defendants

The GSEs and FHA relied on the Servicer Defendants as their watchdogs to monitor and control the foreclosure expenses submitted by law firms. Instead, the Servicer Defendants did nothing, simply filing false claims to the agencies that included the law firms' overcharges, in violation of their obligations. There was a plain motivation for the servicers' lack of oversight: they wished to avoid the substantial time and expense that proper oversight of foreclosure expenses would have required. The servicers preferred to turn a blind eye and pass the false charges along to the GSEs and FHA, all the while continuing to generate massive fees for themselves by servicing federally guaranteed and insured loans. *See, e.g.*, Wells Fargo & Co.,

---

[7]      https://www.reuters.com/article/us-usa-coloradoo-foreclosure/colorado-attorney-general-settles-with-three-more-foreclosure-firms-idUSKBN0IQ2CR20141106.

Annual Report (Form 10-K) (Feb. 28, 2012), Ex. 13 (Annual Report to Stockholders) at 37 (showing $3-$5 billion in servicing revenue each year between 2009, 2010, and 2011). The Servicer Defendants' wholesale failure to monitor, audit, and control foreclosure expenses created the opportunity for law firms and their affiliates, as well as other vendors, to overcharge for those fees. TAC ¶ 117. If the Servicer Defendants had lived up to their obligations to monitor and refuse to pay unreasonable and unnecessary fees, then law firms, including the Foreclosure Defendants, would not have been able to submit false claims to the GSEs and FHA for unnecessary and unreasonable foreclosure expenses. *Id.* ¶ 118.

The Servicer Defendants should have discovered the law firms' misconduct with regard to foreclosure expenses. The Complaints note several red flags, including Relator's own complaints to several of the Servicer Defendants and the Government's 2013 subpoenas relating precisely to this conduct. TAC ¶¶ 154-58. Moreover, the Servicer Defendants now claim that the possibility that law firms might retain affiliates and overcharge was "*exhaustively* reported in the national press for nearly two decades." Servicers' Br. at 41 (emphasis in original).

Moreover, HSBC and its affiliates, formerly co-defendants with the Servicer Defendants in this case, reached a widely-publicized settlement with the Government prior to the unsealing of these actions. In that settlement, HSBC **admitted** that it "failed to create or maintain an adequate FHA quality control program to review the fees and charges submitted by outside counsel," that it "failed to sufficiently oversee the fees and charges, despite certifying to FHA that it had done so," and that it "failed to create or maintain Fannie Mae audit and control systems sufficient to ensure that the fees and expenses submitted by outside counsel and other third providers to HSBC, which HSBC then submitted to Fannie Mae for reimbursement, were reasonable, customary, or necessary." Buland Decl., Ex. A ¶ 2(h), (i), (l). In sum, HSBC

admitted the fundamental accuracy of Relator's allegations.[8]

In the July 2014 Aronowitz complaint, the Colorado Attorney General expressly alleged after its investigation that "there is generally no . . . monitoring" by servicers of foreclosure costs. 12 Civ. 7199, Dkt. 126-14 ¶ 46. The complaint makes clear what causes this lack of oversight: "Servicers that hire the law firm for the investor do not absorb the law firm's costs themselves. Rather, servicers obtain reimbursement from homeowners, investors, and insurers. . . . Here, the servicer has little incentive to scrutinize costs because it ultimately passes those costs to someone else." *Id.* ¶ 47. Consequently, "servicers rely on the law firm's representations as to what its vendors charge for foreclosure services without verifying whether these charges are actual, necessary, reasonable, or consistent with market rates." *Id.* ¶ 48.

### B.    The Government Provided Funds Paid to the Servicers

Following a nationwide crash in the housing market, by September 2008, Fannie Mae and Freddie Mac were at the brink of insolvency. *See* TAC ¶ 45. In response, Congress created the Federal Housing Finance Agency ("FHFA") to provide oversight of Fannie Mae and Freddie Mac. *Id.* ¶ 46. On September 6, 2008, FHFA exercised its statutory authority to place both Fannie Mae and Freddie Mac into conservatorship. Both GSEs remain under FHFA conservatorship today. *Id.* ¶ 47.

As part of this arrangement, the Government provided Fannie Mae and Freddie Mac with over $100 billion between 2009 and 2012 in order to cover the amount by which the GSEs'

---

[8] Since Relator filed his Complaints, the United States has frequently entered into other settlements with many of the Servicer Defendants to resolve other misconduct.  Each time, including settlements with Suntrust, Bank of America, MetLife, US Bank, and Wells Fargo, the United States has specifically carved out of its release liability arising out of the misconduct asserted in Relator's Complaint and specifically cited Relator's Complaint.  *See* Buland Decl. & Exs. C at Ex. J ¶ 3(k); D at ¶ 15(m); E at ¶ 3(d), F at ¶3(d), and G at ¶ 10(e).

liabilities exceeded their assets. *Id.* ¶¶ 49, 75. In this period, each dollar of fraud against the GSEs resulted in their absorption of an additional dollar of taxpayer money. *Id.* ¶¶ 76-77. In exchange, Fannie and Freddie agreed to make quarterly dividend payments to the Treasury under Senior Preferred Stock Purchase Agreements ("SPA"). *Id.* ¶¶ 50-52, 76. In 2012, Third Amendments to the SPAs replaced the current dividend scheme with an obligation for each GSE to make quarterly payments to the United States Treasury equal to their net worth less a small capital reserve. *Id.* ¶¶ 50, 76.

The Government's funds remain invested in the GSEs, and the GSEs' obligations to repay the Government have not been satisfied. *Id.* ¶¶ 53, 80. Because the SPAs obligate the GSEs to make quarterly dividend payments directly related to their net worth, and because any money used to pay servicing expenses necessarily diminishes their net worth, the reimbursements at issue in this case decreased the amount of dividend payments owed and paid to the United States on a dollar-for-dollar basis. *Id.* ¶ 513.

## III.   LEGAL STANDARD

A Rule 12(b)(6) motion to dismiss must be denied where the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible if it supported by "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In analyzing a complaint, the court must "accept[] all factual allegations as true and draw[] all reasonable inferences in favor of the plaintiff." *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016).

Rule 9(b) requires that the plaintiff "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). But "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* "'[T]he adequacy of particularized

allegations under Rule 9(b) is case- and context-specific.'" *U.S. ex rel. Chorches v. Am. Med. Response*, 865 F.3d 71, 81 (2d Cir. 2017) (quoting *Espinoza ex rel. JP Morgan Chase & Co. v. Dimon*, 797 F.3d 229, 236 (2d Cir. 2015)) (alterations omitted); *United States v. Huron Consulting Grp.*, No. 09 Civ. 1800 (JSR), 2011 WL 253259, at *2 (Jan. 24, 2011) (holding Rule 9(b) requirements "should be relaxed" as applied to a relator's claims). "Ultimately, whether a complaint satisfies Rule 9(b) 'depends upon the nature of the case, the complexity or simplicity of the transaction or occurrence, the relationship of the parties and the determination of how much circumstantial detail is necessary to give notice to the adverse party and enable him to prepare a responsive pleading.'" *United States v. TEVA Pharms. USA, Inc*, 13 Civ. 3702 (CM), 2016 WL 750720, at *15 (S.D.N.Y. Feb. 22, 2016).

## IV.   ARGUMENT

### A.   Each Defendant Submitted or Caused the Submission of False Claims

Courts interpreting the False Claims Act consistently hold that parties who seek government funds in excess of what is allowed have submitted false claims. The claims submitted by the Servicer Defendants to the GSEs and FHA are legally false because they do not comply with the rules about how much the Servicer Defendants are entitled to be paid for the services billed.  Many of the claims are also actually false because they were submitted for more than the services actually cost.

#### 1.   The Overcharges Were False Under the Doctrine of Implied Certification

The Complaints adequately plead that the submission of unreasonable, unnecessary, and fraudulent costs are false under the doctrine of implied certification. Implied false certification occurs "where the submission of the claim itself is fraudulent because it impliedly constitutes a certification of compliance." *United States v. Visiting Nurse Serv. of N.Y.*, 14-cv-5739 (AJN), 2017 WL 5515860, at *6 (S.D.N.Y. Sept. 26, 2017) (internal quotation marks omitted).

Here, the agreements and program requirements in place for the GSEs and HUD made clear that law firms could not bill servicers (and servicers could not seek reimbursement) for excessive costs:

- **Fannie Mae:** Fannie's Guide required servicers to monitor costs, permitted reimbursement only for costs that are actual, reasonable, and necessary; prohibited reimbursement of fees that do not meet that standard; and limited fees for law firm affiliates to those that are "customary and reasonable fees for comparable services in the[] jurisdiction." TAC ¶¶ 63-68.  Fannie's Guide also required that the "servicer must attempt to minimize the costs incurred from vendors utilized by law firms— such as auctioneers, process servers, title companies, posting agencies, and newspapers or other publications—by ensuring that all costs are actual, reasonable, and necessary." *Id.* ¶ 62.  Finally, it mandated "[t]he servicer and law firm must regularly examine the pricing offered by alternative vendors and negotiate for the best value from the vendor and other qualified service providers." *Id.*

- **Freddie Mac:** Freddie's Guide permits reimbursement of only costs that are "actual, reasonable, and necessary." TAC ¶ 94.  Like Fannie's, Freddie's Guide also requires servicers to have in place a quality control program that monitors parties to whom foreclosure activities are outsourced and monitor vendors' costs.  *Id.* ¶¶ 91-92.

- **FHA:** For FHA, HUD rules require that servicers have in place a quality control program to ensure that claims are "fully supported."  *Id.*  ¶¶ 104-105.  HUD rules provide that only fees that are "reasonable and customary in the area" are reimbursable and that HUD will not reimburse the servicer for fees and costs that "exceed reasonable and customary fees."  *Id.*  ¶¶ 109-110.

Thus, by submitting claims for cost reimbursement, the Servicer Defendants impliedly certified that the dollar amounts requested were in compliance with these requirements. They were not.

Courts consistently view the submission of overcharges in violation of contractual or program requirements as false claims under the implied certification theory. For example, in *United States v. DynCorp International, LLC*, 253 F. Supp. 3d 89, 100 (D.D.C. 2017), the Court addressed an FCA case in which the Government alleged a contractor had passed on unreasonable rates from vendors, violating a regulation requiring them to only bill the Government reasonable rates. *Id.* at 99-100. The court had no difficulty finding that passing along an unreasonable bill in violation of a program requirement is a false claim under the theory

of implied certification. *Id.* at 100; *see also U.S. ex rel. Heath v. Wisconsin Bell, Inc.*, 272 F. Supp. 3d 1094, 1097 (E.D. Wis. 2017) (relator stated an FCA claim against telecommunications providers who billed higher rates than permitted).

Defendants' falsity argument also flies in the face of this Court's decision in *United States ex rel. Feldman v. City of New York*, 808 F. Supp. 2d 641, 652 (S.D.N.Y. 2011) (Rakoff, J.). In *Feldman*, this court held that an implied certification claim was properly alleged where the defendant, the City of New York, had failed to follow Medicaid regulations in overseeing the administration of certain kinds of Medicaid benefits, but nevertheless passed on claims for reimbursement for those charges to the Federal Government. Just as in *Feldman*, Relator alleges that the defendants failed to follow GSE and FHA rules governing foreclosure expenses, but nevertheless submitted hundreds of millions of dollars' worth of unallowable charges for reimbursement. *Id.* at 651-54 (noting the "allegations in the Government's Amendment Complaint describe the very type of wrongdoing that the FCA was intended to prevent"); *Rainwater v. United States,* 356 U.S. 590, 592 (1958) ("It seems quite clear that the objective of Congress [in enacting the FCA] was broadly to protect the funds and property of the Government" from false and fraudulent claims for payment.).

As for the cases cited by the Servicer Defendants, they are not applicable here. For example, the Servicers cite a portion of *U.S. ex rel. Barko v. Halliburton Co.*, 241 F. Supp. 3d 37 (D.D.C. 2017), holding that the express certification relied upon by the relator did not reach the challenged conduct. *Id.* at 58. In *United States v. Prabhu*, 442 F. Supp. 2d 1008 (D. Nev. 2006), the court held that a jury, based on the summary judgment record, could not find that a defendant's judgment about what was "reasonable" was so unreasonable as to support liability. *Id.* at 1026-27. Defendants also cite *U.S. ex rel. Watkins v. KBR, Inc.*, 106 F. Supp. 3d 946 (C.D.

Ill. 2015), but that case rejected *any* implied certification theory—a holding since abrogated by the Supreme Court. *Id.* at 966 ("Nor can the Relator deny that under binding Seventh Circuit precedent applying 31 U.S.C. § 3729(a)(1)(A), his particular theory of liability *does* require the pleading of a certification." (emphasis in original)). In fact, the court in *Watkins* went out of its way to reject the argument the Servicer Defendants make here about the unenforceability of a "reasonableness" standard. *Id.* at 967 ("The fact that the regulation contemplates that the reasonableness of costs can be determined is sufficient enough indication that such costs can indeed be objectively assessed.").[9] Moreover, a few months later, another judge in the same district held that unreasonable costs submitted for payment did in fact trigger FCA liability. *See U.S. ex rel. Howard v. KBR, Inc.*, 139 F. Supp. 3d 917, 942-47 (C.D. Ill. 2015).

Defendants next argue that the Supreme Court's decision in *Escobar* limits the implied certification theory to instances in which "two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 2001 (2016). But the Court expressly limited its holding to confirming that implied certification existed in "at least" the

---

[9] The McCabe Defendants' arguments about the Federal Acquisition Regulation ("FAR") are unpersuasive. The definition of "reasonable" under FAR has no bearing on this analysis. Courts have had no trouble allowing unreasonable costs to proceed as false claims where the government agencies were governed by FAR. *See, e.g.*, *United States v. DynCorp Int'l, LLC*, 253 F. Supp. 3d 89, 100 (D.D.C. 2017). Moreover, FAR does not even apply to Fannie Mae or Freddie Mac. FAR applies only to "executive agencies," and Fannie Mae and Freddie Mac do not qualify as such. *See* 48 C.F.R. § 1.101 ("The Federal Acquisition Regulations System is established for the codification and publication of uniform policies and procedures for acquisition by all executive agencies."); *id.* § 2.101 (defining "executive agency").

situation described above; it in no way limited the possibility that it applied elsewhere with equal force. *Id.* The Court left open the possibility that broader versions of implied certification are also viable, including that "all claims for payment implicitly represent that the billing party is legally entitled to the payment." *Id.* at 2000.

In the Second Circuit, there is no requirement that claims contain "specific representations" about the goods or services provided. Pre-*Escobar* precedent from the Second Circuit that permitted liability without such a specific representation "remains good law—and binding on this Court—to the extent that it held that it held that falsity may arise from the defendant's submission of a claim for payment that does not include a specific representation about the goods or services provided, coupled with noncompliance with a material payment requirement." *U.S. ex rel. Wood v. Allergan, Inc.*, 246 F. Supp. 3d 772, 811 (S.D.N.Y. 2017); *see also DynCorp*, 253 F. Supp. 3d at 99-100 (explaining and holding that *Escobar* did not foreclose other implied certification theories).

*Allergan* relied on *Mikes v. Straus*, 274 F.3d 687 (2d Cir. 2001), which held that the implied certification theory was valid in the Second Circuit but only where the requirement impliedly certified was a "condition of payment." It imposed no requirement that the claim contain a specific misrepresentation about the goods or services provided. *Id.* at 700. *Escobar* only abrogated *Mikes* insofar as it holds that the violation of a condition of payment is <u>required</u> to succeed on a theory of implied certification. *See Bishop v. Wells Fargo & Co.*, 870 F.3d 104, 106-07 (2d Cir. 2017). Nothing suggests that the *Mikes* holding that non-compliance with a condition of payment that is material no longer meets the requirements of implied certification in the Second Circuit. The Rosicki Defendants cite several cases in which lower courts have misinterpreted *Escobar* to limit implied certification to cases with affirmative representations

about the good or service involved. These cases do not bind this Court and, for the reasons set forth above, are wrong.

The Rosicki Defendants argue that implied certification beyond that expressly sanctioned by *Escobar* raises "serious concerns about fairness and notice." Rosicki Br. at 23. The argument lacks merit. As *Escobar* recognized, enforcing the FCA's scienter and materiality requirements guards against such a risk; the Court also specifically cautioned against trying to limit what it means to be a false claim based on concerns of fairness and notice. *Escobar*, 136 S. Ct. at 2002 ("Instead of adopting a circumscribed view of what it means for a claim to be false or fraudulent, concerns about fair notice and open-ended liability can be effectively addressed through strict enforcement of the Act's materiality and scienter requirements." (internal quotation marks and alterations omitted)).

In any event, there are no fairness concerns here given that there is a specific, misleading representation in each submitted claim at issue in this case. Where, as here, the Defendants' reimbursement was limited to costs that were reasonable and necessary, listing figures on their claims that were not reasonable and necessary without disclosing that fact made the claims misleading.  For example, each servicer obtains reimbursements from HUD using Form 27011, which in turn requires each mortgagee to itemize foreclosure costs in Box 307 to obtain reimbursement. TAC ¶ 108. The HUD Handbook explains that "unallowable costs"—which expressly includes "fees and costs that exceed reasonable and customary fees in the area" and "costs that are not necessarily incurred"—cannot be included in that very box. *See* HUD Handbook 4330.4, 1-21 ("Costs paid by the attorney and reimbursed by the mortgagee are shown in Item 307. If the attorney bills the mortgagee for unallowable costs, they should not be listed in either item."); TAC ¶¶ 110-111. Claiming amounts in Box 307 that are expressly disallowed—

without disclosing that unallowable costs were included—is the precise type of "half-truth" condemned by *Escobar*. "[T]he False Claims Act encompasses claims that make fraudulent misrepresentations, which include certain misleading omissions." *Escobar*, 136 S. Ct. at 1999.

The same is true for Freddie Mac. As the Servicer Defendants point out, Freddie requires servicers to fill out Form 104SF to claim reimbursement. *See* Servicers' Br. at 6. Form 104SF, in turn, requires expense codes that correspond to the expense category, such as process server fees, advertising fees, and title work. Just as the Court found in *Escobar*, using payment codes to describe the services being billed necessarily creates the misleading impression that the payments demanded met the corresponding rules for seeking reimbursement of those payments. *Escobar*, 136 S.Ct. at 2000.

Fannie Mae required servicers to fill out Form 571, Servicers' Br. at 6, which requires foreclosure costs and expenses to be itemized by type.[10] Fannie Mae's procedures for reimbursement make clear that it will not reimburse costs that are not "actual, reasonable, and necessary" and require that "[b]oth the servicer and the law firm must make every effort to reduce default-related legal expenses." Fannie Guide F-1-06 (citing E-5-07); TAC ¶¶ 62, 64-65.

Submitting a claim for a sum certain may not necessarily imply anything about the quality of the good or services provided in exchange for that sum. But in this case, the falsity lies in the price term itself. When the Servicer Defendants submit a claim for a certain amount, they imply that the amount meets the pricing requirements set forth in the rules permitting payment. In the absence of any disclosure that the amount claimed does not comply with the applicable pricing requirements, the claim is misleadingly false.

---

[10] https://www.fanniemae.com/content/guide_form/571.pdf (cited in Servicers' Br. at 6, n.6).

Finally, Defendants cite the GSEs' published maximum limits on title fees as proof that anything less could not be "unreasonable" and that they cannot be faulted so long as the fees remained under the caps. But each GSE was explicit that these figures were the <u>maximum</u> that could be claimed, and that "foreclosure-related title costs must be kept at a minimum and that lower cost services should be used if available." *See* Fannie Mae Servicing Guide E-5-07; Gov't Compl. ¶ 38; Freddie Mac Single-Family Seller/Servicer Guide, 66.15.2 (October 1, 2011) (describing title costs in Exhibit 57A as "limits"); Freddie Mac Single-Family Seller/Servicer Guide, 9701.11 (Mar. 9, 2016) ("**All** foreclosure and related legal fees and costs must be reasonable and comparable to those customarily charged in the area where the property is located." (emphasis added)). As the Government confirmed in its complaint-in-intervention, although "Fannie Mae and the Foreclosure Firms list state-specific maximums for certain expenses, those agreements "make clear that Fannie Mae generally expects the actual costs to be lower." Gov't Complaint ¶ 39. Defendants' behavior here is no different from a lawyer eating an eight-dollar meal at McDonald's while on a business trip and seeking reimbursement for a $50 dinner—on the theory that because his firm had a $50 cap on meal expenses, he had done nothing wrong. But the $50 expense report is a false claim—it is a lie. And the use of an affiliated shell company to hide that lie would not transform his false claim for dinner into an arm's length transaction; it would only betray his guilty conscience.

2.    Fraudulent Overcharges are Factually False

Many of the claims at issue in this case are also factually false because the claims sought more money than the services being billed for actually cost. As the Ninth Circuit observed, a case "where a private company overcharges under a government contract" is an "archetypal *qui tam* False Claims action." *U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1170 (9th Cir. 2006); *U.S. ex rel. Roy v. Anthony*, 914 F. Supp. 1504, 1506 (S.D. Ohio 1994) ("The typical

23

False Claim case occurs, for example, when a government contractor . . . charges $500 for a hammer . . . ."). "[T]he FCA's specific aim was to clamp down on widespread fraud by government contractors who were submitting inflated invoices." *United States v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995); *accord United States v. McNinch*, 356 U.S. 595, 599 (1958).

The Complaints allege that many of the overcharges were literally untrue because the actual cost of the claimed expense was a lower amount (such as a $20-$40 service of process charge falsified as a $125 charge through markups). *See, e.g.*, TAC ¶¶ 173; Gov't Compl. ¶¶ 87-92; *see also* TAC ¶¶ 122-147. These "archetypal" false claims have been recognized consistently as factually false because the cost demanded is more than the actual cost of the service. For instance, *United States ex rel. Howard v. KBR, Inc.*, 139 F. Supp. 3d 917, 942-947 (C.D. Ill. 2015), held that the allegation that the defendant had knowingly "present[ed] invoices for payment to the Government that consisted of unallowable and unreasonable costs" stated a claim for "factual falsity." *See also U.S. ex rel. Hussain v. CDM Smith Inc.*, 14-cv-9107 (JPO), 2017 WL 4326523, at *15 (S.D.N.Y. Sept. 27, 2017) (factually false claim where defendant "pad[s] its billings"); *United States v. Rachel*, 289 F. Supp. 2d 688, 697 (D. Md. 2003) ("The Court concludes, with little difficulty, that the [defendant's] markup of the invoice was fraudulent.").

The Servicer Defendants spend much of their brief trying to imply that Relator's case primarily relates to unreasonable rates charged by vendors in arms' length transactions. This mischaracterizes Relator's Complaints. A key scheme alleged in the Complaints is one in which a law firm found market rate vendors and simply marked up the invoices, either directly or by using a sham affiliate, in order to make more money. To the extent the Servicer Defendants submitted claims to the GSEs and FHA that were far in excess of the true cost of service or process or title searches, they submitted claims that are literally false.

24

The Servicer Defendants similarly argue that because they only passed on claims in the amounts in which they received them, they cannot be liable for submitting a factually false claim. But if the claim was factually false when created by the law firm it remained false when passed on by a Servicer Defendant. What the Servicer Defendants are really arguing is that they lacked scienter—an argument addressed below.

Another argument from the Servicers Defendants is that HUD wanted them to claim the full amount they were charged for reimbursement, regardless of whether it included fraudulently charged amounts. Servicers' Br. at 17 (citing HUD Technical Guide, Part 1.d.)  That argument is simply wrong. HUD Form 27011 requires each servicer to itemize foreclosure costs in Box 307 to obtain reimbursement. TAC ¶ 108. The HUD Handbook explains that "unallowable costs"— which expressly includes "fees and costs that exceed reasonable and customary fees in the area" and "costs that are not necessarily incurred"—cannot be included in that very box. *See* HUD Handbook 4330.4, 1-21 ("Costs paid by the attorney and reimbursed by the mortgagee are shown in Item 307. If the attorney bills the mortgagee for unallowable costs, they should not be listed in either item."); TAC ¶¶ 110-111. The notion that HUD somehow <u>wanted</u> to receive and reimburse unreasonably inflated expense forms is nothing short of bizarre.

Finally, the Servicer Defendants argue that there can be no factual falsity where the amount claimed did not exceed an objective upper bound. Svc. Br. at 18-19. This exact position has been rejected by at least one other Court. *See Howard*, 139 F. Supp. 3d at 941-947 (rejecting defendant's argument that the relators "have not alleged an objective falsehood"). Moreover, for a large portion of the claims, the objective limit is much lower: how much the service actually cost before the law firm or affiliate marked it up.

3.    The Servicers Submitted False Claims and Statements, the Foreclosure
Defendants Caused the Submission of False Claims and Statements

Section 3729(a)(1)(A) of Title 31 imposes liability if one "knowingly presents, or causes to be presented, a false or fraudulent claim." In this case, the Servicers violated (a)(1)(A) by submitting false claims to the GSEs and HUD. The Foreclosure Defendants, including the law firm affiliates, have violated (a)(1)(A) by causing the submission of those false claims by submitting inflated and false foreclosure expenses to the Servicers (or for the affiliates, submitting them to the law firms knowing they would be submitted to the Servicers and GSEs).

Section 3729(a)(1)(B) imposes liability on anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." Again, the Servicer Defendants directly used such false records and statements while the Foreclosure Defendants caused their use.

Under the pre-FERA version of the statute, AOSS and REO are correct that there is no liability for the Fannie and Freddie claims under (a)(1) (the predecessor to (a)(1)(A)) because it required such claims to be submitted to the Government. *See U.S. ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632, 642 (7th Cir. 2016).  (There is pre-FERA (a)(1) liability for FHA loans.)  But even under the pre-FERA statute there is liability under (a)(2) (the predecessor to (a)(1)(B)) for using false statements to get claims for both GSE and FHA loans. That is because FERA made its amendment to the false statements provision—removing the requirement that the false statements be made with the intent to obtain government payment—retroactive and applied to all cases pending or filed after June 7, 2008. *Id.* at 643; *see* 123 Stat 1617, 1625 (2009) (directing that the amendment "shall take effect as if enacted on June 7, 2008, and apply to all claims under the False Claims Act, (31 U.S.C. § 3729 et seq.) that are pending on or after that date").

B.      **The Overcharges Were Material**

Defendants' materiality argument should be rejected. This is an overcharge case, where the allegation is that the GSEs and FHA overpaid due to the Defendants' false and fraudulent conduct. This is not a case about staplers. *Escobar*, 136 S. Ct. at 2004 (suggesting that a regulation requiring use of American-made staplers would not be material). Instead, violations of rules regarding price present classic conduct that has, in the False Claims Act's words, "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4) (defining "material"). When a contractor is limited to seeking reimbursement for one amount, but instead demands more without disclosing that it is more than it is entitled to, the false claim is material to the payment decision.

Here, the GSEs and HUD were entitled to exactly the services they received—but at a lower price. There is simply no reason for them to pay more, and the only reason they did so was because of the false claims submitted by the Servicer Defendants. This situation meets the most demanding standard of materiality—the Defendants' conduct literally caused the Government to pay more than it was required to for the same services. Courts have repeatedly recognized this common-sense point that violations of pricing terms are material to government payment decisions. *See, e.g.*, *Garbe*, 824 F.3d at 639 (explaining that conduct need only be capable of leading to a recipient getting "more money than it should have gotten" to be material); *United States v. Supervalu, Inc.*, 218 F. Supp. 3d 767, 774 (C.D. Ill. 2016) (overcharging Medicaid and Medicare for prescription drugs beyond allowed amount material); *U.S. ex rel. Costa v. Baker & Taylor, Inc.*, No. C-95-1825-VRW, 1998 WL 230979, at *9 (N.D. Cal. Mar. 20, 1998) (statements causing overpayment are "indisputably material"). In *DynCorp*, the Court held that the materiality requirement was easily satisfied in analogous circumstances. There, a prime contractor passed on unreasonable bills from vendors or subcontractors to the government. In

language directly applicable here, the court held that "a claim for costs that are significantly higher than reasonable satisfies the materiality requirement." 253 F. Supp. 3d at 101.

### 1. Overcharges are Material Under *Escobar*

Overcharging the Government for costs that are specifically prohibited is material under any standard, including that articulated in *Escobar*. Under *Escobar*, the materiality inquiry "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." 136 S.Ct. at 2002 (internal quotation marks omitted). For guidance, *Escobar* looked at the standard to materiality under tort law, in which a matter is material either "(1) '[if] a reasonable man would attach importance to [it] in determining his choice of action in the transaction'; or (2) if the defendant knew or had reason to know that the recipient of the representation attaches importance to the specific matter 'in determining his choice of action,' even though a reasonable person would not." *Id.* at 2002-03 (quoting Restatement (Second) of Torts § 538, at 80). Obviously, a reasonable person would not agree for no reason to pay more than they already had bargained to pay. As alleged in the Complaints, there was no reason to pay more—only fraudulent bills that tricked the GSEs and HUD into doing so.

In determining whether the materiality standard is met, *Escobar* provides some relevant considerations. *Id.* at 2003. The first is whether the contractual or program requirement is a condition of payment. Each of the GSEs and FHA clearly indicated that the requirement that costs be reasonable and necessary was a condition of payment. Fannie Mae permits reimbursement of only those costs that are actual, reasonable, and necessary and requires the servicer to reimburse it for those that are not.[11] Likewise, Freddie requires that all foreclosure

---

[11] *See* Fannie Mae Servicing Guide, Part VIII, § 108.03 (Apr. 28, 2010) ("Specifically, Fannie Mae will reimburse the servicer for any of the following out-of-pocket costs that it pays to third-party vendors or the courts, as long as the costs are actual, reasonable, and necessary . . ..");

and related legal fees and costs be "reasonable and comparable to those customarily charged in the area."[12]

On the other hand, "if the Government regularly pays a particular type of claim in full despite ***actual knowledge*** that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirement was not material." *Id.* at 2003-04 (emphasis added). Defendants provide no evidence that any of the Government, HUD, Fannie, or Freddie continued to pay a specific claim that was **actually known** to be fraudulent. *Accord U.S. ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 112 (1st Cir. 2016) ("[M]ere awareness of allegations concerning noncompliance with regulations is different from knowledge of actual noncompliance."). The Rosicki Defendants cite a number of cases where the Government made a conscious decision to pay claims after a regulatory or legislative body had fully aired the allegations made by a relator and made known specifically that the allegation did not affect its willingness to pay a claim.[13]

---

Fannie Mae Servicing Guide, Part VIII, § 106.03 (Mar. 14, 2012) (requiring "the servicer to reimburse Fannie Mae for any unreasonable or excessive fees or costs."); TAC ¶¶ 64, 71.

[12] *See, e.g.*, Freddie Mac Single-Family Seller Servicer Guide, 9701.11 (Mar. 9, 2016) ("All foreclosure and related legal fees and costs must be reasonable and comparable to those customarily charged in the area where the property is located."); TAC ¶ 94. The FHA has similar rules. *See* HUD Handbook 4330.4, 2-15(A) (permitting reimbursement of "[f]ees and costs that are necessarily incurred and are reasonable and customary in the area"); *id.* 4330.4, 2-14(B) (disallowing "Fees and costs that exceed reasonable and customary fees for the area" and "costs that are not necessarily incurred"); TAC ¶¶ 109-110.

[13] *See U.S. ex rel. Harman v. Trinity Indus., Inc.*, 872 F.3d 645, 650-51 (5th Cir. 2017) (alleged fraud relating to quality of highway guard not material when the governmental purchaser expressly stated that it had reviewed the allegations with respect to the device at issue but would continue to purchase it anyway); *Abbott v. BP Expl. & Prod., Inc.*, 851 F.3d 384, 387 (5th Cir. 2017) (finding claims not material after both Congress and Department of Interior investigated allegations and DOI issued report finding project was actually in compliance with regulations despite allegations); *United States v. Sanford-Brown, Ltd.*, 840 F.3d 445, 447 (7th Cir. 2016)

This case is different. Here, the allegation is that tens of thousands of claims are affected by fraud—and the Government has never expressed any willingness to pay inflated expenses. Continued operation of those housing programs does not equal acquiescence to the overcharges. If that were so, government programs would have to grind to a halt any time allegations of fraud arose in order to avoid forfeiting potential FCA claims. That is not the law. Rather, the Government's failure to take action is "not terribly relevant to materiality" unless the Government explains that it is still paying in spite of the false statements. *Rose v. Stephens Ins.*, Case No. 09-cv-05966-PJH, 2016 WL 5076214, at *6 (N.D. Cal. Sept. 20, 2016); *accord U.S. ex rel. Campie v. Gilead Sciences, Inc.*, 862 F.3d 890, 906 (9th Cir. 2017) ("[T]o read too much into the FDA's continued approval—and its effect on the government's payment decision—would be a mistake."); *U.S. ex rel. Poehling v. UnitedHealth Grp., Inc.*, No. CV 16-08697-MWF, 2018 WL 1363487, at *12 (C.D. Cal. Feb. 12, 2018) ("The Government may have had general suspicions about whether Defendants were complying with requirements . . . but because of the allegedly fraudulent representations Defendants made, could not identify which diagnoses were valid and which were not."); *United States v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008) ("The United States is entitled to guard the public fisc against schemes designed to take advantage of overworked, harried, or inattentive disbursing officers; the False Claims Act does this by insisting that persons who send bills to the Treasury tell the truth.").

A failure to pursue false claims, particularly in this context, can result from many factors, including resource constraints or other logistical concerns. *Rose*, 2016 WL 5076214, at *6. That makes particular sense in this case, where DOJ, FHFA, the GSEs, and HUD have had competing

---

(finding claim not material where specific allegations about Title VII compliance investigated by regulatory body and rejected).

demands on their attention over the past decade, including pursuing fraudulent origination practices and "robo-signing" servicers, which threatened the entire economy and wrongfully evicted homeowners from their homes. It is not too late to turn to this scheme now.

Finally, instead of doing nothing after allegations of the fraudulent practice came to light, the GSEs, FHA, and the Government have taken concrete steps to make clear overcharges are material and will not be paid (if known). The Government's pending case against the Rosicki Defendants makes clear that charging Fannie Mae for unreasonable or fraudulent costs is material and will not be tolerated. *See* Gov't Compl. ¶¶ 35-38. Fannie Mae itself dropped the Rosicki firm when the Government filed its Complaint.  Rosicki Br. at 33. And both HUD and Fannie Mae investigated, and supported the U.S. Attorney's Office's settlement with, the Servicing Defendants' co-defendant, HSBC, for submission of false claims for inflated legal costs from foreclosures.  TAC ¶ 159.  FHFA, at that time, reiterated that servicers have a "responsibility" "to have controls in place which ensured the fees and charges submitted to Fannie Mae were appropriate and reasonable." Such actions underscore the materiality of the overcharges to the Government's payment decisions. *See U.S. ex rel. Worthy v. E. Maine Healthcare Sys.*, 2:14-cv-00184-JAW, 2017 WL 211609, at *27 (D. Me. Jan. 18, 2017) (previous government action against similar fraud supports finding of materiality). Finally, Defendants' government-knowledge arguments raise a score of factual questions that are inappropriate for resolution at the pleadings stage.

### 2.   Defendants' Other Arguments Lack Merit

Defendants also argue that the GSEs and HUD "could have" discovered the fraud had they taken certain investigatory steps. There is no support for Defendants' argument. *Escobar* focused on the question of "actual," not "hypothetical," knowledge, and Defendants do not point to other cases placing the focus on whether the Government "could have" discovered the fraud if

it had taken a different course. *Cf. United States v. Public Warehousing Co.*, 1:05-cv-2968-TWT, 2017 WL 1021745, at *6 (N.D. Ga. Mar. 16, 2017) (that one federal agency might have discovered the fraud had it communicated with another did not defeat finding of materiality).

The Servicer Defendants also argue that the fact that the law firms had to sign direct agreements with Fannie and Freddie, and at one point appeared on a list of law firms kept by them, absolves them of responsibility. Svc. Br. at 25. That is a non-sequitur. The Servicer Defendants have cited to no provision in any of the controlling documents that gave them a pass if they used such law firms. The opposite is true. Each provision, including the requirements that the Servicers inquire about affiliates and monitor expenses, applied with full force.

## C.   Defendants Acted "Knowingly"

The FCA imposes liability for false claims if a defendant's conduct is intentional, reckless, or if the defendant acts with "deliberate ignorance of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(ii)-(iii). "'The Act does not require proof of 'a specific intent to defraud' and 'scienter may be alleged generally.'" *U.S. ex rel. Wood v. Allergan, Inc.*, 246 F. Supp. 3d 772, 828 (S.D.N.Y. 2017) (quoting § 3729(b)(1)(B) and Fed. R. Civ. P. 9(b)). This standard—while not a "license to base claims of fraud on speculation"—does "permit[] scienter to be demonstrated by inference" as long as "an ample factual basis" support the charges. *O'Brien*, 936 F.2d at 676. An inference of scienter is appropriate here.

The Complaints allege that law firms nationwide (including both law firms named in this case) intentionally inflated costs, either directly or using sham affiliates, in order to enrich themselves; that the Servicers were on notice of such schemes by law firms and had an obligation to monitor them and their expenses; and that the Servicers acted at least recklessly by doing nothing to monitor the costs, instead simply passing them on to the GSEs and HUD.

32

1.    The Servicer Defendants Acted Recklessly

Recklessness under the FCA "encompass[es] the person who seeks payment from the Government without regard to his eligibility and with indifference to its requirements." S. Rep. No. 96-615, at 5 (1980); *see also* S. Rep. No. 99-345, at 7 (1986) ("[T]hose doing business with the Government have an obligation to make a limited inquiry to ensure the claims they submit are accurate."). FCA recklessness is similar to "gross negligence" or "an extreme version of ordinary negligence." *United States v. Krizek*, 111 F.3d 934, 942 (D.C. Cir. 1997). It is sufficient to show either that a defendant "had reason to know of facts that would lead a reasonable person to realize that [it] was causing the submission of a false claim" or "failed to make a reasonable and prudent inquiry into that possibility." *United States v. King-Vassel*, 728 F.3d 707, 714 (7th Cir. 2013); *see also U.S. ex rel. Ervin & Assocs., Inc. v. Hamilton Secs. Grp., Inc.*, 370 F. Supp. 2d 18, 42 (D.D.C. 2005) ("The standard of reckless disregard, however, was designed to address the refusal to learn of information which an individual, in the exercise of prudent judgment, should have discovered."). Relator has alleged sufficiently that defendants acted recklessly.

The Complaints plead facts giving a rise to a strong inference of recklessness by pleading (a) a duty on the part of the Servicer Defendants to monitor law firm expenses, paying particularly close attention to those using affiliates; (b) a number of further red flags warning the Servicer Defendants of the need to scrutinize law firm bills, including a government investigation into their conduct and settlement with another Servicer acknowledging its duty to monitor such fees and expenses and responsibility for failing to do so; and (c) a nationwide pattern of fraudulent transactions, exemplified by 66 examples detailed in the Complaints, that Servicer Defendants rubber-stamped and passed along to the GSEs and HUD. Moreover, given the way in which the Servicers were paid for their work and their ability to pass on foreclosure

33

expenses, they had an economic incentive to do as little as possible with respect to monitoring foreclosure expenses.

a.      The Servicer Defendants Had a Duty to Monitor Expenses

Fannie Mae imposes an obligation on its servicers to "make every effort to reduce default-related foreclosure expenses" including to "attempt to minimize the costs incurred from vendors utilized by law firms—such as auctioneers, process servers, title companies, posting companies, and newspapers and other publications—by ensuring that all costs are actual, reasonable and necessary. *See, e.g.* TAC ¶ 62. At least as of 2008, Fannie Mae specifically warned and instructed the Servicers that they needed to inquire about and pay special attention to any law firms contracting with affiliates and "<u>monitor[] the fees and expenses charged by any Affiliated Business Entity</u>." Fannie Mae Servicing Guide § 104.03 (Oct. 1, 2008) (emphasis added); *accord* Fannie Mae Servicing Guide Part VIII, § 106.03 (Mar. 14, 2012); *accord* Freddie Mac Guide Vol. II, 69.3(y) (June 1, 2013) (requiring Servicers to monitor law firms for "conflicts of interest or potential conflicts of interest" and "require the firm to disclose whether the firm has a process to select and regularly review costs and performance of vendors of related sources to ensure competitive pricing and high quality."); TAC ¶¶ 63, 93.

Likewise, each of the GSEs and FHA required Servicers to implement quality control programs specifically designed to monitor, among other things, vendors. *See* Fannie Guide Part VIII, § 106.03 (Mar. 14, 2012) (requiring servicers to monitor law firms with affiliates to ensure reasonableness of costs); Freddie Mac Guide Vol. II, 69.3(y) (June 1, 2013) (requiring servicers to implement procedures for oversight of law firms handling foreclosures to ensure compliance with the Freddie Guide); HUD Handbook 4060.1, 7-2 (requiring quality control plan to monitor, among other things, "fees and charges" and  "foreclosure costs"). TAC ¶¶ 63-64, 93, 100-106.

b.      Red Flags Put the Servicer Defendants on Notice of Potential
        Fraud

Notwithstanding this duty, the Servicer Defendants continue to rubber-stamp inflated

foreclosure costs from law firms to this day. The Servicer Defendants are doing so despite red

flags that they needed to investigate excessive, unreasonable, and fraudulent expenses them.

In addition to the explicit rules described above, in 2013, the Government began

notifying many of the Servicers that it had opened an investigation into foreclosure expenses

being passed on by them to the GSEs and FHA. TAC ¶ 158. In 2014, the financial press widely

reported the HSBC settlement.  These red flags also include Relator himself bringing the issue to

the attention of the Servicers and law firms.  TAC ¶ 157.

The Servicer Defendants also would have been aware that the expenses being charged by

the law firms were going up considerably, that vendors were being used from out of state without

any justification, and that they were now charging expenses for things that used to be included,

like filing pleadings or delivering them to court. TAC ¶¶ 127, 143, 155, 156, 160. For example,

the Complaints allege that affiliates would perform functions that were supposed to be included

in the set legal fees as administrative overhead—like filing or delivery of affidavits of service or

other pleadings—and then charge for the work as additional costs. *Id.* These sorts of efforts to

turn law firm overhead into reimbursable costs are expressly prohibited. *See* Fannie Mae

Servicing Guide, E-5-04 (April 12, 2017) (explaining that the legal fee included items like

ordering title reports and reviewing them, "executing all steps necessary to obtain service of

process . . . including review of process server affidavits . . .  and referral and tracking of

published notices"); *id.* (stating that Fannie Mae will "not reimburse the servicer for legal fees

and expenses . . . that are properly allocated to the law firm's overhead expenses"); HUD

Handbook 4330.4, 2-15(B) ("overhead items" not reimbursable).

35

c.      The Servicer Defendants Continued to Submit False Claims

The Complaints allege that, despite red flags of fraud and the Servicers' obligation to monitor foreclosure costs, the Servicers did nothing. Instead, they continued to simply pass the inflated costs along for reimbursement by the GSEs and HUD from the very same law firms that engaged in the fraudulent schemes. TAC ¶ 476.  Many if not most of the example claims cited in the Complaints occurred after the red flags began appearing. In these circumstances, Relator has sufficiently alleged facts that constitute strong circumstantial evidence of recklessness on the part of the Servicer Defendants.

The Servicer Defendants argue that their failure to catch "an" error does not constitute recklessness. Servicers' Br. at 28. But the Complaints plead that the Servicer Defendants uniformly failed to catch ***tens of thousands*** of fraudulent expenses, which they were required to monitor and scrutinize. Missing just one may be negligent. Missing hundreds, let alone thousands, is (at a minimum) reckless. In a similar vein, the Servicer Defendants cite a summary judgment decision for the proposition that "nor does the failure to conduct adequate quality control meet this rigorous scienter requirement." *Id.* (*citing U.S. ex rel. Kirk v. Schindler Elevator Corp.*, 130 F. Supp. 3d 866, 879 (S.D.N.Y. 2015)). But *Kirk* stands only for the proposition that recognizing the need for improvement in a quality control system **and going about improving it** does not evidence reckless disregard. *Id.* The facts pleaded here are the opposite: that the fraud is ongoing, and that the Servicer Defendants have done nothing to stop it. This case is a far cry from a summary judgment posture in which the defendant has produced evidence of continued efforts to improve its systems to catch the fraud.

The Servicer Defendants urge repeatedly that when the governing standard is "reasonableness," they cannot intentionally violate it because reasonable people can always disagree about reasonableness. This argument ignores the substantial body of FCA caselaw

arising from unreasonable or unnecessary medical care provided in violation of Medicare's "reasonable and necessary" requirement. *See, e.g. United States ex rel. Smith v. Yale Univ.*, 415 F. Supp. 2d 58, 98 (D. Conn. 2006) (holding allegations that care was not "reasonable and necessary" "would constitute an FCA violation if true and should not be dismissed for failure to state a claim"). It is also directly foreclosed by the holdings in *United States v. DynCorp.*, 253 F. Supp. 3d 89 (D.D.C. 2017), and *United States ex rel. Howard v. KBR, Inc.*, 139 F. Supp. 3d 917 (C.D. Ill. 2015), cited above.

It also improperly minimizes the actual legal standards governing the servicers' claims for reimbursement, for instance that charges be "reasonable, ***actual, and necessary,***" and that the Servicers had an affirmative duty to monitor legal costs for reasonableness, paying particular attention to affiliated business entities, and failed to do so. The Servicer Defendants cite a summary judgment case, *U.S. ex rel. Farmer v. City of Houston*, 523 F.3d 333 (5th Cir. 2008), in which a divided panel of the Fifth Circuit found, on the particular record before it, that a jury would not conclude the defendant had acted with sufficient scienter. Here, accepting as true the widespread scheme by law firms alleged in the Complaints, and the drastic nature of the markups, a jury could infer that the Servicer Defendants acted recklessly by failing to stop it.

Finally, the Servicer Defendants argue that they had "nothing to gain" from the scheme, because the overcharges were pocketed by the law firms. But this Court has previously recognized the incentive for an intermediary like the Servicers to pass on false claims to avoid the "considerable administrative costs associated with conducting proper due diligence"—even if they receive no monetary payment. *See U.S. ex rel. Feldman v. City of New York*, 808 F. Supp. 2d 641, 655 (S.D.N.Y. 2011) (Rakoff, J.). The Servicer Defendants reap billions of dollars in servicing fees that are based on a "servicing spread" that does not vary by the foreclosure costs

37

submitted. *See, e.g.*, Wells Fargo & Co., Annual Report (Form 10-K) (Feb. 28, 2012), Ex. 13 (Annual Report to Stockholders) at 37 (showing $3-$5 billion in servicing revenue each year between 2009, 2010, and 2011). It is entirely consistent with their own self-interest not to expend the time and resources necessary for compliance when it does not directly affect their compensation—until such time as they get caught.

2.     The Law Firms and Affiliates Acted Knowingly

Relator pleaded that the law firms and their affiliates undertook a scheme whereby they used third-party vendors at market rates, substantially marked up the invoices without adding meaningful value, and then sought reimbursement from servicers. TAC ¶¶ 122-147. The Complaints provide specific examples in which each of the law firms and their affiliates executed the scheme. TAC ¶¶ 122-147, 170-176, 183-189, 206-214, 259-267, 268-288, 334-340, 365-373, 425-435, 452-460; SAC ¶¶ 187-195; 251-259.

McCabe half-heartedly argues that the Complaint does not plead that it acted knowingly. McCabe Br. at 19. This is incorrect. The GSEs and HUD each required vendors to charge fees that are only reasonable, necessary, and actual, and to make every effort to minimize costs. The Fannie Mae form law firm engagement letter submitted in connection with the motions to dismiss makes crystal clear the prohibition on markups: "The costs charged on Fannie Mae loans must be only the actual cost incurred by the third-party vendor as evidenced by the third-party vendor's receipt. Law firms should not seek reimbursement for amounts above the actual amounts charged by the third-party vendor. . . . " *See* 12 Civ. 7199, Dkt. 133-2 at 15 (Horwitz Decl., Ex. B at 15). The idea that these firms had no idea that it was wrong to pay third parties market rates for expenses, mark them up—often two, three, four, or five times over—and then submit them either directly or under an affiliate's name is not persuasive. Indeed, passing them through sham affiliates to add a markup does not negate scienter, but rather demonstrates

consciousness of guilt. To the extent the law firms claim ignorance of these requirements, that constitutes recklessness. *See King-Vassel*, 728 F.3d at 714.

### D.     Relator Alleged the Submission of False Claims with Particularity

Without any hint of irony, Defendants argue out of one side of their mouths that the details of the overcharge scheme were so well publicized that Relator's pre-2010 claims should be dismissed on public disclosure grounds, *see, e.g.,* Svc. Br. at 41-42, but out of the other that Relator's allegations about the scheme are not detailed enough to put them on notice of the fraudulent scheme. Relator's Complaints, which include over 100 pages of specific allegations and examples of transactions alleged to be false, more than satisfy the requirements of Rule 9(b).

"Ultimately, whether a complaint satisfies Rule 9(b) 'depends upon the nature of the case, the complexity or simplicity of the transaction or occurrence, the relationship of the parties and the determination of how much circumstantial detail is necessary ***to give notice to the adverse party and enable him to prepare a responsive pleading***.'" *United States v. TEVA Pharms. USA), Inc.*, 13 Civ. 3702 (CM), 2016 WL 750720, at *15 (S.D.N.Y. Feb. 22, 2016). "Rule 9(b) does not impose a 'one size fits all' list of facts that must be included in every FCA complaint." *U.S. ex rel. Kester v. Novartis Pharms. Corp.*, 23 F. Supp. 3d 242, 258 (S.D.N.Y. 2014) (quoting *In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 337-38 (D. Conn. 2004)). Nor does Rule 9(b) "elevate the standard of certainty that a pleading must attain beyond the ordinary level of plausibility." *Chorches*, 865 F.3d at 82-83.

Relator alleges a detailed scheme by law firms to overbill expenses, including dozens of examples, all of which were passed on by the Servicer Defendants to a GSE or HUD. TAC ¶¶ 170-474; SAC ¶¶ 163-332. The Complaints contain detailed allegations about the affiliates used by the law firms and how they marked up market-rate invoices, passed them on, and pocketed the difference—including specific examples for each firm. TAC ¶¶ 122-147, 170-176, 183-189,

206-214, 259-267, 268-288, 334-340, 365-373, 425-435, 452-460; SAC ¶¶ 187-195; 251-259.

They plead specific examples from other law firms around the country, in which law firms

marked up third-party invoices, sometimes using sham affiliates and sometimes doing it directly.

They allege that the purpose of the scheme was to obtain payment of the fraudulent charges,

including from GSEs and HUD, that it went on for years, and that the Servicer Defendants did

nothing to stop it. As set forth more fully below, these allegations satisfy Rule 9(b).

      1.    <u>Relator Alleged the Fraudulent Scheme with Particularity</u>

The Complaints allege schemes by law firms nationwide to enrich themselves by

overcharging for foreclosure-related expenses. The details pleaded include:

- Sixty-six specific foreclosure actions in which banks charged unreasonable fees, most of which include either pure markups of vendor bills or use of affiliates to inflate charges (TAC ¶¶ 170-474, SAC ¶¶ 163-332);

- Facts about the schemes within two representative law firms, Rosicki and McCabe, derived from Relator's conversations with insiders and investigation, which confirmed the nature and motivation of their scheme (TAC ¶¶ 114-116, 122-147);

- Facts about the types of charges inflated and how the law firms did it (*id.*); and

- Allegations that the Servicer Defendants uniformly passed on each and every one of these inflated costs without doing anything about a single one (TAC ¶¶ 117-121).

Relator has alleged the necessary details of the fraudulent scheme with particularly for each

example. *See Chorches*, 865 F.3d at 81 ("That ordinarily requires a complaint alleging fraud to

(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3)

state where and when the statements were made, and (4) explain why the statements were

fraudulent." (internal quotation marks omitted)). The examples provide information about:

- The fraudulent statements: The law firms, their affiliates, and the servicers submitting the 66 inflated expense claims set forth in each example and the Servicer Defendants submitting those amounts for reimbursement from the GSEs or HUD;[14]

- The speaker: The affiliate, law firm, and servicer who submitted the expense claims or sought reimbursement for them in each of the 66 examples;

- Where and when the statements were made: On invoices between the affiliate and law firm, law firm and servicer, and servicer and GSE or HUD identified in each example in the time period identified in the Complaints when the foreclosure took place; and

- Why the statements were fraudulent: Because the amounts charged to the GSE or HUD did not reflect the actual, reasonable, or necessary cost for the service claimed in violation of contractual or program requirements.

The Servicer Defendants' attempts to pick apart these examples fall flat. For example, they argue that many did not involve affiliated business entities. Servicers' Br. at 40 & n. 34. But the Complaints allege a very clear, similar fraud for many of them—billing the work themselves at marked up rates or hiring affiliates to pass on the work of independent vendors with substantial markups. For example, the Complaints allege that the Aronowitz firm would purchase title work for $125 and then bill it to a Servicer for $275. *See, e.g.*, TAC ¶ 193. The same is true of the Stein Firm. *See, e.g.*, TAC ¶ 255. In fact, all but 16 of the 66 examples include law firms that either used affiliates to inflate charges or simply marked up third-party vendor bills themselves. Relator could amend to include additional examples for each Servicer Defendant that involves the use of an affiliate, but additional exemplary detail is not required by Rule 9(b), because the scheme is more than adequately described.

The Servicer Defendants also challenge the "scope" of the problem of fraudulent or inflated foreclosure costs. But in cases like this, examples are sufficient: "where the alleged

---

[14] There is no requirement in the context of the FCA that individual actors be identified—identifying the corporate entity is sufficient. *See U.S. ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 125 (D.C. Cir. 2015).

fraudulent scheme involved numerous transactions that occurred over a long period of time, courts have found it impractical to require the plaintiff to plead the specifics with respect to each and every instance of fraudulent conduct." *United States v. Wells Fargo Bank, N.A.*, 972 F.Supp.2d 593, 616 (S.D.N.Y. 2013) (internal quotation marks omitted). Instead, a relator "may plead each scheme with particularity, and provide examples of specific false claims submitted to the government pursuant to that scheme." *Id.* (internal alterations and quotation marks omitted); *accord U.S. ex rel. Wood v. Allergan, Inc.*, 246 F. Supp. 3d 772, 809 (S.D.N.Y. 2017); *U.S. ex rel. Forcier v. Computer Sciences Corp.*, 183 F. Supp. 3d 510, 520 (S.D.N.Y. 2016).

The Servicer Defendants' conclusory argument that the examples provided are "unrepresentative" provides no grounds for dismissing the Complaints. First, the "requirement" suggested by the Servicers that claims be "representative" rests on shaky foundation. *See United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1180-81 & n.11 (9th Cir. 2016) (rejecting need for representative examples).  Regardless, the Servicers offer no support for why they are not representative. Relator provided 66 examples from states representing three different regions of the country. The vast majority of the examples reflect the prototypical scheme alleged in the Complaints, either marking up vendor invoices or using an affiliate to inflate costs. The samples come from law firms that that the Servicer Defendants use frequently to this day and that are some of the largest foreclosure firms in their respective states. They are entirely representative. *See Visiting Nurse Serv.,* 2017 WL 5515860, at *16 (evidence from "different geographical zones" supports conclusion that "specific examples were part of a larger pattern of fraud"). And there is absolutely no reason to believe that the Servicer Defendants—most of which conducted business nationwide—had practices that differed in any material respect from place to place.

42

Neither Rule 9(b) nor the False Claims Act imposes any requirement that a relator allege examples of each fraud from each state in which it occurs. *See, e.g.*, *U.S. ex rel. Bilotta v. Novartis Pharms. Corp.*, 50 F. Supp. 3d 497, 517-18 (S.D.N.Y. 2014) (examples of sham speaker event and doctors who attended them sufficient to extrapolate a nationwide scheme).[15] These cases apply with full force here, where the Servicer Defendants' misconduct was the total lack of process or procedure to fulfill its obligation to monitor and check the foreclosure costs the law firms submitted. *See U.S. ex rel. Bibby v. Wells Fargo Bank, N.A.*, 165 F. Supp. 3d 1340, 1348 (N.D. Ga. 2015) ("There would be no reason to think that this commercial conduct was confined just to one region of the country.")

The Servicer Defendants also argue that only an insider with actual knowledge of their reckless lack of oversight could bring an FCA case like this one. There is no such requirement. Once Relator has pleaded with particularity that the law firms generated fraudulent or inflated foreclosure costs, submitted them to the servicers, and the servicers passed them on to the GSEs or HUD, the submission of false claims has been pleaded with particularity. The servicers are a necessary step in that process; the law firms' overcharges could not be submitted as false claims without the servicers. Either the Servicer Defendants monitored foreclosure expenses properly or they did not, and whether they did is a matter "peculiarly within [their] knowledge." *Chorches*, 865 F.3d at 81-82; *see also United States v. Huron Consulting Grp.*, No. 09 Civ. 1800 (JSR), 2011 WL 253259, at *2 (S.D.N.Y. Jan. 24, 2011) ("[R]equirements of Rule 9(b) may be relaxed

---

[15] *See also, e.g., United States v. Supervalu, Inc.*, 218 F. Supp. 3d 767, 774-75 (C.D. Ill. 2016) (allegations sufficient for nationwide, uniform scheme despite lack of specific allegations in all states where operator had pharmacies); *U.S. ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 177 (E.D. Pa. 2012) ("[T]he sheer number of claims identified by Plaintiff in at least three states and Puerto Rico suggests, without need for speculation, that Defendants' reporting practices likely occurred at Defendants' other facilities throughout the country.").

when a plaintiff is not in a position to know specific facts until after discovery and the opposing party has particular knowledge of the facts." (citation omitted)). The Servicer Defendants' particularity argument on this point is nothing more than a scienter argument in disguise.

The Servicer Defendants contend that *United States ex rel. Tessler v. City of New York*, 14-CV-6455 (JMF), 2016 WL 7335654 (S.D.N.Y. Dec. 16, 2016), is "highly analogous." It is not. *Tessler* involved allegations that New York City failed to recoup federal benefits from recipients later deemed ineligible. *Id.* at *3. The reason Judge Furman found the complaint wanting was that "Relators fail to allege a single specific example of a false claim." *Id.* Instead, the relator merely speculated that New York City had a custom and practice of not recouping the benefits. More fundamentally, the regulations at issue in *Tessler* indicated that the City had ***no*** obligation to recoup payments, which entirely undermined the relator's allegations. *Id*. In this case, by contrast, the Relator has alleged 66 examples of fraudulent claims and has set forth in detail the rules and regulations that were violated; and the program rules at issue imposed affirmative obligations on the Servicing Defendants to prevent the submission of inflated claims.

Defendants suggest that the Court should ignore many of the Complaints' allegations because they are pleaded on "information and belief." That is incorrect. In *Chorches*, the court credited the relator's "information and belief" pleadings for purposes of Rule 9(b), and explained that "[p]leading on information and belief is a desirable and essential expedient when matters that are necessary to complete the statement of a claim are not within the knowledge of the plaintiff." 865 F.3d at 82; *see also U.S. ex rel. Gelman v. Donovan*, 12-CV-5142 (RJD), 2017 WL 4280543, at *2, 5-7 (E.D.N.Y. Sept. 25, 2017) (relator's information and belief allegations satisfy Rule 9(b)).

While Rule 9(b) requires particularity, "[i]t is not the purpose of Rule 9(b), as applied to FCA qui tam actions, to render the FCA toothless as to particularly clever fraudulent schemes." *Chorches*, 865 F.3d at 86; *accord Wood*, 246 F. Supp. 3d at 825 ("The purpose of Rule 9(b)'s heightened standard is to ensure that defendants have sufficient notice—not to immunize them from suit at the outset."). The rule "demands specificity, but . . . it does not elevate the standard of certainty that a pleading must attain beyond the ordinary level of plausibility." *Chorches*, 865 F.3d at 88. Here, the Complaints provide extensive detail about a nationwide scheme by law firms and their affiliates to defraud Fannie, Freddie, and HUD and alleges that the Servicers, charged with monitoring these very costs, did nothing. That is all that Rule 9(b) requires.

2.    Relator Alleged Fraudulent Submission of the Claims with Particularity

The Complaints plead the submission to the GSEs or HUD of 66 instances in which law firms overcharged for work on properties owned by the GSEs or insured by HUD and were passed onto those entities (and ultimately taxpayers). Defendants argue the case must be dismissed because the pleading of the submission of the claims to the GSEs or HUD is "on information and belief." Not so. The proper standard is whether the Relator has pleaded "facts supporting a strong inference that" the claims were in fact submitted and "the information that would permit further identification of those claims is peculiarly within the opposing party's knowledge." *Chorches*, 865 F.3d at 84, 86. Relator has met that burden.

The Complaints in this lawsuit allege the particular details of fraudulent schemes undertaken by law firms that only make sense—and only would have endured for years—if the overcharges were submitted for reimbursement to Fannie, Freddie, and HUD. For each of the 66 examples cited in the Complaints, each foreclosure firm knew that the loan was either held or insured by the GSEs and HUD and therefore knew that the inflated expenses would be submitted to them by the servicers. As the Rosicki Defendants acknowledge, each law firm directly signed

45

a retainer with Fannie Mae just so that it could work on such loans and obtain that very reimbursement. Rosicki Br. at 7. The details of the precise date and manner by which the Servicer Defendants actually passed them on to the GSEs and HUD in any specific instance are peculiarly within their knowledge.

The Servicer Defendants citations on this point are inapposite. For example, *United States ex rel. Kester v. Novartis Pharmaceuticals Corp.*, 23 F. Supp. 3d 242 (S.D.N.Y. 2014), is a case where the Government alleged a general scheme of misconduct (kickbacks) by a pharmaceutical company and then alleged that because the drugs were covered by federal healthcare programs, false claims must have been submitted. It is inapposite for two reasons.

First, this case is different because, as *Chorches* explains, if a party has access to the data (as the Government did in *Kester*), it must plead the claims were submitted (as the Government has done here in its Complaint against Rosicki). The Relator does not have the ability to include claims information in his Complaints, pleading on information and belief is "a desirable and essential expedient." *Chorches*, 865 F.3d at 82.

Second, *Kester* stands for the proposition that, standing alone, knowledge that fraud occurred within a company that does some business with the Government is insufficient to presume a fraudulent claim is submitted. There must be a link between the scheme and the submission of a fraudulent claim. This is the same flaw apparent in the other cases cited by Defendants.[16] Here, there are several facts supporting the strong inference that claims generated by the scheme were in fact submitted to the GSEs and FHA:

---

[16] *See Tessler,* 712 F. App'x at 29 ("The SAC alleges in conclusory fashion that there was a "custom and practice" at the City of not recouping aid-to-continue benefits, but it fails to provide particularized facts to support that assertion."); *U.S. ex rel. Bilotta v. Novartis Pharmaceuticals Corp.*, 50 F. Supp. 3d 497, 510 ("[M]erely alleging a fraudulent underlying scheme with particularity is not enough.").

- Each of the 66 examples alleged in the Complaints involved a GSE- or FHA-backed mortgage, such that the fraudulent billing practices would not make sense unless the claims were being reimbursed by those entities;

- It is implausible that the Servicers would pay the law firms' reimbursement claims without, in turn, seeking reimbursement from the GSEs and FHA;

- The Government has intervened on Relator's complaint against Rosicki in 12 Civ. 7199, and filed its own intervention complaint alleging that Rosicki caused false claims to be submitted to the Servicers (with knowledge that the Servicers would thereupon submit the claims to Fannie), thereby causing Fannie to pay "millions of dollars" in inflated claims.  Gov't Compl., ¶¶ 2, 86, 124-27, 130-33, 137-39.  The Government would not have intervened unless false claims were submitted to Fannie.

These facts more than suffice, post-*Chorches*, to create a plausible inference that claims were submitted to the Government.[17]

The central teaching of *Chorches* is that "those who can identify examples of actual claims must do so at the pleading stage," but that a relator also can state a claim by "making plausible allegations creating a strong inference that specific false claims were submitted to the government and that the information that would permit further identification of those claims is peculiarly within the opposing party's knowledge." *Id.* at 86. The Court rejected the exact position advanced by the Servicers because "[a]n interpretation of Rule 9(b) that requires *qui tam* plaintiffs to plead billing details regarding the submission of specific false claims, even when knowledge of such details is peculiarly within the defendant's purview, would discourage the filing of meritorious *qui tam* suits that can expose fraud against the government." *Id.*

### E.   Fraud on Fannie and Freddie is Covered by the False Claims Act

Defendants are liable for defrauding the GSEs under two provisions of the FCA. From the beginning of the bailouts until the end of 2012, and again in 2017, Defendants are liable

---

[17] *See e.g.*, *United States ex rel. Hussain v. CDM Smith*, 14-cv-9107 (JPO), 2017 WL 4326523, at *5 (S.D.N.Y. Sept. 27, 2017) (fraudulent alteration of time records "plausibly creates the inference that false claims were submitted").

under a direct false claims theory because federal funds were actually being used in part to pay the false claims. *See* 31 U.S.C. § 3729(a)(1)(A) and (a)(1)(B). For the years between 2013 and 2017, Defendants are liable for fraud on the GSEs for reverse false claims. *See* 31 U.S.C. § 3729(a)(1)(G). During the years in which the Third Amendments to the SPAs were in place, each act of fraud reduced, dollar for dollar, the amount each GSE paid to Treasury.

### 1.  Defendants are Liable under § 3729(a)(1)(A) and (a)(1)(B)

31 U.S.C. § 3729(a)(1) imposes liability on anyone making a false "claim" and § 3729(b)(2)(A)(ii) defines claim to include any "demand . . . for money or property . . . made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government" either "(I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded."

In 2009, § 3729(b)(2)(A) was strengthened by the Fraud Enforcement and Recovery Act ("FERA"), which clarified that liability under the FCA attached regardless of whether the claim was made directly to the Government and regardless of whether the person making the false claim intended to ultimately defraud the federal government. These changes were made, in part, to help protect from fraud the billions of federal dollars being quickly dispersed to shore up the housing market during the financial crisis.[18]

---

[18] *See, e.g.*, S. Rep. No. 111-10, at 1-2 (2009) (FERA passed to "help protect Americans from future frauds that exploit the economic assistance programs intended to restore and rebuild our economy"); 155 Cong. Rec. S1679-01, 2009 WL 275706 (statement of Sen. Leahy, introducing bill) (criticizing court decisions "which limit the scope of the law and allow sub-contractors paid with government money to escape responsibility for proven frauds" and urging quick passage of FERA "in order to protect from fraud the Federal assistance and relief funds expended in response to our current economic crisis."); 155 Cong. Rec. H5686-01, 2009 WL 1373400

In order to impose liability for a claim submitted to a recipient of government funds, the claim must meet three statutory requirements: (i) it must be made on a "contractor, grantee, or other recipient" of federal dollars; (ii) the money must be used on the Government's behalf or to advance a Government program or interest; and (iii) the Government must provide or have provided any portion of the money or has reimbursed or will reimburse the recipient for any portion claimed. 31 U.S.C. § 3729(b)(2)(A)(ii). Some courts also have required there be a sufficient "nexus" between the Government provision of funds and the fraudulent claim. The fraudulent expense claims at issue in this case meet all four of these standards.

        a.      The GSE Bailout Advanced a Government Program or Interest and was Paid to a "Recipient" of Government Funds

Treasury's bailout of the GSEs served the Government's acute need to keep the entities afloat and ensure their mortgage operations would continue. The Recovery Act created FHFA and charged it with "oversee[ing] the prudential operations" of the GSEs and "ensur[ing] that" they "operate[] in a safe and sound manner," "consistent with the public interest." 12 U.S.C. § 4513(a)(1)(A), (B)(i), (B)(v). To this end, it authorized FHFA with expansive "[g]eneral powers," including the authority to "take such action as may be . . . necessary to put the" GSE "in a sound and solvent condition" and "appropriate to carry on the business of the" GSE "and preserve and conserve [its] assets and property." *Id.* § 4617(b)(2)(D). The Recovery Act simultaneously gave Treasury the authority to "purchase any obligations and other securities" issue by the GSEs, *id.* § 1455(*l*)(1)(A), which led to the SPAs. In September 2008, the GSEs were placed in conservatorship and Treasury agreed to infuse billions in them under the stock purchase agreements so that they could continue their operations.  TAC ¶¶ 47-48.

---

(statement of Rep. Scott) (FERA "is a bill crafted to combat the financial fraud that contributed to causing, and worsening, our Nation's mortgage crisis").

Defendants challenge the notion that money spent on foreclosures furthered the government interest in keeping the GSEs solvent and the mortgage markets functioning. But the ability of mortgage investors, including the GSEs, to efficiently liquidate non-performing mortgages is an important part of the mortgage market and necessary to keep mortgage rates low. Similarly, the Rosicki Defendants argue that the Government funds were used "primarily to cover losses from single-family mortgages," implying that use excludes foreclosure expenses. Rosicki Br. at 15. But part of the "loss" on an investment in a non-performing mortgage is the cost and expense of foreclosing on the home—the precise subject of Defendants' false claims.

The Rosicki Defendants also argue that it would be "draconian" to subject those who defraud bailed-out companies to FCA liability. But Congress was explicit that one purpose of the 2009 FCA amendments was to protect bailout funds. *See infra* at n.18. Thus, far from being a draconian overreach, subjecting those who seek to profiteer from Government funds disbursed during the financial crisis is exactly what Congress had in mind.[19]

        b.     The Government Provided or Reimbursed a Portion of the Money

Liability for fraudulently claiming funds from a grantee of Government funds exists if the Government has or will provide or reimburse "any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A)(ii).[20] Here, at the same time the Government

---

[19] In a footnote, the Servicer Defendants suggest that, despite receiving nearly $200 billion from the Government by 2012, the GSEs were not "recipients" of federal money. Statutes are to be construed giving words their "ordinary meaning." *Moskal v. United States*, 498 U.S. 103, 108 (1990) (internal quotation marks omitted). After $200 billion, it should be beyond dispute that the GSEs received government funds. The Servicers suggest that "specific funds" must be earmarked for "specific projects" as "typically" happens with "grantees." Among the flaws with this theory is its faulty premise that grantees of federal dollars necessarily have their funds earmarked. The Government often provides large block grants with virtually no strings attached.

[20] There is only one statutory exception: "requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income

was putting billions into each GSE each year to fund their operations, the Servicer Defendants were submitting and being paid for their false claims for mortgage expenses. When government grants are substantial and not earmarked, as is the case here, courts have considered each false claim paid by the entity to use some "portion" of Government funds.

Defendants argue that there can still be no liability because there is no way to directly trace the dollars paid on the fraudulent claims back to Treasury. That is not required. *See U.S. ex rel. Marcus v. Hess*, 317 U.S. 537, 544 (1943) (the FCA "does not make the extent of [the funds'] safeguard dependent upon the bookkeeping devices used for their distribution"). The Fourth Circuit's decision in *U.S. ex rel. DRC, Inc. v. Custer Battles*, 562 F.3d 295 (4th Cir. 2009), is instructive. The district court had granted defendant's motion for summary judgment as to part of the fraudulently obtained payments because they had been made by the Iraqi Development Fund and not the United States Government. The relator appealed, arguing that the False Claims Act was implicated because the Government had contributed $210 million towards the Iraqi Development Fund. The Fourth Circuit agreed, holding that "[t]extually, . . . a claim made to a grantee of U.S. money is not defined by the amount of money that the U.S. government paid directly to the claimant. So long as 'any portion' of the claim is or will be funded by U.S. money given to the grantee, the full claim satisfies the definition of claim" under the FCA. *Id.* at 303 ("The district court thus erred when it concluded that it is necessary to consider each source of funds separately." (internal quotation marks omitted)).

Similarly, in *U.S. ex rel. Yesudian v. Howard University*, 153 F.3d 731 (D.C. Cir. 1998), the D.C. Circuit reasoned that fraud on grantees "substantially" funded with federal dollars falls

---

subsidy with no restrictions on that individual's use of the money or property." *Id.* § 3729(b)(2)(B). The fact that Congress believed it needed to make this exclusion, and only this exclusion, suggests how broadly Congress expected the "any portion" language to reach.

within the ambit of the FCA. The case concerned Howard University, which received a substantial amount of its funding from the federal government. The D.C. Circuit explained that this alone was likely enough to subject those who committed fraud against Howard University to liability under the FCA—even if the fraudulent claim submitted to Howard was not resubmitted to the federal government and even if federal dollars could not be directly traced to the fraud. *Id.* at 738-39.

After the bailout, the GSEs became grantees or recipients of Government funds just like the Iraqi Development Fund and Howard University (in fact, the GSEs received hundreds of times as much money as either of those recipients). While Defendants continued to submit, or cause to be submitted, fraudulent claims to the GSEs for hundreds of millions of fraudulent and inflated expenses, the GSEs remained flush with federal funds. By the middle of 2012, Treasury had provided Fannie Mae with more than $100 billion and Freddie Mac with more than $70 billion. None of this money has been repaid. The dividend payments made in the intervening years compensate taxpayers for making the capital available to the GSEs; they do not repay the debt. *See, e.g.*, Fannie Mae 2017 10-K at 15 ("Dividend payments we make to Treasury do not reduce the outstanding liquidation preference of the senior preferred stock . . .").

For the reasons set forth above, the district court cases relied on by Defendants were wrongly decided and should not be followed here.  *See U.S. ex rel. Todd v. Fid. Nat'l Fin., Inc.*, 1:12-cv-666-REB-CBS, 2014 WL 4636394, at *10-11 (D. Colo. Sept. 16, 2014); *U.S. ex rel. Adams v. Wells Fargo Bank Nat. Ass'n*, 2:11-cv-00535-RCJ-PAL, 2013 WL 6506732, at *8 (D. Nev. Dec. 11, 2013).  In fact, on appeal of the *Adams* case, the Ninth Circuit observed:

> To the extent the district court broadly held that claims made to Freddie Mac and Fannie Mae could never be "claims" within the FCA's definition of that term, the district court was mistaken. A properly pled claim under § 3729(b)(2)(A)(ii) could give rise to

> FCA liability, but not as alleged in the three amended complaints
> pled here.

*U.S. ex rel. Adams v. Aurora Loan Servs., Inc.*, 813 F.3d 1259, 1260 (9th Cir. 2016). The Ninth

Circuit actually went out of its way to disclaim the trial court's decision, since its holding was

that the relator had not pleaded a theory of the case that Fannie and Freddie were grantees,

instead incorrectly pleading and arguing they were part of the federal government.  *Id.*

c.      There is a Sufficient Nexus Between the Fraud and Fannie and
        Freddie's Receipt of Federal Dollars

Defendants also argue that, unless the funds are traceable directly to government

disbursements, there is a slippery slope towards liability for anyone who benefits from federal

aid. That position has been rejected by both appellate courts that have considered it. Even *Garg*

*v. Covanta Holding Corp.*, 478 F. App'x 736 (3d Cir. 2012), the unreported Third Circuit case

each Defendant relies on heavily for this point, does not go as far as the Defendants suggest.

Instead, *Garg* merely proposes that there needs to be some "nexus between the alleged fraud and

the government funds," which it then interprets as a requirement that the "fraudulent claims . . .

would cause economic loss to the government." *Id.* at 741. Even if that were the standard, it is

met here, where the vast majority of the fraudulent claims (through 2012) caused the

Government to overpay each GSE on a dollar-for-dollar basis.

Taking a similar approach in *Howard University*, Judge Garland observed that, with

respect to fraud against grantees of federal money, the FCA perhaps "should not apply to all

grantees." 153 F.3d at 738. To guard against unlimited FCA liability, Judge Garland posited "[i]t

may not be appropriate" to impose FCA liability if (i) "the grantee's federal funds are an

insubstantial percentage of its total budget," (ii) "there is little likelihood that any of a

defendant's money actually came from a federal grant," or (iii) "there is little continuing contact

between the grantee and the government once the grant is made." *Id.*

Here, the foreclosure-expense fraud against the GSEs has a sufficient nexus under each of these tests. *First*, the Government's existing capital in the GSEs—about $200 billion, as measured by its current liquidation preference—cannot be characterized as an "insubstantial" percentage of its total budget. By way of comparison, from 2009 through 2012, Fannie's revenue each year was between $17 and $23 billion, and its net loss over the period was $84 billion.[21] The Government's $112 billion injection of money into Fannie over this period, even in comparison to Fannie's size, is massive by any measure. TAC ¶ 49.

*Second*, because the bailout funds were not earmarked, there is every reason to believe that they were used, in some part, in paying the false claims, as the court reasoned in *Howard University*. *See Howard University*, 153 F.3d at 738-39.

*Third*, and perhaps most significantly, this is clearly not a scenario where "there is little continuing contact between the grantee and the government." On the contrary, the GSEs continued to be subject to stringent FHFA oversight and receiving infusions of federal money for each dollar of operating shortfall into 2012.

Finally, although not expressly articulated by Judge Garland, a further important limiting factor is that cited by *Garg*—the ability to identify harm to the Government. Here, it is easy because of the one-to-one relationship between money taken out of the GSEs and additional federal cash infusions.

Surprisingly, the Servicer Defendants (some of the most sophisticated banks in the world) assert that "the government has not lost a penny on those investments—in fact, it has made $87 billion." Servicers' Br. at 33. Of course, those banks know that $87 billion does not represent a

---

[21] *See* Federal National Mortgage Association, Annual Report (Form 10-K) (Apr. 2, 2013), *available at* http://www.fanniemae.com/resources/file/ir/pdf/quarterly-annual-results/2012/10k_2012.pdf.

profit. The reality is that none of the principal has been repaid. The intervening payments are interest—payment to taxpayers for putting so much capital at risk when no one else would or could.

### 2.    Liability For Reducing Net Sweeps Paid by the GSEs Under § (a)(1)(G)

Beginning in 2013, each GSE was obligated to pay Treasury its net worth each quarter, less a small capital buffer. TAC ¶¶ 50, 76. When the Servicer Defendants obtained payment for each false claim for mortgage expenses during those years, it decreased the amount that Treasury would receive from the GSEs dollar-for-dollar. Defendants are liable for these decreased payments pursuant to 31 U.S.C. § 3729(a)(1)(G), which imposes liability upon anyone who:

> [K]nowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

*Id.* In this circumstance, the fraud was material to and decreased the obligation of the GSEs to make the net worth sweeps.

As the Rosicki Defendants acknowledge, courts have recognized and enforced this type of "indirect reverse false claim" where a defendant's fraudulent acts caused someone else to underpay the Government. *See United States v. Caremark, Inc.*, 634 F.3d 808, 815-16 (5th Cir. 2011); *U.S. ex rel. Hunt v. Merck-Medco Managed Care, L.L.C.*, 336 F. Supp. 2d 430, 444-45 (E.D. Pa. 2004); *United States ex rel. Koch v. Koch Indus., Inc.*, 57 F. Supp. 2d 1122, 1128–29 (N.D. Okla. 1999). The Servicer Defendants do not challenge the viability of the theory of indirect reverse false claims.

After recognizing this authority, the Rosicki Defendants cite none to the contrary, arguing only that these cases should be limited to circumstances in which there is a close nexus between

the defendant's behavior and the payee's obligation to the Government. As explained above, there continues to be a close nexus between Defendants' fraud and the GSEs' liability to pay Treasury the net worth sweeps. FHFA continues to exercise the same broad authority over any of their operations. Treasury continues to be committed to funding any operational shortfalls they might incur. In fact, for the last quarter of 2017, each GSE had a net worth shortfall and requested, and will be given, more than $3 billion. TAC ¶¶ 55, 82.

Still, the Rosicki Defendants argue that the nexus must be tied to a specific payment obligation, such as when someone defrauds a healthcare organization and knows the Government will ultimately bear the cost. But that hardly distinguishes this situation. It strains credulity to suggest that foreclosure law firms were unaware of the bailout of the GSEs—their biggest clients—and inconceivable that the Servicer Defendants did not know. To the extent they want to argue that they did not realize that their fraud would flow through to taxpayers, they are free to do so to a jury. But the Complaints sufficiently plead the Defendants' knowledge.

The Rosicki Defendants' other argument is that the GSEs had no "obligation" to the Government that was reduced by their fraud. Rosicki Br. at 35. Rosicki Defendants' theory is that the bailout documents made the dividend payments subject to the "discretion" of the GSEs' Boards of Directors, and therefore did not create an "obligation" within the statute's meaning.

The False Claims Act defines "obligation" broadly to encompass "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3). The GSE's obligation to pay the net worth sweeps fits comfortably within this definition. The Third Amendments to the SPAs require, beginning in 2013, each GSE to pay Treasury a quarterly dividend equal to their net

worth, less a small capital reserve. 12 Civ. 7199, Dkt. 133-6 at 4 (Horwitz Decl., Ex. F at 4). While the dividends were subject to being approved by the Board of Directors "in their sole discretion," they were also a contractual "obligation." If they were ever not paid, they would accrue and be added onto the GSE's liquidation preference owed to Treasury. *Id.* Moreover, given the reality of the arrangement with Treasury and oversight from FHFA, neither GSE has failed to pay a dividend when it had a positive net worth since 2013.

In fact, the reality is so clear that both the D.C. Circuit and Fannie Mae and Freddie Mac treat the net worth sweep as a "requirement" or "obligation." For example, this is how the D.C. Circuit describes the arrangement:

> The Third Amendment to the Stock Agreements replaced the previous quarterly 10% dividend formula with a **requirement** that Fannie and Freddie pay as dividends only the amount, if any, by which their net worth for the quarter exceeded a capital buffer of $3 billion, with that buffer decreasing annually down to zero by 2018. In simple terms, the Third Amendment **requires** Fannie and Freddie to pay quarterly to Treasury a dividend equal to their net worth—however much or little that might be.

*Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 602 (D.C. Cir. 2017) (emphasis added); *see id. generally* (describing dividends to Treasury as either "requir[ed]" or an "obligation" more than a half dozen times). Likewise, the GSEs' own filings each refer to the dividend payments to Treasury as "obligation[s]." *See, e.g.*, Federal National Mortgage Association, Annual Report (Form 10-K) (Apr. 2, 2013) at 4; Federal Home Loan Mortgage Corporation, Annual Report (Form 10-K) (Feb. 18, 2016) at 2, 8.[22]

The commitment by the GSEs to pay dividends to Treasury, therefore, lies in stark contrast to the issue in *United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497 (3d Cir. 2017).

---

[22]     *Available      at*      http://www.fanniemae.com/resources/file/ir/pdf/quarterly-annual-results/2012/10k_2012.pdf                                                              and http://www.freddiemac.com/investors/financials/pdf/10k_021816.pdf.

In that case, the Small Business Administration ("SBA") owned preferred shares in a technology company. *Id.* at 500. The court held that a reverse false claims count failed because the SBA was not the Government. In dicta, it went on to also conclude that the dividend provision in the corporate documents was too uncertain to be an "obligation" under the FCA, because it depended on a board decision to pay dividends, **which it had never done**, or liquidation of the company, **which had never happened**. *Id.* at 506. In this case, by contrast, the dividend obligation was much more certain and in fact has happened without exception when called for by the Third Amendments to the SPAs. If it ever did not happen, the contractual obligation undertaken by the GSEs would have increased their liquidation preference to the Government by the same amount.

### F. The Complaints Plead a Reverse False Claims Theory for Overpayments Received by Defendants

The Servicer Defendants are liable under Section (a)(1)(G) because, by knowingly receiving overpayments and failing to repay them, they avoided and decreased their obligation to pay money to the United States.

The source of the Servicer Defendants' obligation to the Government is twofold. First, the obligation is created by the FCA itself, which defines an "obligation" as a duty that arises "from the retention of any overpayment." 31 U.S.C. § 3729(b)(3). Second, an "obligation" arises as to Fannie and FHA from the contractual or program requirements that the Servicers return any overpayments. *See id.* ("obligation" can arise from duty arising in "express or implied contractual, grantor-grantee, or licensor licensee relationship, form a fee-based or similar relationship, from statue or regulation").

58

1.   The FCA Requires the Servicers to Return Overpayments

As described above, Fannie Mae, Freddie Mac, and FHA allow servicers to be paid only for fees that are actual, reasonable, and necessary, and the servicers knowingly received and retained amounts in violation of those standards. *See* TAC ¶¶ 64, 94, 112. These allegations make out a straightforward reverse false claim: the servicers knowingly avoided or decreased their obligations to the Government by retaining the overpayments they received.

The Servicer Defendants argue that an obligation to return the funds cannot be implied by the mere fact of overpayment itself. But the statutory definition of obligation is clear that the duty to pay the money back can arise from many contractual or other relationships **or** the retention of any overpayment:

> [T]he term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation**, or from the retention of any overpayment**.

31 U.S.C. § 3729(b)(3) (emphasis added). The fact that the retention of any overpayment is enumerated separately indicates that the "knowing" retention of an overpayment alone—independent of any contractual or statutory obligation—establishes a duty to return the money. Otherwise, the last seven words of the provision would be superfluous. In fact, Congress explicitly intended that this obligation reach overpayments of which the Government was not even aware. S. Rep. No. 111-10, at 14-15 (2009) ("Thus, the violation of the FCA for receiving an overpayment may occur once an overpayment is knowingly and improperly retained, without notice to the Government about the overpayment.").

Nowhere does the statute preclude reverse false claims where the overpayment results from the submission of an ordinary false claim, and dismissal on these grounds at this stage

would be particularly inappropriate, given that there has been no discovery as to defendants' state of mind regarding the overpayments. For example, the Servicer Defendants argue that they did not "knowingly" submit false claims. If at trial Relator was unable to demonstrate a Servicer Defendant's knowledge for an early part of the claim period, but nevertheless proved that the Servicer Defendant later learned of the fraud and its receipt of overpayments, the reverse false claim count would cover payments where (a)(1)(A) and (a)(1)(B) liability might not. *See generally Kane ex rel. U.S. v. Healthfirst, Inc.*, 120 F. Supp. 3d 370 (S.D.N.Y. 2015) (sustaining reverse false claim allegations for knowing retention of overpayments, even where initial errors leading to overpayments were not alleged to violate Act). This is why courts often allow relators to proceed under both ordinary and reverse false claims theories at the motion to dismiss stage. *See, e.g., U.S. ex rel. Keltner v. Lakeshore Med. Clinic, Ltd.*, No. 11-CV-00892, 2013 WL 1307013, at *4 (E.D. Wis. Mar. 28, 2013) (allowing related claims under (a)(1)(A), (a)(1)(B), and (a)(1)(G) to proceed at the motion to dismiss stage); *U.S. ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 171-73 (E.D. Pa. 2012) (similar).

### 2. The Servicers are Required by Agreement to Return Overpayments

Second, the Fannie Guide and HUD Handbook specifically impose a duty on servicers to refund excessive fees and costs. The Fannie Guide requires servicers to "monitor[] the fees or expenses charged by" any law firm's affiliates, and states that Fannie Mae "will require the servicer to reimburse Fannie Mae for any unreasonable or excessive fees or costs." TAC ¶¶ 69, 71; Fannie Mae Servicing Guide, Part VIII § 106.03 (Mar. 14, 2012). The HUD Handbook also states that servicers "must promptly reimburse HUD for any amount overpaid because of incorrect, unsupported or inappropriate information" they provide. TAC ¶ 104; HUD Handbook 4330.4, 1-28. Thus, by knowingly retaining the overpayments, the servicers also decreased an

obligation to the Government "arising from an express or implied contractual . . . relationship." 31 U.S.C. § 3729(b)(3).

The notion that the obligations created by the Fannie Guide and HUD Handbook are not "self-executing" is simply incorrect. They are. The Fannie Guide states that a servicer "is responsible for monitoring fees or expenses," and that Fannie Mae "will require the servicer to reimburse Fannie Mae for any unreasonable or excessive fees or costs." In other words, the Guide provides that if a servicer ever submits unreasonable or excessive fees or costs to Fannie Mae and is paid for them, the servicer becomes responsible for reimbursing Fannie Mae for those fees or costs. *See United States v. Merck-Medco Managed Care, LLC*, 336 F. Supp. 2d 430, 445 (E.D. Pa. 2004) ("Medco, in other words, incurs the obligation to pay a penalty when its conduct falls below specific contractual obligations, and when there is a contractual provision specifying that such conduct *will* incur a penalty." (emphasis added)). The HUD Handbook is even clearer. It says that that the servicer "is responsible for the completeness and accuracy of the claim submission," and that it "must promptly reimburse HUD for any amount overpaid because of incorrect, unsupported or inappropriate information provided." HUD Handbook 4330.4, 1-16, 1-28. Again, once an overpayment is made to HUD as a result of "incorrect, unsupported or inappropriate information" the servicer has provided, it becomes the servicer's obligation to "promptly reimburse HUD for any amount overpaid."

The sole case that the Servicers cite in support of their argument, *U.S. ex rel. Landis v. Tailwind Sports Corp.*, 160 F. Supp. 3d 253 (D.D.C. 2016), is inapposite. *Landis*'s reverse false claim was decided under the pre-FERA version of the FCA, *id.* at 257, 266, before Congress had defined "obligation" to include both "contingent and fixed" obligations, including contractual ones. The change was intended to broaden the existing understanding of obligation to encompass

"contingent, non-fixed obligations" that can "arise[] across the spectrum of possibilities from the fixed amount debt obligation where all particulars are defined to the instance where there is a relationship between the Government and a person that results in a duty to pay the Government money, whether or not the amount owed is yet fixed." S. Rep. No. 111-10, at 14 (2009) (internal quotation marks omitted).

In any event, in *Landis*, the court concluded that relevant contract did not create a statutory "obligation" because it "did not obligate [defendant] to reimburse the Government," but instead merely "acknowledged [the government's] preexisting entitlement to exercise any other right or remedy available to it under law or in equity." *Id.* at 266-72. Here, by contrast, the Fannie Guide and HUD Handbook expressly obligate the Servicers to reimburse them for any amounts they are overpaid. At most, the Government may have discretion over *when* to request those overpayments, but that discretion does not negate a pre-existing obligation. *See, e.g.*, *U.S. ex rel. Boise v. Cephalon, Inc.*, 2015 WL 4461793, at *5 (E.D. Pa. July 21, 2015) ("The existence of a contractual obligation to pay does not typically depend upon the timing of the demand for payment."). Indeed, *U.S. ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1204 (10th Cir. 2006), which was cited approvingly in the Judiciary Committee's Report accompanying the FERA Amendments, noted that "the need for some further governmental action or some further process to liquidate an obligation does not preclude a reverse false claims action." The Servicers knowingly decreased their obligations to the Government by submitting overcharges and failing to reimburse the Government for them. This behavior gives rise to reverse false claims liability under Section (a)(1)(G).

### 3.  The Complaints Allege Scienter for the Reverse False Claims

As with ordinary false claims, scienter for reverse false claims need not be alleged with particularity. Instead, the "conditions of a person's mind, including knowledge, may be alleged

generally." *Kane ex rel. U.S. v. Healthfirst, Inc.*, 120 F. Supp. 3d 370, 395 (S.D.N.Y. 2015). For the same reasons set forth above, the Complaints adequately allege scienter for the reverse false claims. *See supra* at IV.C.1 (describing red flags and indicators of defendants' scienter).  *See Kane*, 120 F. Supp. 3d at 395 (finding complaint adequately alleged scienter for reverse false claim where defendant was put on notice of potential overpayments); *Lakeshore*, 2013 WL 1307013, at *4 ("If the government overpaid defendant for . . . services and defendant intentionally refused to investigate the possibility that it was overpaid, it may have unlawfully avoided an obligation to pay money to the government."); *see also U.S. ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 380 (4th Cir. 2015) (finding "ample support" for jury verdict as to defendant's intent based on evidence of defendant's "inaction in the face of . . . warnings").

### G.    The Complaints State a Claim for Conspiracy Against the Law Firms and Their Affiliates

McCabe argues that the Complaints fail to allege an overt act among it and its affiliates. That is not true. For example, the Complaints alleges that REO billed above market rates for title searches on Katsura Property (TAC ¶¶ 306-307), the Roundtree Court Property (SAC ¶¶ 189-190), and the Country Club Lane Property (*id.*¶¶ 253-254).  As for AOSS, the SAC alleges AOSS hired a third-party process server to perform work cheaply on the Roundtree Court Property and Country Club Lane Properties, marked it up, and then McCabe passed along the marked up bills, which were reimbursed by Freddie Mac.  (SAC ¶¶ 191-195, 255-259.)

McCabe also argues that the conspiracy claim should be dismissed because there is no "specific statement where defendants agreed to defraud the government." McCabe Br. at 23 (internal quotation marks omitted). No such requirement exists. *See Meyer v. Kalanick*, 174 F. Supp. 3d 817, 825 (S.D.N.Y. 2016) ("It is fundamental to the law of conspiracy that the agreements that form the essence of the misconduct are not to be judged by technical niceties but

by practical realities.  Sophisticated conspirators often reach their agreement as much by the wink and the nod as by explicit agreement."). To state a conspiracy claim, a relator must simply allege that "(1) the defendant conspired with one or more persons to get a false or fraudulent claim allowed or paid by the United States" and "(2) one or more conspirators performed any act to effect the object of the conspiracy." *Wood*, 246 F. Supp. 3d at 825. [23]

The Rosicki Defendants also argue that the conspiracy claim cannot survive because entities within the same corporate family cannot conspire with one another.  Rosicki Br. at 39-40. But it is not clear that the "intracorporate conspiracy" doctrine applies in the FCA context.  The doctrine developed within the context of antitrust law, and the Supreme Court has noted that it "turns on specific antitrust objectives." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 166 (2001). The Second Circuit has not determined the applicability of the doctrine to claims brought under the FCA, but several courts around the country have held that it does not apply to such claims. *See, e.g.*, *U.S. ex rel. Millin v. Krause*, 2018 WL 1885672, at *12 (D.S.D. Apr. 19, 2018) ("[B]ecause the intracorporate conspiracy doctrine does not apply to criminal conspiracy, and because the conduct that Relator alleges would constitute a violation of both 18 U.S.C. § 371 and the civil liability provisions of § 3729(a), the intracorporate conspiracy must not shield the same conspiracy from civil liability."); *U.S. ex rel. Harris v. Lockheed Martin Corp.*, 905 F. Supp. 2d 1343, 1354-55 (N.D. Ga. 2012); *see also United States v. President & Fellows of*

---

[23] *United States ex rel. Ladas v. Exelis*, 824 F.3d 16 (2d Cir. 2016), the case McCabe cites, was simply reciting a district court ruling which had already concluded no false claims had been submitted, and then went on to find that a stand-alone conspiracy claim could not survive absent specific evidence of an agreement to violate the FCA. It did not create a separate requirement that the relator must also allege an express statement or conversation among the co-conspirators, and courts do not require one. *See, e.g.*, *Wood*, 246 F. Supp. 3d at 826 (finding conspiracy claim adequately pleaded where no "specific statement" was alleged).

*Harvard Coll.*, 323 F. Supp. 2d 151, 198 n.40 (D. Mass. 2004) (noting, without ruling on issue, that "it is questionable whether" the intracorporate conspiracy doctrine applies to FCA case).

Even if the intracorporate conspiracy doctrine could apply to claims brought under the FCA, however, it would not justify dismissal of the conspiracy claim here. Where it applies, the doctrine bars conspiracies between parents and their *wholly-owned subsidiaries.* That is because such entities "have a complete unity of interest" and "must be viewed as that of a single enterprise." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 772 (1984). Here, the Relator's Complaints do not plead the specific ownership structure among the Rosicki Defendants, and they certainly do not allege that Paramount, Threshold, and Enterprise are wholly-owned subsidiaries of the Rosicki Firm. Instead, they allege that they are affiliated entities over which the law firms could exercise control and may have some ownership interest in. TAC ¶¶ 122, 139. Thus, even if the intracorporate conspiracy doctrine could ever apply in the FCA context, it would be inappropriate to resolve its applicability at this stage of the litigation.

## H.     The Action is Not Barred by Any Public Disclosure

The public disclosure bar does not apply to this suit.  That provision "is intended to bar parasitic lawsuits based upon publicly disclosed information in which would-be relators seek remuneration although they contributed nothing to the exposure of the fraud." *U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1157 (2d Cir. 1993).  Here, the Government acknowledges that Relator not parasitic at all: he revealed Defendants' schemes and thereby launched the Government's investigation. For the first time ever in the Southern District of New York, the Government has thus vetoed the public disclosure bar defense.[24]

---

[24] The Government has explained that Congress, in its 2010 amendment, "clearly delineated its concern that the only *qui tam* actions that should be eligible for dismissal based on the grounds that they are parasitic vis-à-vis the Government are ones that the Government considers to be

1.    <u>There Was No Public Disclosure</u>

Under the pre-March 2010 version of the Act, a "public disclosure (via an enumerated source) must be of the material elements of the 'allegations or transactions' on which the claim is based." *U.S. ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 103 (2d Cir. 2010) (quoting 31 U.S.C. § 3730(e)(4)(A) (2009)), *rev'd on other grounds*, 563 U.S. 401 (2011). The bar applies "*only* when either the allegation of fraud or the critical elements of the fraudulent transaction themselves were in the public domain." *U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 654 (D.C. Cir. 1994), *quoted by Kirk*, 601 F.3d at 103.   A disclosure "must occur through one of the sources enumerated in the statute," *Schindler Elevator Corp.*, 601 F.3d at 103, such as in the "news media" or in a civil suit, 31 U.S.C. § 3730(e)(4)(A) (2009).

The public disclosure bar requires not only that the enumerated source disclose the fraudulent scheme (*i.e.*, overcharges and reimbursement by HUD at the GSEs), but also that it disclose the involvement of each defendant. *U.S. ex rel. Cosens v. Yale-New Haven Hosp.*, 233 F. Supp. 2d 319, 329 (D. Conn. 2002) (bar applies only if each defendant "could be readily identified" by disclosure); *see also Cooper v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562, 566-67 (11th Cir. 1994). "[N]o court of appeals supports the view that a report documenting widespread false claims, but not attributing them to anyone in particular, blocks *qui tam* litigation against every member of the entire industry." *U.S. ex rel. Baltazar v. Warden*, 635 F.3d 866, 867-68 (7th Cir. 2011).

---

parasitic. . . . [T]he Government is in the best position to make these types of determinations." Gov't Mem. dated June 10, 2016, at 23, *U.S. ex rel. Conroy v. Select Med. Corp.*, 3:12-cv-00051 (S.D. Ind.), Dkt. 157.  The defendants do not raise any public disclosure bar defense as to claims arising post-amendment (*i.e.*, as of March 23, 2010).

None of the material cited by the Defendants triggers a public disclosure bar here. None of those materials alleged both that vendors were generating excessive and unnecessary foreclosure-related fees (the first critical fact) and that HUD and the GSEs were unwittingly reimbursing those fees (the second critical fact)—and certainly none states Relator's conclusion that HUD and the GSEs were paying false claims (the conclusion). Most of the cited media is irrelevant, as it describes law firms rushing foreclosures to generate attorneys' fees, rather than overcharging vendor fees. *See* Schilling Decl., Exs. B, D, F-J. While a few articles do mention possible overcharges by two specific law firms, they nowhere state that HUD or the GSEs were being overcharged. *See id.*, Exs. C, E, L-M. The sole item even suggesting both elements— vendor overcharges and reimbursements in violation of HUD or GSE rules—is from 1998.[25] That article mentions only a single defendant: SunTrust. And, being twenty years old, it cannot trigger the public disclosure bar, because courts do not "accept the proposition that information" disclosed so far in the past, "constitute[s] 'public disclosure' of facts on the ground . . . years later." *Kester*, 23 F. Supp. 3d at 353 (S.D.N.Y. 2014).

This suit stands in stark contrast to Defendants' precedents, which illustrate the parasitical nature of cases properly dismissed under the public disclosure bar. One case was built entirely on information disclosed by government agents during the execution of a search warrant, *see U.S. ex rel. Doe v. John Doe Corp.*, 960 F.2d 318 (2d Cir. 1992), another came after "the government actually took several steps" to investigate the fraud, as disclosed in a front-page *New York Times* article, *see Ping Chen ex rel. United States v. EMSL Analytical, Inc.*, 966 F. Supp. 2d 282, 292-93, 297-99 & n.12 (S.D.N.Y. 2013), and a third alleged conduct already disclosed,

---

[25] Defendants also cite a posting on Relator's website and Relator's litigation with the Rosicki Firm.  But that posting and litigation involved the Rosicki Firm, and did not disclose any wrongdoing by the Servicer Defendants or the McCabe Firm.

litigated, and publicly resolved in a prior government action, *see U.S. ex rel. Advocates for Basic Legal Equality v. U.S. Bank, N.A.*, No. 13 Civ. 704 (N.D. Ohio May 12, 2015).

2.   <u>Relator Is an Original Source</u>

Even if a relevant public disclosure could be found, Relator is an original source.

<u>First</u>, Defendants argue otherwise only by citing the wrong definition. All of Defendants' arguments proceed from the premise that Relator needed "direct and independent knowledge" to be considered an original source. *See* Servicers' Br. at 44-45; McCabe Br. at 13-16. But in the 2010 amendments, Congress clarified the definition of "original source" to mean anyone "who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions." 31 U.S.C. § 3730(e)(4)(B). Congress made that clarification precisely because FCA defendants were attempting—as Defendants do here—to use "the public disclosure bar to deny an award to a *qui tam* relator despite the objections of the United States." S. Rep. No. 110-507, at 22 & n.80 (2008); *see also* H. Rep. No. 111-97, at 24 (2009). Because that amendment was a clarification, rather than a substantive change, the clarification applies retroactively to the pre-March 2010 claims alleged in this lawsuit. *See Bellevue v. Universal Health Servs. of Hartgrove*, 867 F.3d 712, 718 (7th Cir. 2017); *see generally Leshinsky v. Telvent GIT SA*, 873 F. Supp. 2d 582, 590-91 (S.D.N.Y. 2012).

There can be no question that Relator's knowledge was "independent of" any public disclosures and "materially add[ed]" to any such disclosures. None of Defendants' cited disclosures revealed the alleged overcharging by any of the Servicer Defendants or the McCabe Defendants. Nor did any of the disclosures reveal the submission of false statements to HUD or the GSEs. These core details, marshaled by Relator, were independent of and materially added to any prior disclosure. Defendants do not appear to contest those facts, and cite pre-2010 caselaw to attack the source of Relator's knowledge as insufficient to make him an original source. But

68

those arguments did not survive the 2010 amendment. Indeed, prior to enacting the 2010 amendment, the Judiciary Committee acknowledged that Defendants' construction of "original source" "run[s] contrary to the intent of [Congress]." S. Rep. No. 110-507, at 22-23 & nn.80-88. The Committee provided a list of cases wrongly decided—and needing clarification—and that list strikingly mirrors Defendants' list of chief authorities. *See id.* at n.82, (criticizing *U.S. ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1158 (3d Cir. 1991)), n.81 (criticizing *U.S. ex rel. Doe v. John Doe Corp.*, 960 F.2d 318 (2d Cir. 1992)), & n.88 (criticizing cases dismissing relator, where he conducted his own investigation). Presciently, the Judiciary Committee emphasized that "the best source for determining whether a relator has provided meaningful, new information to the Government is the Government itself." *Id.* at 24. Here, the Government correctly concludes that Relator is an original source.

<u>Second</u>, any in any event, Defendants' arguments fail even under the pre-March 2010 "original source" definition. Relator "obtained direct and independent knowledge of these schemes through his communications with lawyers from large foreclosure law firms," TAC ¶ 490, including with a partner at the "law firm of Steven J. Baum, P.C.," then the "largest foreclosure firm in New York," as well as through "communications with lawyers at the Rosicki Firm and with partners of other firms throughout the country with affiliate vendors." *Id.* ¶ 491. He learned, through admissions from foreclosure firm partners, that the Servicer Defendants were "paying for inflated and unnecessary foreclosure expenses, without any real effort to obtain the best value or exercise quality control over vendor fees, knowledge about the affiliate business model, knowledge about the mark-up practices of the affiliate vendors, and knowledge of specific examples of unreasonable and unnecessary foreclosure fees being generated and paid by servicers." *Id.* ¶ 492. Relator could submit evidence and additional pleadings further detailing

some of these communications. But there is no merit to the Servicer Defendants' argument that, because Relator spoke to law firms and not the Servicers themselves, he somehow could not be an original source with respect to them. *See United States v. Huron Consulting Grp., Inc.*, 843 F. Supp. 2d 464, 472 (S.D.N.Y. 2012) (holding relator "demonstrated direct and independent knowledge of his 'core allegation' against" a defendant, even though he "did not work at" the defendant "and does not know how it processed [the particular] charges").

## I.   The Settlements Release Less Conduct than the Servicers Contend[26]

### 1.   Bank of America's "Riders" Do Not Immunize its Misconduct

Bank of America argues that because of purported disclosures made by it in its annual certifications to the GSEs and FHA, all of the Relator's FCA claims that arise from its post-disclosure claims for reimbursement of foreclosure expenses should be dismissed and, by extension, that it faces no liability whatsoever for noncompliance with any Fannie, Freddie, or HUD rules. BofA Br. at 2-5. The argument is wrong both factually and legally.

As a factual matter, the annual certifications affirmatively represent BofA's compliance with the servicer requirements. The Fannie Mae certification is illustrative:

12.a)   Is the lender complying with all requirements . . . of the Mortgage Selling and Servicing Contract and all addenda thereto, and with all applicable Fannie Mae Guides and all bulletins, announcements, and lender letters issued in connection therewith?

**YES.**

Declaration of Adam Hakki, Ex. 2, 13 Civ. 1467, Dkt. 60-2 at 4.  The Freddie Mac certification

---

[26] The Chase, Wells Fargo, Citi, and Bank of America Defendants argue that their National Mortgage Settlement Releases preclude liability for false claims submitted prior to February 9, 2012. Relator agrees.

is similarly broad.  *Id*., Dkt. 60-3 at 2.[27]

Bank of America cannot have its cake and eat it too. It cannot affirmatively represent its compliance with program rules and then avoid any obligation to comply with them with vague qualifications that followed. It cites no case accepting is position. As to the specific riders it points to, they did not "explicitly inform[]" anyone that Bank of America was "already under investigation for the types of alleged conduct at issue in this action." BofA Br. at 3.  There is nothing in the riders that suggests that the pending "investigation" involves the submission of overstated foreclosure expense claims to the GSEs and to FHA. Vague warnings about how large Bank of America's operations are or the fact that its conduct has merited multiple investigations did not disclose any particular fraudulent schemes or failures to monitor foreclosure expenses. Thus, the linchpin of its argument—that the riders "explicitly" disclosed a pending investigation of its submission of claims for overstated foreclosure expenses—is missing.

Bank of America's argument with respect to scienter is even more bizarre. The riders represent that Bank of America was doing its best to comply with all applicable rules. But the Complaints allege that Bank of America was doing no such thing and, in fact, acted recklessly or with a willful disregard as to whether it was complying or not. Such scienter allegations are not undermined by qualifications to an annual certification; if anything the opposite is true, as the riders at most reflect a clumsy attempt at a cover-up. *See United States ex rel. Swoben v. United Healthcare Ins. Co.,* 848 F.3d 1161, 1178-79 (9th Cir. 2016) (affirming denial of dismissal based on qualified certification because FCA's scienter standard "does not allow a contractor to

---

[27] Bank of America did not provide a copy of the annual certification given to HUD.  *See* 13 Civ. 1467, Dkt. 60-4 (Hakki Decl., Ex. 4) (containing type-written rider only).

deliberately turn a blind eye" to false statements).[28]

Its argument with respect to materiality is meritless. A materiality defense premised on *Escobar* requires disclosure of actual non-compliance or the Government's payment of a claim with actual knowledge that the specific claim is false. *See* 136 S. Ct. at 2002. Neither condition is present here. A company cannot opt out of the entire FCA by stating that, with respect to huge swaths of its operations, its doing its best to comply with all rules but it can never know for certain. It would be antithetical to the purposes of the FCA to allow a defendant to escape accountability where it clearly answers "YES" to questions that it was following the rules, but slips in its own riders, which have no effect, that purport to qualify those clear representations.

### 2. The Flagstar Release Is Narrow

The Flagstar settlement arose amid allegations that Flagstar had been fraudulently endorsing loans for FHA insurance in violation of FHA's Direct Endorsement Lenders ("DEL") program and been lying to FHA about its <u>underwriting</u> practices. 12 Civ. 7199, Dkt. 127-1 at 2. Flagstar only acknowledged responsibility for misconduct related to underwriting and agreed that it would comply with the rules of the DEL program (an origination program). *Id.* ¶ 2. Flagstar agreed to subject itself to a one-year monitoring period with respect to its compliance "with all relevant HUD/FHA rules <u>applicable to Direct Endorsement Lenders in the DEL program</u>." *Id.* ¶ 3(a). In short, the settlement was only about origination practices.

Nevertheless, Relator acknowledges the breadth of the release language and will not challenge that it covers mortgages: (a) that were <u>endorsed for FHA insurance</u> from January 1,

---

[28] Bank of America's reliance on *United States v. Ekelman & Assocs.*, 532 F.2d 545, 549-50 (6th Cir. 1976), is unavailing. Not only was *Ekelman* decided before Congress expanded the definition of scienter under the False Claims Act (in 1986), but the case involved a regulatory scheme in which the defendant was not expected to make independent efforts to verify the accuracy of information submitted.

2002 to February 24, 2012 **and** (b) for which foreclosure expenses had already been paid by February 24, 2012.  The release does not apply to any GSE loans or to any HUD loans that Flagstar either acquired from another originator after it had been endorsed for FHA insurance or for any loan endorsed outside of the ten year period covered by the Flagstar Settlement.

### 3.    The OneWest Release Does Not Come Close to Covering this Fraud

Defendant OneWest argues that a release with the Federal Reserve absolves it of liability here. The argument completely lacks merit. The release is from the Federal Reserve and not any of the GSEs, HUD, the FHFA, or Treasury. The release is expressly limited to (a) "liability that has been or might have been asserted by the Board of Governor" and (b) "conduct that is subject to" the consent orders "to the extent known to the Board of Governors as of the date of the" release. In other words, OneWest must show the claims asserted by the Relator are ones that belonged to the Federal Reserve and that the Federal Reserve knew about the specific conduct alleged in the Complaints. OneWest has not shown either, nor could it possibly do so.

OneWest also argues that the a series of consent decrees it entered into with regulators who had oversight of its banking operations—the Office of Thrift Supervision, the Comptroller of Currency, or the Federal Reserve—somehow render its false claims immaterial. The consent decrees, for which OneWest provides no context, show that OneWest has a difficult time living up to the promises it makes as a servicer. But nothing about them discloses the particular fraud at issue here—failing to scrutinize or monitor in any way legal costs submitted by law firms. Moreover, the agreements are with regulatory bodies, not any of the GSEs, HUD, or FHFA.

## V.     CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss should be denied.


Dated:  May 7, 2018                              Respectfully submitted,
        New York, New York


                                                 SUSMAN GODFREY L.L.P.


                                                 */s/ Jacob W. Buchdahl*       
                                                 Jacob W. Buchdahl
                                                 Arun Subramanian
                                                 Cory S. Buland
                                                 1301 Avenue of the Americas, 32nd Fl.
                                                 New York, NY 10019
                                                 Telephone No.:  (212) 336-8330
                                                 Fax No.:  (212) 336-8340
                                                 jbuchdahl@susmangodfrey.com
                                                 asubramanian@susmangodfrey.com
                                                 cbuland@susmangodfrey.com

                                                 *Attorneys for Plaintiff-Relator Peter Grubea*


                                                 WILLENS & SCARVALONE LLP


                                                 */s/ Edward Scarvalone*       
                                                 Edward Scarvalone
                                                 40 Wall Street, Suite 4100
                                                 New York, New York 10005
                                                 Telephone No.:  (646) 200-6334
                                                 Fax No.:  (800) 879-7938
                                                 escarvalone@willensscarvalone.com

                                                 *Attorney for Plaintiff-Relator Peter Grubea*
                                                 *in 13 Civ. 1467*