UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA *ex rel.* PETER D. GRUBEA,

                              Plaintiff,

         v.

ROSICKI, ROSICKI & ASSOCIATES, P.C., *et al.*,

                              Defendants.

---

UNITED STATES OF AMERICA,

                              Plaintiff-Intervenor,

         v.

ROSICKI, ROSICKI & ASSOCIATES, P.C., PARAMOUNT LAND, INC., THRESHOLD LAND INC., and ENTERPRISE PROCESS SERVICE, INC.,

                              Defendants.

---

No. 1:12-Civ.-7199 (JSR)

# REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE ROSICKI DEFENDANTS' MOTION TO DISMISS

M\ :small-caps:McLAUGHLIN & STERN, LLP
260 Madison Avenue
New York, New York 10016
(212) 448-1100
*Attorneys for Defendants*
*Rosicki, Rosicki & Associates, P.C.,*
*Paramount Land, Inc.,*
*Threshold Land Inc., and*
*Enterprise Process Service, Inc.*

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................................................i

INTRODUCTION ..................................................................................................................... 1

ARGUMENT ............................................................................................................................. 1

    I.    The Complaints Fail To Adequately Allege that the Servicers' Requests for Payment
        Submitted to the GSEs Were "Claims" Under the FCA..................................................... 1

    II.   The Government Has Failed To Plead a False Claim with Particularity. .......................... 6

    III.  The Complaints Fail To Adequately Allege that Any Claims Submitted by the
        Servicers Were "False or Fraudulent" Under the Implied Certification Theory. .............. 7

    IV.  The Complaints Fail To Adequately Allege that the Supposed Overcharges Were
        Material to Fannie Mae's Payment Decisions, Much Less that the Rosicki Defendants
        Knew They Were Material............................................................................................... 13

    V.   The Complaints Fail To Adequately Allege Reverse False Claims. ............................... 17

    VI.  Relator's Conspiracy Claim Must Be Dismissed............................................................ 19

CONCLUSION........................................................................................................................ 20

# <u>TABLE OF AUTHORITIES</u>

CASES

*Allison Engine v. U.S. ex rel. Sanders*,
    553 U.S. 662 (2008).................................................................................................. 2

*Bishop v. Wells Fargo & Co.*,
    870 F.3d 104 (2d Cir. 2017).............................................................................. 11, 12

*Christians of Cal., Inc. v. Clive Christian N.Y., LLP*,
    No. 13-cv-275-KBF, 2015 WL 468833 (S.D.N.Y. Feb. 3, 2015) ................................... 20

*Garg v. Covanta Holding Corp.*,
    478 F. App'x 736 (3d Cir. 2012) ............................................................................... 2

*Hartline v. Gallo*,
    546 F.3d 95 (2d Cir. 2008)................................................................................. 19, 20

*Murphy v. City of Stamford*,
    634 F. App'x 804 (2d Cir. 2015) .............................................................................. 19

*Paskar v. City of N.Y.*,
    3 F. Supp. 3d 129 (S.D.N.Y. 2014)........................................................................... 14

*Roberts v. FHFA*,
    No. 17-1880, 2018 WL 2055940 (7th Cir. May 3, 2018)............................................... 18

*U.S. ex rel. Adams v. Aurora Loan Servs., Inc.*,
    813 F.3d 1259 (9th Cir. 2016) ................................................................................... 4

*U.S. ex rel. DRC, Inc. v. Custer Battles, LLC*,
    562 F.3d 295 (4th Cir. 2009) .................................................................................... 4

*U.S. ex rel. Grubea v. HSBC Bank USA, N.A.*,
    No. 1:13-cv-1467-JSR (S.D.N.Y. Mar. 5, 2013) .......................................................... 14

*U.S. ex rel. Kester v. Novartis Pharm. Corp.*,
    23 F. Supp. 3d 242 (S.D.N.Y. 2014)........................................................................ 6, 7

*U.S. ex rel. Koch v. Koch Indus., Inc.*,
    57 F. Supp. 2d 1122 (N.D. Okla. 1999)...................................................................... 18

*U.S. ex rel. Kraus v. Wells Fargo & Co.*,
    No. 11-cv-5457-BMC (E.D.N.Y. May 10, 2018)....................................................... 2, 19

*U.S. ex rel. Lupo v. Quality Assurance Servs., Inc.*,
    242 F. Supp. 3d 1020 (S.D. Cal. 2017)...................................................................... 19

*U.S. ex. rel. Mikes v. Straus*,
    274 F.3d 687 (2d Cir. 2001)................................................................. 10

*U.S. ex rel. Petras v. Simparel*,
    857 F.3d 497 (3d Cir. 2017)................................................................. 18

*U.S. ex rel. Todd v. Fidelity Nat'l Fin. Inc.*,
    No. 12-cv-666-REB-CBS, 2014 WL 4636394 (D. Colo. Sept. 16, 2014)......................... 2

*U.S. ex rel. Wood v. Allergan, Inc.*,
    246 F. Supp. 3d 772 (S.D.N.Y. 2017), *appeal pending*, No. 17-2191 (2d Cir.).............. 11

*U.S. ex rel. Yesudian v. Howard University*,
    153 F.3d 731 (D.C. Cir. 1998) ............................................................. 5

*U.S. ex. rel. O'Donnell v. Countrywide Fin. Corp.*,
    No. 1:12-cv-1422-JSR (S.D.N.Y. Jan. 11, 2013) ......................................... 3, 4

*United States v. Caremark, Inc.*,
    634 F.3d 808 (5th Cir. 2011) .............................................................. 18

*United States v. Merck-Medco Managed Care, L.L.C.*,
    336 F. Supp. 2d 430 (E.D. Pa. 2004) ...................................................... 18

*Universal Health Servs. v. U.S. ex rel. Escobar*,
    136 S. Ct. 1989 (2016)........................................................ 8, 9, 10, 11, 12, 13

**STATUTES**

31 U.S.C. § 3729(a)(1)(G) .................................................................... 18

31 U.S.C. § 3729(b)(2)(A)(ii) .............................................................. 2, 6

**OTHER AUTHORITIES**

Federal Housing Finance Agency Office of Inspector General,
    *FHFA's Oversight of Fannie Mae's Default-Related Legal Services*,
    (Sept. 30, 2011), https://goo.gl/A8ZyuB ................................................ 14, 16

FHFA, *Quarterly Draws on Treasury Commitments to Fannie Mae and Freddie Mac
    per the Senior Preferred Stock Purchase Agreements*,
    https://goo.gl/4ayrPj (last visited May 11, 2018)......................................... 3

U.S. Attorney's Office, Press Release, *Manhattan U.S. Attorney Settles Civil Fraud
    Claims Against HSBC Bank for Failure to Monitor Fees Submitted for
    Foreclosure-Related Services*, (July 1, 2014), https://goo.gl/ve8SJu.................... 14

## INTRODUCTION

Despite the Government's six-year investigation and Relator's filing of multiple amended complaints, they have failed to plead viable claims under the False Claims Act.  For all Plaintiffs' complaints about alleged overcharges, they cannot come up with a plausible theory of fraud.  The notion that Fannie Mae was somehow deceived about whether the Rosicki firm's charges exceeded the "market rate" for foreclosure services or "the value actually received" by Fannie Mae, Gov't Opp. 18, is self-refuting: Fannie Mae knew exactly how much it was being asked to pay and for what services, and Fannie Mae knew better than anyone what the market rate was and what those services were worth.  Neither complaint alleges that the Rosicki firm ever lied to Fannie Mae or the servicers about what services were performed or who performed them, and it is undisputed both that the Rosicki firm incurred the same amounts in costs for the services that it billed the servicers and that Fannie Mae knew that the Rosicki firm was using affiliates.  The simple reality is that this is not a fraud case.  As a result, even if requests to Fannie Mae for payment for foreclosure services constituted "claims" subject to the FCA—and they do not—the complaints should be dismissed with prejudice.

## ARGUMENT

**I.    The Complaints Fail To Adequately Allege that the Servicers' Requests for Payment Submitted to the GSEs Were "Claims" Under the FCA.**

The Government agrees that the GSEs are not officers, employees, or agents of the United States, Gov't Opp. 4, but it wants them treated exactly as if they were.  According to the Government, to invoke the FCA's punitive remedies, it has to show only that "a claim was paid by an entity that receives a substantial amount of federal money and has a strong nexus to the Government," without any need to show "that those [federal] funds were used to satisfy the claims."  Gov't Opp. 5.  The Government's position is impossible to square with the statute

because it ignores the explicit nexus requirement: a request to a grantee or other recipient is an

FCA "claim" only if the Government "provides," "has provided," or "will reimburse" at least a

portion of "the money or property requested or demanded."  31 U.S.C. § 3729(b)(2)(A)(ii).

Courts interpreting this provision have required a showing that the Government provided

"at least a portion of the *specific money or property requested* or reimburse[d] the grantee for that

*specific demand*."  *Garg v. Covanta Holding Corp.*, 478 F. App'x 736, 740–41 (3d Cir. 2012)

(emphasis added, quotation marks omitted).  The only court to rule on whether requests for

payment submitted to either of the GSEs post-conservatorship qualify as FCA "claims" cited *Garg*

and found that the nexus requirement was not satisfied.  *U.S. ex rel. Todd v. Fidelity Nat'l Fin.*

*Inc.*, No. 12-cv-666-REB-CBS, 2014 WL 4636394, at *10–11 (D. Colo. Sept. 16, 2014).  The

Government's brief does not so much as mention either *Garg* or *Todd*.[1]

The nexus requirement is satisfied in cases—like *Allison Engine v. U.S. ex rel. Sanders*,

553 U.S. 662 (2008)—where a general contractor pays a subcontractor's claim using government

funds that are specifically earmarked for expenses incurred as part of a particular project, like the

provision of medical services to beneficiaries of a government healthcare program.  But the nexus

requirement is not satisfied just because the Government has provided general, undifferentiated

financial support to the entity from which the defendant sought payment.  To the contrary, the

point of the nexus requirement is that such a generalized connection with the *entity* is insufficient

and that the required nexus is to "the money or property requested or demanded."

The Government nonetheless invites this Court to apply the FCA to all requests for

---

[1] *See also* Order Granting Mot. To Dismiss, *U.S. ex rel. Kraus v. Wells Fargo & Co.*, No. 11-cv-5457-BMC, ECF No. 92, at 18 (E.D.N.Y. May 10, 2018) (loan requests to Federal Reserve Banks (FRBs) were not "claims" because Government's "financial connection with FRBs" did "not extend to funding or reimbursing FRBs for *the individual loans* at issue" (emphasis added)).

payment to the GSEs because, during the 2008 economic crisis, Treasury gave the GSEs what was effectively an interest-bearing loan.   But Treasury provided the GSEs with general, undifferentiated financial support, not funds earmarked for specific projects or expenses.  Neither complaint draws a link between Treasury funds and the funds the GSEs used to reimburse the servicers for foreclosure expenses.  To the contrary, the Government has acknowledged that the federal funds received by the GSEs were "used primarily to cover losses from single-family mortgages purchased and guaranteed by the GSEs."  Amended Compl., *U.S. ex. rel. O'Donnell v. Countrywide Fin. Corp.*, No. 1:12-cv-1422-JSR, ECF No. 40, ¶ 29 (S.D.N.Y. Jan. 11, 2013). Relator offers no support for his contention that those mortgage losses included foreclosure expenses.  *See* Relator Opp. 50.  In fact, the federal funds were used to cover mark-to-market paper losses on mortgages and securities, not foreclosure expenses.  Fannie Mae's foreclosure expenses were relatively flat from 2007 through 2017 and magnitudes smaller than the bailout funds received.  Plainly, the federal bailout of Fannie Mae was not aimed at providing money to pay foreclosure expenses.[2]

  The Government cites no post-FERA case that supports its elimination of the nexus

[2] The following table shows (in millions of dollars) how much Fannie Mae received from the Government and how much it spent on foreclosure expenses from 2007 through 2017, based on data in Fannie Mae's annual 10K reports.  In 2012 and 2013, Fannie Mae recognized foreclosure *income* (not expense) because of delay fees paid by primary servicers, gains from resolution agreements, and improving REO sales prices.  Information on Fannie Mae's Treasury draws can be found on the FHFA's website.  FHFA, *Quarterly Draws on Treasury Commitments to Fannie Mae and Freddie Mac per the Senior Preferred Stock Purchase Agreements*, https://goo.gl/4ayrPj (last visited May 11, 2018)

| **Year** | **2007** | **2008** | **2009** | **2010** | **2011** | **2012** | **2013** | **2014** | **2015** | **2016** | **2017** |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Treasury Draw** | 0 | 0 | 59,900 | 27,700 | 23,978 | 4,571 | 0 | 0 | 0 | 0 | 0 |
| **Foreclosure Expenses** | 448 | 1,858 | 910 | 1,718 | 780 | -254 | -2,839 | 142 | 1,629 | 644 | 521 |

requirement.  As noted above, it does not even acknowledge the most pertinent authority, *Garg* and *Todd*.  The only post-FERA cases the Government cites expressly declined to decide whether all requests for payment to Fannie Mae qualify as FCA "claims."  *See U.S. ex rel. Adams v. Aurora Loan Servs., Inc.*, 813 F.3d 1259, 1261 (9th Cir. 2016) ("express[ing] no opinion" about that question); *United States v. Countrywide Fin. Corp.*, 961 F. Supp. 2d 598, 609 (S.D.N.Y. 2013) (Rakoff, J.) (stating that the point was "arguabl[e]" but had not been argued).  To the Rosicki Defendants' knowledge, no case applies the FCA to requests for payment made to an entity based on the Government's provision of temporary, undifferentiated financial support over a relatively short period of time via an interest-bearing loan.

Lacking relevant authority construing the post-FERA provision that governs here, the Government cites *U.S. ex rel. DRC, Inc. v. Custer Battles, LLC*, 562 F.3d 295 (4th Cir. 2009). There, the court held that requests for payment to the Development Fund for Iraq, which included funds provided by the Government as well as funds from non-U.S. sources, were "claims" under the pre-FERA FCA.  *Id.* at 303-04.  The defendant there had argued, and the district court had held, that the Government did not "provide" any of the funds used to pay the claim because when it contributed money to the Development Fund, it no longer had "title to" or "control of" those funds.  *Id.* at 302-03.  The Fourth Circuit held that the FCA did not require that the Government pay the claimant "directly" or have "control" over the funds used to pay the claimant, only that "some portion" of the claim be paid with "U.S. money," even if that money was in the hands of a grantee.  *Id.* at 303-04.

The Rosicki Defendants are not making the arguments the Fourth Circuit rejected in *Custer Battles*.  They do not contend that the FCA requires the Government to allege that Treasury paid the servicers directly or that it retained control of the funds provided to Fannie Mae.  Rather, the

allegations must be sufficient to establish that Treasury provided a portion of *the specific funds* that Fannie Mae used to pay the servicers, as opposed to merely providing an undifferentiated source of funds that Fannie Mae could have used for any purpose.  The defendant in *Custer Battles* did not make, and the Fourth Circuit did not consider, a similar argument with respect to the Development Fund for Iraq.  Accordingly, to the extent *Custer Battles* can be read to support the proposition that the Government's provision of undifferentiated funding to a private entity automatically brings every request for payment submitted to that entity within the ambit of the FCA, such a suggestion reflects only unconsidered dictum that has not been embraced by other courts.[3]

The Government does not seriously dispute that its elimination of the statutory nexus requirement would vastly expand the reach of the FCA's draconian remedies.  Under its theory, any request for payment to any of the nearly 1,000 private firms that received bailout funds after the 2008 financial crisis would trigger the FCA.  *See* Rosicki Mot. 16.  But that is just the tip of the iceberg.  The Government's theory would make the FCA apply to any request for payment submitted to any individual or entity that received financial support from the Government, such as a loan from the Small Business Administration or a federal farming subsidy.

Seemingly recognizing the breadth of its interpretation, the Government seeks to reassure the Court by stating that the amount of federal money provided must be "substantial" and the recipient must have a "strong nexus to the Government."  Gov't Opp. 5.  But even apart from their

---

[3] The Government also cites *U.S. ex rel. Yesudian v. Howard University*, 153 F.3d 731 (D.C. Cir. 1998), for its suggestion in dicta that the pre-FERA FCA might apply to requests for payment submitted to Howard University, which had long received annual federal grants that covered 80% of its operating expenses.  *Id*. at 739.  As the court made clear, however, it did not have to "resolve that question today" because the relator had not appealed the adverse jury verdict on his *qui tam* claim, but only the rejection of his retaliation claim, which did not require him to have "developed a winning qui tam action."  *Id*.

vagueness, these supposed limiting principles have no basis in the statutory text.  The Act requires either that the recipient of the claim be the Government or that there be a nexus between funds provided by the Government and "the money or property requested" by the claimant.  If the GSEs were the Government, there would be no need for a nexus to the funds requested.  But the Government concedes that the GSEs are not the Government.  There is no third option for entities that are sort of like the Government but not quite the Government, for which the funds nexus requirement can be ignored.  The Court should apply the statute that Congress enacted, which plainly requires the Government to show that it provided or reimbursed a portion of the specific "money or property requested" by the claimant.  31 U.S.C. § 3729(b)(2)(A)(ii).[4]

## II.    The Government Has Failed To Plead a False Claim with Particularity.

The *sine qua non* of FCA liability is a false or fraudulent claim.  *U.S. ex rel. Kester v. Novartis Pharm. Corp.*, 23 F. Supp. 3d 242, 253 (S.D.N.Y. 2014).  Here, as the Government acknowledges, the only "claims" even arguably covered by the FCA are those submitted by the servicers to Fannie Mae.  Gov't Opp. 8.  The Government's case against the Rosicki Defendants thus depends on showing (1) that the servicers submitted false claims to Fannie Mae, and (2) that the Rosicki Defendants caused the submission of those false claims or made false statements that were material to those false claims.  Thus, the false claims the Government has to plead with particularity are the *servicers' claims*.  The Rosicki Defendants lack access to those claims and need that information to prepare their defense, which is the "'point of Rule 9(b)."  Gov't Opp. 9.

---

[4] Presumably the Government would maintain that § 3729(b)(2)(A)(ii) applies whenever a government contractor pays a subcontractor's claim using government funds specifically earmarked for that purpose, without any need to show that the amount of federal funding provided to the contractor was "substantial" or that the contractor had a "strong nexus to the Government" (whatever that means).  The Government would be right: courts should enforce the limiting principles set forth in the statute's text, not empty ones invented by the Government to be used when they serve the purpose of expanding FCA liability and discarded when they do not.

Although the Government spent *six years* investigating, its allegations still lack the requisite "who, what, when, where, and how" of the alleged fraudulent claims. Indeed, the Government admits its failure to plead with particularity. It says it "chose not to identify by name the relevant third-party servicers" that allegedly submitted false claims, much less *when* they submitted those claims and *how* those claims were false or fraudulent. *Id.* Whatever the Government's reasons may be for this pleading choice, they cannot excuse its failure to plead the alleged false claims with the particularity required by Rule 9(b).

Despite admitting that it cannot benefit from the relaxed Rule 9(b) standard that is sometimes available to relators, the Government does exactly what Rule 9(b) prohibits: It alleges details of alleged underlying conduct but not of actual *claims*. *See* Gov't Opp. 9–10. Rule 9(b), however, "does not permit a plaintiff asserting an FCA claim to describe a private scheme in detail and then simply allege that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government. Rather, the plaintiff must allege with particularity an actual false claim for payment being made to the Government." *Kester*, 23 F. Supp. 3d at 255 (internal quotation marks and citations omitted).

## III. The Complaints Fail To Adequately Allege that Any Claims Submitted by the Servicers Were "False or Fraudulent" Under the Implied Certification Theory.

Plaintiffs' responses confirm that they are proceeding under the "implied certification" theory of FCA liability. *See* Gov't Opp. 10; Relator Opp. 16.[5] They have no viable basis, however,

---

[5] Relator also argues that claims seeking payment for allegedly unreasonable or excessive amounts were "factually false." Relator Opp. 23-24. The Government does not join that argument, for good reason. There is no dispute that the foreclosure services in question were actually performed and that the amounts for which the servicer defendants allegedly sought reimbursement reflected what they had actually been charged by the Rosicki firm. There is likewise no dispute that what the Rosicki firm charged the servicers is what the Rosicki affiliates actually charged the firm. *See* Gov't Opp. 2 (stating that the Rosicki firm "billed the same amounts to the servicers" that the Rosicki affiliates had billed the Rosicki firm).

7

to deem the servicers' claims—which did no more than request payment for expenses actually incurred—to be "false or fraudulent."

*First*, the Government alleges that the servicers' requests for reimbursement for foreclosure expenses for which the servicers had paid the Rosicki firm were false under the version of implied certification the Supreme Court approved in *Escobar*.  According to the Government, the servicers' reimbursement requests were "classic examples of misleading half-truths" because a reasonable payor "'would probably—but wrongly—[have] conclude[d]' that the expenses were the actual expenses incurred by the Rosicki Defendants."  Gov't Opp. 11-12 (quoting *Universal Health Servs. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 2000 [2016]); *see also* Relator Opp. 21-22 (making a similar argument).  As a legal matter, the Government's argument ignores the Supreme Court's carefully drawn distinction between claims that contain "specific representations" that amount to "misleading half-truths," on the one hand, and those that "merely request payment," on the other.  136 S. Ct. at 2001.

In *Escobar*, the Supreme Court held that "the implied certification theory can be a basis for liability, at least where two conditions are satisfied: first, the claim *does not merely request payment, but also makes specific representations about the goods or services provided*; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths."  136 S. Ct. at 2001. (emphasis added).  The Court explained that a half-truth is a "representation[] that states the truth only so far as it goes, while omitting critical qualifying information."  *Id.* at 2000.  It based that definition on the common-law rule that "if the defendant does speak, he must disclose enough to prevent his words from being misleading."  *Id.* at 2000 n.3.  In other words, a half-truth requires a *specific, affirmative representation* that is literally true but from which material information is

8

omitted.  *Escobar* gave the example of a seller who informs a buyer that "there may be two new roads near the property he is selling, but fails to disclose that a third potential road might bisect the property."  *Id.* at 2000.

Neither complaint identifies any literally true but misleading statement that the servicers made in their claims (or even that the Rosicki Defendants made in their requests for payment to the servicers, which no one contends were "claims").  The cash disbursement request form the servicers submitted to Fannie Mae (Form 571) is not remotely analogous to the claims at issue in *Escobar*.  There, the defendants submitted claims using payment codes that corresponded to specific professional services and provider identification numbers that corresponded to specific job titles.  *Id.*  The Court explained that the use of certain billing codes or provider numbers could amount to a misleading half-truth because, for example, it could convey that a service was performed by a licensed physician (when it allegedly was performed by a non-physician).  *See id.* at 1997, 2000-01.

Form 571 contains no billing codes or other, similar affirmative representations.  It simply lists different types of expenses with blank spaces for the claimant to enter dollar amounts.  *See* Declaration of Daniel J. Horwitz, dated Apr. 27, 2018 ("Horwitz Decl."), Ex. E.[6]  It is, in other words, exactly what the Supreme Court described as a claim that "merely request[s] payment."  *Escobar*, 136 S. Ct. at 2001.  (Every request for payment must identify *what* it is requesting payment *for*.)  There is no dispute that the expenses for which the servicers sought reimbursement on Form 571 were for foreclosure-related services that were actually provided.  While Plaintiffs allege that the charges for those services were unreasonably high, seeking reimbursement for

---

[6] While Form 571 includes a blank for "title examination/abstract," it makes no mention of service of process.  Presumably process-service costs are billed to the "Other" category.

expenses actually incurred for services actually performed is nothing like seeking reimbursement for a service (like family therapy provided by a qualified social worker, *see id*. at 1997) that the claimant did not provide.

*Second*, the Government argues that even if the servicers' claims "do not constitute misleading half-truths, those claims are still false under an implied certification theory." Gov't Opp. 13. The Government urges the Court to adopt a "broad construction of the FCA's falsity requirement" under which "the mere submission of a claim for payment without a specific representation about the goods or services provided . . . , coupled with a defendant's noncompliance with a material payment requirement, is sufficient to establish a defendant's liability under an implied certification theory." *Id.* at 13-14. The Court should reject that expansive theory, which is untethered from the language and common-law background of the FCA and would transform every run-of-the-mill contract dispute involving a government agency or a recipient of government funds into an occasion for applying the treble damages and harsh penalties provided in the FCA.

The Government contends that *U.S. ex. rel. Mikes v. Straus*, 274 F.3d 687 (2d Cir. 2001), supports its theory. The Government is mistaken. In *Mikes*, the Second Circuit sought to *limit* the implied certification theory. Reasoning that "caution should be exercised not to read this theory expansively and out of context" because "to construe the implied false certification theory in an expansive fashion would improperly broaden the Act's reach," the Second Circuit held that "implied certification is appropriately applied only when the underlying statute or regulation upon which the plaintiff relies *expressly* states that the provider must comply in order to be paid." *Id.* at 700. As the Government recognizes, *Escobar* abrogated *Mikes* by holding that the implied certification theory could reach claims that contained "misleading half-truths" even if the

underlying requirement was not "expressly designated a condition of payment." *Escobar*, 136 S. Ct. at 2001.  Yet the Government contends (with no small measure of chutzpah) that although *Escobar* rejected *Mikes*' account of implied certification, it left *Mikes* in place as binding precedent, just shorn of its key limiting principle—with the result that this Court, by accident, became bound to apply an extraordinarily broad form of the implied certification theory that *neither* the Supreme Court *nor* the Second Circuit has ever endorsed.  That cannot be right.

  *Escobar* supplies the new controlling framework for addressing these questions—and it makes clear that the analysis must look to common-law fraud principles (which *Mikes* did not attempt to apply).  *Id*. at 1999 n.2 (presuming that FCA incorporates all the "elements of common-law fraud that are consistent with the statutory text"); *see also id.* at 1999-2000, 2002-03 & n.3; *Bishop v. Wells Fargo & Co.*, 870 F.3d 104, 107 (2d Cir. 2017) (liability "must be grounded in the text of the FCA, including the well-settled meaning of the common-law terms the FCA uses").  And as our motion demonstrated, under the common law a mere demand for payment can be deemed to implicitly certify, at most, only those facts that go to the "essence" of the transaction.  *See* Rosicki Mot. 24-26.  The Government does not argue otherwise.

  As the Government points out, one judge in this District recently adopted the Government's theory that the alchemy of *Mikes* and *Escobar* inadvertently produced a new, expansive form of implied-certification liability within the Second Circuit.  *See U.S. ex rel. Wood v. Allergan, Inc.*, 246 F. Supp. 3d 772, 811 (S.D.N.Y. 2017), *appeal pending*, No. 17-2191 (2d Cir.).  To reach that conclusion, *Wood* held that a claim can be "false" without being "fraudulent" and that *Escobar* requires courts to look to the common law to understand what makes a claim "fraudulent" but not what makes a claim "false."  *Id.* at 811 n.24.  That takes splitting hairs to a new level.  *Escobar* construed the statutory term "false or fraudulent claim" without any hint that falsity and

11

fraudulence were distinct concepts. *See, e.g.*, 136 S. Ct. at 1999 ("Because common-law fraud has long encompassed certain misrepresentations by omission, 'false or fraudulent claims' include more than just claims containing express falsehoods."). If *Wood* were correct, then *Escobar*'s discussion of materiality—which looked to "common-law principles" because "the common law could not have conceived of 'fraud' without proof of materiality," *id.* at 2002—would not apply to *Wood*'s newly discovered subspecies of false-but-not-fraudulent claims. *Wood*'s suggestion that falsity can be divorced from the common law, even though fraudulence cannot, is impossible to square with the approach taken by the Supreme Court in *Escobar* (or by the Second Circuit in *Bishop*, which post-dated *Wood*).[7]

The Government did not plead any facts that support the notion that charging allegedly unreasonable prices for foreclosure-related services, while not exceeding Fannie Mae's state-specific maximum limits for such charges, went to the "essence" of the bargain between Fannie Mae and the servicers (or even of the bargain between Fannie Mae and the Rosicki firm).[8] It offers only the conclusory assertion that "there is no question" that the alleged conduct went to the essence of the transaction. Gov't Opp. 15. But this is nothing like a case where "a defendant delivered guns that 'do not shoot.'" *Id.* (quoting *Escobar*, 136 S. Ct. at 2001). The services at issue were actually performed, and there is no allegation that they were deficient in any way. The allegation that a defendant charged more for a service than was reasonable describes a "garden-

---

[7] In *Bishop*, decided after *Wood*, the Second Circuit left no doubt that courts should indeed look to the common law in determining the scope of liability under the FCA. *See Bishop*, 870 F.3d at 107.

[8] The Government argues that the relevant question is whether the alleged overcharges went to the "essence of the bargain" between Fannie Mae and the Rosicki firm. Gov't Opp. 19. That is incorrect. Although the Rosicki firm had a "separate contractual relationship with Fannie Mae," *id.*, it did not submit claims to Fannie Mae; only the servicers did. To determine whether *the servicers'* claims were false, it is necessary to ask what representations were implied in *those* claims, which requires asking what facts went to the essence of the bargain between Fannie Mae and *the servicers*. In any event, the answer is the same either way.

variety breach[] of contract" claim, *Escobar*, 136 S. Ct. at 2003—not a fraud claim that can give rise to punitive sanctions under the FCA.

IV.     **The Complaints Fail To Adequately Allege that the Supposed Overcharges Were Material to Fannie Mae's Payment Decisions, Much Less that the Rosicki Defendants Knew They Were Material.**

A claimant's noncompliance with a contractual requirement is not material just because it would give the recipient the option of declining to pay the claim. *Escobar*, 136 S. Ct. at 2003.. Rather, materiality "looks to the effect on the *likely or actual behavior* of the recipient." *Id.* at 2002 (emphasis added). Accordingly, if the recipient paid the claims at issue, or similar claims, despite knowing about the claimants' alleged noncompliance with certain requirements, that is "strong evidence that the requirements were not material." *Id.* at 2004.

It is not, as the Government asserts, "unsubstantiated speculation" to suggest that Fannie Mae was aware of the Rosicki Defendants' alleged billing practices. Gov't Opp. 21. As demonstrated in our motion (at 29-33), the allegations in the complaints, the documents incorporated therein by reference, and other judicially noticeable materials—all of which are properly considered on a motion to dismiss—strongly suggest that the GSEs have had actual knowledge of the billing practices alleged in the complaints for *years*.

***First***, Fannie Mae had the right to audit all the Rosicki firm's records, including the invoices the firm's affiliates received from third parties and the invoices the affiliates submitted to the firm. *See* Rosicki Mot. 30-31. The Government brushes this aside as a mere "general right to audit." Gov't Opp. 31. If this phrasing is meant to suggest that Fannie Mae may not have exercised that right—a suggestion the Government knows to be false—now is not the time to present evidence showing otherwise. But even publicly available, judicially noticeable documents confirm that, as early as 2010, Fannie Mae performed audits of all the law firms in its Retained Attorney Network, which would have included the Rosicki firm. *See* Federal Housing Finance Agency

13

Office of Inspector General, *FHFA's Oversight of Fannie Mae's Default-Related Legal Services*, 18 (Sept. 30, 2011), https://goo.gl/A8ZyuB.[9]

*Second*, Relator has been pressing his allegations about the Rosicki Defendants' billing practices for years.  In addition to disclosing those allegations to the Government (in connection with his filing of this case) and on his public website in 2012, *see* Rosicki Mot. 31-32, Relator filed a companion *qui tam* action in 2013 that included the same allegations regarding the Rosicki Defendants that he and the Government have pleaded here.  *See* Compl., *U.S. ex rel. Grubea v. HSBC Bank USA, N.A.*, No. 1:13-cv-1467-JSR, ECF No. 22, ¶¶ 17-20, 28, 33, 76-79, 85-101 (S.D.N.Y. Mar. 5, 2013).  In July 2014, one of the defendants in that case, HSBC, entered into what Relator describes as a "widely-publicized settlement."  Relator Opp. 13; *see* U.S. Attorney's Office, Press Release, *Manhattan U.S. Attorney Settles Civil Fraud Claims Against HSBC Bank for Failure to Monitor Fees Submitted for Foreclosure-Related Services*, (July 1, 2014), https://goo.gl/ve8SJu.  Fannie Mae's conservator participated in that investigation and settlement, *see id.*, and thus undoubtedly knew about the allegedly inflated expenses asserted here.  *See also* Relator Opp. 3 ("HSBC settlement" was "for the same misconduct" alleged here).  Even if knowledge of the allegations in a *qui tam* complaint should not be imputed to the allegedly defrauded entity until "the end of an investigation," Gov't Opp. 21 n.10, surely such knowledge should be imputed to Fannie Mae no later than the time of the HSBC settlement.

*Third*, the Government does not dispute that the Rosicki Defendants' billing practices were open and obvious.  *See* Rosicki Mot. 31; Relator Opp. 1, 13.  On the contrary, the Government contends that the Rosicki firm billed servicers up to 750% of the market rate for title services and

---

[9] "Official government reports and other types of government records are appropriate for judicial notice."  *Paskar v. City of N.Y.*, 3 F. Supp. 3d 129, 134 (S.D.N.Y. 2014).

process services and that the servicers routinely asked Fannie Mae to reimburse those charges by submitting a form that itemized the charges at issue.  And the Government does not dispute that Fannie Mae required servicers to use multiple law firms in each jurisdiction (*see* Rosicki Mot. 34), which made it easy to compare what various firms were charging for expenses.  Fannie Mae was not only in the best position—better than even the servicers—to know what were reasonable prices for foreclosure-related services; given its size and influence in the housing market, it effectively dictated market prices for those services.  Either the Rosicki Defendants' charges were not out of step with the market, or Fannie Mae knew those charges were above market and continued to reimburse the servicers for them anyway.[10]

Despite all this, there is no allegation that Fannie Mae ever objected to the amounts charged by the Rosicki firm.  The Government thus asks the Court to assume that even though Fannie Mae (1) knew exactly what it was paying and for which services, (2) knew the Rosicki firm was using affiliates, (3) knew about Relator's allegations against the Rosicki Defendants, (4) settled with a major bank in a case involving identical allegations about the Rosicki Defendants' practices, and (5) had the right to audit the Rosicki firm whenever it wanted, Fannie Mae was somehow deceived about whether the Rosicki Defendants' charges exceeded "market rate[s]" so that it was tricked into "paying significantly more for a service than the value actually received."  Gov't Opp. 18.  The Government's theory strains credulity, to put it mildly.

Given the very strong indications (even on the record available at the pleading stage) that

---

[10] The Government does not contend that the Rosicki Affiliates could not add *any* margin for services performed by third-party vendors.  The Rosicki Defendants were, after all, expected to direct and review the work done by third-party vendors and were responsible for their performance. *See* Horwitz Decl., Ex. B at 11.  The Government objects only to the "reasonableness" of the alleged margin; yet it has pointed to no provision or guideline that indicates what is an acceptable margin or how that margin should be calculated, let alone how additional margin would render a claim "false or fraudulent."

Fannie Mae knew about the alleged overcharges and yet continued to reimburse the servicers, the Government must, at the very least, offer more than a conclusory allegation that the Rosicki Defendants' alleged billing practices were material to Fannie Mae's payment decisions (and that the Rosicki Defendants knew they were material).  It has not done so.  Instead, it dismisses all these indications of Fannie Mae's knowledge as "disparate facts and unsupported theories outside the four corners of the Complaint."  Gov't Opp. 21.  But as explained above, the Rosicki Defendants have offered far more than theories.  And the Government does not contend that we have cited anything that the Court cannot properly consider in ruling on a motion to dismiss.

Relator takes a different tack.  He asserts that the alleged overcharges *must* have been material (and the Rosicki Defendants must have known they were material) because "a reasonable person would not agree for no reason to pay more than they had already bargained to pay."  Relator Opp. 28.  That assertion does not withstand scrutiny.  When Fannie Mae retained a law firm, it did not pay for title services and process services in isolation or for their own sake, but as part of a bundle of services that also included legal work.  Fannie Mae was concerned not only with the cost of those services, but also with their quality.  *See* Rosicki Mot. 33.[11]  And even with regard to cost, Fannie Mae cared about what it was paying for the *entire bundle* far more than it cared about what it was paying for any individual stick.  Plaintiffs have offered only conclusory assertions, not facts, to support their contention that the alleged overcharges for two of those sticks—title services

---

[11] As has been widely reported, the volume of Fannie Mae foreclosures increased substantially after the housing crisis in 2008.  With that increase in volume came an increase in foreclosure process mistakes, including by attorneys handling Fannie Mae foreclosures.  FHFA, *FHFA's Oversight of Fannie Mae's Default Related Legal Services*, 11, 14-16 (Sept. 30, 2011), https://goo.gl/A8ZyuB.  Fannie Mae recognized that such mistakes posed "operations, reputational and legal risks" for it.  *Id.* at 13.  Fannie Mae's response was to increase oversight to ensure efficient timeline management of foreclosures and proper performance of the foreclosure process.  *Id.*

and process services—were material to Fannie Mae's decision to pay for the overall package of professional services that the Rosicki Defendants provided.

## V.     The Complaints Fail to Adequately Allege Reverse False Claims.

As the Rosicki Defendants explained in their motion, the "reverse false claims" allegations fail because they do not establish either (1) that the GSEs had any "obligation" to pay dividends to the Government or (2) that there was a meaningful nexus between any such obligation and the Rosicki Defendants' alleged conduct.  Plaintiffs fail to refute either point.

***First***, Plaintiffs concede that the FCA does not apply to a duty to pay that is potential or contingent, and they do not dispute that the GSEs' boards of directors had discretion with respect to whether to pay any dividends to Treasury.  They contend, however, that the dividends were nonetheless "obligations" within the meaning of the FCA because the board decided to pay them in every quarter when funds were available.  Gov't Opp. 26-27; Relator Opp. 57-58.  But the GSEs' practice of routinely paying dividends does not change the fact that those payments were voluntary. As the Director of the FHFA, Fannie Mae's conservator, testified before Congress: the FHFA "has the authority to withhold dividend payments without the consent of Treasury" if it determines that doing so is in Fannie Mae's best interests.  Federal National Mortgage Association, Quarterly Report (Form 10-Q), at 9 (Nov. 2, 2017).

Plaintiffs also argue that the dividends were established obligations because the Third Amendment provided that Treasury's liquidation preference would increase by the amount of any dividend that was not declared.  Gov't Opp. 26; Relator Opp. 57.  But Treasury has no entitlement to receive funds under the liquidation preference unless the GSEs are placed into receivership, their assets are liquidated, and sufficient assets remain to pay the liquidation preference after other creditors are satisfied.  Any payment Treasury might someday receive under the liquidation preference was thus even more contingent than the dividends.  Indeed, the Third Circuit held that

a business's duty to make certain payments to the Small Business Administration was not an FCA "obligation" because it "would never materialize if the Board never exercised its discretion to declare the dividends *or if [the business] never liquidated*." *U.S. ex rel. Petras v. Simparel*, 857 F.3d 497, 506 (3d Cir. 2017) (emphasis added). And the Seventh Circuit recently recognized that Treasury's "right to receive dividends only if the [GSEs'] boards declare them" and its right to "receive[] a payout of its liquidation preference if the [GSEs] opt to pay it or to dissolve" are *both* "contingent" rights because "Treasury cannot unilaterally trigger their payment." *Roberts v. FHFA*, No. 17-1880, 2018 WL 2055940, at \*8 (7th Cir. May 3, 2018).

*Second*, even if there were an FCA obligation, Plaintiffs failed to plead that anything the Rosicki Defendants did was "material to," "avoid[ed]," or "decrease[d]" that obligation. 31 U.S.C. § 3729(a)(1)(G). This requires some nexus between the alleged act and the purported underpayment. That requirement is not satisfied here because there was no obligation for Fannie Mae to pay Treasury any money related to foreclosure expenses. Although Plaintiffs deny any such requirement, they can point to no court that has found liability for a "reverse false claim" absent a discrete and articulable nexus between the defendant's action and the obligation owed to the Government.[12] And they cannot explain why eliminating this nexus requirement would not expand "reverse false claims" liability beyond all reasonable bounds. *See* Rosicki Mot. 38-39.

A district court in this Circuit recently dismissed a *qui tam* action brought against defendants that had obtained money, allegedly under false pretenses, from Federal Reserve Banks,

---

[12] *See, e.g.*, *United States v. Caremark, Inc.*, 634 F.3d 808, 817 (5th Cir. 2011) (improper denial of medical insurance benefits caused state Medicaid agency to return less Medicaid funds to Government); *United States v. Merck-Medco Managed Care, L.L.C.*, 336 F. Supp. 2d 430, 444 (E.D. Pa. 2004) (improper retention of contract penalties from medical service contract caused third party not to pay same penalties to Government); *U.S. ex rel. Koch v. Koch Indus., Inc.*, 57 F. Supp. 2d 1122, 1129 (N.D. Okla. 1999) (improper reporting of oil drilling volumes caused third parties to underpay oil-based royalties to Government).

which (like the GSEs here) are required to transfer surplus funds to Treasury annually or upon liquidation.  *See U.S. ex rel. Kraus v. Wells Fargo & Co.*, No. 11-cv-5457-BMC, ECF No. 92, at 9-10 (E.D.N.Y. May 10, 2018).  The court held that the argument that the defendants had caused the FRBs to have "less money to send to the Treasury at the end of each year" was "too tenuous of a connection" to justify imposing FCA liability, "and one that taken to its extreme would render *any* fraud that reduced a party's liability to the Government actionable under the FCA"—including even fraud that "reduced [the victim's] tax exposure, because that would have the effect of depriving the Government of money it was otherwise owed."  *Id.* at 10 & n.8.  The "reverse false claims" allegations here pose the same dangers, and they too should be rejected.[13]

## VI.   Relator's Conspiracy Claim Must Be Dismissed.

Relator argues that "it is not clear" that the intra-corporate conspiracy doctrine applies outside of antitrust cases.  Relator Opp. 64.  But the Second Circuit itself has applied the doctrine in non-antitrust cases.  *See, e.g.*, *Hartline v. Gallo*, 546 F.3d 95, 99 n.3 (2d Cir. 2008); *Murphy v. City of Stamford*, 634 F. App'x 804, 805 (2d Cir. 2015).  Relator does not explain why the doctrine should not apply to FCA claims, and the majority of district courts have held that it does.  *See U.S. ex rel. Lupo v. Quality Assurance Servs., Inc.*, 242 F. Supp. 3d 1020, 1027 (S.D. Cal. 2017) (collecting cases).  The doctrine's logic is not limited to particular contexts: it recognizes that just

---

[13] The *Kraus* court was considering claims brought under § 3729(a)(1)(A) and (B), because the relators there, unlike Relator here, had "sensibly not ple[d] a 'reverse' false claim."  *Id*. at 10.  But the court's observations about the dangers of basing FCA liability on so "tenuous" a connection to the Government as an alleged victim's generalized obligation to remit surplus funds to Treasury apply with full force to the claims pleaded here.

as a person cannot conspire with himself, two companies under common control cannot conspire with each other.[14]

## CONCLUSION

For the reasons set forth above and in the Rosicki Defendants' motion, the Court should dismiss the complaints with prejudice.

Dated: New York, New York
         May 11, 2018

<div style="margin-left:40%;">

MCLAUGHLIN & STERN, LLP

By:      */s/ Daniel J. Horwitz*
         Daniel J. Horwitz, Esq.
         Tracy A. Burnett, Esq.
         260 Madison Avenue
         New York, New York 10016
         dhorwitz@mclaughlinstern.com
         tburnett@mclaughlinstern.com
         Telephone: (212) 448-1100
         Fax: (212) 448-0066

*Attorneys for Defendants*
*Rosicki, Rosicki & Associates, P.C.,*
*Paramount Land, Inc.,*
*Threshold Land Inc., and*
*Enterprise Process Service, Inc.*

</div>

---

[14] Relator also argues that the doctrine applies only to "conspiracies between parents and their wholly-owned subsidiaries."  Relator Opp. 65.  But he cites no basis for this supposed limitation, and none exists.  The doctrine does not require complete unity of interest, only membership in one corporate family.  *See Hartline*, 546 F.3d at 99; *Christians of Cal., Inc. v. Clive Christian N.Y., LLP*, No. 13-cv-275-KBF, 2015 WL 468833, at *9 (S.D.N.Y. Feb. 3, 2015).