UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* PETER D. GRUBEA,<br><br>          Plaintiff,<br><br>     v.<br><br>ROSICKI, ROSICKI & ASSOCIATES, P.C., *et al.*,<br><br>          Defendants. | 12 Civ. 7199 (JSR) |
| UNITED STATES OF AMERICA,<br><br>          Plaintiff-Intervenor,<br><br>     v.<br><br>ROSICKI, ROSICKI & ASSOCIATES, P.C., ENTERPRISE PROCESS SERVICE, INC., and PARAMOUNT LAND, INC.,<br><br>          Defendants. | |

**SUR-REPLY MEMORANDUM OF LAW OF PLAINTIFF-INTERVENOR
UNITED STATES OF AMERICA IN FURTHER OPPOSITION TO THE
ROSICKI DEFENDANTS' MOTION TO DISMISS**

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
86 Chambers Street, Third Floor
New York, New York 10007

*Attorney for Plaintiff-Intervenor
United States of America*

CRISTINE IRVIN PHILLIPS
ANDREW E. KRAUSE
LAUREN A. LIVELY
Assistant United States Attorneys
– Of Counsel –

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

ARGUMENT .........................................................................................................................1

I.       The Claims Submitted to Fannie Mae Are "Claims" Under the FCA ................................1

II.      The Government's Allegations Against the Rosicki Defendants More Than Satisfy Rule 9(b) ...............................................................................................................4

III.     The Claims At Issue Were Legally False Under an Implied Certification Theory .............5

IV.     The Government Has Adequately Pleaded Materiality .......................................................7

V.      The Rosicki Defendants Violated the Reverse False Claims Provision of the FCA ..........9

CONCLUSION .......................................................................................................................13

**TABLE OF AUTHORITIES**

**CASES**                                                                   **PAGE**

*Bishop v. Wells Fargo & Company*,
    870 F.3d 104 (2d Cir. 2017) .................................................................................. 6

*Garg v. Covanta Holding Corp.*,
    478 F. App'x 736 (3d Cir. 2012) ......................................................................... 2, 3

*Hutchins v. Wilentz, Goldman & Spitzer*,
    253 F.3d 176 (3d Cir. 2001) ................................................................................... 2

*Mikes v. Straus*,
    274 F.3d 687 (2d Cir. 2001) ................................................................................ 6, 7

*Roberts v. Federal Housing Finance Agency*,
    --- F.3d ----, 2018 WL 2055940 (7th Cir. May 3, 2018) ..................................... 11

*United States ex rel. Bahrani v. Conagra*,
    465 F.3d 1189 (10th Cir. 2006) ............................................................................ 10

*United States. ex rel. Kraus v. Wells Fargo & Co.*,
    No. 11 Civ. 5457 (BMC), 2018 WL 2172662 (E.D.N.Y. May 10, 2018) ......... 11, 12

*United States ex rel. Ladas v. Exelis, Inc.*,
    824 F.3d 16 (2d Cir. 2016) ..................................................................................... 4

*United States ex rel. Pasto v. Megabyte Bus. Sys.*,
    No. 3:98CV693, 2000 U.S. Dist. LEXIS 23099 (E.D. Va. Apr. 18, 2000) ......... 12

*United States v. Public Warehousing Co., 1:05-CV-2968-TWT*,
    2017 WL 1021745 (N.D. Ga. Mar. 16, 2017) ........................................................ 8

*United States ex rel. Todd v. Fidelity National Financial, Inc.*
    No. 12-cv-666, 2014 WL 4636394 (D. Colo. Sept. 16, 2014) ............................... 3

*United States ex rel. Wood v. Allergan, Inc.*,
    246 F. Supp. 3d 772 (S.D.N.Y. 2017) ................................................................ 6, 7

*Universal Health Services v. United States ex rel. Escobar*,
    136 S. Ct. 1989 (2016) ................................................................................... passim

*Wood ex rel. United States v. Applied Research Associates, Inc.*,
    328 F. App'x 744 (2d Cir. 2009) ......................................................................... 13

**STATUTES**

31 U.S.C. § 3729(a)(1)(G) .......................................................................................................... 12

31 U.S.C. § 3729(b)(2) ........................................................................................................... 1, 2, 3

**RULES**

Fed. R. Civ. P. 9(b) ........................................................................................................................ 4

**OTHER**

S. Rep. No. 111-10, 111th Cong. 1st Sess. 10, 2009 U.S.C.C.A.N. 430 (Mar. 23, 2009) ............. 10

## INTRODUCTION

The reply submitted by Rosicki, Rosicki & Associates, P.C. ("Rosicki"), and its wholly-owned subsidiaries, Enterprise Process Service, Inc. ("Enterprise") and Paramount Land, Inc. ("Paramount," and collectively, the "Rosicki Defendants"), does not refute the legal soundness or factual sufficiency of the allegations made by the United States ("Government") in its complaint-in-intervention ("Complaint" or "Compl.") regarding the Rosicki Defendants' fraudulent mark-up scheme and the manner in which it violated the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"). Instead, the Rosicki Defendants' reply employs the same misguided logic and unfounded speculation—relying on information outside the scope of the complaint—to baselessly attack the Government's claims. The Court should reject the Rosicki Defendants' arguments, deny their motion to dismiss, and allow the Government's case to go forward.

## ARGUMENT

### I. The Claims Submitted to Fannie Mae Are "Claims" Under the FCA

The Rosicki Defendants' argument in their reply as to whether claims submitted by mortgage servicers to Fannie Mae are "claims" as defined by the FCA, *see* 31 U.S.C. § 3729(b)(2), fails to recognize the nexus created by the unprecedented arrangement between Fannie Mae and the U.S. Department of the Treasury ("Treasury"), which has included Fannie Mae's receipt of more than $100 billion dollars in Treasury funds since 2009, *see* Compl. ¶ 19. This money was extended to serve the Government purpose of stabilizing the housing market. *See id.* ¶ 16. These unique facts qualify Fannie Mae as, at a minimum, an "other recipient" of funds such that claims submitted to Fannie Mae are actionable under the FCA. *See* 31 U.S.C. § 3729(b)(2)(A)(ii). The Rosicki Defendants' reply instead portrays the Government's position as asking that "the FCA apply to any request for payment submitted to any individual or entity that received financial support from the Government." Rosicki Rep. at 5. This argument—

which ignores the scale, structure, and other unique circumstances of the funding here—is inaccurate and wholly unavailing.

The Rosicki Defendants' strong reliance upon *Garg v. Covanta Holding Corp.*, 478 F. App'x 736 (3d Cir. 2012), an unreported decision from the Third Circuit, betrays the weakness of this point.  In *Garg*, the court determined that a company utilizing a run-of-the-mill tax-exempt bond is not a "grantee" under Section 3729(b)(2)(A)(ii) of the FCA, because a generalized tax benefit of an undisclosed amount is not enough to create a nexus to federal funds where the federal government otherwise had no interest in the transaction at issue.  *See id.* at 741.  As that court recognized, "'the False Claims Act only prohibits fraudulent claims *that cause or would cause economic loss to the government.*'"  *Id.* (emphasis in original) (quoting *Hutchins* v. *Wilentz, Goldman & Spitzer,* 253 F.3d 176, 179 (3d Cir. 2001)).  This reasoning is entirely consistent with the Government's claims here:  Treasury made a commitment in the Senior Preferred Stock Purchase Agreement ("SPA") to match Fannie Mae's net revenue deficiencies dollar-for-dollar, *see* SPA at 2, 4 § 2.2, available at https://www.fhfa.gov/Conservatorship/Documents/Senior-Preferred-Stock-Agree/2008-9-26_SPSPA_FannieMae_RestatedAgreement_N508.pdf (last visited May 16, 2018), and accordingly paid Fannie Mae billions of dollars during numerous years in which Fannie Mae was simultaneously paying out hundreds of millions of dollars in foreclosure expenses, *see* Rosicki Rep. at 3 n.2,[1] including foreclosure expenses that the Government claims were fraudulently

---

[1] The Rosicki Defendants' interpretation of isolated excerpts from Fannie Mae's quarterly and annual filings with the Securities and Exchange Commission, which are devoid of any detail or context to support the conclusions the Rosicki Defendants draw from them, is inappropriate to overcome the Government's Complaint at the pleading stage.  *See, e.g.,* Rosicki Rep. at 3 n.2.  But even if the Court were to consider this information, it does not disprove the nexus between federal funds and Fannie Mae expenditures on foreclosure expenses; on the contrary, it shows that Fannie Mae was paying substantial amounts in foreclosure expense reimbursements,

inflated. *See* Compl. ¶ 2. The nexus between federal funds and monies paid to fraudulent claims in this matter is both unmistakable and distinguishable from the facts in *Garg* and others like it.[2]

Nor is the Rosicki Defendants' rehash of their argument that recognizing Fannie Mae as an "other recipient" of federal funds will open the floodgates to FCA litigation on behalf of entities with only tenuous connections to federal funds (such as any entity receiving "a loan from the Small Business Administration or a federal farming subsidy," Rosicki Rep. at 5) any more convincing now than it was in their opening brief. This "slippery slope" argument is belied not only by the unique circumstances of the Fannie Mae conservatorship, including the scale and structure of the cash infusion from Treasury, but also by the actual history of FCA litigation almost nine years after the passage of the 2009 FERA amendments: none of the predicted broad-reaching FCA cases, of which the Rosicki Defendants argue this matter is "just the tip of the iceberg," *id.*, have materialized.

The Court should reject the Rosicki Defendants' arguments and conclude that claims submitted to Fannie Mae are "claims" under Section 3729(b)(2)(A)(ii) of the FCA.

---

including for fraudulently inflated expenses, at the same time it was accepting billions of dollars from Treasury to boost its balance sheet and avoid potential insolvency. *See id.*; Compl. ¶ 16.

[2] Similarly, the Rosicki Defendants cite *United States ex rel. Todd v. Fidelity National Financial Inc.*, No. 12-cv-666, 2014 WL 4636394 (D. Colo. Sept. 16, 2014), another unreported case in which the district court adopted a report and recommendation from a magistrate judge with little explanation, and after acknowledging that "the precise status of [the Federal Home Loan Mortgage Corporation ("Freddie Mac")] at the relevant times is an unsettled question." *Id.* at *1. The underlying report and recommendation concluded that the relator had failed to establish a link between the Government funds paid to Freddie Mac and the funds that the relator alleged Freddie Mac paid for certain insurance policies. *Id.* at *11. But the magistrate judge in *Todd* identified a pleading failure that is not present here; rather, Treasury's dollar-for-dollar commitment to Fannie Mae, as set forth in the SPA, establishes that link. *See supra* at 2; *see also* Compl. ¶ 15.

## II. The Government's Allegations Against the Rosicki Defendants More Than Satisfy Rule 9(b)

The Rosicki Defendants' reply arguments pursuant to Federal Rule of Civil Procedure Rule 9(b) duplicate those made in their original memorandum of law. Defendants fail to acknowledge that in identifying the precise Fannie Mae loan number associated with each of the six highlighted foreclosure properties in the Complaint, the Government has provided them with all of the information necessary to defend against the Government's claims. *See, e.g., United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 25 (2d Cir. 2016) (identifying the purpose of Rule 9(b) as, *inter alia*, providing a defendant with "fair notice" of a plaintiff's claim).

Instead, the Rosicki Defendants continue to insist that without information such as the names of the servicers that submitted each claim—information that they can obtain readily from their own files using the Fannie Mae loan numbers—the Government's allegations are insufficient. Yet, as set forth in its opposition to the motion to dismiss, the Government has pleaded with particularity the fraudulent submissions, *e.g.,* the exact amounts overcharged by Rosicki, and the fact that these inflated costs then *were* submitted to and paid by Fannie Mae (not, as the Rosicki Defendants claim, that such costs must or should have been submitted). *See* Gov. Mem. at 8-9 (citing Compl. ¶¶ 34, 86, 87, 92, 93, 98, 99, 104, 105, 111, 112, 117, 118, 123). Further, the Rosicki Defendants provide no support for their baseless contention that without further information such as the precise time at which the servicers submitted the inflated claims to Fannie Mae, the Rosicki Defendants cannot defend against the Government's claims that the Rosicki Defendants submitted fraudulent claims to the servicers which then caused the inflated charges to be passed to Fannie Mae. The Government has pleaded its claims with sufficient particularity to satisfy the Rule 9(b) standards, and nothing in the Rosicki Defendants' submissions demonstrates otherwise.

**III.    The Claims At Issue Were Legally False Under an Implied Certification Theory**

On reply, the Rosicki Defendants challenge the Government's assertion that the claims submitted to Fannie Mae constituted misleading half-truths, and argue, incorrectly, that the claims were merely requests for payment. *See* Rosicki Rep. at 8. In fact, the Rosicki Defendants cannot distinguish the representations made here in the claims submitted to Fannie Mae, for their inflated foreclosure expenses, from the representations made in the claims submitted to the Centers for Medicare and Medicaid Services ("CMS") in *Universal Health Services v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016), which are directly analogous, and which the Supreme Court found to be misleading half-truths, *see id.* at 2000.

The Rosicki Defendants argue that the claims in *Escobar* are unlike the claims for the inflated Rosicki foreclosure expenses for a single reason: because the *Escobar* claims contained billing codes, required by CMS, which corresponded to the job titles of the individuals purportedly performing the billed services. *See* Rosicki Rep. at 9. But the rationale for why the billing codes constituted misleading half-truths in *Escobar* applies equally here and compels a finding that the representations the Rosicki Defendants caused to be made with the corresponding claims also constitute misleading half-truths. In *Escobar*, the billing codes were actionable misrepresentations because they gave rise to the conclusion that the person who performed the billed-for service had the job title that corresponded to the billing code, when in fact he or she allegedly did not. *See Escobar*, 136 S. Ct. at 2000-01. Similarly, in this matter, the Rosicki Defendants caused the servicers to submit to Fannie Mae, on the Cash Disbursement Request, Form 571, a representation that particular services had been performed and the purported price of those services. *See* Compl. ¶ 34; Fannie Mae Cash Disbursement Request (Form 571), Dkt. No. 133-5. These representations give rise to the conclusion that the cost

5

submitted for reimbursement constituted the "actual" and "reasonable" cost of performing those services, as required by Fannie Mae, Compl. ¶ 37, when in reality those prices were the product of a mark-up scheme, which exponentially increased the price of the services in order to garner more profits. *See* Compl. ¶¶ 71-72; 79-81. No further "half-truth" needed to be asserted in order to foster this incorrect conclusion—indeed, it is hard to imagine what else could have been represented to further the assumption that the costs submitted were the "actual" costs. Despite the Rosicki Defendants' arguments, the claims submitted in this matter, just like the claims in *Escobar*, constituted more than just a request for payment, and easily satisfy *Escobar's* "misleading half-truth" requirement. *See* 136 S. Ct. at 2000.

The Court should similarly reject the argument by both the Rosicki Defendants and the Servicer Defendants that the Second Circuit's holding in *Mikes v. Straus*, 274 F.3d 687 (2d Cir. 2001), concerning implied certification without a misrepresentation, is no longer good law. *See* Rosicki Rep. at 10-11; Servicer Rep. at 6. The Second Circuit has rightly observed that *Escobar* abrogated *Mikes* on the issue of implied certification only insofar as it required that "the underlying statute or regulation upon which the plaintiff relies *expressly* states the provider must comply in order to be paid." *Bishop v. Wells Fargo & Company*, 870 F.3d 104, 106 (2d Cir. 2017) (emphasis in original). *Escobar* did not address whether the submission of a claim for payment, without any further representation, could be sufficient to find a false claim under the implied certification theory, *see United States ex rel. Wood v. Allergan, Inc.*, 246 F. Supp. 3d 772, 816 (S.D.N.Y. 2017) (noting that "the *Escobar* Court expressly refrained from defining the outer limit of implied certification claims"), nor did *Bishop* address it. But *Mikes* answered that question in the affirmative. *See Mikes*, 274 F.3d at 698. And the argument from both the Rosicki Defendants and Servicer Defendants against continuing to rely on *Mikes* for this

6

principle ignores that *Mikes* remains binding precedent on this point, and overlooks the *Escobar* Court's express decision to limit the scope of claims not through a more narrowly circumscribed definition of falsity, but rather through courts' materiality and scienter analyses. *See* 136 S. Ct. at 2002 ("Instead of adopting a circumscribed view of what it means for a claim to be false or fraudulent, concerns about fair notice and open-ended liability can be effectively addressed through strict enforcement of the Act's materiality and scienter requirements.") (internal citations and quotes omitted).

Had the Supreme Court wished to rule out claims based on implied certification without a misrepresentation, it could have done so. Instead, it left that issue open. *See Allergan*, 246 F. Supp. 3d at 816. This Court thus should follow *Mikes'* binding precedent and find that such an implied certification claim is viable, *see Mikes*, 274 F.3d at 698, and that a defendant engaging in self-dealing by using wholly-owned affiliates to exponentially mark up its bills, *see* Compl. ¶ 2, represents exactly the type of fraudulent conduct that, even if it does not involve a misleading half-truth, is still actionable under the FCA.

## IV. The Government Has Adequately Pleaded Materiality

The Rosicki Defendants spend a considerable amount of effort in their reply effectively attempting to place Fannie Mae on trial regarding its actual knowledge of their fraudulent conduct, using speculative and one-sided conjecture, while ignoring the fact that such arguments are not only ineffective but also inappropriate at the pleading stage. *See* Rosicki Rep. at 13-15. Nevertheless, the Rosicki Defendants' reply fails to identify any evidence that Fannie Mae had actual knowledge of their alleged conduct when it continued to pay the relevant claims, and these arguments should not impact the materiality analysis. *See Escobar*, 136 S. Ct. at 2002-04

7

(holding that the Government's payment of claims when it had "actual knowledge" of the fraud is a relevant factor for evaluating materiality).

The requirement in *Escobar* of actual knowledge, as opposed to conjecture and innuendo, is clear and appropriate.  Were the Court to consider, as the Rosicki Defendants urge, facts like Fannie Mae's generalized right to audit foreclosure firms, *see* Rosicki Rep. at 13-14, to be proof that Fannie Mae had "actual knowledge" of Rosicki's mark-up scheme, large institutions with diverse mandates like Fannie Mae (as well as virtually every federal agency) would effectively waive all FCA claims by failing to catch and dismantle every possible fraudulent scheme in the course of a routine audit—a result that is inconsistent with the broad scope of the FCA.  Similarly, treating the public statements or the allegations of the relator as sufficient to constitute actual knowledge by Fannie Mae would require the Government to take action against potential defendants upon the filing of a *qui tam* complaint before claims are fully vetted through an investigation, or risk the release of FCA liability—an unworkable and unappealing framework for both the Government and *qui tam* defendants who ultimately may be absolved through an investigation.  *See United States v. Public Warehousing Co.*, 1:05-CV-2968-TWT, 2017 WL 1021745, at *6 (N.D. Ga. Mar. 16, 2017) (the "appropriate time to impute knowledge" of fraudulent conduct "is at the end of an investigation, not at the beginning").  Nor can the Rosicki Defendants purport to know what awareness Fannie Mae had about the Rosicki Defendants' specific fraudulent conduct in their New York foreclosure practice based upon the Government's settlement of nationwide claims, not specific to any foreclosure firm, against HSBC, a national mortgage servicer.  *See* Rosicki Rep. at 14.

Finally, the Rosicki Defendants argue, unconvincingly, that their mark-up scheme was "open and obvious"—ignoring the fact that Rosicki used Enterprise and Paramount specifically

to mask the mark-ups it applied to the actual foreclosure expenses. *See* Compl. ¶¶ 71-72, 79-81. This assertion also ignores the fact that the Fannie Mae Servicing Guide tasked Rosicki, as an approved foreclosure firm operating under a retention agreement with Fannie Mae, *see id.* ¶¶ 28, 30, with monitoring its own foreclosure expenses to ensure they were "actual, reasonable, and necessary," *id.* ¶ 37, and kept to a "minimum," *id.* ¶ 38. It also ignores Rosicki's knowledge, as described at length in the Government's response, that this requirement was material to Fannie Mae, *see* Gov. Mem. at 22-24; Compl. ¶¶ 36-38, 41, 125-27, and Rosicki's false assurances to Fannie Mae that it was adhering to these obligations, *see* Compl. ¶¶ 53, 84-85.

Notably missing in the Rosicki Defendants' reply is any assessment of the other materiality factors cited in *Escobar*, including whether the Fannie Mae rules that the Rosicki Defendants violated were conditions of payment and whether the Rosicki Defendants' conduct went to the essence of the bargain between Fannie Mae and the Rosicki Defendants. *See* 136 S. Ct. at 2002-04; *see also id.* at 2001 (noting that no one factor is dispositive in a materiality analysis and a trial court must evaluate the totality of the circumstances). For all of the reasons set forth in the Government's opposition brief, *see* Gov. Mem. at 16-19, these factors demonstrate that the Rosicki Defendants' fraudulent conduct was material to Fannie Mae.

## V.     The Rosicki Defendants Violated the Reverse False Claim Provision of the FCA

Nothing in the Rosicki Defendants' reply demonstrates any shortcoming in the Government's allegations that the Rosicki Defendants are liable under the reverse false claim provision of the FCA for improperly decreasing Fannie Mae's obligation to the Government.

As an initial matter, the Government has not made the blanket concession that "the FCA does not apply to a duty to pay that is potential or contingent." Rosicki Rep. at 17. Indeed, the legislative history of the definition of "obligation," added as part of the 2009 FERA

9

amendments, makes clear that the term "expressly includes contingent, non-fixed obligations," and that even under the pre-FERA version of the FCA, an "obligation" could arise "across the spectrum of possibilities from the fixed amount debt obligation where all particulars are defined to the instance where there is a relationship between the Government and a person that results in a duty to pay the Government money, whether or not the amount owed is yet fixed." S. Rep. No. 111-10, 111th Cong. 1st Sess. 10, 2009 U.S.C.C.A.N. 430 (Mar. 23, 2009) (internal quotation marks omitted).

Whatever discretion is retained by Fannie Mae's Board of Directors as part of the Third Amendment to the SPA, there is no dispute that for the 21 quarters to date during which this contractual relationship between Fannie Mae and the Government has been in effect, the dividend payment requirement has resulted in payments transmitted to Treasury for each quarter when the prescribed dividend amount has exceeded zero.[3] *See U.S. ex rel. Bahrani v. Conagra*, 465 F.3d 1189, 1204 (10th Cir. 2006) (holding, even under the pre-FERA version of the FCA, that "the need for some further governmental action or some further process to liquidate an obligation does not preclude a reverse false claims action" (internal quotation marks omitted)). This regular practice of dividend payments pursuant to the Third Amendment is not comparable to a fact pattern where the payment obligation never materialized; here, the payment obligation materialized repeatedly, with improperly diminished dividend amounts being paid to Treasury

---

[3] The Rosicki Defendants cite to a Fannie Mae 10-Q that discusses a portion of Congressional testimony from the Director of FHFA regarding the Third Amendment dividend payments. Rosicki Rep. at 17. But the language in the 10-Q is more nuanced than the Rosicki Defendants' excerpt suggests—it says that FHFA has the authority to withhold dividend payments "[t]o avoid a draw" of additional federal funds. *See* Fannie Mae Q2 2017 Form 10-Q at 9, available at http://fanniemae.com/resources/file/ir/pdf/quarterly-annual-results/2017/q22017.pdf (last visited May 16, 2018). The 10-Q further explains that "the Secretary of Treasury testified before the same committee and stated that *it was Treasury's expectation that dividends should be paid* per the terms of the senior preferred stock purchase agreement." *Id.* (emphasis added).

10

quarter after quarter after quarter. *See* Gov. Mem. at 26-27. Moreover, there is nothing discretionary about the capture of the dividend funds for the benefit of the Government if the Board of Directors were not to remit the quarterly payment. In this unprecedented scenario, Section 2(b) of the Fannie Mae Senior Preferred Stock Certificates provides that the dividend funds "shall accrue" and "shall be added" to the Government's Liquidation preference.[4] Thus whether through the quarterly dividend payment or through the backstop supplied by stock certificates, Fannie Mae had a clear obligation to make payments to the Government, those payments have always been made, and those payments have been negatively affected by the Rosicki Defendants' conduct.

While the Rosicki Defendants reiterate their proposed "reasonably close nexus" limitation on the scope of the reverse false claim provision, they again offer no support for this purported requirement, and make no effort to square the concept with the effort to broaden the scope of reverse false claims liability in the 2009 FERA amendments. *See* Gov. Mem. at 28. Nor do they make any meaningful effort to explain how the Rosicki Defendants' regular participation in an aspect of Fannie Mae's wide-ranging role in the housing market is different from the regular participation by defendants in other indirect reverse false claims cases in large and complex healthcare programs; it is not. *See* Gov. Mem. at 28.

Last week's Eastern District of New York decision in *United States ex rel. Kraus v. Wells Fargo & Co.*, No. 11 Civ. 5457 (BMC), 2018 WL 2172662 (E.D.N.Y. May 10, 2018), does not

---

[4] The Rosicki Defendants' citations to *Roberts v. Federal Housing Finance Agency*, --- F.3d ----, 2018 WL 2055940 (7th Cir. May 3, 2018), a decision that affirmed the dismissal of a complaint by private shareholders regarding the Third Amendment, are unavailing as those citations merely highlight points that are plain from the text of the SPA and the stock certificates. Notably, in that same decision, the Seventh Circuit, in describing the operation of the Third Amendment, explained that "it funneled substantially all profits (if any) to the federal government." *Id.* at *3.

11

alter the reverse false claim analysis. *Kraus* considers the statutory requirement that surplus funds from Federal Reserve Banks be transferred (eventually) to the Treasury to assess whether the banks should be treated as the Government or its agents under the FCA, *id.* at *3, 5-6, a point not at issue here, *see* Gov. Mem. at 4.  The *Kraus* plaintiffs did not allege a reverse false claim, and Judge Cogan's brief discussion of 31 U.S.C. § 3729(a)(1)(G) in dicta makes no mention of the indirect reverse false claim concept that is central in this action. *See id.* at *6.  Moreover, a different district court addressed the significance of the same statutory provision in a substantially similar context as *Kraus*, but reached the *opposite* conclusion. *See United States ex rel. Pasto v. Megabyte Bus. Sys.*, No. 3:98CV693, 2000 U.S. Dist. LEXIS 23099, at *8 (E.D. Va. Apr. 18, 2000) ("Since Federal Reserve Banks return all earnings in excess of operating and other expenses to the U.S. Treasury, fraudulent claims reduce the excess earnings, causing the Treasury to forfeit money to which it would otherwise be entitled, and triggering liability under the False Claims Act.").  Of course, there is no indication that the *Pasto* decision led to the type of explosion of FCA liability posited by the *Kraus* court, *see* 2018 WL 2172662 at *5 and n.8, and by defendants here, *see* Rosicki Mem. at 19.[5]

Finally, contrary to the implication in the Servicer Defendants' reply, *see* Servicer Rep. at 18, the Second Circuit has not foreclosed the type of indirect reverse false claim that has been

---

[5] The Rosicki Defendants also cite *Kraus*, in a footnote, in support of their argument that claims submitted to Fannie Mae are not "claims" as required by Sections (a)(1)(A) and (a)(1)(B) of the FCA.  *See* Rosicki Mem. at 2 n.1.  But again, the Government does not allege that Fannie Mae is a Government agency, and in any event, the *Kraus* court's reasoning on that issue is based on its conclusion that the Government has a "considerably limited financial connection with [Federal Reserve Banks]."  *See* 2018 WL 2172662, at *9; *see also id.* at *6 ("Significantly, the Government does not fund FRBs on either an original or ongoing basis.").  As discussed in the Complaint, the Government's opposition brief, and Section I, *supra*, the Government has a significant financial nexus to Fannie Mae, a far cry from the "considerably limited" connection described in *Kraus*.  Accordingly, this aspect of the *Kraus* decision also should have no bearing on the Court's assessment here.

12

expressly recognized by other courts and that is properly alleged in in the Complaint.  Indeed, the decision in *Wood ex rel. United States v. Applied Research Associates, Inc.*—reflected in a summary order that applies the pre-FERA version of the reverse false claim provision—says nothing at all about a reverse false claim where a third-party's obligation to the Government was impaired by the conduct of defendants.  *See* 328 F. App'x 744, 748 (2d Cir. 2009).  Rather, it stands for nothing more than the uncontroversial proposition that where a complaint makes "no mention" of any financial obligation owed to the Government, a plaintiff has not adequately pled a reverse false claim.

That is not the case here.  As set forth in the Complaint, the Rosicki Defendants' fraudulent overbilling scheme prompted overpayments for foreclosure-related services by Fannie Mae; these overpayments thereby reduced the amount owed by Fannie Mae to the Government in accordance with the Third Amendment payment obligation.  Accordingly, the Complaint has sufficiently alleged a violation of the reverse false claim provision of the FCA.

## CONCLUSION

For the reasons set forth herein and in the Government's memorandum of law in opposition to the Rosicki Defendants motion to dismiss, the Court should deny the motion in its entirety, and the Government's claims against the Rosicki Defendants should proceed.

Dated: New York, New York
May 16, 2018

                    Respectfully submitted,

                    GEOFFREY S. BERMAN
                    United States Attorney
                    Southern District of New York
                    Attorney for Plaintiff-Intervenor
                    United States of America

By:    */s/ Cristine Irvin Phillips*
                    CRISTINE IRVIN PHILLIPS
                    ANDREW E. KRAUSE
                    LAUREN A. LIVELY
                    Assistant United States Attorneys
                    86 Chambers Street, Third Floor
                    New York, New York 10007
                    Telephone Nos. (212) 637-2696/2769/2689
                    Facsimile Nos. (212) 637-2702/2786/2717
                    cristine.phillips@usdoj.gov
                    andrew.krause@usdoj.gov
                    lauren.lively@usdoj.gov