```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
UNITED STATES OF AMERICA ex rel.    :
PETER D. GRUBEA,                     :        12-cv-7199 (JSR)
                                     :
          Plaintiff,                 :
                                     :
          -v-                        :
                                     :
ROSICKI, ROSICKI & ASSOCIATES,       :
P.C., PARAMOUNT LAND, INC.,          :
THRESHOLD LAND INC., ENTERPRISE      :
PROCESS SERVICE, INC., MCCABE,       :
WEISBERG, & CONWAY, P.C., ATTORNEY   :
OUTSOURCING SUPPORT SERVICES, INC.,  :
REO AMERICA ABSTRACT, INC., CENLAR   :
FSB, CITIGROUP, INC., CITIBANK,      :
N.A., CITIMORTGAGE, INC., DITECH     :
FINANCIAL LLC, EVERHOME MORTGAGE     :
COMPANY, EVERBANK FSB, FLAGSTAR      :
BANK, FSB, GREEN TREE CREDIT, JAMES  :
B. NUTTER & CO., METLIFE BANK,       :
N.A., NATIONSTAR MORTGAGE LLC,       :
ONEWEST BANK FSB, PHH MORTGAGE       :
CORPORATION, PNC BANK, FSB,          :
SUNTRUST MORTGAGE, INC., U.S.        :
BANK, N.A., and WELLS FARGO & CO.,   :
                                     :
          Defendants.                :
------------------------------------x
UNITED STATES OF AMERICA,            :
                                     :
          Plaintiff-Intervenor,      :
                                     :
          -v-                        :
                                     :
ROSICKI, ROSICKI & ASSOCIATES,       :
P.C., ENTERPRISE PROCESS SERVICE,    :
INC., PARAMOUNT LAND, INC.,          :
                                     :
          Defendants.                :
------------------------------------x
UNITED STATES OF AMERICA ex rel.     :
PETER D. GRUBEA,                     :        13-cv-1467 (JSR)
                                     :
          Plaintiff,                 :
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 6/25/18

1

```
                                        :
              -v-                       :
                                        :
BANK OF AMERICA CORPORATION, BANK       :
OF AMERICA, N.A., J.P. MORGAN CHASE     :
& CO., and JPMORGAN CHASE BANK,         :        OPINION AND ORDER
N.A.,                                   :
                                        :
              Defendants.               :
------------------------------------x
```

JED S. RAKOFF, U.S.D.J.

On September 24, 2012, Peter D. Grubea ("Relator") filed a "qui tam" action on behalf of the United States of America (the "Government") against Rosicki, Rosicki & Associates ("Rosicki"), Enterprise Process Service, Inc. ("Enterprise"), Paramount Land, Inc. ("Paramount"), Threshold Land, Inc. ("Threshold") (collectively, the "Rosicki Defendants") and various mortgage servicers (the "First Suit"). See Complaint, Dkt. 25. On February 28, 2013, Grubea filed a First Amended Complaint naming as additional defendants McCabe, Weisberg & Conway, P.C. ("McCabe"), Attorney Outsourcing Support Services, Inc. ("AOSS"), REO America Abstract, Inc. ("REO") (collectively, the "McCabe Defendants"), and certain additional mortgage services. See Dkt. 27.

On March 5, 2013, Grubea filed suit against four mortgage servicers: HSBC Bank USA, N.A., HSBC Finance Corporation, HSBC Mortgage Corporation (USA), HSBC Mortgage Services, Inc. (collectively, "HSBC") (the "Second Suit"). See Complaint, Dkt. 22, No. 13 Civ. 1467. Thereafter, in 2014, HSBC admitted to liability and the Court entered judgment in the amount of $10

2

million. See Stipulation and Order of Settlement and Dismissal, Dkt. 151-1.

On June 27, 2014, Grubea filed a Second Amended Complaint in the First Suit adding still more servicers as defendants. See Dkt. 28. On July 8, 2014, Grubea filed a First Amended Complaint in the Second Suit naming Bank of America Corporation, Bank of America, N.A. (collectively, "Bank of America"), and J.P. Morgan Chase & Co, and JPMorgan Chase Bank, N.A. (collectively, "JPMorgan Chase") as defendants. See Dkt. 23, No. 13 Civ. 1467.

All of this remained under seal while the Government undertook its own inquiry in order to determine whether to intervene. However, in January of 2018, both suits were reassigned to this Judge, see Dkt. 19; Dkt. 20, No. 13 Civ. 1467, and the Court required the Government to make its election without further delay. On February 13, 2018, the Government elected to intervene in part and to decline intervention in part in the First Suit, see Government's Notice of Election to Intervene in Part and Decline Intervention in Part, Dkt. 33, and to decline any intervention in the Second Suit, see Notice of Election to Decline Intervention, Dkt. 31, No. 13 Civ. 1467.

Accordingly, on March 27, 2018, the Government filed a three-count complaint against the Rosicki Defendants[1] for violations of

---

[1] The Government did not sue Paramount's predecessor-in-interest Threshold. Accordingly, for simplicity, when this Opinion and

3

the False Claims Act ("FCA"). See Complaint-in-Intervention ("CII"), Dkt. 22. On April 3, Relator filed a five-count Third Amended Complaint ("TAC") in the First Suit against the Rosicki Defendants, the McCabe Defendants, and all of the Servicer Defendants[2] except for JPMorgan Chase and Bank of America, see Dkt. 29, and a five-count Second Amended Complaint ("SAC") in the Second Suit against the remaining Servicer Defendants, JPMorgan Chase and Bank of America, see Dkt. 28, No 13. Civ. 1467.

The Servicer Defendants, the Rosicki Defendants, McCabe, and the McCabe Affiliates[3] now move to dismiss the three operative complaints. See Dkts. 123, 132, 135, and 137; Dkt. 56, No. 13 Civ. 1467; Memorandum of Law in Support of the Servicer Defendants' Motion to Dismiss the Complaint ("Servicer Mem."), Dkt. 124; Memorandum of Law in Support of the Rosicki Defendants' Motion to Dismiss ("Rosicki Mem."), Dkt. 134; Memorandum of Law in Support

Order refers to the Rosicki Defendants, it means to include Threshold when it is referring to Relator's claims and to exclude Threshold when it is referring to the Government's claims.

[2] The "Servicer Defendants" are Bank of America; Cenlar FSB; Citigroup Inc., Citibank, N.A., and CitiMortgage, Inc. (collectively, "Citi"); Ditech Financial LLC; EverHome Mortgage Company and EverBank FSB (collectively, "EverBank"); Flagstar Bank, FSB ("Flagstar"); Green Tree Credit; James B. Nutter & Co.; JPMorgan Chase; MetLife Bank, N.A.; Nationstar Mortgage LLC; OneWest Bank FSB ("One West"); PHH Mortgage Corporation ("PHH"), PNC Bank, FSB ("PNC"); SunTrust Mortgage, Inc.; U.S. Bank N.A.; and Wells Fargo & Co ("Wells Fargo").

[3] The "McCabe Affiliates" are REO and AOSS.

4

of Motion to Dismiss the Third Amended Complaint by Defendant, McCabe, Weisberg & Conway, P.C. ("McCabe Mem."), Dkt. 138; Memorandum of Law in Support of Attorney Outsourcing Support Services, Inc.'s and REO America Abstract, Inc.'s Motion to Dismiss Third Amended Complaint ("AOSS Mem."), Dkt. 136; Reply Memorandum of Law in Further Support of the Servicer Defendants' Motion to Dismiss the Complaint ("Servicer Reply"), Dkt. 158; Reply Memorandum of Law in Further Support of the Rosicki Defendants' Motion to Dismiss ("Rosicki Reply"), Dkt. 157; Reply in Support of Motion to Dismiss the Third Amended Complaint by Defendant, McCabe, Weisberg & Conway, P.C. ("McCabe Reply"), Dkt. 163; Reply Memorandum of Law in Support of Attorney Outsourcing Support Services, Inc.'s and REO America Abstract, Inc.'s Motion to Dismiss Third Amended Complaint ("AOSS Reply"), Dkt. 162.[4]

Grubea and the Government oppose. See Memorandum of Law of Plaintiff-Intervenor United States of America in Opposition to the Rosicki Defendants' Motion to Dismiss ("Gov't Mem."), Dkt. 149; Memorandum of Law in Opposition to Defendants' Motions to Dismiss ("Relator Mem."), Dkt. 150; Sur-Reply Memorandum of Law of Plaintiff-Intervenor United States of America in Further

---

[4] Additionally, the Court is in receipt of supplemental papers from six Servicer Defendants — OneWest, Flagstar, Wells Fargo, Citi, Bank of America, and JPMorgan Chase — in support of their motions to dismiss.

Opposition to the Rosicki Defendants' Motion to Dismiss ("Gov't Reply"), Dkt. 167; Relator's Sur-Reply ("Relator Reply"), Dkt. 168.

Following this extensive briefing, the Court heard oral argument on May 25, 2018. See Transcript dated May 25, 2018 ("Tr."), Dkt. 176. Now, after careful consideration, the Court hereby dismisses with prejudice the claims against the Servicer Defendants; dismisses the claims against McCabe and the McCabe Affiliates without prejudice to Relator amending his complaint to detail further specific examples of McCabe and its Affiliates' allegedly fraudulent conduct; and otherwise denies the motions (in particular, denying the motion to dismiss of the Rosicki Defendants).

The pertinent allegations, as set forth in the operative complaints,[5] are as follows:

Grubea is an experienced consumer bankruptcy attorney residing in Erie County, New York. See TAC ¶ 18. Rosicki is a New York professional corporation specializing in mortgage law, with offices in Plainview, Batavia, and Fishkill, New York. Id. ¶ 19. Threshold is a New York business corporation, incorporated on May 30, 2003, and dissolved on July 11, 2011, with its principal office

---

[5] The allegations in Relator's complaints in the two suits are substantially the same. This Opinion and Order cites to the TAC in the First Suit except as needed to refer to information contained only in the SAC in the Second Suit.

in Plainview, New York. Id. ¶ 21. Paramount is the successor-in-interest to Threshold and a New York business corporation, with its principal office in Plainview, New York. Id. ¶¶ 20-21. Enterprise is a New York business corporation, with its principal office in Plainview, New York. Id. ¶ 22.

McCabe is a New York professional corporation with locations in New York and Pennsylvania. Id. ¶ 23. AOSS is a Pennsylvania corporation with its principal office in Philadelphia, Pennsylvania. Id. ¶ 24. REO is a Pennsylvania corporation with its principal office in Philadelphia, Pennsylvania. Id. ¶ 25.

Cenlar FSB ("Cenlar") is a federal savings bank, with its principal office in Trenton, New Jersey. Id. ¶ 26. Citigroup, Inc. is a Delaware corporation, with its principal office in New York; Citibank, N.A. is a subsidiary of Citigroup; and CitiMortgage, Inc. is a New York corporation and a subsidiary of Citigroup (collectively, "Citi"). Id. ¶ 27. EverHome Mortgage Company is a Florida corporation, with its principal office in Jacksonville, Florida and EverBank FSB is a federal savings bank, with its principal office in Jacksonville, Florida. Id. ¶ 28. Flagstar Bank, FSB ("Flagstar") is a federal savings bank, with its principal office in Troy, Michigan. Id. ¶ 29. Green Tree Credit ("Green Tree") is a Delaware limited liability company, with its principal office in St. Paul, Minnesota. Id. ¶ 30. James B. Nutter & Co. ("Nutter") is a Missouri corporation, with its principal office in

Kansas City, Missouri. Id. ¶ 31. MetLife Bank, N.A. ("MetLife") is a national banking association, with its principal office in Morristown, New Jersey. Id. ¶ 32. Nationstar Mortgage LLC ("Nationstar") is a Delaware limited liability company, with its principal office in Dallas, Texas. Id. ¶ 33. OneWest Bank FSB ("OneWest") is a federal savings bank, with its principal office in Pasadena, California. Id. ¶ 34. PHH Mortgage Corporation ("PHH") is a New Jersey business corporation, with its principal office in Mount Laurel, New Jersey. Id. ¶ 35. PNC Bank, FSB ("PNC") is a federal savings bank, with its principal office in Pittsburgh, Pennsylvania. Id. ¶ 36. SunTrust Mortgage, Inc. ("SunTrust") is a Virginia business corporation, with its principal office in Richmond, Virginia. Id. ¶ 37. U.S. Bank, N.A., ("U.S. Bank") is a national banking association, with its principal office in Minneapolis, Minnesota. Id. ¶ 38. Wells Fargo & Co. ("Wells Fargo") is a Delaware corporation, with its principal office in San Francisco, California. Id. ¶ 39.

Bank of America Corporation is a Delaware corporation headquartered in Charlotte, North Carolina; Bank of America, N.A. is a national banking association and subsidiary of Bank of America Corporation, with a principal place of business in Charlotte, North Carolina. See SAC ¶ 20. J.P. Morgan Chase & Co. is a Delaware corporation headquartered in New York, New York, and JPMorgan Chase Bank, N.A. is a national banking association with a principal place

8

of business in Columbus, Ohio (collectively, "JPMorgan Chase").
Id. ¶ 22.

The Federal Housing Administration ("FHA") is a division of
the United States Department of Housing and Urban Development
("HUD") that insures approved lenders against losses on mortgage
loans, including losses incurred in foreclosure proceedings. See
TAC ¶¶ 1, 5. The Federal National Mortgage Association ("Fannie
Mae") and the Federal Home Loan Mortgage Corporation ("Freddie
Mac") are government-sponsored enterprises ("GSEs"), chartered by
Congress to help lenders originate single-family mortgages by
purchasing and guaranteeing mortgage loans and by issuing mortgage
debt securities, id. ¶¶ 44, 72. Since 2008, the GSEs have been
under U.S. Government conservatorship. CII ¶¶ 13-14. Between 2008
and 2012, the GSEs received nearly $200 billion in federal funding.
See TAC ¶ 1. During that time, the GSEs paid quarterly dividends
to the U.S. Treasury equal to 10% of the total amount of federal
funds received. Thereafter, the GSEs paid the U.S. Treasury
quarterly amounts equal to their net worth less a $3 billion
capital reserve. See id. ¶¶ 50, 76.

In the ordinary course of conducting their affairs, FHA and
the GSEs pay financial institutions called "servicers" to
"service" mortgages they own or insure by, for example, collecting
payments from borrowers, pursuing delinquent loans, and
prosecuting foreclosures. Id. ¶ 4. In their contracts with

9

servicers, the GSEs and FHA agree to reimburse various costs and expenses related to foreclosure actions. The servicers, in turn, typically contract with law firms to prosecute these actions. Id. ¶ 6. The GSEs and FHA agree to pay these attorneys a flat fee for their legal work. Separately, the GSEs and FHA reimburse so-called "default-related legal expenses," which typically include title searches, service of process, and publication and posting costs. Id. Any overhead related to these activities, however, must be included in legal fees and not as expenses.

FHA and the GSEs permit reimbursement only of those default-related legal expenses that are actual, reasonable, and necessary. The FHA, for example, requires that its servicers certify that "with the submission of each loan for insurance or request for insurance benefits, the applicant has and will comply with the requirements of the Secretary of Housing and Urban Development ["HUD"], which include, but are not limited to . . . HUD's regulations, FHA handbooks, mortgagee letters, and Title I letters and policies." Id. ¶ 98 (quotations omitted). To maintain FHA approval, a servicer must submit an annual certification that states, inter alia, "I know or am in the position to know, whether the operations of the above named mortgagee to conform to HUD-FHA regulations, handbook, and policies," and certifies to conformance with the same. Id. ¶ 99. Among other things, HUD and the FHA require servicers to have in place a quality control plan, see id.

10

¶¶ 101-103, to review all claims for insurance benefits, id. ¶ 104, and to ensure that unallowable foreclosure processing fees are not included in insurance claims, id. ¶ 105.

Servicers must further ensure that their "contractors" and "agents" complied with certain specific FHA requirements. Id. ¶ 106 (quoting HUD Handbook 4060.1, 7-3). Among these is the requirement that, in the event a borrower defaults on an FHA-insured mortgage and the servicer prosecutes a foreclosure on the mortgage, "fees and costs that exceed reasonable and customary fees for the area" are not to be submitted for reimbursement. Id. ¶ 110. Also unallowable are costs "not necessarily incurred or required because of dilatory service," and costs that are "overhead items such as postage, telephone, or duplicating or collection services, all of which should be included in the attorney's or trustee's fees." Id. HUD rules expressly prohibit banks from listing any unallowable costs on any application for insurance benefits as either fees or costs. Id. ¶ 111. HUD rules further require banks to "promptly reimburse HUD for any amount overpaid [by HUD] because of incorrect, unsupported or inappropriate information" provided by the servicers or their agents. Id. ¶ 112 (quoting HUD Handbook 4330.4, 1-28).

Fannie Mae likewise requires its servicers to retain competent, diligent legal counsel and to "make every effort to reduce default-related foreclosure expenses." Id. ¶ 62 (quoting

Fannie Mae Servicing Guide E5-07 (Dec. 13, 2017)). Among other things, Fannie Mae servicers "must attempt to minimize the costs incurred from vendors utilized by law firms — such as auctioneers, process servers, title companies, posting companies, and newspapers or other publications — by ensuring that all costs are actual, reasonable, and necessary." Id.; see also id. ¶ 64 ("Fannie Mae will reimburse the servicer [for out-of-pocket costs that it pays to third-party vendors of the courts], as long as the costs are actual, reasonable and necessary"). Further, Fannie Mae servicers and law firms must "regularly examine the pricing offered by alternative vendors and negotiate for the best value from the vendor and other qualified service providers." Id. ¶ 62. Where attorneys have an economic interest in other companies involved in the foreclosure process, Fannie Mae requires that such relationships be disclosed and that "any fees or expenses for such services" not "exceed the customary and reasonable fees for comparable services in" the jurisdiction. Id. ¶ 63 (quoting the Fannie Mae Servicing Guide, Part VIII, § 106.03 (Mar. 14, 2012)). Fannie Mae further prohibits reimbursement of costs that are unnecessary or costs that are not reasonable, see id. ¶¶ 65-66, and requires that servicers monitor fees and expenses and reimburse Fannie Mae for "any unreasonable or excessive fees or costs," id. ¶ 63; id. ¶ 71.

12

Freddie Mac imposes requirements akin to those just discussed. For example, Freddie Mac requires that its servicers submit annual eligibility certifications attesting to compliance with Freddie Mac requirements, id. ¶ 88, including the requirement that servicers manage the foreclosure process "in a cost-effective, expeditious, and efficient manner," id. ¶ 89, "create and implement a quality control program" to ensure the same, id. ¶ 90, and impose "policies and procedures reasonably designed to ensure that firms handling Freddie Mac Default Matters are in compliance with [] the applicable provisions of the Guide, and applicable law," id. ¶ 93. Freddie Mac also requires that servicers require law firms to "disclose the identity of, and relationship with any entities the firm relies upon to provide third-party support functions performed on the Servicer's behalf, including, but not limited to, title searches, title insurance, posting, publication, and process services." Id. ¶ 92. Servicers must also require firms to disclose whether they have "a process to select and regularly review costs and performance of vendors of related sources to ensure competitive pricing and high quality." Id. Freddie Mac permits reimbursement only of those costs that are "reasonable and comparable to those customarily charged in the area where the property is located." Id. ¶ 94; see also id. ("Servicers must ensure that attorney fees and costs incurred are reasonable and comparable to those charged in the area where the

property is located.") (quoting Freddie Mac Single-Family Seller/Servicer Guide Bulletin Number 2013-6 (Apr. 15, 2013)).

Against this background, Cenlar, Citi, Everbank, Flagstar, Green Tree, Nutter, MetLife, Nationstar, OneWest, PHH, PNC, SunTrust, U.S. Bank, Wells Fargo, Bank of America, and JPMorgan Chase overcharged Fannie Mae, Freddie Mac, and the FHA hundreds of millions of dollars. See TAC ¶¶ 1-3, 11. Specifically, these servicers submitted claims for reimbursement of foreclosure expenses without regard to how unnecessary or unreasonable the expenses were.

Rosicki and McCabe are law firms. To handle title searches, service of process, and the arrangement of publication of legal notices, Rosicki created Threshold, Paramount, and Enterprise and McCabe created AOSS and REO. Id. ¶¶ 114, 122, 139. These affiliates, it is alleged, were designed to generate invoices for unnecessary services and charge excessive rates. See id. The affiliates passed these costs on to the law firms, the law firms passed them on to the servicers, and, upon information and belief, the servicers passed them on to the Government. Id.

Rosicki, for example, controls Enterprise - a service-of-process affiliate. See CII ¶ 54. Rather than actually serve process, however, Enterprise allegedly hired third-party vendors to serve process. Id. ¶ 70. These vendors charged Enterprise approximately $15-25 for each individual served. Id. ¶ 71.

14

Enterprise then generated invoices for service of process charging between $75 and $125. Id. ¶ 72. These invoices exceeded competitive market rates. Id. ¶ 73. Enterprise charged these amounts to Rosicki, which charged them to the Servicers. Enterprise also regularly billed for unnecessary expenses including service upon the New York State Department of Taxation and Finance despite the absence of any tax lien; service upon judgment debtors with names similar to the foreclosure defendant even though the relevant names were irreconcilable; ineffective and worthless service upon "John Doe" defendants; and services that were part of law firm overhead expenses such as court filings. See TAC ¶ 124. Similarly, Rosicki used Paramount to conduct title searches. Rather than do the work itself, however, Paramount engaged third-party abstractors at market rates to provide title documents and marked up their bills substantially (e.g. to $495 where market rates were between $100 and $250) before submitting them to Rosicki and the Servicers. See id. ¶ 131; CII ¶¶ 79-82.

McCabe also used affiliates – AOSS and REO – to conduct title searches and serve process. See TAC ¶¶ 139-40. AOSS and REO billed McCabe and ultimately the FHA and the GSEs at excessive rates including at more than $450 for title searches despite market rates between $100 and $250, and for personal service at more than $200 despite market rates of approximately $20 to $40. Id. ¶ 141. Like Paramount and Enterprise, AOSS and REO often contracted with other

15

entities to conduct the actual work and marked up the bills before seeking reimbursement from McCabe and thereafter from the Servicers. Although McCabe could have contracted with these entities directly, McCabe chose instead to contract with its affiliates in order to mark up the bills and generate profits. Id. ¶ 145.

Upon information and belief, the Servicer Defendants submitted these false claims to the GSEs and FHA in order to save resources that they would otherwise have had to expend on compliance, quality control, and efforts to negotiate better prices. Id. ¶ 11. If the Servicers had monitored and refused to pay unreasonable and unnecessary fees, Relator posits, neither Rosicki's affiliates, McCabe's affiliates, or the other vendors mentioned in the complaints would have been able to continue billing for unnecessary and unreasonable foreclosure expenses. Id. ¶ 118. The Servicers Defendants perpetuated this scheme over many years by falsely certifying to the GSEs and to the FHA that their claims were accurate and that they were in compliance with their contractual commitments to monitor foreclosure costs. Id. ¶ 120. To this day, upon information and belief, the Servicer Defendants have improperly retained the overpayments. Id. ¶¶ 3, 12. And they have done so despite contractual obligations to refund the GSEs and FHA and despite red flags including knowledge that the Justice Department was investigating the overpayments. Id. ¶ 486.

The operative complaints include over sixty specific examples of foreclosure actions in which Rosicki, McCabe, and other law firms charged unreasonable or unnecessary expenses, which the Servicer Defendants, upon information and belief, submitted for reimbursement to FHA, Fannie Mae, and Freddie Mac. See id. ¶¶ 170-474; SAC ¶¶ 163-332; CII ¶¶ 87-123. In one instance, Rosicki foreclosed on a property on Lake Street in Angola, New York. Id. ¶ 87. Rosicki contracted with Enterprise to effect service of process on the two named foreclosure defendants. Id. ¶ 88. Enterprise, however, did not serve the process; instead it contracted with a third-party to do so. Id. The third-party process server charged $20 for one of the named defendants, $10 for the other, and $33.50 for four Doe defendants. Id. ¶ 89. Enterprise then charged Rosicki $50 for attempted service on each named defendant, $125 for service on each named defendant, and $300 for the four Doe defendants. Id. ¶ 90. Thus, while service of process actually cost $63.50, Fannie Mae ultimately paid $650. Id. ¶¶ 89-90. Rosicki also contracted with Paramount to perform a title search for the Lake Street property. Rather than do the work itself, Paramount engaged a third-party vendor. Thereafter, Paramount submitted a bill for $275, the maximum amount allowed by Fannie Mae, as well as a $35 document retrieval fee. Id. ¶ 91.

In another instance, Flagstar foreclosed on a Fannie Mae mortgage secured by a property on East 45th Street in Brooklyn, New

17

York. See TAC ¶ 206. Flagstar engaged Rosicki to handle the legal proceedings. Id. ¶ 207. Rosicki contracted with Enterprise to bill for service of process. Id. ¶ 208. Enterprise invoiced Rosicki approximately $125 per defendant for each of the defendants at the property, well above market rates of $20-$40 per person, which, upon information and belief, Enterprise itself paid to a third-party process server who actually performed the work. Id. ¶ 209. Similarly, Paramount billed $495 for title searches related to that property, well above the market rate of between $100 and $250, which, upon information and belief, is what Paramount paid to the third-party company that actually conducted the title search. Id. ¶ 211.

Grubea discovered defendants' fraudulent scheme in the course of his bankruptcy practice when he noticed a pattern of foreclosure-related proofs-of-claims presenting unreasonable costs. Id. ¶ 489. Frequently, when he challenged servicers on these costs in his clients' bankruptcy proceedings, the servicers or their agents, the law firms, reduced the claim amounts. Id. Thereafter, Grubea conducted additional market research, id., and obtained direct and independent knowledge of the schemes through communications with lawyers from foreclosure law firms, id. ¶ 490, including a partner at Steven J. Baum, P.C., formerly the largest foreclosure firm in New York, lawyers at Rosicki, and lawyers at other firms around the country that use affiliate vendors, id. ¶

491. Among other things, Grubea learned that the Servicer Defendants paid these inflated and unnecessary foreclosure expenses without making any real effort to obtain the best value or to exercise quality control over fees and costs. Id. ¶ 492. Prior to Grubea's disclosures to the Government, see id. ¶ 493, no one had previously identified these mass overbillings, id. ¶ 494.

In connection with these allegations, Relator asserts that the McCabe Defendants and the Servicer Defendants submitted false claims to Fannie Mae, Freddie Mac, and FHA in violation of 31 U.S.C. § 3729(a)(1)(A) ("False Claims"), made false statements to Fannie Mae, Freddie Mac, and FHA in violation of 31 U.S.C. § 3729(a)(1)(B) ("False Statements"), and submitted false claims to Fannie Mae and Freddie Mac, which caused Fannie Mae and Freddie Mac to pay the United States less than what the United States would have otherwise been entitled to receive in violation of 31 U.S.C. § 3729(a)(1)(G) ("Reverse False Claims"). See TAC ¶¶ 495-502, 511-513; SAC ¶¶ 353-360, 364-366. Relator also asserts that the McCabe Defendants conspired to submit false claims and make false statements to Fannie Mae, Freddie Mac, and FHA in violation of 31 U.S.C. § 3729(a)(1)(C) ("False Claims Conspiracy"), see TAC ¶¶ 503-507, and that the Servicer Defendants used or caused to be made false records or statements material to an obligation to pay or transmit money to the United States or knowingly concealed, avoided, or decreased an obligation to pay or transmit money to

19

the United States in violation of 31 U.S.C. § 3729(a)(1)(G) ("Reverse False Claims"), see id. ¶¶ 508-510; SAC ¶¶ 361-363.

The Government, intervening in part, asserts that the Rosicki Defendants submitted: (1) false claims to Fannie Mae in violation of 31 U.S.C. § 3729(a)(1)(A) ("False Claims"), (2) false statements to Fannie Mae in violation of 31 U.S.C. § 3729(a)(1)(B) ("False Statements"), and (3) false claims to Fannie Mae, which caused Fannie Mae to pay the United States less than what the United States would have otherwise been entitled to receive in violation of 31 U.S.C. § 3729(a)(1)(G) ("Reverse False Claims"). See CII ¶¶ 128-146. Relator also asserts False Claims, False Statements, Reverse False Claims, and False Claims Conspiracy counts against the Rosicki Defendants with respect to Freddie Mac and FHA.

As mentioned, defendants move, pursuant to Rule 12(b)(6) and Rule 9(b), to dismiss the above-mentioned claims. To survive a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is plausible if it is supported by "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). In analyzing a complaint, the court "accept[s] all factual allegations as true and draw[s] all reasonable inferences in favor

20

of the plaintiff." Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt., 843 F.3d 561, 566 (2d Cir. 2016).

As the FCA is an antifraud statute, FCA claims must also satisfy Rule 9(b) of the Federal Rules of Civil Procedure. See U.S. ex rel. Ladas v. Exelis, Inc., 824 F.3d 16, 26 (2d Cir. 2017). Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "[T]he adequacy of particularized allegations under Rule 9(b) is case- and context-specific." U.S. ex rel. Chorches v. Am. Med. Response, 865 F.3d 71, 81 (2d Cir. 2017).[6] "Ultimately, whether a complaint satisfies Rule 9(b) depends upon the nature of the case, the complexity or simplicity of the transaction or occurrence, the relationship of the parties and the determination of how much circumstantial detail is necessary to give notice to the adverse party and enable him to prepare a responsive pleading." United States v. TEVA Pharms. USA, Inc., 13-cv-3702, 2016 WL 750720, at *15 (S.D.N.Y. Feb. 22, 2016).

## I. THE SERVICER DEFENDANTS

The Servicer Defendants argue that Grubea's claims fail because, inter alia, the operative complaints do not adequately allege scienter. See Servicer Mem. at 26-28, 31-32.

---

[6] Unless otherwise indicated, in quoting cases all internal quotation marks, alterations, footnotes, and citations are here omitted.

21

To state a False Claims or False Statements claim under the FCA, Grubea must plausibly allege, inter alia, that the Servicer Defendants "knowingly" presented or caused to be presented false or fraudulent claims. 31 U.S.C. § 3729(a). To state a Reverse False Claims claim under the FCA, Grubea must plausibly allege, inter alia, that the Servicer Defendants "knowingly" concealed or "knowingly" and improperly avoided or decreased an obligation to reimburse the Government. Id. § 3729(a)(1)(G).

The FCA defines "knowingly" to include a person who acts recklessly. See id. § 3729(b)(1)(A). Recklessness entails conduct that is "highly unreasonable and which represents an extreme departure from the standards of ordinary care." Chill v. Gen. Elec. Co., 101 F.3d 263, 269 (2d Cir. 1996). See also S. Rep. No. 96-615, at 5 (1980) (recklessness "encompass[es] the person who seeks payment from the Government without regard to his eligibility and with indifference to its requirements").

The FCA's scienter requirement is "rigorous," Universal Health Servs., Inc. v. United States ("Escobar"), 136 S. Ct. 1989, 2002 (2016), because, "under Rule 9(b), the proponent of an FCA claim must allege facts that give rise to a strong inference of fraudulent intent," United States ex rel. Tessler v. City of New York, 14-cv-6455, 2016 WL 7335654, at *5 (S.D.N.Y. Dec. 16, 2016), aff'd, 712 F. App'x 27 (2d Cir. 2017); see also O'Brien v. Nat'l Prop. Analysts Partners, 936 F.2d 674, 676 (2d Cir. 1991).

22

Conclusory allegations that defendants "'knew or were reckless in not knowing' . . . do not satisfy the requirements of Rule 9(b)." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129 (2d Cir. 1994).

Here Grubea alleges "upon information and belief" that the Servicer Defendants: "failed to 'make every effort' to reduce default-related legal expenses" as required by Fannie Mae, TAC ¶ 149; "did not exercise quality control over foreclosure expenses," id. ¶ 151; and "submitted false claims without undertaking any process to assess whether foreclosure expenses were reasonable or necessary," id. ¶ 153.[7] But when at oral argument on the instant motions, the Court inquired into the "information" that supported these "beliefs," Grubea's counsel specified only that Grubea had had conversations with people at various law firms. See Tr. at 41 (Buchdahl) ("the information primarily is that our Relator heard and saw directly evidence of inflated charges of these various foreclosure expenses" and had conversations with "people at the law firms involved in these foreclosures"). Although counsel also alleged at oral argument that Grubea had raised the issue of inflated charges with more than one Servicer Defendant, his counsel

---

[7] See also id. ¶ 157 ("Relator repeatedly brought the illegal and excessive nature of affiliates' fees to the attention of various Bank Defendants, as well as to their agents, and the Rosicki Firm. Yet, upon information and belief, the Bank Defendants have taken no action."). Relator has not pointed to any specific information underlying this allegation, as discussed further herein.

failed to name even one or to provide the particulars of any such conversation. See id. at 43. Moreover, these alleged conversations seem to have resulted in nothing more than foreclosure charges being lowered in certain bankruptcy cases involving Grubea's clients. Id. at 42 ("[w]hen he brought it to their attention, often they simply said, OK, we'll mark that back down").

In other words, rather than basing his complaints on any particularized information about the Servicer Defendants, Grubea asks the Court to infer their knowledge or recklessness from sixty-odd examples of excessive charges billed by Rosicki, McCabe, and other law firms in various foreclosure actions around the country.[8] According to Grubea these examples are "illustrative of the manner in which" the Servicer Defendants "engaged in wrongdoing." TAC ¶ 169. Grubea, however, says nothing about how these examples were

_____

[8] According to Grubea, his complaints here give rise to a strong inference of recklessness because they allege (1) an express duty on the part of the Servicer Defendants to monitor law firm foreclosure costs; (2) a number of "red flags" that put the Servicer Defendants on notice that various law firms were inflating expenses and submitting false claims for reimbursement; and (3) specific examples of a "nationwide pattern" of fraudulent claims. See Relator Mem. at 33. But the relevant question is not whether the Servicer Defendants had a duty to monitor foreclosure costs (the Court assumes, they did), or whether they were "on notice" that various law firms were inflating expenses (which they may have been); the relevant question is whether and to what extent each Servicer Defendant did or did not monitor foreclosure costs. On this point, Grubea confesses ignorance. See Relator Mem. at 43 (explaining that whether the Servicers monitored foreclosure costs is "peculiarly within [their] knowledge"); id. (explaining that "[e]ither the Servicer Defendants monitored foreclosure expenses properly or they did not").

24

compiled (whether they represent 5% of foreclosure charges submitted by the various individual Servicer Defendants, 50% of foreclosure charges, or .5% of foreclosure charges). Nor does Grubea have any information about whether the Servicer Defendants actually passed on these charges to the Government, and if they did, whether they did so recklessly. He knows nothing about what compliance systems the Servicers did or did not have in place. Indeed, he alleges nothing in particular about any of the Servicer Defendants except that they serviced the mortgages mentioned in the complaints.

In this regard, it is relevant that the mere fact of the charged amounts themselves do not support a strong inference of gross negligence on the part of the Servicers. The amounts are facially believable - after all, for the scheme alleged against the law firm defendants to work, it was necessary that the charges be below various absolute cut-offs established by the GSEs and FHA. It is also relevant that the various law firms had a fiduciary duty to honestly represent their costs, and, as regards charges submitted to FHA, that the Servicers were on the hook for one-third of the bill no matter what. See HUD Handbook 4330.4, 2-15(C)(2) ("HUD will calculate the two-thirds allowance based on the amounts entered on the claim form."). Accordingly, in the absence of particularized pleadings that would permit the Court to infer that these sixty examples are, in fact, representative of

the tens of thousands of mortgages defendants service each year, or facts regarding Defendants' actual servicing practices, Relator's allegations are based on little more than conjecture. At best, they support an inference that the servicers were negligent.[9]

Relator's pleadings also fail to satisfy Rule 9(b) because Relator's basis for alleging that the Servicers recklessly passed on fraudulent claims to the Government is merely that the law firms were generating fraudulent claims "for years and years with no changes," "one of the servicers [HSBC] that was alleged to have participated in this conduct admitted exactly what the allegations were," and "the most plausible allegation is that nothing happened to interrupt the flow of improper charges." Tr. at 43-44. A complaint fails to satisfy Rule 9(b), however, where it alleges "nothing at all" with respect to how each individual defendant

---

[9] In its answering papers, the Government includes a Statement of Interest in accordance with 28 U.S.C. § 517, addressing arguments made by the Servicer Defendants regarding Relator's complaints. See Gov't Mem. at 29-35. Among the arguments addressed by the Government is Defendants' contention that "their alleged failure to satisfy their obligations under the Fannie Mae, Freddie Mac, and HUD servicing guides and implement an adequate quality control program cannot form the basis for FCA liability." Id. at 32. While the Court agrees with the Government that widespread quality control failures of the sort alleged by Relator can give rise to FCA liability (in particular where the defendant has affirmatively acknowledged its obligation to conduct quality control as a funding condition), the Court nonetheless finds Relator's claims deficient because of Relator's failure to plead factual allegations supporting a strong inference that the Servicer Defendants, in fact, failed to conduct quality control or otherwise recklessly disregarded their contractual obligations to Fannie Mae, Freddie Mac, and FHA.

26

"did or did not perform" its obligations, "except to make the bare assertion that the results in and of themselves show" that the defendants "must not have done so." U.S. ex rel. Pervez v. Beth Israel Med. Ctr., 736 F. Supp. 2d 804, 813 (S.D.N.Y. 2010). While Rule 9(b) permits scienter to be demonstrated by inference, it is not a "license to base claims of fraud on speculation and conclusory allegations." Wexner v. First Manhattan Co., 902 F.2d 169, 172 (2d Cir. 1990).[10] Accordingly, the motions of the Servicer Defendants to dismiss Relator's complaints are granted. And because Relator has had ample opportunity to plead every possible factual basis for scienter, and was not able, even at oral argument, to provide more than is discussed above, the dismissal is with prejudice.[11]

## II. THE MCCABE DEFENDANTS

The McCabe Defendants move to dismiss Relator's complaint on the grounds that, inter alia, it fails to plead fraud with

---

[10] Relator has similarly failed to state a claim for Reverse False Claims. As regards these counts, Relator argues only that they succeed for the "same reasons" as Relator's False Claims and False Statements counts succeed. See Relator Mem. at 63. As discussed, the False Claims and False Statements counts fail. The Reverse False Claims allegations are also conclusory. See, e.g., TAC ¶ 479-483; id. ¶ 483 ("[n]one of the [Servicer] Defendants, upon information and belief, complied with [their] obligation [to return retained over payments]").

[11] Accordingly, the Court does not reach numerous other defenses raised by the Servicer Defendants regarding the adequacy of Relator's complaints or raised by the supplemental briefing submitted by six Servicers.

27

particularity as required by Rule 9(b). See McCabe Mem. at 23; AOSS Mem. at 8-9; McCabe Reply at 1-2. Among other things, the McCabe Defendants argue that the three examples of fraud by those defendants alleged by Relator in his complaint are conclusory and do not give rise to a strong inference of fraud. See AOSS Mem. at 8-9; McCabe Mem. at 6-8.

To satisfy Rule 9(b), a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Ladas, 824 F.3d at 25. To state an FCA claim with particularity, the operative complaints must set forth particularized allegations of fact regarding both the fraudulent "scheme" and the submission of false claims. See, e.g., U.S. ex rel. Kester v. Novartis Pharm. Corp., 23 F. Supp. 3d 242, 255 (S.D.N.Y. 2014).

Here, out of the dozens of examples of fraudulent claims included by Relator in his complaint, only three examples relate to McCabe and its affiliates. The first involves a Freddie Mac mortgage on a property in Penfield, New York (the "Katsura Court property"). Relator alleges that Flagstar retained McCabe to handle the foreclosure on the Katsura Court property and that, upon information and belief, McCabe retained REO and AOSS to conduct a title search and serve process. See TAC ¶¶ 302-310. Relator further alleges that, upon information and belief, AOSS

28

invoiced McCabe for service of process at an amount "above market rates," id. ¶ 305, and REO charged McCabe $450 for title work, at an amount "well above market rates," which were between $100 and $250, id. ¶ 307.

The second example involves a Freddie Mac mortgage secured by a property located on Columbia Street in Hamburg, New York (the "Columbia Street property"). Id. ¶ 325. Relator alleges that PNC retained McCabe to handle the foreclosure on the Columbia Street property, and that, upon information and belief, McCabe retained AOSS and REO to serve process and conduct a title search. See id. ¶¶ 325-333. Relator further alleges that, upon information and belief, AOSS invoiced McCabe for service of process at "an amount above market rates," id. ¶ 328, and that, upon information and belief, REO billed $450, an amount "well above market rates," id. ¶ 330.

The third example involves an FHA insured mortgage secured by a property on O'Brien Avenue in the Bronx, New York (the "O'Brien Avenue property"). Relator alleges that Flagstar retained McCabe to handle the foreclosure on O'Brien Avenue, and that, upon information and belief, McCabe retained AOSS to serve process. See id. ¶¶ 400-06. Relator further alleges that, upon information and belief, AOSS invoiced McCabe for service of process at "an amount above market rates." Id. ¶ 403. No mention is made of whether REO was involved in this foreclosure.

These three foreclosures, even taken together, do not give rise to a strong inference of fraud. The allegations regarding the O'Brien Avenue property, for example, are entirely conclusory. Relator states merely that AOSS invoiced McCabe at above-market rates. Relator nowhere specifies the amount AOSS charged (i.e. the fraudulent statement). In fact, in its moving papers McCabe argues that AOSS was not even hired to conduct service of process on this property. According to McCabe, a third-party vendor, Servium, served process and charged $520. See McCabe Mem. at 7-8.

As regards the Columbia Street and Katsura Court properties, Relator similarly fails to specify what AOSS charged. Relator instead merely asserts that AOSS billed McCabe an amount "well above market rates." Again, in its moving papers McCabe argues that AOSS was not retained to work on these foreclosures at all. Id. at 6-7. And, as regards REO, although Relator specifies the amount REO billed McCabe to perform title searches on these properties ($450), Relator does not allege that REO outsourced this work to a third-party for a lower price (as is alleged with respect to work performed by AOSS and other affiliates in this case). [12] Accordingly, the complaint alleges a total of two

[12] The reason this outsourcing is significant is because, as mentioned previously, the relevant rules bar law firms from claiming as default-related legal expenses the costs of overseeing service of process or conducting title searches. See Fannie Mae Servicing Guide, E-5-04 (April 12, 2017) (legal fees include ordering title reports and reviewing them, "[e]xecuting all steps

30

fraudulent statements involving McCabe: REO's $450 charge to conduct a title search on the Columbia Street property and REO's $450 charge to do the same for the Katsura Court property. These amounts, although potentially inflated, are facially plausible, and Relator makes no allegation that REO outsourced the work to a third party for a substantially lower rate. Accordingly, in the absence of further specific pleadings, these allegations are not sufficient to state a claim under the FCA.[13]

In his answering papers, Relator offers to cure these deficiencies by supplementing his complaint with additional examples. Specifically, Relator proposes to incorporate two examples already included in Relator's complaint in the Second Suit (to which the McCabe Defendants are not a party). See SAC ¶¶ 187-95, 251-59. Among other things, these examples specify the

___

necessary to obtain service of process . . . including review of process server affidavits . . . and referral and tracking of published notices"); id. (stating that Fannie Mae will "not reimburse the servicer for legal fees and expenses . . . that are properly allocated to the law firm's overhead expenses"); HUD Handbook 4330.4, 2-15(B) (noting that "overhead items" are not reimbursable). Accordingly, taking the factual allegations in the complaints as true, see, e.g., TAC ¶¶ 127, 143, mark-ups by the affiliates of third-party bills are presumptively improper.

[13] McCabe argues that Relator's claims also fail because Relator does not plead the basis for his market rate calculations, see McCabe Mem. at 23, but McCabe cites no case law for this proposition and the Court is not of the view that such additional detail is required at the pleading stage. (Relator, of course, may be subject to Rule 11 sanctions if it turns out he has no factual basis for pleading that, for example, market rates for title searches in Hamburg, New York are between $100 and $250.)

31

actual amounts billed by AOSS. See, e.g., id. ¶ 192 (alleging that AOSS invoiced McCabe approximately $133 for service on each defendant at a property in Beacon, New York); id. (alleging that $133 was well above market rates of between $20 and $40); id. (alleging that AOSS hired a third party process service vendor to serve each defendant at the Beacon property and paid that vendor market rates). These examples also specify that REO hired a third party vendor to conduct title searches at market rates of between $100 and $250 and marked up those invoices to $445 before passing them on to McCabe. Id. ¶ 190.

Relator further points to an affidavit that includes additional examples of fraudulent conduct including one example in which AOSS billed $836 for personal service on two defendants, three attempts at service, and mailings, all of which should have cost less than $150. Relator Mem. at 10 n.5 (citing Declaration of Kaleigh Erin Wood dated May 7, 2018 ("Wood Decl.") ¶¶ 8-23, Exs. 2-3, 5-6, Dkt. 152). According to Relator, McCabe chose not to contract directly with the process server — who charged $30 for personal service — but to route service through AOSS so that AOSS could aggressively mark up the bill before seeking reimbursement. Wood Decl. ¶¶ 6-7.[14]

_____

[14] Additionally, Relator explains that he could describe conversations with individual process servers who signed certificates of service on behalf of AOSS for McCabe foreclosures. These process servers told him that they signed the certificates

32

These examples are precisely the sort of specific allegations that are lacking in the Third Amended Complaint but that are necessary to state a claim for fraud under the FCA. Accordingly, the Court dismisses Relator's complaint as against the McCabe Defendants' without prejudice to Relator further amending it to incorporate these allegations, provided such amended pleadings are filed no later than July 11, 2018.[15]

## III. THE ROSICKI DEFENDANTS

The Rosicki Defendants argue that the operative complaints (A) fail to state False Claims and False Statements claims; (B) fail to state Reverse False Claims claims; and (C) fail to state False Claims Conspiracy claims. Further, they argue that (D) the FCA does not cover any claims submitted to Fannie Mae and Freddie Mac because these entities are not part of the U.S. Government in the relevant sense. Below, the Court considers each of these arguments in turn.

### A. False Claims and False Statements

---

as if they worked for AOSS, but that they were actually independent process servers who charged market rates to AOSS. See Relator Mem. at 10-11 n.5.

[15] If Relator does so amend, and the McCabe Defendants then wish to renew their motion to dismiss on any of the grounds they previously asserted (including those not reached in this Opinion), they should call chambers, jointly with Relator, by no later than July 18, 2018, to arrange a briefing schedule.

According to the Rosicki Defendants, the operative complaints fail to adequately allege falsity and materiality and the Government's complaint fails to satisfy Rule 9(b).

**(1) Falsity**

The FCA recognizes two types of false claims: factually false claims and legally false claims. See U.S. ex rel. Wood v. Allergan, Inc., 246 F. Supp. 3d 772, 783 (S.D.N.Y. 2017). "A claim is 'factually false' where the party submitting the claim supplies 'an incorrect description of the goods and services provided or a request for reimbursement for goods and services never provided.'" Kester, 23 F. Supp. 3d at 260-61 (quoting Mikes v. Straus, 274 F.3d 687, 697 (2d Cir. 2001), abrogated by Universal Health Servs., Inc. v. United States, 136 S. Ct. 1989 (2016)). A claim is legally false either where it "involves a defendant's express representation of compliance" with a "federal statute, regulation, or contractual provision" when "it is actually not compliant," New York ex rel. Kurana v. Spherion Corp., No. 15 Civ. 6605, 2016 WL 6652735, at *14 (S.D.N.Y. Nov. 10, 2016), or where "a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements . . . render[ing] the . . . representations misleading." Escobar, 136 S. Ct. at 1999.

Both the Government and Relator here contend that the claims submitted by the Rosicki Defendants are, inter alia, legally false

34

because they constitute misleading "half-truths" that are actionable under Escobar.[16] Half-truths are "representations that state the truth only so far as it goes, while omitting critical qualifying information." 136 S. Ct. at 2000. For example, in Escobar, the Court held that a defendant who submitted claims for payment to Medicaid using payment codes that "corresponded to specific counseling services" had "represented that it had provided individual therapy, family therapy, preventive medication counseling, and other types of treatment" as defined by Medicaid. The Court reasoned that anyone:

> informed that a social worker at a Massachusetts mental health clinic provided a teenage patient with individual counseling services would probably — but wrongly — conclude that the clinic had complied with core Massachusetts Medicaid requirements (1) that a counselor "treating children [is] required to have specialized training and experience in children's services," 130 Code Mass. Regs. § 429.422, and also (2) that, at a minimum, the social worker possesses the prescribed qualifications for the job, § 429.424(C). By using

[16] Relator and the Government also contend that the claims are legally false under Mikes. See Gov't Mem. at 10-11. Mikes holds that a claim may be legally false even where a defendant does not make a representation in submitting the claim but (1) "the submission of the claim itself . . . impliedly constitutes a certification of compliance," United States v. Visiting Nurse Serv. of N.Y., No. 14 Civ. 5739, 2017 WL 5515860, at *6 (S.D.N.Y. Sept. 26, 2017), and (2) defendants' noncompliance relates to a "material payment requirement," Mikes, 274 F.3d 687; see also Wood, 246 F. Supp. 3d at 816 (concluding that Mikes remains controlling law in the Second Circuit on the issue of implied false certification without an affirmative representation). Relator contends that "[m]any" of the claims submitted by defendants are also factually false because they were "submitted for more than the services actually cost." Relator Mem. at 16. Because, as discussed further herein, the Court finds that the claims are legally false under Escobar, it need not reach these questions.

> payment and other codes that conveyed this information
> without disclosing [] many violations of basic staff and
> licensing requirements for mental health facilities,
> [defendants'] claims constituted misrepresentations.

Escobar, 136 S. Ct. at 2000-01.

The complaints in this case state a claim under Escobar. The servicers obtained reimbursements from the Government by submitting claims for payment that relied on the half-truths represented by the Rosicki Defendants. When submitting claims to HUD, the servicers used Form 27011, which requires each mortgagee to itemize foreclosure costs in Box 307 to obtain reimbursement. See TAC ¶ 108. The HUD Handbook explains that "unallowable costs" — which expressly include "fees and costs that exceed reasonable and customary fees in the area" and "costs that are not necessarily incurred" — cannot be included in the box. Id. ¶ 110. When submitting claims to Freddie Mac, the servicers used Form 104SF, which requires expense codes corresponding to various expense categories, such as process server fees and title work. Freddie Mac's rules require that expenses in these categories be actual, reasonable, and necessary. See TAC ¶ 94. When submitting claims to Fannie Mae, the servicers submit Form 571, which requires them to itemize foreclosure costs and expenses by type. Fannie Mae bars servicers from itemizing costs that are not "actual, reasonable, and necessary" and requires "[b]oth the servicer and the law firm"

to "make every effort to reduce default-related legal expenses."
Fannie Guide E-5-07; TAC ¶¶ 62, 64-65.[17]

The complaints allege that Rosicki improperly passed off foreclosure expenses submitted by their affiliates as the actual and reasonable costs of the services performed, thereby masking enormous mark-ups applied by the affiliates. See TAC ¶¶ 136-37. These were classic half-truths: true "so far as it goes," in that Rosicki was in fact billed by its affiliates for these amounts, but materially misleading because the charges were part of a scheme to bilk the Servicers and the Government. As in Escobar, upon receiving the requests here, Fannie Mae "would probably — but wrongly — conclude" that the expenses were the actual expenses incurred by the Rosicki Defendants, rather than the product of fraudulent mark-ups. Accordingly, the complaints allege falsity.

**(2) Materiality**

Next, defendants argue that the operative complaints fail to allege that the purported false statements were "material" to the

---

[17] Rosicki argues that, while the servicers ultimately submitted Form 571 to Fannie Mae, the form contains "no billing codes or other, similar affirmative representations." Rosicki Reply at 9. It "simply lists different types of expenses with blank spaces for the claimant to enter dollar amounts," and so it is "exactly what the Supreme Court described as a claim that 'merely request[s] payment." Id. (citing Escobar, 136 S. Ct. at 2001). But the allegations here are not that Rosicki did not actually perform service of process or conduct title searches. The allegations are that these services did not cost what Rosicki said they cost. Rosicki's representation about the "cost" was at best a half-truth, and in certain circumstances factually false.

Government's decision to pay the relevant claims. See Rosicki Mem. at 26-33. Specifically, Rosicki argues that the complaints do not allege anything tending to suggest that the FHA, Fannie Mae, or Freddie Mac would not have paid the claims if they knew of the false statements. See id. at 27.[18]

It is well established that a false claim or statement is actionable only if it is "material" to the false or fraudulent claim for payment. 31 U.S.C. § 3729(a)(1)(B). For purposes of the FCA, a statement is material only if it has a "natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). The materiality requirement is "rigorous" and "demanding," and can be satisfied only by allegations that include particularized facts. Escobar, 136 S. Ct. at 1996, 2003, 2004 n.6.

In assessing materiality, courts look to "the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." Grabcheski v. Am. Int'l Grp., Inc., 687 F.

---

[18] Additionally, Rosicki argues, despite access to Fannie Mae, the Government never alleges that Rosicki lied to Fannie Mae about its excessive fees or that Fannie Mae was unaware of them. See Rosicki Mem. at 30. According to Rosicki, given the Government's investigation, the substantial publicity around Relator's efforts to raise awareness of Rosicki's practices, and Rosicki's suit against Relator for defamation in 2012, Fannie Mae had plenty of opportunity since this case was filed to conduct an audit. Id. at 32-33. Yet Fannie Mae terminated its relationship with Rosicki only after the Government's decision to intervene earlier this year. Id. at 33.

38

App'x 84, 87 (2d Cir. 2017) (summary order). In implied certification cases, among the factors courts consider are whether the relevant rule was a condition of payment, whether the defendant's misrepresentation went to the "very essence of the bargain," and how the Government reacted to similar misconduct when it had "actual knowledge" of it. Escobar, 136 S. Ct. at 2003-04, n.5.

Under the plain meaning of the rules here, expenses that are substantially inflated by law firm affiliates and accordingly are multiple times higher than market rates, are not reimbursable. See, e.g., United States v. DynCorp Int'l, LLC, 253 F. Supp. 3d 89, 101 (D.D.C. 2017) (holding that "a claim for costs that are significantly higher than reasonable satisfies the materiality requirement"). Rosicki's argument that it never submitted the claims itself is irrelevant as they caused the claims to be submitted and the necessity and reasonableness of the expenses was central to the entities' decisions to pay the claims.

Rosicki's further argument that the GSEs and the FHA knew of the fraudulent conduct at issue is pure speculation. Although these various entities knew of the amounts Rosicki was charging in specific cases, there is no evidence that they knew that those costs were fraudulently inflated nor is there evidence that they continued to pay the costs once they had "actual knowledge" that the costs were inflated. See Escobar, 842 F.3d at 112 ("mere

awareness of allegations concerning [a defendant's misconduct] is different from knowledge of actual [misconduct]"). Moreover, these unsubstantiated assertions about what Fannie Mae, Freddie Mac, and FHA must have known relate to facts beyond the scope of the complaints and cannot be resolved at the pleading stage.

Under the natural tendency test, the complaints need only allege that "a reasonable man would attach importance to [the misrepresented information] in determining his choice of action in the transaction." Escobar, 136 S. Ct. at 2002. As it is highly implausible that FHA or the GSEs would willingly pay inflated expenses, and defendants point to no evidence that FHA or the GSEs paid any claims having actual knowledge that they contained inflated expenses, the complaints here adequately allege materiality.

### (3) Particularity

Rosicki also argues that the Government's complaint lacks particularity. See Rosicki Mem. at 17-19. Specifically, Rosicki argues that Rosicki "did not itself submit any claims" to Fannie Mae, Freddie Mae, or FHA nor does the "Government's complaint [] identify with particularity even a single allegedly false claim submitted by a servicer." Id. According to Rosicki, the Government has failed to specify the identities of the servicers in each of their six examples. See id. at 20 (noting that the Government is "in a far better position than the Rosicki defendants to provide

40

the details of any allegedly false claims the servicers may have submitted to Fannie Mae").

As previously mentioned, to satisfy Rule 9(b) a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Ladas, 824 F.3d at 25. To state an FCA claim with particularity, the operative complaints must set forth particularized allegations of fact regarding both the fraudulent "scheme" and the submission of false claims. See, e.g., Kester, 23 F. Supp. 3d at 255.

Each of the properties at issue in the Government's complaint is identified by a unique Fannie Mae loan number and the street and town where the property is located. Equipped with this information, the Rosicki Defendants should easily be able to identify the specific servicers they used in each of these cases. Moreover, the Government's complaint specifies the amounts that the Rosicki Defendants overcharged mortgage servicers and that the mortgage servicers passed on these claims to Fannie Mae for reimbursement. See CII ¶¶ 87-123.

Contrary to the Rosicki's Defendants' contention, the Government's complaint also alleges that the specific inflated expenses detailed in the Complaint were submitted to Fannie Mae using a Cash Disbursement Request, Form 571, and were paid by

Fannie Mae. See CII ¶ 86 (alleging that the "following examples represent a small fraction of the many Fannie Mae loans for which, in connection with foreclosure proceedings, Enterprise and/or Paramount submitted invoices for inflated expenses to Rosicki, and for which Rosicki, in turn, submitted bills for the inflated expenses to the Servicers, which the Servicers paid. Claims for those inflated expenses were then submitted to Fannie Mae for reimbursement, and were paid by Fannie Mae.").

Accordingly, the Government's complaint states with sufficient particularity that the claims submitted by the Rosicki Defendants, which were identified by loan number, were actually submitted to Fannie Mae as required by Rule 9(b).

## B. Reverse False Claims

Under the FCA, liability attaches to an entity that "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). The term "obligation" is defined as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of an overpayment." 31 U.S.C. § 3729(b)(3). The FCA

42

does not require that the obligation to pay or transmit money to the Government be the defendant's obligation – rather, the provision applies whenever a defendant has decreased "an obligation" to pay the Government. U.S. ex rel. Landis v. Tailwind Sports Corp., 51 F. Supp. 3d 9, 60 (D.D.C. 2014).

A "duty to pay," however, "must be formally 'established' before liability can arise." U.S. ex rel. Barrick v. Parker-Migliorini Int'l, LLC, 878 F.3d 1224, 1231 (10th Cir. 2017). "In other words, there is no liability for obligations to pay that are merely potential or contingent." Id.; see also U.S. ex rel. Taylor v. Gabelli, 345 F. Supp. 2d 313, 338 n.141 (S.D.N.Y. 2004) (reverse false claims "depend[], in part, on the nature of defendants' obligation to pay the Government – a contingent, speculative, or potential obligation is not actionable").

Grubea and the Government contend that Rosicki is liable for submitting so-called reverse false claims because, by fraudulently causing Fannie Mae and Freddie Mac to reimburse hundreds of thousands of dollars in inflated foreclosure expenses, defendants caused a reduction in the amount of money Fannie Mae and Freddie Mac paid the Treasury pursuant to the terms of the Third Amendment to the Senior Preferred Stock Purchase Agreement ("SPA") between the GSEs and the Treasury. See Dkt. 133-6.

The Rosicki Defendants argue that although liability for a reverse false claim may attach where, as here, the defendants'

conduct "cause[s] a third party to impair its obligation to the federal government," United States v. Caremark, Inc., 634 F.3d 808, 817 (5th Cir. 2011), the Third Amendment's terms qualify Fannie Mae's "obligation" to make quarterly dividend payments.[19] Specifically, the Third Amendment provides that Treasury has a right to receive dividends only "when, as and if declared by [Fannie Mae's] Board of Directors, in its sole discretion." SPA at 3, Dkt. 133-6 (emphasis added). Because Fannie Mae's Board has discretion as to whether to make a dividend payment, Rosicki argues, Fannie Mae did not have an "obligation" within the meaning of the FCA. Rosicki cites the Third Circuit's holding that a company's contractual promise to pay dividends to the Small Business Administration was "contingent on . . . the Board's declaration of dividends," and was not an "obligation" for FCA purposes because it was "dependent on a future discretionary act." U.S. ex rel. Petras v. Simparel, Inc., 857 F.3d 497, 505-06 (3d Cir. 2017).

But it is undisputed that for each quarter during which the Third Amendment has been in effect and for which the prescribed dividend amount has exceeded zero, Fannie Mae has remitted the required quarterly dividend payment to Treasury. And, even in the

---

[19] Defendants make the identical argument as regards Freddie Mac. See Rosicki Mem. at 36, n.4.

44

event that Fannie Mae's Board of Directors were to elect not to declare a dividend for a given quarter — something that has never occurred in more than five years — the payment obligation to the Government would not disappear. Section 2(b) of the Fannie Mae Senior Preferred Stock Certificates provides that to the extent dividends on the Senior Preferred Stock are not paid, the dividends "shall accrue and shall be added to the Liquidation Preference [retained by the Government] pursuant to Section 8, whether or not there are funds legally available for the payment of such dividends and whether or not dividends are declared." See Gov't Mem. at 26; see also Perry Capital LLC v. Mnuchin, 864 F.3d 591, 602 (D.C. Cir. 2017) ("[T]he Third Amendment requires Fannie . . . to pay quarterly to Treasury a dividend equal to [its] net worth — however much or little that might be").

Thus this case is markedly different from Petras, where a one-time dividend payment requirement could have been triggered by a board's declaration or by a liquidation of the company, neither of which materialized. See 857 F.2d at 506. Indeed, in that case, the relator did not even allege that "the Board declared the dividends or had an inclination to do so." Id. at n.50. Here, Fannie Mae's obligation to the Government did materialize — dividend payments pursuant to the Third Amendment were made routinely in accordance with the specific schedule set forth in the Third Amendment. And even if Fannie Mae had declined to make

one or more of its dividend payments, the payment obligation remained intact. Accordingly, the Government and Relator have adequately alleged an obligation by Fannie Mae to pay funds to the United States beginning in 2013.

The Rosicki Defendants also argue that the complaints do not plead a reasonably close nexus between their conduct and any funds owed to the Government. See Rosicki Mem. at 37-38. As Rosicki puts it, because the theory of liability here would cover a contractor who fraudulently overcharged Fannie Mae for lawn maintenance (i.e. such a fraudulent payment would also "decrease the amount of dividend payments" that Fannie Mae could make to the Government), the theory of reverse false claims liability is too broad. Id.

But, quite aside from the fact that this case does not involve lawn mowers, Rosicki offers no support for this purported "nexus" requirement. The fraudulent billing activities of the Rosicki Defendants were conducted on behalf of Fannie Mae as part of Fannie Mae's role in the housing market. The FHFA exercises broad authority over Fannie Mae's operations. Treasury is obligated to fund any operational shortfalls Fannie Mae might incur. See TAC ¶¶ 55, 82. Relator plausibly alleges that Rosicki was aware of the bailout of Fannie Mae and Freddie Mac, its biggest clients (indeed, it seems highly implausible that Rosicki was not). Accordingly, Rosicki's fraud had the predictable effect of depriving the Government of money it was owed and is sufficiently connected to

46

Fannie Mae's payment obligations to the Government to state a claim

under the FCA. See U.S. ex rel. Hunt v. Merck-Medco Managed Care,

L.L.C., 336 F. Supp. 2d 430, 444 (E.D. Pa. 2004) (holding that

"[i]f Medco's actions had the predictable consequence of depriving

the Government of money it was owed, then Medco was acting (or

failing to act) within the ambit" of the reverse false claim

provision).[20]

## C. False Claims Conspiracy

---

[20] Rosicki also cites a recent case in which a court in the Eastern District of New York held that loan requests to Federal Reserve Banks (FRBs) were not "claims" within the meaning of the FCA because the Government's "financial connection" with the FRBs did not "extend to funding or reimbursing" FRBs. See U.S. ex rel. Kraus v. Wells Fargo & Co., No. 11 Civ. 5457, 2018 WL 2172662, at *9 (E.D.N.Y. May 10, 2018). While the Court disagrees with Kraus, even if this decision were correct, it would not affect the analysis here, because here the Government did have a financial connection with the GSEs that, during the relevant period, extended to funding their operations, including their foreclosure operations. Moreover, Kraus runs contrary to at least one prior federal court decision. See United States ex rel. Pasto v. Megabyte Bus. Sys., No. 3:98 Civ. 693, 2000 U.S. Dist. LEXIS 23099, at *8 (E.D. Va. Apr. 18, 2000) ("Since the Federal Reserve Banks return all earnings in excess of operating and other expenses to the U.S. Treasury, fraudulent claims reduce the excess earnings, causing the Treasury to forfeit money to which it would otherwise be entitled, and triggering liability under the False Claims Act."). In any event, Kraus appears to this Court to be erroneous. Although, as a legal matter the Federal Reserve Banks are federal instrumentalities, not federal agencies, they are properly conceived of as part of the federal Government under the FCA. Although their funding is not appropriated by Congress, they are themselves the federal Government's money-issuing authority, and accordingly are funded by the sovereign public as much as any other federal agency.

47

To state a conspiracy claim, Relator must allege that "(1) the defendant conspired with one or more persons to get a false or fraudulent claim allowed or paid by the United States and (2) one or more conspirators performed any act to effect the object of the conspiracy." United States ex rel. Wood v. Allergan, Inc., 246 F. Supp. 3d 772, 825 (S.D.N.Y. 2017).

The Rosicki Defendants argue that Relator's conspiracy claim is barred by the intra-corporate conspiracy doctrine. See Rosicki Mem. at 39. But, Relator does not plead common ownership among the Rosicki Defendants or that Paramount, Threshold, and Enterprise are wholly-owned subsidiaries of Rosicki. Instead, Relator alleges that Rosicki and/or Rosicki's principals have an interest in and control over Paramount, Threshold, and Enterprise. See TAC ¶¶ 122, 139. If the doctrine even applies in this context (a separate issue disputed by the parties), plainly the relevant entities would have to "have a complete unity of interest" and "be viewed as that of a single enterprise," Copperweld Corp. v. Indep. Tube Corp., 467 U.S. 752, 771 (1984). The Court cannot resolve that question of fact on a motion to dismiss. Accordingly, the Court finds that Relator states a claim for False Claims Conspiracy against the Rosicki Defendants.

## D. **False Claims Act Liability, Generally**

Rosicki argues that the operative complaints should be dismissed as regards reimbursement requests submitted to Fannie

Mae or Freddie Mac. Such requests, Rosicki contends, are not "claims" within the meaning of the FCA, see, e.g., Rosicki Mem. at 11-16, because, unlike the FHA or the Treasury Department, the GSEs are not Government entities – they are independent for-profit companies that happened to receive additional capital from the Government during an emergency bailout. Id. at 15.

Additionally, Rosicki argues, the operative complaints cannot state "economic loss" to the taxpayer resulting from defendants' alleged misconduct because the taxpayers' investment in the GSEs have generated enormous returns. Thus, were the Court to sustain the complaints in the case, Rosicki explains, it would mean that "whenever a private entity receives a bailout from the Government, the False Claims Act applies to all claims submitted to that entity – just as if the bailout had transformed it into a federal agency." Id. at 16.

Under current law,[21] in order to qualify as a "claim" under the FCA, defendants' "request or demand . . . for money or property" must be "presented to an officer, employee, or agent of the United States" or "a contractor, grantee or other recipient"

---

[21] The FCA was strengthened on May 20, 2009 by the Fraud Enforcement and Recovery Act ("FERA") to "help protect Americans from future frauds that exploit the economic assistance programs intended to restore and rebuild our economy." S. Rep. No. 111-10 at 1-2 (2009). The amendment did not have retroactive effect. See Pub. L. No. 111-21, § 4(f)(1), 123 Stat. 1617, 1625 (2009); United States v. Countrywide Fin. Corp., 961 F. Supp. 2d 598, 609 (S.D.N.Y. 2013).

49

of federal funds. 31 U.S.C. § 3729(b)(2)(A). In the case of requests made to contractors, grantees, and other recipients of federal funds, the FCA applies only (1) "if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest" and (2) the Government either "provides or has provided any portion of the money or property requested or demanded" or "will reimburse such contractor, grantee or other recipient for any portion of the money or property which is requested or demanded." Id.

Because the Treasury provided $200 billion to the GSEs to stabilize the housing market following the mortgage crisis, the GSEs are "other recipients" of federal funds within the meaning of § 3729. With respect to prong one — advancement of a Government interest — the Government's interest here was in keeping the GSEs afloat and ensuring that their mortgage operations could continue. Indeed, the GSEs were not simply recipients of bailout funds, they were placed under Government conservatorship. The Recovery Act created the Federal Housing Finance Authority ("FHFA") and charged it with "oversee[ing] the prudential operations" of the GSEs and "ensur[ing] that" they "operate[] in a safe and sound manner," "consistent with the public interest." 12 U.S.C. § 4513(a)(1). The Act furthered authorized FHFA to "take such action as may be (i) necessary to put the" GSEs "in a sound and solvent condition; and (ii) appropriate to carry on the business of the" GSEs and

"preserve and conserve [its] assets and property." Id. at §
4617(b)(2)(D). Although defendants challenge the notion that money
spent on foreclosure furthered the Government's interest in the
GSEs, plainly the ability of the GSEs to efficiently liquidate
their non-performing loans is a critical component of their
operations and necessary to keep mortgage rates low. In fact,
defendants concede that federal funds were used "primarily to cover
losses from single-family mortgages," somehow ignoring the fact
that "losses" on mortgages include the costs of foreclosure. See
Rosicki Mem. at 15.

With respect to prong two — provision of federal dollars to
a portion of the money demanded — the funds here are substantial
and not earmarked, accordingly, it is not necessary to show that
the funds were provided specifically to pay defendants' claims.
Rather, the FCA applies as long as any portion of the claim is or
will be funded by U.S. money. See U.S. ex rel. Marcus v. Hess, 317
U.S. 537, 544 (1943) (the FCA "does not make the extent of [the
funds'] safeguard dependent upon the bookkeeping devices used for
their distribution"); United States ex rel. Yesudian v. Howard
Univ., 153 F.3d 731, 738-39 (D.C. Cir. 1998).

Because the GSEs are in Government conservatorship they can
draw each quarter from Treasury their "deficiency amount" — i.e.,
the "amount, if any, by which . . . the total liabilities of
[Fannie Mae or Freddie Mac] exceed . . . total assets" — up to a

51

specified limit. See SPA at 2, 4 § 2.2. Thus, every dollar subtracted from the bottom line of the GSEs by fraud is potentially passed along to the Government to the extent it results in or worsens a net shortfall. In the event of a net shortfall, the Government is contractually obligated to cover the shortfall. Indeed, the Government did so to the tune of billions of dollars.

Although defendants also argue that, unless the funds are traceable directly to Government disbursements there is a slippery slope towards liability for anyone who benefits from federal aid, previous courts have rejected this argument. The D.C. Circuit, for example, posited in a similar context that "[i]t may not be appropriate" to impose FCA liability if (1) "the grantee's federal funds are an insubstantial percentage of its total budget," (2) "there is little likelihood that any of a defendant's money actually came from a federal grant," or (3) "there is little continuing contact between the grantee and the government once the grant is made." Yesudian, 153 F.3d at 738. But the bailout funds in this case are vastly larger than the annual revenues of the GSEs. Accordingly, during the period when the GSEs were losing money, the claims were virtually guaranteed to be paid with federal funds. Beginning in 2013, once the GSEs began to earn profits, each GSE was obligated to pay Treasury its net worth each quarter less a small capital buffer, such that any request for payment on a false claim after 2013 decreased the amount that Treasury

received from the GSEs dollar-for-dollar. Accordingly, adopting a definition of "claim" that would include the GSEs would not expand the FCA beyond Congress' intent, rather it would allow the Government to prosecute fraud on behalf of a taxpayer-supported entity that is in federal conservatorship – precisely what Congress had in mind when it amended the statute.[22]

Defendants separately argue that the complaints fail to overcome an additional requirement under the FCA that the alleged false claims "cause economic loss to the government." See Servicer Mem. at 36 (quoting Garg v. Covanta Holding Corp., 478 F. App'x 736, 741 (3d Cir. 2012). According to defendants, the Government's deal with the GSEs generated enormous returns, which defendants estimate to be "$87 billion more than [the] Treasury invested." Id. But defendants are wrong on the facts and on the law. The $87 billion figure does not represent a profit, as none of the Treasury's principal investment has been repaid. Rather the dividends that Treasury has received are equivalent to interest payments owed to the taxpayers for putting their capital at risk. It is inapposite to whether the false claims in this case caused

---

[22] See, e.g., 155 Cong. Rec. H5686-01, 2009 WL 1373400 (statement of Rep. Scott) (FERA "is a bill crafted to combat the financial fraud that contributed to causing, and worsening, our Nation's mortgage crisis"); 155 Cong. Rec. S1679-01, 2009 WL 275706 (Sen. Leahy) (recommending passage of FERA "in order to protect from fraud the Federal assistance and relief funds expended in response to our current economic crisis").

an economic loss to the Government that, as the supermajority shareholder of the GSEs, the Treasury may ultimately earn substantial returns on its investment. It would still be the case that every dollar extracted from the GSEs by fraud would be a dollar less in return to the Government.

Accordingly, because the claims paid for reimbursement of foreclosure expenses were monies "spent or used [] to advance a Government program or interest" and because the Government provided a "portion of the money or property requested or demanded," the Court finds that the operative complaints adequately allege "claims" within the meaning of the FCA as regards Fannie Mae and Freddie Mac.

## IV. CONCLUSION

For the reasons set forth above, the Court grants the motions of the Servicers Defendants and dismisses with prejudice both Relator's Second Amended Complaint in the Second Suit in its entirety and Relator's Third Amended Complaint in the First Suit as to the Servicer Defendants. The Court also grants the motions of the McCabe Defendants in part and dismisses Relator's Third Amended Complaint in the First Suit as to the McCabe Defendants, but without prejudice to Relator filing a Fourth Amended Complaint including certain additional allegations detailed by Relator in his answering papers, provided that such amended pleadings are

filed by no later than July 11, 2018. Finally, the Court denies the motion of the Rosicki Defendants.

The Clerk of Court is hereby instructed to close docket entry numbers 123, 132, 135, and 137 in the First Suit and number 56 in the Second Suit.

SO ORDERED.

Dated: New York, NY
       June 23, 2018

_____
JED S. RAKOFF, U.S.D.J.