# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel. | : | |
| PETER D. GRUBEA, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Case No.  12 Civ. 7199 (JSR) |
| v. | : | |
| | : | |
| ROSICKI, ROSICKI & ASSOCIATES, P.C., et al., | : | |
| | | |
| | **:** | |
| Defendants. | : | |

_____

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO DISMISS THE FOURTH AMENDED COMPLAINT
## BY DEFENDANT, MCCABE, WEISBERG & CONWAY, P.C.

# TABLE OF CONTENTS

I.    Factual Background ...........................................................................................................1

   A.    Relationship of Parties............................................................................................1

   B.    Servicers' Contracts ...............................................................................................3

      1.    FHA-Insured Loans .......................................................................................3

      2.    Freddie Mac ..................................................................................................4

         a.    PPI Restrictions / Statewide Coverage .................................................4

         b.    General Reimbursement Eligibility Requirements ................................5

         c.    Reimbursable Fees and Costs ...............................................................6

         d.    Non-Reimbursable Expenses .................................................................7

   C.    Examples Involving MWC ......................................................................................8

      1.    Crain Process Service ...................................................................................8

      2.    David Avenue Property ................................................................................8

      3.    Herkimer Street Property ..............................................................................9

      4.    South Division Property ..............................................................................10

      5.    Benson Street Property ...............................................................................10

      6.    4th Avenue Property ...................................................................................11

   D.    Sheriff Service Exemplars / Licensing .................................................................11

   E.    This Action............................................................................................................12

      1.    Contentions Against Rosicki .......................................................................12

      2.    Contentions Against MWC .........................................................................12

         a.    First Three Rounds of Pleading.............................................................12

         b.    Fourth Amended Complaint ..................................................................14

II.    Arguments of Law ...........................................................................................................14

   A.    Standard .................................................................................................................14

   B.    Grubea Did Not Correct the Defects Identified by the Court................................16

      1.    The Title Charges Are Facially Plausible ..................................................16

      2.    No Strong Inference of Fraud Arising from the AOSS Charges ................16

         a.    No Fraudulent Statement About the Total Charges ..............................17

         b.    No Outsourcing for a Substantially Lower Rate ..................................17

         c.    Grubea's "Market Rates" Are Facially Implausible ............................18

i

    3.    No Support the Claims Were Submitted for Reimbursement ................................ 20

    C.    No Knowing Intent to Commit Fraud ................................................................... 20

    D.    No False Claims ................................................................................................... 23

    E.    No Conspiracy (Third Claim) ............................................................................... 25

    F.    No Reverse False Claims (Fourth Claim) ............................................................. 25

III.   Conclusion ...................................................................................................................... 26

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..................................................................................................... 14, 15

*Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*,
62 F.3d 69 (2d Cir. 1995).................................................................................................. 15

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..................................................................................................... 14, 15

*Bishop v. Wells Fargo & Co.*,
870 F.3d 104 (2d Cir. 2017).............................................................................................. 23

*Brass v. American Film Technologies, Inc.*,
987 F.2d 142 (2d Cir. 1993).............................................................................................. 16

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002).............................................................................................. 15

*Cortec Indus., Inc. v. Sum Holding L.P.*,
949 F.2d 42 (2d Cir. 1991)................................................................................................ 15

*DiVittorio v. Equidyne Extractive Indus.*,
822 F.2d 1242 (2d Cir. 1987)............................................................................................ 15

*Gold v. Morrison-Knudsen Co.*,
68 F.3d 1475 (2d Cir. 1995).............................................................................................. 15

*Huntington Hosp. v. Thompson*,
319 F.3d 74 (2d Cir. 2002)........................................................................................... 21, 22

*Kramer v. Time Warner, Inc.*,
937 F.2d 767 (2d Cir. 1991).............................................................................................. 16

*Roth v. Jennings*,
489 F.3d 499 (2d Cir. 2007).............................................................................................. 16

*Sacred Heart Med. Ctr. v. Sullivan*,
958 F.2d 537 (3d Cir. 1992).............................................................................................. 22

*United States ex rel. Chorches v. Am. Med. Response, Inc.*,
865 F.3d 71 (2d Cir. 2017)................................................................................................ 15

*United States ex rel. Colucci v. Beth Isr. Med. Ctr.*,
785 F. Supp. 2d 303 (S.D.N.Y. 2011)........................................................................... 21, 22

*United States ex rel. Doe v. Taconic Hills Cent. Sch. Dist.*,
8 F. Supp. 3d 339 (S.D.N.Y. 2014)..........................................................................21

*United States ex rel. Hussain v. CDM Smith, Inc.*,
2017 U.S. Dist. LEXIS 159538 (S.D.N.Y. Sept. 27, 2017)......................................23

*United States ex rel. Ladas v. Exelis, Inc.*,
824 F.3d 16 (2d Cir. 2016)........................................................................................25

*United States ex rel. Quinn v. Omnicare, Inc.*,
382 F.3d 432 (3d Cir. 2004)......................................................................................21

*United States ex rel. Youssef v. Tishman Constr. Corp.*,
2017 U.S. Dist. LEXIS 15823 (E.D.N.Y. Feb. 2, 2017)...........................................23

*Universal Health Servs. V. United States ex rel. Escobar*,
136 S. Ct. 1989 (2016)..............................................................................................23

*Wang v. FMC Corp.*,
975 F.2d 1412 (9th Cir. 1992) ..................................................................................21

**Statutes**

31 U.S.C. § 3729(a)(1)(C) ........................................................................................25

31 U.S.C. § 3729(b)(1) .............................................................................................20

**Other Authorities**

48 CFR 31.000 *et seq.*..............................................................................................23

48 CFR 31.201-3(a) ..................................................................................................23

48 CFR 31.201-3(b) ..................................................................................................24

Fed. R. Civ. P. 9(b) ...................................................................................................14

Fed. R. Civ. P. 12(b)(6).............................................................................................14

N.Y.C. Admin. Code §§ 20-403……………………………………………………11

N.Y.C. Admin. Code §§ 20-406……………………………………………………11

N.Y.C. Admin. Code §§ 20-406.1…………………………………………………11

N.Y.C. Admin. Code §§ 20-406.2…………………………………………………11

## I.      Factual Background

This is a *qui tam* action against law firms and vendors arising from the reimbursement of costs incurred by law firms during the prosecution of foreclosure actions for their servicer-clients.  The claims against defendant, McCabe, Weisberg & Conway, P.C. ("MWC"), are based on the contention MWC contracted with defendants, Attorney Outsourcing Support Services, Inc. ("AOSS") and REO America Abstract, Inc. ("REO"), to provide title searches and personal service above market rates.  4th Am. Compl. [Dkt. 185] ("FAC") ¶ 141.  MWC was reimbursed for the foreclosure costs by servicers who submitted the costs to the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac") and the Federal Housing Administration ("FHA") for reimbursement.  FAC ¶¶ 147-48.  The claims asserted against MWC are presentation of false claims, 31 U.S.C. § 3729(a)(1)(A) (first claim), use of false statements, 31 U.S.C. § 3729(a)(1)(B) (second claim), conspiracy, 31 U.S.C. § 3729(a)(1)(C) (third claim), and reverse false claims, 31 U.S.C. § 3729(a)(1)(G) (fifth claim).

The fourth amended complaint did not correct the fatal defects identified by the Court in its opinion granting MWC's motion to dismiss the third amended complaint.  The claims against MWC in the fourth amended complaint should be dismissed with prejudice.

### A.      Relationship of Parties

The FHA insures approved lenders against losses on mortgage loans, including losses incurred in mortgage foreclosures.  FAC ¶ 5.  Fannie Mae and Freddie Mac are government-sponsored enterprises ("GSEs") chartered by Congress to help lenders originate single-family mortgages by purchasing and guaranteeing mortgages and issuing mortgage debt securities. FAC ¶ 4.  The FHA and GSEs engage financial institutions called "servicers" to service mortgages they own or insure by collecting payments and delinquencies and retaining counsel to

handle foreclosures.  FAC ¶¶ 4-5.   The servicers must follow guidelines when servicing FHA-insured and GSE-backed mortgages.  FAC ¶¶ 60, 87, 98.  Some expenses incurred by servicers, including foreclosure fees and costs, are reimbursed by the FHA and GSEs according these guidelines.  FAC ¶ 6.  Expenses that do not qualify for reimbursement are born by the servicers.

MWC was a law firm that provided legal services to servicers in connection with foreclosures.  FAC ¶¶ 6, 23.  MWC used affiliated entities AOSS and REO to provide service of process and title searches for some foreclosures it handled.  FAC ¶¶ 24, 25.  AOSS and REO submitted invoices to MWC for services they performed that MWC paid.  The AOSS invoices typically included multiple services and were itemized.  Gairo Decl ("Gairo") Exs. B, D, F, H.  MWC invoiced the servicers for its fees and costs.  Gairo Exs. C, E, G, I.  The invoices to servicers usually included a single line item that reflected the total amount charged for process of service-related services.  *Id.*  However, MWC submitted the third-party cost invoices, including the itemized AOSS invoices, to the servicers with their invoices.  Gairo ¶ 11.

Defendant, Rosicki, Rosicki & Associations, P.C. ("Rosicki"), is a foreclosure law firm in New York.  FAC ¶ 19.  Defendants, Paramount Land, Inc. ("Paramount"), Threshold Land, Inc. ("Threshold"), and Enterprise Process Service, Inc. ("Enterprise") (collectively "Rosicki Affiliates"), were entities affiliated with Rosicki that provided service of process and title search services to Rosicki.  FAC ¶¶ 20-22, 122.

Relator, Peter D. Grubea ("Grubea"), is an attorney in Erie County, New York who represented consumers in bankruptcy proceedings.  FAC ¶ 18.  Grubea did not allege he worked for any defendant, servicer, creditor's bankruptcy or foreclosure law firm, title or process service vendor, Fannie Mae, Freddie Mac, the FHA or Housing and Urban Development ("HUD").  Grubea claimed he "discovered a pattern of foreclosure-related proofs-of-claims presenting

unreasonable costs" during "the course of his bankruptcy practice[.]"  FAC ¶ 509.  Grubea alleged the claims included "foreclosure fees beyond any reasonable sum, as well as fees for unnecessary work" and servicers would reduce their claims when "he challenged servicers on these costs[.]"  *Id.*  Grubea claimed he "studied market rates for foreclosure fees" and determined servicers and law firms were "claiming supra-market rates."  *Id.*

Grubea alleged he developed his theory through "communications" with a partner at Steve J. Baum, P.C., lawyers at Rosicki, and "partners of other firms throughout the country with affiliate vendors."  FAC ¶ 511.  Grubea claimed he "obtained non-public information about the affiliate vendor business model of such law firms and related practices of servicers" from these "conversations[.]"  *Id.*  Grubea did not claim he obtained "insider" information about the business practices of MWC, AOSS or REO.

**B.      Servicers' Contracts**

**1.      FHA-Insured Loans**

Servicers must certify they will comply with HUD regulations to service FHA-insured loans.  FAC ¶¶ 98-99.  Servicers can be reimbursed for foreclosure "[c]osts that are required by law, such as private service of process" and "[f]ees and costs that are necessarily incurred and are reasonable and customary in the area."  FAC ¶¶ 107-09 (quoting HUD Handbook).  HUD will not reimburse for costs caused by "dilatory service, such as courier service or express mail or property inspection by attorneys" or "overhead items such as postage, telephone, duplicating or collection services[.]"  FAC ¶ 110 (quoting HUD Handbook).  Servicers are not permitted to seek reimbursement for "unallowable costs."  FAC ¶ 111.

Servicers use the HERMIT System to manage FHA-insured loans and to submit claims for reimbursement.[1]  HUD provides a user guide that describes how to use the system and timetables for claim submission.  *See* HERMIT.  Servicers can submit a claim for reimbursement arising from foreclosure or deed-in-lieu of foreclosure after title is acquired.  HERMIT § 8 (CLAIMS).  If the foreclosure is dismissed, then title is not acquired.

### 2.      Freddie Mac[2]

The servicers have contracts with Freddie Mac that incorporate the Freddie Mac Single-Family Seller/Servicer Guide ("Guide").  FAC ¶ 87.  The Guide and monthly bulletins are publicly available on Freddie Mac's website and regularly updated.[3]  The current Guide is 2248 pages with hundreds of exhibits and forms.[4]

### a.      PPI Restrictions / Statewide Coverage

The Guide includes "information security and business continuity planning requirements" that apply to the servicers as well as the servicers' vendors.  Guide § 1302.1; Guide § 9501.3(o) (applying to law firms).  The information security requirements include "human resources security" (background checks and information security training for employees) and "data

---

[1]      Hermit Systems & Resources, https://www.hud.gov/program_offices/housing/comp/ hecm_hermit (last accessed Jul 27, 2018) ("HERMIT").

[2]      MWC limited its discussion to Freddie Mac's guide because Grubea provided no Fannie Mae "example" as to MWC.  However, Fannie Mae's guidelines are substantially similar.

[3]      Freddie Mac Website, Single-Family Business, http://www.freddiemac.com/singlefamily/ guide/ (last accessed Jul 27, 2018).

[4]      For ease of reference, MWC cites the current version.  Prior versions are available on the Freddie Mac Website.  Grubea cited a 2011 version in the FAC.  The "examples" that pertain to MWC are from 2012, 2013, 2014 and 2015.

encryption" for the transmission of Protected Personal Information (PPI).   Guide § 1302.2(a)(i), (x).  PPI is not defined in the Guide but is defined in statutes and regulations as information such as social security numbers, drivers' license numbers, date of birth, telephone number and address.  *See, e.g.* 18 U.S.C. § 2725; 32 CFR 701.115.

Freddie Mac requires foreclosure firms have "the ability to cover foreclosure, bankruptcy, eviction, REO closing matters and default-related litigation throughout the State." Guide § 9501.3(d).  Freddie Mac contemplated "relationships with third parties" would be required to satisfy the statewide requirement and created criteria to manage them.  *Id.*

### b.   General Reimbursement Eligibility Requirements

Freddie Mac will reimburse servicers for legal fees and costs incurred during foreclosures that are "reasonable and comparable to those customarily charged in the area where the property is located."  FAC ¶ 94 (quoting 2011 Guide); Guide § 9701.11.  Servicers may seek reimbursement for costs incurred through a law firm's affiliated entity provided the law firm "disclose[s] whether the firm has a process to select and regularly review costs and performance of vendors of related sources to ensure competitive pricing and high quality."  FAC ¶ 92 (quoting Freddie 2011 Guide).  Freddie Mac sets outer limits on reimbursable attorneys' fees and certain costs.  *See, e.g.,* Guide §§ 9301.15(e), 9701.11, Exhibit 57A (uncontested foreclosure). However, servicers can request approval for amounts exceeding the limits.  *See, e.g.,* Guide §§ 9301.15(e), 9301.17, 9301.24, 9301.28(e), 9701.11(1), 9701.11.

Freddie Mac only permits servicers to seek reimbursement of foreclosure fees and costs that are not recoverable from the borrower.  *See* Guide § 9701.5.  The servicers must recover fees and costs from bankruptcy from the borrower in the bankruptcy proceeding.  Guide § 9401.11.

5

Servicers are required to complete foreclosures within a certain timetable.  Guide §§ 9301.45 - 47.  If the timetable is not satisfied, then the foreclosure fees and costs are not eligible for reimbursement.  *Id.*  The servicer must submit the claim within the appropriate trigger date (*i.e.,* foreclosure sale) to qualify for reimbursement.  Guide § 9701.5.  Freddie Mac can deny reimbursement or assess penalties if the servicer does not comply with the reporting, approval, timelines or eligibility guidelines.  *See, e.g.,* Guide §§ 9401.11, 9501.15, 9701.4.  However, the servicers still have to pay the lawyers who provided the foreclosure legal services.[5]

### c.      Reimbursable Fees and Costs

Attorneys' fees for uncontested foreclosures are subject to pre-set limits.  Guide § 9701.11, Exhibit 57A.  The flat-fee for uncontested foreclosures includes first legal, review of borrower package, SCRA verification, review of title examination, preparation and filing of notices, orders for expedited or alternative service, court appearance, entry of judgment, foreclosure sale and deed preparation and recording.  Guide § 9701.11(1).  If the foreclosure is contested, includes mediation and/or becomes non-routine, then additional attorneys' fees are permitted.  Guide § 9701.11.

As it relates to service of process, Freddie Mac permits:

5.  Costs of serving legal notices, when required by law

7.  Costs of posting of notices of foreclosure or other legal proceedings, as required by State or local law.  Reimbursable costs incurred for the posting of such legal notices are for actual charges imposed for physical posting of notices on the property.

Guide § 9701.11(5), (7).

---

[5]      Freddie Mac provides a "non-reimbursable items" section in its reimbursement program, so servicers can track non-reimbursed expenses.  Expense Reimbursement Desk Reference April 2018, http://www.freddiemac.com/learn/pdfs/service/104sf_desk_reference.pdf (last accessed Jul 27, 2018).

The Guide provides "Approved Attorney Fees and Title Expenses" in Exhibit 57A. Gairo Ex. A. Effective September 1, 2013, the approved cost for title work was $510 in New York and $560 in New York City. Gairo Ex. A p. E57A-2. The title search includes the search and an update. Guide § 9701.11(4). An additional $75 is permitted if title becomes stale due to a bankruptcy delay. Gairo Ex. A p. E57A-3.

### d.      Non-Reimbursable Expenses

Effective July 24, 2018, Freddie Mac modified Section 9701.15 of its Guide relating to non-reimbursable expenses. Guide § 9701.15. Previously, the section provided:

> Freddie Mac considers the following items to be standard operating costs for Servicers, the attorney or broker and, as part of the cost of doing business, not reimbursable:
> . . . .
> 11.      Other costs of an attorney, such as time or fees for curing a Delinquency, document preparation, work processing or notary public services performed by an attorney; co-counsel fees; referral fees, packaging fees or other similar fees and new case start-up fees.
> . . . .
> 18.      Additional fees or service charges billed by a law firm, or any entities the firm relies upon to provide third-party support functions performed on the Servicer's behalf, that are considered included in the attorney's fees listed in Exhibit 57A.

Guide as of 12.2017, http://www.freddiemac.com/singlefamily/guide/bulletins/pdf/ 122017Guide.pdf (last accessed July 27, 2018).

The reference to "attorney" was removed and clarification the section applies to servicers' overhead added:

> Consistent with Section 8101.2, standard operating costs incurred by a Servicer, or its Servicing Agent and/or Outsourced Vendor(s), as applicable, in connection with the Servicer's obligations and duties owed to Freddie Mac are part of the Servicer's cost of doing business, and, therefore, are not reimbursable by Freddie Mac, unless expressly provided for otherwise in the Servicing Contract.

Guide § 9701.15.  Freddie Mac requires the servicers to pay the foreclosure lawyers "at its own

expense" and without reimbursement if the servicers rely upon foreclosure counsel to perform

servicers' overhead.  Guide § 9701.11(1) (last paragraph).

## C.    Examples Involving MWC

### 1.    Crain Process Service

Grubea alleged AOSS subcontracted with Crain Process Service ("Crain"):

> Crain generally charged law firms $30 to serve process.  Crain charged the same amount
> to serve defendants in actions filed by the McCabe firm.  However, in those cases, the
> McCabe Firm insisted that Crain use forms bearing the name of AOSS, rather than Crain.
> McCabe then marked up the $30 to amounts more than double that actual charge.

FAC ¶ 146.  Grubea claimed during motion practice he had a statement from Crain's principal,

Bobbi Bronson, who he also references in his pleadings.  *See* FAC ¶¶ 153, 162

According to Bronson, the principal of Crain, Bronson never charged law firms $30

because that was her subcontractor rate and included less services than those she provides to law

firms.  Bronson Decl. ("Bronson") ¶ 17.  Crain / Bronson charged law firms $60 to $75, the same

amount AOSS charged law firms.  Bronson ¶¶ 4-19; Dougherty Decl. ("Dougherty") Ex. H

(reflecting invoices from Crain to other law firms available on the public docket).  AOSS

provided additional services, through W-2 employees, necessary to complete effective service

when using Bronson as a subcontractor.  Bronson ¶¶ 4-19; *See* Br. AOSS / REO.

### 2.    David Avenue Property

Freddie Mac held a mortgage on property on David Avenue, Cheektowaga, New York

and contracted with HSBC to service it.  FAC ¶ 150; Gairo Ex. C.  HSBC retained MWC to

handle the foreclosure.  FAC ¶ 151; Gairo Ex. C.  MWC retained REO to provide title searches,

and REO charged $445.  FAC ¶ 155.  MWC retained and was invoiced by AOSS for service of

process in the amount of $836, which Grubea alleged was above market rates of $20-40 per

person and a result of "marking up" Bronson's invoice.  FAC ¶ 153.  The $836 charge from AOSS included numerous attempted service, postal verification, skip tracing, notices to tenants and does, 3215 notices and out-of-state service in Nevada.  Gairo Ex. B.  An AOSS W-2 employee prepared the 3215 notices and work in addition Bronson's work.  Bronson ¶¶ 4-19; *See* Br. AOSS / REO; Dougherty Ex. B.

MWC submitted the $836 charge by AOSS to HSBC without mark-up.  Gairo Ex. C. HSBC was provided the itemized AOSS invoice.  Gairo ¶ 11.  Grubea alleged "upon information and belief" HSBC was reimbursed by a GSE for the charges.  FAC ¶ 157-58.

### 3.    Herkimer Street Property

Freddie Mac held a mortgage on property on Herkimer Street in Buffalo, New York and contracted with PHH to service it.  FAC ¶ 159; Gairo Ex. G.  PHH retained MWC to handle the foreclosure.  FAC ¶ 160.  MWC retained REO to provide title searches, and REO charged $510. FAC ¶¶ 163-64.  MWC retained and was invoiced by AOSS for service of process in the amount of $578, which Grubea alleged was above market rates of $20-40 per person and a result of "marking up" Bronson's invoice.  FAC ¶ 162.  The $578 charge from AOSS included postal verification, skip tracing, notices to tenants and out-of-state service in Puerto Rico and Florida. Gairo Ex. F.  AOSS did not simply "mark-up" Bronson's charge but added additional services. Bronson ¶¶ 4-19; *See* Br. AOSS / REO.

MWC submitted the $578 charge by AOSS to PHH without mark-up.  Gairo Ex. G.  PHH was provided the itemized AOSS invoice.  Gairo ¶ 11.  Grubea alleged "upon information and belief" PHH was reimbursed by a GSE for the charges.  FAC ¶ 166-67.

### 4.      South Division Property

Freddie Mac held a mortgage on property at South Division Street, in Peekskill, New York, which was serviced by PNC.  FAC ¶ 168.  PNC retained MWC to handle the foreclosure. FAC ¶ 169.  MWC retained REO to provide title searches, and REO charged $435.  FAC ¶ 173. MWC retained and was invoiced by AOSS for service of process in the amount of $1,341.  FAC ¶ 171.  Grubea claimed "upon and information and belief" AOSS marked-up the invoice of an unidentified process server.  *Id.*  The $1,341 charge from AOSS included numerous instances of service, a DMV search, postal verifications, and out-of-state service in Georgia.  Gairo Ex. D.

MWC submitted the $1,1341 charge by AOSS to PNC without mark-up.  Gairo Ex. E. PNC was provided the itemized AOSS invoice.  Gairo ¶ 11.  Grubea alleged "upon information and belief" PNC was reimbursed by a GSE for the charges.  FAC ¶ 174-75.

### 5.      Benson Street Property

Freddie Mac held a mortgage on property at Benson Street in Haverstraw, New York, which was serviced by PHH.  FAC ¶ 177; Gairo Ex. I.  PHH retained MWC to handle the foreclosure.  FAC ¶ 178.  MWC retained REO to provide title searches, and REO charged $445. FAC ¶ 180.  MWC retained and was invoiced by AOSS for service of process in the amount of $475.  *Id.*  Grubea claimed "upon and information and belief" AOSS marked-up the invoice of an unidentified process server.  *Id.*  The $475 charge from AOSS included numerous instances of service, attempted service, DMV searches, postal verifications, and tenant notice.  Gairo Ex. H.

MWC submitted the AOSS charge to PHH without mark-up.  Gairo Ex. I.  PHH was provided the itemized AOSS invoice.  Gairo ¶ 11.  Grubea alleged "upon information and belief" PHH was reimbursed by a GSE for the charges.  FAC ¶ 184-85.

### 6.     4th Avenue Property

FHA insured a mortgage on property on 4th Avenue in Troy, New York, which was serviced by Flagstar.  FAC ¶ 420.  Flagstar retained MWC to handle the foreclosure.  FAC ¶ 421. MWC retained and was invoiced by AOSS for service of process.  FAC ¶ 180.  Grubea did not allege how much AOSS charged but claimed "upon and information and belief" AOSS marked-up the invoice of an unidentified process server.  FAC ¶ 423.  Grubea alleged "upon information and belief" Flagstar submitted the unknown charge to the FHA for reimbursement.  FAC ¶¶ 425-26.  The docket reflects the foreclosure action was dismissed before foreclosure completed, so no claim could have been submitted to the FHA by Flagstar.  Dougherty Ex. A.

### D.     Sheriff Service Exemplars / Licensing

In New York City, the sheriff charges $52.00 for each summons and $35 for each location.  Dougherty Ex. F.  There is a three-week lead time.  *Id.*  In Philadelphia County, Pennsylvania, the sheriff charges $175 to serve one defendant.  Dougherty Ex. G.  In DeKalb County, Georgia, sheriff service ranges from $61 to $91 per defendant per address.  DeKalb County, http://dekalbcounty.org/ sheriff/pdf/CivilPaperFee.pdf (last accessed Jul 27, 2018).  It is an additional charge of $56 per defendant at the same address.  *Id.*

Some jurisdiction have license, insurance and bonding requirements for process servers. In New York City, process servers must be licensed with the NYC Department of Consumer Affairs, which requires a test at licensing and renewal.  N.Y.C. Admin. Code §§ 20-403, 20-406. Individual process servers must pay a surety bond of $10,000, and process server agencies must pay a bond of $100,000.  N.Y.C. Admin. Code §§ 20-406.1  A "process server agency" is "legally responsible" for the conduct of each process server.  N.Y.C. Admin. Code §§ 20-406.2.

### E.    This Action

### 1.    Contentions Against Rosicki

This action was commenced on September 24, 2012.  Rosicki and the Rosicki Affiliates were originally-named defendants.  On March 27, 2018, the United States filed a complaint-in-intervention against Rosicki and the Rosicki Affiliates.  Inter. Compl. [Dkt. 22] ("Govt").  The Government contended Rosicki "created a system in which Enterprise and Paramount acted as vehicles for marking up foreclosure expenses as much as possible, while adding as little operating expenses as possible, in order to maximize revenue[.]"  Govt ¶ 64.  The Government provided specific examples it claimed reflected the Rosicki Affiliates "exponentially" marked up the invoices of third parties, charged amounts above the Fannie Mae max allowable rates and charged for services it never provided (*i.e.*, "document retrieval fee").  *See, e.g.,* Govt ¶¶ 66-67, 75, 81, 83, 86-123.  The Government also contended Rosicki submitted "bills for its foreclosure-related expenses to courts for judicial approval . . . [with] substantially lower costs for service of process than the actual bills . . . submitted to the Servicers for comparable work."  Govt ¶ 74. The Government alleged communications between individuals at Rosicki reflecting a plan to mark-up costs to supplement a "very reduced fee" for legal services.  Govt ¶ 65.  The examples by the Government reflected "mark-ups" of 6, 10 and 25 times higher than the cost of service. Govt ¶¶ 96, 102, 110.

### 2.    Contentions Against MWC

### a.    First Three Rounds of Pleading

MWC was not added as a defendant until the first amended complaint on February 28, 2013.  Grubea's claims against MWC were initially limited to the contention MWC contracted with AOSS and REO "for services at excessive rates" to generate fees for AOSS and REO.  3d

Am. Compl. ¶ 142 ("TAC").   In his first amended complaint, Grubea defined "excessive rates

for services" as title searches "well above market rates . . . between $200-$325" and personal

service "well above market rates . . . of approximately $40."  1st Am. Compl. [Dkt. 27] ¶ 130.

Without explanation, Grubea reduced his contention of "market rates" to "between $100-$250"

for title searches and "approximately $20-$40" for personal service.  FAC ¶ 141. Grubea did not

include factual allegations describing what services the market rates included, what market he

studied, what law firms or servicers he used for comparison or the source of the law firm and

servicer fee information he relied on.  Grubea did not allege the criteria he applied to determine

the vendor base or what services were included in the rates he identified.

Grubea baldly asserted MWC profited by offloading unidentified "tasks" to REO and

AOSS and improperly sought reimbursement for "[t]hese services."  TAC ¶¶ 143-44.  Without

any factual predicate or support from the "examples", Grubea accused AOSS of marking up bills

with MWC's assent.  TAC ¶ 145.  However, AOSS did not even complete service in the

examples provided by Grubea.

MWC moved to dismiss the third amended complaint, which was granted.  Op. pp. 27-

33.  However, the Court granted Grubea leave to replead because Grubea claimed he would

plead facts to satisfy his pleading burden.  Op. pp. 31-33.  Specifically, Grubea told the Court he

intended to add two examples from the Second Suit (Dkt. 22, No. 13 Civ. 1467) to which MWC

is not a party.  Op. pp. 31-32.  These examples related to a Beacon, New York property and were

supposed to include allegations that AOSS and REO "marked up" an invoice from a vendor that

charged market rates.  Op. p. 32.  Grubea claimed he would add allegations that AOSS charged

$836 for personal service that should have cost $150 and that MWC "chose not to contract

directly with the process server . . . so that AOSS could aggressively mark up the bill before seeking reimbursement."  Op. p. 32.

### b.      Fourth Amended Complaint

On July 11, 2018, Grubea filed the fourth amended complaint.  Grubea did not allege the facts he told the Court he would include in a fourth amended complaint.  Grubea did not include the Beacon property allegations or any allegations that REO "marked up" charges.  Grubea included new "examples" of alleged conduct by AOSS, which, this time, included the aggregate amounts charged by AOSS with bald assertions of mark-ups.  Grubea did not identify the services provided by AOSS for the aggregate charge amounts or facts supporting the amounts were actually submitted by a servicer for reimbursement.

## II.      Arguments of Law

### A.      Standard

Grubea's claims must satisfy the pleading requirements of *Federal Rules of Civil Procedure* 9(b) and 12(b)(6).  To survive a motion to dismiss under *Rule* 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  The complaint must include "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Twombly*, 550 U.S. at 555.  A complaint must provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).  A complaint must include facts to plausibly support the legal sufficiency of the claims asserted.

False Claim Act ("FCA") claims must satisfy the heightened pleading standard of *Rule* 9(b).  *Gold v. Morrison-Knudsen Co.*, 68 F.3d 1475, 1476-77 (2d Cir. 1995).  "Rule 9(b)

pleadings cannot be based upon information and belief." *DiVittorio v. Equidyne Extractive Indus.*, 822 F.2d 1242, 1247 (2d Cir. 1987).  The only exception is "facts peculiarly within the opposing party's knowledge, in which event the allegations must be accompanied by a statement of facts upon which the belief is based." *Id.*  "[T]hose who *can* identify examples of actual [FCA] claims *must* do so at the pleading stage." *United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 86 (2d Cir. 2017) (emphasis in original).  Fraud allegations that do not inform each defendant of its role in the alleged fraudulent activity or specify time, place, speaker and content of the alleged misrepresentations should be dismissed. *DiVittorio*, 822 F.2d at 1247-48.

The Court may consider the complaint and documents outside the complaint that are "integral" to the complaint. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002).  The complaint includes "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Id.* at 152 (quoting *Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)).  The Court may consider a document if the complaint "relies heavily upon its terms and effect" even if not incorporated by reference. *Id.* at 153 (quoting *Audiotext Network*, 62 F.2d at 72).  A plaintiff is deemed to have actual notice of materials the plaintiff relied on in bringing the suit or framing the complaint. *Id.* (citing *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991)).  When fraud is alleged, the Court may examine the documents a plaintiff claimed contained the alleged non-disclosure or misrepresentation "to see whether that representation was made" or take judicial notice of public records integral to a fraud complaint. *Roth v. Jennings*, 489 F.3d 499, 509-10 (2d Cir. 2007) (citing *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991); *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)).

## B.    Grubea Did Not Correct the Defects Identified by the Court

### 1.    The Title Charges Are Facially Plausible

Grubea did nothing more than identify four (4) new examples where REO charged the Freddie Mac allowable charges for title searches.  Grubea alleged REO charged $445, $510, $435 and $445 for title searches as the purported "fraudulent statements."  *See* Op. pp. 30-31. These amounts are within the allowable charges permitted by Freddie Mac and therefore are "facially plausible."  *See* Op. p. 31.  Grubea "makes no allegation that REO outsourced the work to a third party for a substantially lower rate."  *See* Op. p. 31.  Grubea did not allege the "market rates" were for New York; what type of title search (one owner, two owner); what the rates included (original and updated reports); or whether the rates were from vendors able to meet the eligibility criteria to handle the PPI needed to conduct title work.  Grubea cannot plead fraudulent statements about whether the title charges were "reasonable and comparable to those customarily charged in the area where the property is located" absent showing the rates he claims as the metric for the fraudulent statement are comparable services to those provided by REO. *See* FAC ¶ 94.  As the Court already held, "in the absence of further <u>specific</u> pleadings, these allegations are not sufficient to state a claim under the FCA."  *See* Op. p. 31 (emphasis in original).  Accordingly, the claims against MWC should be dismissed with prejudice.

### 2.    No Strong Inference of Fraud Arising from the AOSS Charges

Grubea's claims arising from the AOSS charges depend on whether the David Avenue, Herkimer Street, South Division, Benson Street and 4th Avenue examples are sufficient to rise to a strong inference of fraud.  *See* Op. p. 30.  The 4th Avenue example did not include the amount AOSS charged.  *See* FAC ¶¶ 420-36.  The failure to include the "amount AOSS charged (i.e., the fraudulent statement)" is a fatal pleading flaw previously identified by the Court.  *See* Op. p. 30.

16

The Court should limit its review to the David Avenue, Herkimer Street, South Division and Benson Street examples because Grubea did not allege a fraudulent statement relating to the 4th Avenue example.[6]

### a. No Fraudulent Statement About the Total Charges

The allegedly fraudulent statements attributed to MWC are: AOSS's charge of $836 at David Avenue, $578 at Herkimer Street, $1,341 at South Division Street and $475 at Benson Street. While the aggregate charges for each example may appear high, the itemization of charges reflects numerous services were provided beyond just the delivery of papers. AOSS performed skip-traces, DMV look-ups, postal verifications, numerous attempts at different and, at times, out of state locations. AOSS did not perform one or two services that were marked up by factors of 6, 10 or 25 times, as alleged against Rosicki. The itemized services are not tasks that are included in the attorneys' fees paid to MWC but appropriate service of process costs.

The itemized charges were also provided to the servicers. MWC did not conceal any charges in a lumpsum amount. The individual charges on the AOSS invoices are facially plausible and support the aggregate charges when the itemization is considered. Grubea has not plead a fraudulent statement relating to the total charges by AOSS.

### b. No Outsourcing for a Substantially Lower Rate

The other fraudulent statements attributed to MWC related to alleged mark-ups. As to the David Avenue property, Grubea alleged AOSS hired Bronson to serve each person at market rates and marked up those invoices. However, the amounts charged by AOSS are consistent with the charges Bronson charged other law firms for the full professional service rate.

---

[6]     The 4th Avenue charges also could not have been a claim submitted to the FHA because the foreclosure was dismissed before eligible for reimbursement.

As to the Herkimer Street property, the itemized invoice again reflects numerous services besides delivery of papers.  Two $65 charges appear attributable to work by Bronson based on the affidavits of service.  However, the charges also included work by a W-2 employee of AOSS perfecting the 3215 notices and completing the affidavits.  Dougherty Ex. C (Raymond Bercse).  The subcontractor charge was not marked-up without the addition of services appropriate for the process server company and not part of the attorneys' fees.  Bronson's invoices to other law firms reflect she charges more than $65 dollars for service and the 3215 notice.  Dougherty Ex. H; Bronson ¶¶ 4-19.

As to the South Division and Benson Street Properties, Grubea alleged "upon information and belief" there was a mark-up.  However, the itemized invoices from AOSS, like the other examples, reflect services more than the delivery of papers, charges for work to which a W-2 employee of AOSS contributed and no services within the purview of MWC's attorneys' fees.  The total per item charges were consistent with the Crain invoices, the process service firm Grubea used as an example of a firm charging "market rates."  A marginal difference of $20 to $35 dollars between the unsubstantiated "market rates" and what was charged is not a "substantial" difference that creates the strong inference of fraud.

### c.    Grubea's "Market Rates" Are Facially Implausible

Grubea's contention that the "market rates" for process service are between $20 to $40 per person is not plausible.  The New York sheriff charges $52 for service of one defendant at one location.  AOSS's charges are consistent with the New York sheriff's charges but do not require a three-week lead time.  It cannot reasonably be contended that charges that are less than the state-sponsored charges define the "market rate" or that charges consistent with the sheriff are fraudulently inflated and excessive.

Grubea provided no explanation of the source of his market rate allegation. Grubea did not disclose what actual work was included in the rates, whether the rates were from vendors that satisfied the PPI handling requirements or if the service would be completed consistent with the fast foreclosure timelines. There can be no bona fide comparison of "market rates" against the AOSS rates absent knowing if the comparison is an equal comparison.

Grubea's claims of fraudulent statements depend on his definition of "market rates." Grubea must plead, with particularity, the basis for his "market rates" under *Rule* 9(b) because the allegations are the anchor for his fraud claims. Since Grubea is an outsider to MWC, AOSS (and REO), he cannot possibly know whether his allegations of market rates are an "apples to apples" or equal comparison to the AOSS charges.[7] To that end, MWC has now repeatedly shown Grubea's allegations are demonstrably false. Notice pleading and "upon information and belief" contentions about the "market rates" that form the source for the fraud claims do not satisfy Grubea's burden to plead with particularity under *Rule* 9(b).

The David Avenue, Herkimer Street, South Division and Benson Street examples do not support MWC made a fraudulent statement related to whether the service of process charges were "reasonable and comparable to those customarily charged in the area where the property is located." *See* FAC ¶ 94. The individual charges themselves were consistent with what other process service firms in the area charged law firms for the same services. The publicly accessible materials, which are supported by the Bronson declaration, reflect MWC could not obtain the full process of service services at the partial, subcontractor rate. Grubea has not

---

[7]     The party with bona fide insider information through investigation – the Government – did not intervene.

established fraudulent statements by MWC, which is an element of each of his claims. Accordingly, Grubea's claims against MWC should be dismissed with prejudice.

### 3. No Support the Claims Were Submitted for Reimbursement

Grubea treats the servicers' reimbursement rights as if they limit MWC's right to be paid by the servicers. The FHA and GSE guidelines do not restrict MWC to charges to the extent the servicers' can seek reimbursement. Grubea alleges "upon information and belief" that every charge a servicer paid MWC was submitted for reimbursement by the servicers. The reimbursement process is not automatic, the servicer is not required to request the full extent of MWC's charges for reimbursement and, in some circumstances, the servicer is not permitted to obtain reimbursement for no reason related to MWC's compliance with the guidelines. To the extent this concept was unclear, Freddie Mac recently updated its Guide to make clear servicers have to pay law firms, like MWC, for "overhead" they improperly offload at their (the servicers') own expense. Grubea cannot establish a claim was actually submitted to the FHA and/or GSEs merely because MWC was paid by a servicer for its fees and costs.

### C. No Knowing Intent to Commit Fraud

Grubea's claims require a knowing intent to defraud by MWC. A violation of the FCA requires the defendant acted "knowingly" in presenting the claim for payment, making or using a false record, conspiring to present a false claim or avoiding an obligation to pay. 31 U.S.C. § 3729(b)(1); *United States ex rel. Doe v. Taconic Hills Cent. Sch. Dist.*, 8 F. Supp. 3d 339, 350 (S.D.N.Y. 2014); *United States ex rel. Colucci v. Beth Isr. Med. Ctr.*, 785 F. Supp. 2d 303, 315-16 (S.D.N.Y. 2011). "In the absence of a clear obligation . . ., FCA liability is not appropriate, for the FCA is intended to punish only 'wrongdoing,' not honest mistakes." *Colucci*, 785 F. Supp. 2d at 316 (quoting *Wang v. FMC Corp.*, 975 F.2d 1412, 1419 (9th Cir. 1992)). The relator

must establish the defendant "knew it was not permitted to bill" for the disputed amounts. *Doe*,
8 F. Supp. 3d at 351.  Allegations a defendant "took advantage of a lack of clarity . . . to
maximize . . . reimbursements" is "insufficient to plead the 'knowing' conduct element" of an
FCA claim. *Colucci*, 785 F. Supp. 2d at 317.

      FCA liability cannot be imposed based on a rate challenge in absence of a clear
obligation to charge at a specific rate.  Taking "advantage of the uncertainty in the regulations to
maximize . . . billings . . . is not fraud." *Colucci*, 785 F. Supp. 2d at 314-15 (finding no fraud
where there was "no specific provision" requiring providers "only be reimbursed for their actual
costs.") (citing *United States ex rel. Quinn v. Omnicare, Inc.,* 382 F.3d 432, 434, 445 (3d Cir.
2004) (holding no FCA liability could be imposed "in light of the absence of a clear obligation to
credit Medicaid . . . at a specific rate.")).  "[M]aximiz[ing ]reimbursements" is also not fraud. *Id*.
at 315.

      There are numerous government programs that reimburse providers based on a schedule
like Freddie Mac and Fannie Mae.  In *Huntington Hosp. v. Thompson*, 319 F.3d 74, 76 (2d Cir.
2002), the Second Circuit discussed a DRG reimbursable cost schedule provided by Medicare.
The reimbursable amounts were based on regional or national averages of costs to treat certain
illnesses, not a specific cost to any particular hospital. *Id.*

> When a hospital's actual operating costs exceed its federally prescribed limit for the
> given DRG, the hospital must absorb the difference.  Conversely, if a hospital's costs are
> lower than the federal rates, the hospital retains the difference.

*Id.* (quoting *Sacred Heart Med. Ctr. v. Sullivan*, 958 F.2d 537, 541 (3d Cir. 1992)).  It is not a
false claim merely because the full allowable amount is retained.

      MWC did not knowingly bury or disguise charges to the servicers.  MWC retained
vendors that satisfied the eligibility requirements of Freddie Mac.  The vendors charged the

express allowable amount of title charges (REO) or the amount customary in the area for service of process (AOSS).  MWC provided the servicers itemizations of the charges as support for its invoices.  The itemizations reflected charges that were squarely within the purview of a "process service vendor" as opposed to attorneys' fees.

The examples by Grubea, even though erroneous or half-truths, reflect there was no common design or scheme.  The circumstances of the AOSS charges were unique to each matter of representation.  There was no systematic conduct or scheme to "exponentially" inflate charges, as described by the Government regarding Rosicki.

This action has seemingly been reduced to a debate about whether AOSS could use a subcontractor in place of a W-2 employee for some services.  There are legitimate business reasons that companies subcontract work – i.e., liability issues, employment law requirements, tax benefits, staffing requirements, Freddie Mac's statewide reach requirements, bonding, insurance and licensing.  The level of granularity and scrutiny being given to the internal operating procedures of AOSS is simply not contemplated in the guidelines provided by the GSEs or the FHA, much less clearly articulated as prohibited.

Grubea did not identify a specific contractual provision or guideline that prohibited MWC from seeking reimbursement for the amounts it submitted to the servicers.  At best, Grubea alleged MWC "took advantage of the uncertainty" or maximized its reimbursements, which is not fraud, as a matter of law.  *See Colucci*, 785 F. Supp. 2d at 314-15.  Grubea's claims against MWC are rate challenges that cannot form the basis for FCA liability.  Accordingly, the claims against MWC should be dismissed with prejudice.

D.    **No False Claims**

Whether Grubea has established a legally false claim depends on whether MWC

expressly or impliedly certified compliance with contractual requirements material to payment.

Grubea did not allege MWC expressly certified compliance.

> To assert an implied certification claim after *Escobar*, a plaintiff must allege that (1) the
> defendant made specific representations about goods or services, (2) the defendant failed
> to disclose noncompliance with a legal or contractual requirement, (3) the omission
> renders the representation misleading with respect to the goods or services provided, (4)
> the omission is material to the government's payment decision, and (5) the defendant
> acted knowingly.

*United States ex rel. Hussain v. CDM Smith, Inc.*, 2017 U.S. Dist. LEXIS 159538 *19 (S.D.N.Y.

Sept. 27, 2017) (citing *Universal Health Servs. V. United States ex rel. Escobar*, 136 S. Ct. 1989,

1999-2004 (2016); *Bishop v. Wells Fargo & Co.*, 870 F.3d 104 (2d Cir. 2017)).  Grubea must

establish a knowing failure to disclose noncompliance.

The Federal Acquisition Regulation (FAR) governs how executive agencies of the United

States acquire goods or services by contract with appropriated funds.  *See* 48 CFR 31.000 *et seq.*

"The FAR establishes uniform policies and procedures for all executive agencies in order to

produce consistent costs, quality, and timeliness in Government acquisitions."  *United States ex*

*rel. Youssef v. Tishman Constr. Corp.*, 2017 U.S. Dist. LEXIS 15823 *5 (E.D.N.Y. Feb. 2,

2017).  Under FAR, "[a] cost is reasonable if, in its nature and amount, it does not exceed that

which would be incurred by a prudent person in the conduct of competitive business."  48 CFR

31.201-3(a).

> What is reasonable depends upon a variety of considerations and circumstances,
> including—
>> **(1)**  Whether it is the type of cost generally recognized as ordinary and
>> necessary for the conduct of the contractor's business or the contract performance;
>>
>> **(2)**  Generally accepted sound business practices, arm's length bargaining,
>> and Federal and State laws and regulations;

(3)  The contractor's responsibilities to the Government, other customers, the owners of the business, employees, and the public at large; and

(4)  Any significant deviations from the contractor's established practices.

48 CFR 31.201-3(b).

Grubea can only establish an implied certification claim if the title search and personal service costs were noncompliant with the Fannie Mae, Freddie Mac and/or FHA/HUD guidelines for reimbursement.  Grubea's claims depend on whether the title search and personal service costs were "actual, reasonable and necessary" (Fannie Mae); "reasonable and comparable to those customarily charged in the area where the property is located" (Freddie Mac); or "necessarily incurred and are reasonable and customary in the area" (FHA / HUD).  *See* FAC ¶¶ 64, 94, 107-09.

Grubea's contention that title search and personal service costs are not reasonable because they are above market rates is not supported by the legal definition of reasonable applied by the government.  Reasonable does not mean at cost.  The title search charges identified by Grubea in the fourth amended complaint are consistent with the Freddie Mac allowable rates.  The personal service charges Grubea complained about vis a vis AOSS were consistent with charges by Crain to law firms (the example provided by Grubea as a process server that charges market rates).  Grubea has not alleged the title searches and personal service costs incurred by MWC do not meet the regulatory definition of reasonable.

Grubea cannot establish MWC was noncompliant with the Fannie Mae, Freddie Mac and/or FHA/HUD guidelines without showing the title searches and personal service costs were not reasonable.  MWC was compliant with the guidelines and therefore had no noncompliance to disclose.  MWC omitted no information material to payment that can form a basis for an implied certification claim.  Grubea cannot establish a legally false claim.

24

### E.     No Conspiracy (Third Claim)

Grubea's claim for conspiracy (third claim) is based on the contention MWC, REO and AOSS "conspired" to commit false claims.  FAC ¶ 505.  A defendant is liable under 31 U.S.C. § 3729(a)(1)(C) if he "conspires to commit a violation of subparagraph (A) [or] (B)" of Section 3729(a)(1).  31 U.S.C. § 3729(a)(1)(C).  Dismissal of an FCA conspiracy claim is appropriate where the complaint "fail[ed] to identify a specific statement where [defendants] agreed to defraud the government."  *United States ex rel. Ladas v. Exelis, Inc.,* 824 F.3d 16, 27 (2d Cir. 2016).  Grubea's claim for conspiracy fails absent proof of a false claim.

Grubea has not alleged an overt act by MWC, AOSS or REO in furtherance of a conspiracy.  There is no contention of an agreement between or among MWC, AOSS or REO to defraud the government.  Grubea's conspiracy claim appears based only on the fact that MWC has affiliated entities.  The mere existence of affiliated entities is not a fraud, conspiracy or even noncompliance with the contracts and guidelines upon which Grubea depends for his claims.  Fannie Mae and Freddie Mac expressly permit affiliated entities when appropriately disclosed.  Grubea has not established a conspiracy claim.  Accordingly, the third claim against MWC in the fourth amended complaint should be dismissed with prejudice.

### F.     No Reverse False Claims (Fourth Claim)

Grubea asserted a claim for reverse false claims (fifth claim) against MWC.  Grubea did not allege MWC misrepresented or concealed information to avoid paying an obligation to the government.  A reverse false claim does not apply, as a matter of law, as asserted by Grubea.  Accordingly, the fourth claim against MWC in the fourth amended complaint should be dismissed with prejudice.

**III.    Conclusion**

The motion to dismiss the third amended complaint by defendant, McCabe, Weisberg &

Conway, P.C., should be granted and the claims against defendant, McCabe, Weisberg &

Conway, P.C., dismissed with prejudice.

Respectfully Submitted,

By: /s/ Candidus K. Dougherty
    Jeffrey B. McCarron
    Candidus K. Dougherty
    SWARTZ CAMPBELL LLC
    50 S. 16th St., 28th Fl.
    Philadelphia, PA 19102
    (215) 299-4296
    cdougherty@swartzcampbell.com

Date: July 27, 2018